1

*AUDILETT LAW PC*
335 NORTH WILMOT RD SUITE 500
TUCSON, ARIZONA 85711-2636
(520) 748-2440
Email: daa@audilettlaw.com

Daryl A. Audilett, Esq.
State Bar No. 009007; PCC No. 2036
Attorney for Defendants Napier and Barnes

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Steven Cutler, individually and as Administrator of the Estate of David A. Cutler, deceased, on behalf of himself and on behalf of all beneficiaries of the Estate of David A. Cutler, deceased, and Renee Luddington Cutler; <br><br> Plaintiffs, <br><br> vs. <br><br> Mark D. Napier, Sheriff of Pima County, Arizona, in his official capacity; Rural Metro Fire Dept., Inc., an Arizona for profit corporation; Keith Barnes and Jane Doe Barnes, his spouse; Grant Reed and Brittany Reed; <br><br> Defendants. | NO. CV-18-00383-TUC-FRZ <br><br> DEFENDANTS NAPIER AND BARNES' MOTION FOR SUMMARY JUDGMENT <br><br> (Oral Argument Requested) <br><br> (The Honorable Frank R. Zapata) |

Defendants Pima County Sheriff Mark D. Napier and Pima County Sheriff Deputy Keith Barnes and his wife Jane Doe Barnes move for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, on all of Plaintiffs' claims.

## **FACTUAL BACKGROUND**

Twenty-three-year-old David Cutler (Cutler) died on June 5, 2017. (SSOF 2.) Medical Examiner David Winston MD attributed Cutler's death to Hyperthermia due to exposure to the elements, and LSD toxicity. The toxicology analysis documented LSD in Cutler's blood. (SSOF 1, 3-6.) After Cutler's death, a sample of LSD from the batch taken by Cutler was brought to the Sheriff's Department by Cutler's father, and the sample tested positive for a useable quantity of LSD at the DPS Crime Lab. (SSOF 7.) Dr. Winston testified that LSD is the classic drug people talk about having a trip, getting high, having hallucinations; and that LSD had a toxic effect on Cutler's body, and put him in a situation where he was walking through the desert with no clothes on. Dr. Winston testified the LSD raised Cutler's body temperature and contributed to his heat-related death. (SSOF 8, 9.)

On autopsy, Dr. Winston found no blunt force trauma that contributed to Cutler's death, no blunt force trauma that caused skull fracture or caused damage to the brain. The hyoid bone and laryngeal cartilages were intact, ruling out strangulation. (SSOF 10-14.) Dr. Winston did not find any burns on Cutler's body that he could associate with being on the ground or on hot rocks. (SSOF 15.)

Hyperthermia and increased respiration rates are known complications of LSD, according to Dr. Winston. (SSOF 16, 17.) After meeting with Cutler's father, Robert Cutler, who earned a Ph.D. in chemistry in approximately 1980 but worked in finance and IT and is now retired, Dr. Winston changed the autopsy cause of death from LSD toxicity to Hyperthermia due to exposure to the elements and LSD toxicity. (SSOF 18, 19.) Dr.

Winston did not agree with Dr. Cutler that it was highly likely that the ketamine administered by Rural Metro caused Cutler to go into cardiac arrest and therefore, along with hyperthermia, was a key cause in his death; or that LSD was not a cause of death. Dr. Winston wrote that LSD was a contributing factor to the cause of death, and he still believes that today. (SSOF 20, 21.)

Cutler took LSD and then text messaged with his girlfriend Megan Cypcar (Megan) in North Carolina, confirming he had taken LSD, stating he was "tripping so hard." Cutler sent Megan LSD-related YouTube videos, and exchanged "I love you" texts. Cutler's last text to Megan was at 9:04 North Carolina time, 6:04 a.m. Tucson time on June 5, 2017. Megan sent several more texts to Cutler, but Cutler stopped responding. (SSOF 22-32.)

At around 9:40 am on June 5, 2017 Pima County Sheriff's Department units were dispatched to a 911 report of a fire in the vicinity of Melpomene and 22nd Street on Tucson's far east side. (SSOF 33, 34.) Deputy Keith Barnes, Deputy Christopher Davenport and Rural Metro Fire Department were among the responders to the fire. The fire destroyed a Jeep Wrangler, later found to be owned by Cutler. Rural Metro extinguished the fire. Deputy Davenport traced the Jeep tire tracks from the location of the fire back through a desert area that showed the Jeep had been driven through bushes, over cactus and through a steep wash. Despite search efforts, no one associated with the Jeep was found. (SSOF 35, *See* Photos Ex 15; SSOF 36-39.)

Defendant Deputy Barnes and Defendant Rural Metro Paramedic Grant Reed were among the responders that went to the fire call. Both Rural Metro Paramedic Grant Reed

and Rural Metro EMT Vince Figueroa participated in putting out the Jeep fire.  (SSOF 38.)

At 11:32 a.m., two hours after the fire call, local resident Kristen Powell called 911 from her home and reported someone on the hill behind her home, naked and screaming for help.  (SSOF 40.)  Deputy Barnes had recently left the Jeep fire call location, and was en route to this new call at 11:34:24, with lights and siren.  (SSOF 41, 42.)  At 11:39:50 Deputy Barnes arrived and saw a naked person standing at the very top of the hill in a pose that looked to Deputy Barnes like a "Jesus on the cross" pose.  (SSOF 43.)  Deputy Barnes tried to use the PA system on his patrol SUV to order the man to come down to him, but the PA system did not work.  Barnes yelled saying he was Sheriff's Department, that he was there to help, and asked the man to come down.  The naked man on top of the hill took off running east, away from Deputy Barnes, and yelling. (SSOF 44.)

Deputy Barnes climbed up the hill through brush and loose rocks, for about a quarter of a mile.  Deputy Barnes lost visual of the man so he would walk and then stop and look up, catch his breath, so that if the man started coming that way Deputy Barnes would be prepared for anything.  (SSOF 45.)  Despite Deputy Barnes telling him to come towards him, that he was there to help, the man did not come down or walk towards Deputy Barnes.  (SSOF 46.)

At 11:46:59, Deputy Barnes advised he was with the subject on top of the mountain.  Deputy Barnes also advised the radio dispatcher that he was going to need meds.  The Radio Log Summary shows that at 11:47:20, Deputy Barnes called for medical assistance.  (SSOF 47, 48.)  At 11:45, Rural Metro got the call for medical assistance.  (SSOF 49.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Deputy Davenport, still at the Jeep fire location, announced at 11:48:58 he had sight of Deputy Barnes, and was going to make his way to Barnes' location. The distance from the Jeep fire location to Deputy Barnes' location was approximately a half mile, if not further. (SSOF 50, 62.)

Defendants have provided an aerial photo labeled with the various locations (SSOF 33, Ex 12) and a drone video showing the rugged terrain and the various pertinent locations. (SSOF 51, Ex 24.) Reviewing the aerial photo and the drone video is critical to understanding the physical and geographical environment with which the deputies and Rural Metro were dealing.

At the top of the hill, Deputy Barnes again asked Cutler to come toward him. Cutler then put his head down, and looking down, yelled, "Just decapitate me, just decapitate me." (SSOF 52.) Deputy Barnes told Cutler that he wanted to handcuff Cutler, and Cutler complied. (SSOF 53.) Barnes initially thought he recognized Cutler from a prior contact. Cutler said something to the effect of, "Hey, Deputy Barnes." Deputy Barnes said, "Hey, what's going on", and Cutler said something about his car. It turned out later Cutler was not the prior contact Barnes was thinking of. (SSOF 54.) Deputy Barnes radioed he wasn't sure how he was going to get Cutler down the hill, that Cutler was delusional and bleeding from the face. Deputy Barnes asked if the ambulance was responding, Barnes was told they had been advised. Deputy Barnes asked for PCSD Search and Rescue to respond in order to help get Cutler down from the hill. (SSOF 55,56.)

Deputy Barnes saw that Cutler was covered with blood. Deputy Barnes asked Cutler

5

if he was able to walk back. Cutler responded: "I don't want to go back, I don't want to go back." Cutler pulled away from Deputy Barnes like Cutler was going to go over the other side of the hill. Deputy Barnes grabbed Cutler and took Cutler to the ground. (SSOF 57.) Once on the ground, Cutler started shaking and yelling, talking something about bombing Iraq. Cutler said that he's sorry for his parents, and that he wanted to say goodbye to his mom. Then Cutler started talking about the devil and said if we don't kill the devil, we'll never be able to finish the wars. (SSOF 58.) Cutler then started trying to roll off the side of the hill. Deputy Barnes grabbed Cutler by the arm and Cutler stood up. Deputy Barnes directed Cutler back to the ground. There was no shade to put Cutler under and Cutler was red as a firebox. (SSOF 59.) While on the ground, Cutler began banging his head on the rocks. Deputy Barnes put his right foot under Cutler's head, so that Cutler was banging his head on Deputy Barnes' right foot instead of on the rocks. (SSOF 60.)

Then Cutler started kicking and flailing and trying to roll down the side of the hill again. (SSOF 61.) Deputy Davenport arrived. He described that Cutler was trying to get up and run, and that Cutler kept trying to roll down the hill. Davenport described Cutler as combative, in that he wasn't listening to commands, kept trying to get away, was thrashing about, his feet and legs were thrashing about. (SSOF 62, 63.) Deputy Dittmer arrived with a RIPP strap restraint to control Cutler's feet. Deputy Barnes described Cutler as "just flipping around like a, a gator." (SSOF 64.) Deputy Barnes did not have water and did not ask for water or a blanket to be brought up to the hilltop. The deputies normally carry about 30-35 pounds of equipment and body armor. Deputy Barnes testified that his focus was to

get Cutler off that mountain and down to the ambulance so Cutler could get medical attention. (SSOF 65.)

The terrain was rocky, slippery, with a lot of brush and cactus. (SSOF 70.) The three deputies initially tried to pick Cutler up and carry him down the hill, but Cutler kept kicking and bucking. They carried Cutler about ten feet, began to lose their footing, and were unable to carry Cutler any farther. (SSOF 66.) Cutler rolled into a thick, thorny bush and didn't react to pain. Deputy Ernst arrived. (SSOF 67.) Deputy Barnes got on the radio and talked to Search and Rescue about needing help to get Cutler down the hill. (SSOF 67 - 71.) Deputy Barnes advised Cutler was restrained but still delusional and combative, but to have Meds respond, that the deputies needed assistance. (SSOF 72, 73.) After they got Cutler to a cleared area, he seemed to calm down. Deputy Barnes asked Dittmer to video Cutler's behavior using her cell phone; Cutler was wiggling and thrusting his hips into the ground, thrashing about and making unintelligible verbal noises. (SSOF 74, 75, *See* Ex 30A, 30B and 30C.) Davenport heard Barnes request Medical multiple times. (SSOF 76.) Hospital and autopsy photos show how scratched and scraped Cutler was from being in the desert naked for two hours. (SSOF 77.)

Rural Metro personnel arrived. Paramedic Grant Reed testified that the deputies were trying to restrain Cutler, had Cutler suspended up off the ground, but Cutler was fighting them quite a bit, and the deputies were struggling to keep hold of Cutler. Cutler was "flailing back and forth, trying to fold back and forth like a child throwing a temper tantrum. Kicking, flailing, and definitely tossing them around." (SSOF 79.) The Rural

Metro Patient Care Report shows Rural Metro received the call and was dispatched at 11:48:00; was on scene at 12:07:34 and at the patient's side at 12:13:00. It shows the patient was transported by Rural Metro at 12:35:00 and arrived at Tucson Medical Center at 12:54:00. (SSOF 80.)

After arriving on the hilltop, Rural Metro Paramedic Grant Reed injected Cutler with Ketamine, a sedative. (SSOF 81.) Search and Rescue Deputy West arrived and helped get Cutler off the hilltop via a wheeled Stokes basket. (SSOF 82.) Cutler had become nonresponsive and was pronounced dead later at Tucson Medical Center. (SSOF 83.) A summary timeline of the call is included in the Statement of Facts. (SSOF 84.)

None of the responding deputies (Barnes, Davenport, Dittmer, Ernst, West) had water with them. Their primary objective was to physically control Cutler to keep him from further injuring himself in the rough terrain, and to get Cutler off the hill quickly and to the ambulance. It took 41 minutes from the time of the 911 call, sedation by Rural Metro and use of the wheeled Stokes basket to accomplish that. Deputy Barnes had custody of Cutler for at most 26 minutes, from the time Deputy Barnes was first with Cutler until the time Rural Metro took over Cutler's care.

## SUMMARY JUDGMENT PRINCIPLES

Summary judgment is proper when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) that after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N.*

*Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). "Only disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact arises only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256-57. The non-moving party must present more than "some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Relying on conclusory allegations unsupported by factual data cannot defeat a summary judgment motion. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

## **FIRST AMENDED COMPLAINT**

***Note: There is a pending motion to amend the First Amended Complaint to assert a 42 U.S.C. 1983 claim against Rural Metro and to create a Second Amended Complaint. The proposed Second Amended Complaint does not change the legal claims against Defendants Sheriff Napier or Deputy Barnes that are found in the First Amended Complaint.

Plaintiffs Robert Cutler and Renee Cutler are the parents and statutory beneficiaries of decedent David Cutler. Plaintiffs sued Pima County Sheriff Mark D. Napier (Sheriff Napier) in his official capacity, Pima County Sheriff Deputy Keith Barnes (Deputy Barnes)

and wife Jane Doe Barnes.  Plaintiffs also sued Rural/Metro Fire Department, Inc. and its Paramedic Grant Reed and wife Brittany Reed.

This motion for summary judgment is brought on behalf of Sheriff Mark D. Napier and Sheriff's Deputy Keith Barnes and wife Jane Doe Barnes.

**COUNT ONE**

**<u>Violation of Civil Rights under the Fourth, Eighth, and Fourteenth Amendments and 42 U.S.C. 1983 (Defendant Barnes)</u>**

Count One is directed at Defendant Deputy Barnes only.  There is no 42 USC 1983 constitutional violation claim against Sheriff Mark Napier.  There is no claim under *Monell v Department of Social Services*, 436 U.S. 658 (1978).  Plaintiffs bring suit against Deputy Barnes alleging violations of the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

**The Fourth Amendment is not applicable**

Plaintiffs Robert Cutler and Renee Cutler have no Fourth Amendment claim arising from the death of their son David Cutler.  A Fourth Amendment claim, such as excessive force, is individual, and may not be asserted vicariously.  *Smith v. City of Fontana*, 818 F.2d 1411, 1417 (9th Cir. 1987); see also, *Moreland v. City of Las Vegas*, 159 F.3d 365 (9th Cir. 1998).  In *Smith* the court specifically held: "The children were not directly subjected to the excessive use of state force and therefore cannot maintain personal causes of action under section 1983 in reliance on this Fourth Amendment theory." 818 F.2d at 1417.

Plaintiffs were not directly subjected to any use of force and therefore have no

Fourth Amendment claim.

**The Eighth Amendment is not applicable**

The Eighth Amendment has no application here. The Eighth Amendment "cruel and unusual punishments" clause is not applicable until a subject has been convicted of a crime. *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244 (1983). Decedent Cutler was not a convicted prisoner.

**The Fourteenth Amendment claim fails, lacking evidence that Deputy Barnes' conduct amounted to objectively unreasonable deliberate indifference**

Plaintiffs bring a wrongful death claim under 42 USC § 1983 and the Fourteenth Amendment alleging that the decedent's death interfered with Plaintiffs' liberty interests in the companionship and society of their deceased son David Cutler.

Plaintiffs allege that Deputy Barnes failed to provide adequate care to Cutler while in Deputy Barnes' custody. Claims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment are evaluated under an "objectively unreasonable deliberate indifference" standard. *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25, (9th Cir. 2018); *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070-71 (9th Cir. 2016). The mere lack of due care does not deprive an individual of life, liberty, or property under the Fourteenth Amendment. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016); *Gordon v. County of Orange*, 888 F.3d at 1125. The conduct of Deputy Barnes must be shown to "be objectively unreasonable, a test that will necessarily 'turn[ ] on the 'facts and circumstances

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

of each particular case.'" *Id.*, citations omitted.

Plaintiffs must prove two things: (1) that Deputy Barnes ***recklessly disregarded*** (2) an ***obvious substantial risk***. *Id.*, emphasis added. The "objectively unreasonable" test requires proving that the defendant did not take ***<u>reasonable</u>*** available measures to abate a substantial risk of serious harm, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved --- making the consequences of the defendant's conduct obvious. *Gordon v. County of Orange*, 888 F.3d at 1125. See also, Ninth Circuit Model Civil Jury Instruction - 9.30, Revised June 2019. Here, Deputy Barnes' decision to summon resources to get Cutler down the mountain to the ambulance as quickly as possible was a reasonable available measure taken to rescue Cutler. Deputy Barnes did not recklessly disregard the risks to Cutler.

None of the responders (not deputies or paramedics) took water or blankets with them up the hill. Cutler was initially quite alive, conscious, and physically active. Cutler was not cooperating. Cutler was resisting. Cutler was not asking for water. Cutler was not complaining about heat. Cutler was not complaining of pain. But it was clear that Cutler needed medical intervention. Deputy Barnes radioed for meds less than one minute after Deputy Barnes confronted Cutler. Deputy Barnes chose to summon all the resources necessary to get Cutler off the hill and to the ambulance as quickly as possible. The remoteness of the location, the ruggedness of the terrain, and Cutler's own resistive and combative conduct greatly complicated his own rescue. No reasonable jury could conclude that Deputy Barnes deliberately or recklessly disregarded a substantial risk of harm to

Cutler. Deputy Barnes is entitled to summary judgment on Count One.

## **QUALIFIED IMMUNITY**

Qualified immunity provides immunity to officers from claims for constitutional violations. It protects all but the plainly incompetent or those who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity protects officials who make reasonable but mistaken judgments about open legal question. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). "Qualified immunity is an entitlement not to stand trial." *Saucier v. Katz*, 533 U.S. 194 (2001). Qualified immunity is immunity from suit rather than a mere defense to liability. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Saucier v. Katz*, 533 U.S. 194 (2001).

The analysis involves a two-step process. First, a court must decide whether there is a constitutional violation. Second, if there is a constitutional violation, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. 533 U.S., at 201.

### **1. There is no constitutional violation**

The standard for a 14th Amendment substantive due process violation is "objectively unreasonable deliberate indifference". Negligence or lack of due care is insufficient. The evidence in this case does not rise to the level of objectively unreasonable deliberate indifference by Deputy Barnes.

### **2. No clearly established law was violated**

There is no clearly established law that says that Deputy Barnes violated Plaintiffs'

1
2
Fourteenth Amendment rights by not providing water to Cutler to drink or to be splashed on his body, or to cover Cutler with a blanket.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
The threshold for determining whether a governmental official's conduct violates clearly established law requires a determination that at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.  A case directly on point is not required, but existing precedent must have placed the statutory or constitutional question beyond debate.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). A robust consensus of cases of persuasive authority is required.  (*Id*.)  It is inappropriate to define clearly established law at a high degree of generality.  (*Id*.) "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.  (*Id*.) In other words, the question of whether there exists clearly established law must focus on the specific conduct in the specific circumstances at issue.

18
19
Deputy Barnes is entitled to qualified immunity.

20
**COUNT TWO**

21
**Wrongful Death Pursuant to ARS 12-611 (All Defendants)**

22
23
24
25
26
Count Two alleges a wrongful death claim against Deputy Barnes and a respondeat superior claim against Sheriff Napier.  The claim is that Deputy Barnes breached a duty to exercise ordinary care towards Cutler by 1) not providing necessary medical care to Cutler while Cutler was in custody, 2) failing to provide water to Cutler, 3) for using excessive

force on Cutler, 4) for not providing immediate care for Cutler's heat-related distress, and 5) for requesting sedation that was unnecessary and potentially dangerous.

### 1)  Not providing necessary medical care to Cutler

Deputy Barnes called (radioed) for meds (medical assistance) in less than one minute after he came face to face with Cutler. There was a short delay in medical assistance arriving, because Deputy Barnes radioed that Cutler was being combative. There is no credible evidence that the few minutes delay in meds arriving caused or contributed to causing Cutler's death. Moreover, the evidence is overwhelming that Cutler was uncooperative, resistive, non-compliant, and combative.

### 2)  Failing to provide water to Cutler

Deputy Barnes did not have water on his person or in his patrol vehicle. Of the approximately six responders to the hilltop, (four deputies, a paramedic, an EMT), none of them had water on their persons or with any of their gear. The sole objective was to get Cutler off the top of the hill, to the ambulance, and to the hospital.

### (3)  Using excessive force on Cutler

There is no evidence that Deputy Barnes used excessive force. Deputy Barnes handcuffed Cutler and when Cutler turned to run away, Deputy Barnes took Cutler to the ground for Cutler's own safety. The medical examiner ruled out blunt force trauma, strangulation or burns from being on the ground or on rocks. Deputy Dittmer applied a RIPP restraint on Cutler's legs for his own safety, to prevent Cutler from getting up and running away. Deputy Barnes inserted his boot between Cutler's face and the rocks to

protect Cutler from harming himself.

The standard of care for a law enforcement officer's use of force is best articulated in *Graham v. Conner*, 490 U.S. 386 (1989).

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *** The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments---in circumstances that are tense, uncertain, and rapidly evolving--- about the amount of force that is necessary in a particular situation. *Graham v. Connor*, 490 U.S. at 396-97.

No reasonable interpretation of the evidence in this case could lead a reasonable juror to conclude that Deputy Barnes used excessive force on Cutler.

**(4) For not providing immediate care for Cutler's heat-related distress**

Deputy Barnes immediately called for medical assistance. Rural Metro medical providers hesitated for only a few minutes because Deputy Barnes said that Cutler was combative. Cutler was indeed combative as Rural Metro Paramedic Reed testified that when he arrived at the bottom of the hill, he saw Cutler at the top of the hill fighting with the deputies, flailing back and forth, kicking, flailing, and tossing the deputies around. (SSOF 79.) That delay for only a few minutes was not unreasonable under the circumstances. In any event, there is no evidence that the few minutes delay in Rural Metro getting to Cutler on the hilltop caused or contributed to Cutler's death.

**(5) For requesting sedation that was unnecessary and potentially dangerous**

There is no evidence that Defendant Deputy Barnes personally requested sedation for

Cutler. There are communications from Deputy West to dispatch to the effect that maybe Rural Metro could give Cutler something to calm him down. (SSOF 85.) First, Deputy West is not a defendant. Second, a suggestion of that nature by a law enforcement officer to a medical provider could not rise to the level of an actionable claim under any application of the law.

## PUNITIVE DAMAGES

Arizona Revised Statute 12-820.04 prohibits liability for punitive damages against public officers acting in the course and scope of their employment. Defendants Sheriff Napier and Deputy Barnes are immune from punitive damages for the wrongful death claim asserted in Count Two.

Federal law allows punitive damages against public officers in their individual capacity only. Defendant Sheriff Napier is sued in his official capacity only and is therefore immune from punitive damages in this federal civil rights case. See, *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259-71 (1981).

Deputy Barnes can be liable for punitive damages for the federal claims in this lawsuit, but only if there is sufficient evidence for that issue to go to the jury. The federal punitive damages standard requires essentially the same proof as the Plaintiffs' claim of Fourteenth Amendment violation arising from the death of their son David Cutler. In *Castro v. County of Los Angeles*, 797 F.3d 654, 699 (9th Cir. 2015) the court allowed punitive damages to go to the jury where the claim was that the defendant's conduct evinced reckless or callous indifference to others' rights. Since, as discussed above, Plaintiffs'

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Fourteenth Amendment claim fails as a matter of law, so fails the claim for punitive damages on the Fourteenth Amendment claim.

## CONCLUSION

Plaintiffs, surviving parents of their son David Cutler, cannot bring a claim under the Fourth Amendment. The Eighth Amendment is not applicable to an arrestee or pretrial detainee, such as Cutler. The Fourteenth Amendment does apply, but as a matter of law no reasonable juror could conclude that Deputy Barnes' conduct constituted objectively unreasonable deliberate indifference. Deputy Barnes is entitled to qualified immunity. The punitive damages claim related to the Fourteenth Amendment claim fails with the Fourteenth Amendment claim. The punitive damages claim related to the state law Wrongful Death claim is barred by ARS 12-820.04.

Plaintiffs' claims should be dismissed in their entirety with regard to these Defendants, Sheriff Napier, Deputy Barnes and Jane Doe Barnes.

DATED this 4th day of September, 2020.

*AUDILETT LAW PC*

/s/ Daryl Audilett
_____
Daryl A. Audilett
Attorney for Defendants Napier and Barnes

CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Shaun Kuter, Esq.
Paul J. Vaporean, Esq.
Goldman & Zwillinger, PLLC
17851 N. 85th Street, Suite 175
Scottsdale, AZ 85255
**Attorney for Plaintiffs**

Scott Zwillinger, Esq.
Witthoft Derksen, P.C.
3550 North Central Avenue, Suite 1006
Phoenix, AZ 85012
**Attorney for Plaintiffs**

Scott Reynolds, Esq.
Galen H. Satterlee, Esq.
SATTERLEE GIBBS, PLLC
3133 W. Frye Road, Suite 101
Chandler, AZ 85226
**Attorneys for Rural Metro**
**Fire Department and Reed**

By /s/ Karen Audilett