*AUDILETT LAW PC*
335 NORTH WILMOT RD SUITE 500
TUCSON, ARIZONA 85711-2636
(520) 748-2440
Email: daa@audilettlaw.com

Daryl A. Audilett, Esq.
State Bar No. 009007; PCC No. 2036
Attorney for Defendants Napier and Barnes

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Steven Cutler, individually and as Administrator of the Estate of David A. Cutler, deceased, on behalf of himself and on behalf of all beneficiaries of the Estate of David A. Cutler, deceased, and Renee Luddington Cutler;<br><br>     Plaintiffs,<br><br>vs.<br><br>Mark D. Napier, Sheriff of Pima County, Arizona, in his official capacity; Rural Metro Fire Dept., Inc., an Arizona for profit corporation; Keith Barnes and Jane Doe Barnes, his spouse; Grant Reed and Brittany Reed;<br><br>     Defendants. | NO. CV-18-00383-TUC-FRZ<br><br>DEFENDANTS NAPIER AND BARNES' SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT<br><br>(Oral Argument Requested)<br><br>(The Honorable Frank R. Zapata) |

     The following Separate Statement of Facts and attached exhibits are submitted in

support of Defendants Sheriff Mark D. Napier and Pima County Sheriff's Deputy Keith

Barnes and Jane Doe Barnes' Motion for Summary Judgment on all of Plaintiffs' claims.

## **DAVID CUTLER CAUSE OF DEATH**

1. All counsel for the Parties stipulated and the Court ordered that the following stipulations may be read to the jury by the Court and that counsel may utilize the written stipulations and the documents and photographs referred to therein where appropriate during opening statements, during witnessing examination, and during closing arguments. (Stipulations of All Counsel for Trial, Doc 100; Order Doc 102, 2-11-20.)

  1. The blood sample that was tested by AXIS Forensic Toxicology and National Medical Services was post-mortem (after death) peripheral blood from David Cutler during the autopsy performed on June 7, 2017.

  2. The toxicology test results from the AXIS Forensic Toxicology laboratory on that blood sample are true and accurate.

  3. The toxicology test results from National Medical Services laboratory on that blood sample are true and accurate.

  4. The Arizona Department of Public Safety Scientific Examination Report of the LSD exemplar sample submitted by Robert Cutler showing that it "contained a usable quantity of Lysergic Acid Diethylamide (LSD)" is true and accurate.

  5. The David Cutler Autopsy Report dated June 7, 2017, including the AXIS and National Medical Services laboratory reports, is admitted into evidence.

6. The Arizona Department of Public Safety Scientific Report of the LSD exemplar sample submitted by Robert Cutler is admitted into evidence.

7. The photographs taken at the hospital by the medical examiner investigator and the autopsy photographs depicting the exterior injuries to David Cutler's body are admitted into evidence.

This stipulation concerns SSOF Exhibits 1, Autopsy Report; 2, Toxicology Report from Autopsy; 3, DPS Scientific Examination Report regarding LSD sample received from decedent's father Robert Cutler, and Ex 4, Hospital and Autopsy photos of Cutler's torn skin, abrasions and cuts, excerpted, which are admitted into evidence by stipulation.

2. David Cutler, age 23, (hereafter "Cutler") died on June 5, 2017. (First Amended Complaint, Doc 55, ¶ 27.)

3. On June 7, 2017 an autopsy was conducted by Pima County Medical Examiner Dr. David Winston. (Exhibit 1, Autopsy Report, Amended. See ¶ 1 above.)

4. The Autopsy Report Pathologic Diagnoses stated: (Id., p. 2)

    1. Hyperthermia
        a. Exposure to the elements
        b. Lysergic acid diethylamide toxicity
            i. See toxicology report.
        c. Tympanic temperature 102.9 F degrees at scene

5. The Autopsy Report "cause of death" opinion of Medical Examiner Dr. Winston stated: (Id., p. 2)

In consideration of the known circumstances surrounding this death, the

available medical history and the examination of the body, the cause of

death is ascribed to hyperthermia due to exposure to the elements and

lysergic acid diethylamide toxicity.

The manner of death is accident.

6.    The Toxicology Report attached to the Autopsy Report noted the presence of Lysergic Acid Diethylamide in the "Blood, Peripheral" sample from Cutler. (Ex 2, Toxicology Report from Autopsy, p. 2 of 5. See ¶ 1 above.)

7.    After Cutler's death, Cutler's father brought to the Sheriff's Department a sample of LSD from the batch of LSD taken by Cutler. That sample was analyzed by the Arizona Department of Safety Crime Laboratory and was found to contain LSD. (Ex 3, DPS Scientific Examination Report. See ¶ 1 above.)

8.    Lysergic acid diethylamide or LSD is a psychoactive drug discovered in the earlier part of the 20th Century, 1900s. It's probably the classic drug when people talk about having a trip, getting high, having hallucinations. (Ex 5, Dr. Winston Deposition, pp. 17:25 – 18:8.)

9.    LSD toxicity in this case meant that it had a toxic effect on his body. It put him in a situation where he was walking through the desert with no clothes on. And it also raised his body temperature. It contributed to his heat-related death. (Ex 5, Dr. Winston Deposition, p. 18:11-19.)

10.    There was no blunt force trauma that contributed to his death. (Ex 5, Dr. Winston Deposition, pp. 20:18 - 21:5.)

11.     There was no blunt force trauma that caused a skull fracture or caused damage to the brain.  (Ex 5, Dr. Winston Deposition, pp. 21:21 – 23:13.)

12.     The hyoid bone and laryngeal cartilages were intact, ruling out a strangulation death.  (Ex 5, Dr. Winston Deposition, p. 24:5 – 25.)

13.      There was an abrasion all the way around the neck that caused concern that Cutler may have been strangled.  But Dr. Winston ruled out strangulation because there was no hemorrhage in Cutler's neck.  This is just scraping of the skin, nothing deeper.  (Ex 5, Dr. Winston Deposition, pp. 51:21 – 52:17.)

14.     Dr. Winston was provided a drawing of a crystal medallion necklace type thing, possibly by Cutler's father, which, if Cutler was wearing it at the time, could explain the abrasion on Cutler's neck.  He was provided the drawing and a screen capture of an exemplar necklace, which is part of his file.  (Ex 5, Dr. Winston Deposition, pp. 52:20 – 53:24; Ex 6, which is Exhibit 4 to Dr. Winston's Deposition, Drawing of necklace and screen shot of exemplar necklace.)

15.     Dr. Winston did not find any burns on Cutler's body that he could associate with being on the ground or on hot rocks.  (Ex 5, Dr. Winston Deposition, p. 28:4-9.)

16.     Hyperthermia is a known complication of LSD.   (Ex 5, Dr. Winston Deposition, p. 62:18-24; 66:19-20.)

17.     Cutler was in shock.  Hyperventilation could be due to shock, and he could also be anxious because of the situation he was in, becoming hyperthermic.  As well as increased respiration rate is a symptom of LSD toxicity.  (Ex 5, Dr. Winston Deposition,

pp. 64:21 – 65:14.)

18.     After meeting with Dr. Robert Cutler, David Cutler's father, Dr. Winston changed his stated cause of death from LSD toxicity to Hyperthermia due to exposure to the elements and LSD toxicity.  (Ex 5, Dr. Winston Deposition, p. 67:12 – 25.)

19.     Dr. Cutler, David Cutler's father, has a Ph.D in chemistry in approximately 1980, but he is not a medical doctor.   He worked in finance and IT, Information Technology, and is now retired.  (Ex 7, Deposition of Robert Cutler, pp. 7:8 – 8:4.)

20.     Dr. Winston did not agree with Dr. Cutler, David's father, that it is highly likely that the ketamine (administered by Rural Metro) caused David Cutler to go into cardiac arrest and therefore, along with hyperthermia, was a key cause in his death.  (Ex 5, Dr. Winston Deposition, p. 69:17-23; parenthetical information added.)

21.     Dr. Winston did not agree with Dr. Cutler that LSD was not a cause of death, Dr. Winston wrote that LSD was a contributing factor to the cause of death; he believes that today.  Dr. Winston feels confident that that is the right conclusion he came to, based on all the information he has right now.  (Ex 5, Deposition of Dr. Winston, p. 70:3-24.)

## **DAVID CUTLER TOOK LSD (Lysergic Acid Diethylamide)**

22.     Prior to Cutler's death, Cutler ingested LSD.  The night before Cutler died, Megan Cypcar received a phone text from Cutler "that said he had a tab of acid, or something along those lines."   Cypcar "told him to be careful."  (Ex 8, Megan Cypcar Deposition, p. 18: 11 - 22.)

23.     At her deposition, Cypcar confirmed that Exhibit 1 to her deposition contains

screen shots of the June 5, 2017 texts between Cypcar and Cutler that occurred that morning. The evening time stamps at the top of the screen shots range from 9:24 pm to 9:26 pm. Cypcar stated in her deposition she sent the screen shots of the texts that same day, June 5, 2017, at 9:25 p.m. to Dr. Cutler, Cutler's father. (Ex 8, Cypcar Deposition, p. 28:4 – 11; Ex 9, which is Exhibit 1 to Cypcar Deposition, screen shots of text messages.)

24.     The time stamps for the texts are logged by Cypcar's phone. At the time of the text communications in question, Cutler was in Tucson, Arizona and Cypcar was in Asheville, North Carolina. There was a three-hour time difference between Tucson, Arizona and Asheville, North Carolina on June 5, 2017. (Undisputed; Ex 8, Cypcar Deposition, p. 84:12 - 21.)

25.     The text times referenced in the following statements of fact Nos. 26 - 32 are the North Carolina date stamp times on the screen shots shown in Cypcar Deposition Exhibit 1. Keep in mind that the time in Tucson is three hours earlier. (Ex 9, Cypcar Deposition Exhibit 1, Screen Shots of Text Messages.)

26.     The phone text exchanges in Cypcar Deposition Exhibit 1 between Cypcar and Cutler begin at 7:25 am North Carolina time (4:25 am Arizona time) and end with Cutler's last response text at 9:04 am North Carolina time (6:04 am Arizona time). Thereafter, there are additional texts from Meghan Cypcar to Cutler, but no response texts from Cutler. For the purposes of the following statements of fact, we will refer to the North Carolina time stamps, keeping in mind that the Arizona time is three hours earlier. (Ex 9, Cypcar Deposition Exhibit 1, Screen Shots of Text Messages.)

27.     During the relevant two-hour timeframe, Cutler sent Cypcar "youtu.be" videos.  The first one is titled "Frank takes acid and trips balls.  It's Always Sunny in Philadelphia" (7:49 am). The second video is untitled, showing a woman with her hands on some sort of desktop or tabletop (7:55 am). The third video is titled "Workaholics – It's Kicking In" (7:59 am).  (Ex 8, Cypcar Deposition, pp. 30:7 – 31:3.; Ex 9, which is Cypcar Deposition Exhibit 1, Screen Shots of Text Messages.)

28.     At 8:08 am, Cutler writes "I'm tripping so hard babe," followed by five heart emojis.  Cypcar understands that Cutler has taken LSD and is tripping on the LSD.  (Ex 8, Cypcar Deposition, p. 31:4-12.)  Cypcar explained that they would send each other cute hearts, like the emojis and that kind of thing.  (Id., p. 81:12 – 17.)

29.     At 8:33 am, Cutler writes "Ruff".  Cypcar explains that "Ruff" was a silly and cute expression she and Cutler used.  (Id., p. 81:17 – 23.)

30.     At 9:00 am, Cypcar texts to Cutler, "You took the tab…Babe."  (Ex 8, Cypcar Deposition, pp. 81:24 – 82:3.)  Cutler responds "Ruff". (Id.)

31.     Then, also at 9:00 am, Cypcar says "Did u" and Cutler responds "Yesss" at 9:01 am.  (Id., p. 82:4–8.)  To which Cypcar responds "OK" at 9:04 am. Cypcar explained that she was confirming that Cutler had taken LSD. (Ex 8, Cypcar Deposition, p. 82:9 – 13.)

32.     Cypcar and Cutler then exchange "Ily" (I love you) texts, with the last "Ily more" from Cutler at 9:04 am.  (Ex 8, Cypcar Deposition, p. 82:21 - 25.)  Thereafter, Cypcar sends Cutler several texts inquiring about him and expressing concern and worry

about him.  Cutler did not respond.  (Ex 9, Deposition Exhibit 1 to Cypcar Deposition,

Screen Shots of Texts.)

### PARTIES' STIPULATION REGARDING USE OF PIMA COUNTY SHERIFF'S OFFICE AND RURAL METRO MATERIALS IN PRETRIAL MOTIONS

In their "Stipulation Regarding Use of Exhibits in Pretrial Motions," Doc 116, the

Parties stipulated that "for the purposes of pretrial motions only, documents and electronic

materials generated by the Pima County Sheriff's Department (PCSD) and by Rural Metro

(RM) as part of the investigation of the death of David Cutler are admissible without further

foundation or authentication.  This includes but is not limited to incident reports,

supplemental incident reports, audio interviews, transcripts of audio interviews, dispatch

and radio audio and transcripts, 911 audio and transcripts, video recordings, and

photographs."  The Court has not yet signed the Order.

NOTE:  Regarding Exhibit 22, the Audio Recording of the PCSD Radio Traffic is

not real time, but is intended to provide recordings of the individual transmissions, which

can be correlated to the timed entries on Exhibit 21, the PCSD Radio Log Summary Report.

### DAVID CUTLER JEEP WRANGLER FIRE

33.    On June 5, 2017, at approximately 0940 hours Tucson time, Pima County

Sheriff Department Units were dispatched to a possible structure fire in the vicinity of

Melpomene and 22nd Street, located on the far east side of Tucson.  (Ex 10, PCSD CAD

Master Call Table; Ex 12, Google Earth aerial photo; Ex 25, Declaration of David Boyan

regarding foundation for labeled aerial photo.)

34.     The actual location of the fire turned out to be behind the property address of 11260 E. Twin Hills Trail.   (Ex 10, PCSD CAD Master Call Table; Ex 13, Deputy Christopher Davenport Recorded Statement Transcript, p. 2:12-13.)

35.     On fire was a Jeep Wrangler.  Deputy Christopher Davenport traced the Jeep tire tracks from the location of the fire back through a desert area that showed that the Jeep had been driven through bushes, over cactus, and through a steep wash.  (Ex 14, Deputy Davenport Deposition,  pp. 26:16 – 27:9; Ex 15, PCSD Photos of Jeep after fire.)

36.     The photos of the location of the Jeep fire show that the Jeep had been driven off-road, crashed into a Palo Verde tree, rolled backward and caught fire.  The Jeep was totally destroyed by the fire.  (Ex 15, PCSD Photos of Jeep and location after fire.)

37.     Defendant PCSD Deputy Keith Barnes responded to the Jeep fire call and climbed up a hill and directed the fire personnel to the location of the fire.  Deputy Barnes was on scene at the fire for about 1 to 1.5 hours, then left.  (Ex 16, Deputy Barnes Recorded Statement Transcript, p. 3:8-11.)

38.     Rural Metro responded and put out the vehicle fire.  Defendant Rural Metro Paramedic Grant Reed and Rural Metro EMT Vince Figueroa both participated in extinguishing the Jeep fire.  (Ex 17, Grant Reed Deposition, pp. 61:22 – 62:1; Ex 18, Vince Figueroa Deposition, pp. 27:19 - 28:1.)  Hours later, by the time they arrived at the Cutler hilltop scene, Reed and Figueroa were aware that Cutler may be associated with the Jeep fire.  (Ex 18, Vince Figueroa Deposition, p. 35:17-24; Ex 17, Grant Reed deposition, p. 68:10 – 20.)

39.     Despite the search efforts of the responding deputies to find anyone associated with the Jeep fire, Cutler was not found at the scene of the fire.  (Ex 14, Deposition of Deputy Davenport, pp. 23:14 – 24:3.)  It was later determined that the Jeep belonged to Cutler.  (Undisputed.)

40.     About two hours after the fire call, at approximately 11:32 a.m, Kristen Powell called 911 from her home at 11405 E. Calle Catalina in Tucson to report someone on the hill behind her home screaming for help.  Ms. Powell reported that the subject did not have any clothes on.  (Ex 19, CAD Master Call Table, p. 1; Ex 20, Kristen Powell Deposition, pp. 58:10 - 59:12.)

41.     Deputy Barnes saw on his patrol unit computer an "Unknown Problem" being input referencing the same area where the Jeep fire had been.  Then there was a broadcast over the radio about a naked man standing on a hill east of the Powell residence yelling for help.  Deputy Barnes assumed that this naked man "call" was related to the fire call from two hours earlier.  He responded with lights and siren.  (Ex 16, Barnes Recorded Statement Transcript,  p. 3:11 - 30.)

42.     The Pima County Sheriff's Department Radio Log Summary Report contains the relevant times and activities of the responders to the naked man on the hill call.  For reference, Deputy Barnes was Unit 362.  Deputy Barnes is logged as ENROUTE at 11:34:24.  (Ex 21, PCSD Radio Log Summary, p. 1.)

43.     When Deputy Barnes got to the area of the Powell residence, he saw an individual at the very top of the hill without clothing, standing with his arms out in what

looked to Deputy Barnes like a "Jesus on the cross" pose. (Ex 16, Deputy Barnes Recorded Statement Transcript, p. 4:9-10.) According to the Radio Log Summary, Deputy Barnes had sight of the subject at 11:39:50, approximately 5 minutes after he was logged as ENROUTE. At 11:40:16 Deputy Barnes said the subject is on the mountain east of the one with the flag. At 11:40:31 Deputy Barnes is attempting access. At 11:41:03, Deputy Barnes is east of the complainant's (Kristen Powell's) address. Code 10-17 means "Complainant". (Ex 21, Radio Log Summary, p. 1.)

44. Upon sighting the subject, Deputy Barnes tried to use his PA system to order the man to walk down towards him, but the PA system did not work. Barnes started yelling to the subject, identifying himself as the Sheriff's Department, saying that he was there to help, and asking the man to come down. The subject then took off running east from the top of the hill. Barnes could hear the subject yelling but could not understand what he was saying. (Ex 16, Barnes Recorded Statement Transcript, p. 4:16-29.)

45. Deputy Barnes then started to climb the hill, maneuvering around and through brush and over loose rocks towards the top of the hill, a distance of about a quarter of a mile. Deputy Barnes had lost visual of the man so he would walk and then stop and look up, catch his breath, so that if the man started coming that way Barnes would be prepared for anything. (Ex 16, Barnes Recorded Statement Transcript, p. 5:15-29.)

46. Barnes would walk and then stop to see where he wanted to walk to next, he would yell Sheriff's Department, come back towards me, I'm here to help. At one point, the subject came and looked over towards Barnes. Barnes yelled at him to stop, to come

down, to walk towards Barnes. At that time Barnes could tell that the subject was naked. The man did not come down or walk towards Barnes. (Ex 16, Barnes Recorded Statement Transcript, p. 5:31 – 6:10.)

47. At 11:46:59, Deputy Barnes advised that he was with the subject on top of the mountain. (Ex 21, Radio Log Summary, p. 1.) Deputy Barnes also advised that he was going to need meds. (Ex 22, Audio, Radio Traffic, at 4:20 minutes.)

48. The Radio Log Summary shows that at 11:47:20, Deputy Barnes called for medical assistance. That is logged as "c901". The "c" stands for "call." 901 stands for "ambulance." (Ex 21, Radio Log Summary, p. 1.)

49. At 11:48.00, Rural Metro got the call for medical assistance. (Ex 23, Rural Metro Patient Care Report, p. 1.)

50. In the meantime, Deputy Davenport (Unit 757) had been still at the Jeep fire, and now was making his way on foot to the area where Deputy Barnes and the naked man were located. The Radio Log Summary (Ex 21) shows Deputy Davenport announcing at 11:48:58 that he is west of one mountain, and has sight of Deputy Barnes (Unit 362). Deputy Davenport's audio announcement is contained on Ex 22, Audio, Radio Traffic, at 4:35 minutes. Davenport further states there that he is going to make his way to Deputy Barnes' location.

51. To provide an understanding of the terrain at the location of the Jeep fire, the terrain at the hilltop where Deputy Barnes encountered Cutler, of the ground in between the two locations, and of the terrain where the responders were trying to get Cutler down

from the top of the hill, Defendants Napier and Barnes had drone video footage made in June of 2019, the same time of year as the Cutler incident. That drone video is 5 minutes and 55 seconds long. The drone video begins at the Jeep fire site near a horse arena and goes first to and over a hilltop with an American flag on it, then to the hilltop where Deputy Barnes encountered David Cutler (Cutler hilltop), ultimately circling the Cutler hilltop. The footage was made by Randy Metcalf, who is a Pima County Communications Officer, Visual Communications Photographer and Videographer. Randy is an FAA licensed and certified drone pilot. This video was previously timely disclosed to all counsel in this case. For purposes of this motion, the video has been excerpted, and is narrated by exhibit preparer David Boyan, who was in attendance when the drone video was made, and who has hiked the area between the location of the Jeep fire and the Cutler hilltop. (Ex 24, Drone Video; Ex 25, Declaration of David Boyan regarding preparation of drone video.)

52.  Now at the top of the hill with the naked man, Deputy Barnes again announced "Sheriff's Department" and asked the subject to come towards him. The naked man stopped and put his head down and looking down, started yelling, Just decapitate me, just decapitate me. (Ex 16, Barnes Recorded Statement Transcript, p. 7:4-7.)

53.  Deputy Barnes put his baton away, and pulled out his pepper spray and told the subject "Don't make me spray you." Deputy Barnes told the subject that he wanted to handcuff him and the subject complied. (Ex 16, Barnes Recorded Statement Transcript, p. 7:13-20.)

54.    Deputy Barnes thought he may have recognized Cutler from a prior contact. Cutler said, something to the effect of, Hey, Deputy Barnes. Deputy Barnes said, Hey, what's going on, and Cutler said something about his car. (Ex 16, Deputy Barnes Recorded Statement Transcript, p. 7:9-18.) It turned out later Cutler wasn't the person Barnes was thinking of. (Undisputed.)

55.    At 11:50:25 the Radio Log Summary Report shows that Deputy Barnes announced that the subject is delusional and has blood on his face. (Exhibit 21, Radio Log Summary Report, p. 1.) The audio of that statement by Deputy Barnes' is located at 4:48 minutes into the Audio, Radio Traffic recording. (Ex 22, Audio Recording, Radio Traffic.) There, Deputy Barnes states, "I'm not quite sure how I'm going to get him down. He's delusional and bleeding from the face."

56.    At 11:50:31 there is an entry attributed to Unit 362, Deputy Barnes, that says "rfd advd", meaning rural fire department advised. (Exhibit 21, Radio Log Summary, p. 1.) To corroborate that entry, at 5 minutes, 10 seconds into the Audio, Radio Traffic recording, Deputy Barnes states, "Is Code 109 (ambulance) responding?" The dispatcher says, "10-4, they've been advised." Then Deputy Barnes says, "Also, can you get Search and Rescue to us?" The dispatcher says "10-4" and then radios to Search and Rescue. (Ex 22, Audio Recording, Radio Traffic.)

57.    According to Deputy Barnes, the naked man was covered with blood from head to toe. Deputy Barnes asked him if he was able to walk back. The subject said, "I don't want to go back, I don't want to go back" and pulled away from Deputy Barnes and

started like he was going to go over the other side of the hill. Deputy Barnes grabbed the subject's arm and took him to the ground. (Ex 16, Barnes Recorded Statement Transcript, p. 7:22-29.)

58.     Once on the ground, the subject started shaking and yelling, talking something about bombing Iraq.  The subject said that he's sorry for his parents, that he wanted to say goodbye to his mom.  He started talking about the devil and that if we don't kill the devil, we'll never be able to finish the wars.  (Ex 16, Barnes Recorded Statement Transcript, p. 7:31-36.)

59.     Then the subject started rolling off the side of the hill.  (Ex 16, Barnes Recorded Statement Transcript, p. 8:2.)  This event is corroborated by the entry at 11:53:22 (Ex 21, Radio Log Summary Report, p. 1) that says "roll down hill."  This event is further corroborated in Ex 22, Audio, Radio Traffic, at 6 minutes 20 seconds when Deputy Barnes states, "He's trying to roll down the hill now."   Deputy Barnes grabbed his arm and the subject stood up. Deputy Barnes grabbed his left arm and directed him to the ground. There was no shade to put him under and he was red as a firebox.  (Ex 16, Barnes Recorded Statement Transcript, p. 8:4-9.)

60.     Once back on the ground, the subject began banging his head on the rocks. Deputy Barnes put his foot under the subject to prevent him from banging his head on the rocks; he was banging Deputy Barnes' right foot instead.  The subject opened up a gash by his right eye.    (Ex 16, Barnes Recorded Statement Transcript, p. 8:11-21.)  There is a photo of blood on the top of Deputy Barnes' right boot consistent with that description.

(Ex 26, PCSD Photo of Barnes' boot.)

61.     Barnes started trying to stabilize him again, on his side, holding his head down, trying to keep him from banging.  He started kicking and flailing, and tried to roll down the hill again. When Deputy Barnes got up to get into a better position, the subject started rolling down the side of the hill again.  (Ex 16, Barnes Recorded Statement Transcript, p. 8:23-28.)

62.     At that time, Deputy Davenport arrived at the scene, having hiked from the Jeep fire scene. According to Steven West, Pima County Sheriff's Office Search and Rescue, the Jeep fire scene was about a half mile, if not further, away.   Deputy Davenport said Cutler was trying to get up and run and they wanted to prevent him from doing that. Cutler kept trying to roll down the hill.  (Ex 13, Davenport Recorded Statement Transcript, p. 8:1-12; p. 9:6-15; Ex 27, Deputy Steven West Recorded Statement Transcript, p. 10:34-35.)

63.     When he got to the top of the hill where Barnes and Cutler were, Deputy Davenport would describe Cutler as a combative individual in that he wasn't listening to commands, kept trying to get away, to roll down the hill, he was thrashing about.  His feet and legs were thrashing about.  Whether or not he was actually trying to kick them, Davenport didn't know.  (Ex 14, Deputy Davenport Deposition, pp. 51:12 – 52:10.)

64.     A female deputy (Nadeen Dittmer) arrived with a RIPP restraint to control the subject's feet.  Even though Deputy Barnes was holding the subject's feet, the subject was "just flipping around like a, a gator." (Ex 16, Barnes Recorded Statement Transcript, p.

8:33-36.)

65. Deputy Barnes did not have water on his person, or in his patrol vehicle. (Ex 28, Barnes Deposition, p. 22:13-14.) Deputy Davenport estimated the equipment he normally wears weighs from 30 to 35 pounds. (Ex 14, Davenport Deposition, pp. 20:16 – 21:11.) During Deputy Barnes' encounter with Cutler, he called for "meds" right away when he first encountered Cutler on the top of the hill. Deputy Barnes also asked for Search and Rescue but did not ask anyone to bring water to the hilltop. When questioned about not asking anyone, including 911 caller Kristen Powell, to bring water or blankets, Deputy Barnes testified:

> "At that point I need people up there. We don't have time to go and interview people. It's a dynamic situation there's lots of inputs coming in, a lot of stimulus going on, so to stop and say, hey, my focus right now is to get him off the mountain so we get him into an ambulance where they're going to have the necessities that they need in that situation. If I can get him off the hill faster, that's going to be better, in my mind to get him into that ambulance, get that medical care given to him, than trying to administer water to him on the side of the hill or trying to do any type of extensive first aid to him that he needs. He needs to be off the side of the hill and in the ambulance so that he can get that medical care." (Ex 28, Barnes deposition, p. 63:17 - 64:19.)

When asked about the purpose of asking Deputy Dittmer to bring up the RIPP restraint used to hobble Cutler's legs and feet, Deputy Barnes explained:

"I thought if I could secure his feet and keep him from bucking, kicking, that we would then be able to have a better chance of being able to get him from that spot down to the bottom down to where an ambulance can treat him."

**\*\*\*\*\*\*\*\*\*\***

"Without him being able to flail, I was hoping that the three of us would have been able to manage him, one holding his feet, the other two holding arms maybe and carry him down the side of the hill trying to get him down there. Again, the focal point is we need him off that side of the hill so he can get that treatment that he needs and we're not going to be able to provide it. The four deputies up there are not going to be able to provide that treatment on the side of the hill. (Ex 28, Barnes Deposition, page 64:20 - 65:12.)

66.     Even after the RIPP restraint (leg and ankle hobble) was applied, it was not possible for the three deputies to carry Cutler down the hill because he kept on kicking and bucking. He was carried about ten feet and then the deputies started losing footing, losing traction on the hillside and they were unable to proceed any further. (Ex 28, Barnes Deposition, pp. 67:12 - 69:8.)

67.     The subject was still trying to roll down the hill. He rolled into a really thick, thorny bush which contacted his genital area, and he didn't even react. After that a fourth deputy arrived, Deputy Ernst. (Ex 13, Deputy Davenport Recorded Statement Transcript, p. 10:27-33.)

68.     Communications was trying to direct Meds in, and Search and Rescue had

been called at that time. While the deputies were waiting for them to arrive, the subject kept squirming and wanting to roll down the hill. The deputies made the decision to move him about 15 or 20 feet over to a clear area where there wasn't cactus or anything that would hurt him further. (Ex 13, Deputy Davenport Recorded Statement Transcript, p. 11:23-32.)

69. Search and Rescue was called because of the location, and so the deputies could get their expertise to help them load him and get him down. (Ex 13, Deputy Davenport Recorded Statement Transcript, p. 11:24-26.)

70. Deputy Dittmer described the ground terrain as rocky, very slippery, with a lot of brush and cactus. (Ex 29, Deputy Dittmer Recorded Statement Transcript, p. 6:1-3.) Deputy Davenport described the ground terrain as very rocky, super rocky, lot of brush, 20 degree incline, fairly steep, and that he was slipping all sorts on the rocks. (Ex 13, Deputy Davenport Recorded Statement Transcript, p. 8:14-22.) Pima County Search and Rescue Deputy Steven West described the terrain as a fairly steep hill, probably about a 30-degree angle, loose rocks, lots of cactus. (Ex 27, Steven West Recorded Statement Transcript, p. 3: 3-4.)

71. At 11:58:49 the Radio Log Summary Report (Ex 21) notes show that Deputy Barnes called and referenced, "side of cliff, holding him in position, naked and delusional, needs extricating from top of hill." At 7 minutes and 32 seconds on the Audio, Radio Traffic recording (Ex 22), Deputy Barnes is talking to Search and Rescue and says, "We are on the side of a cliff here. We are currently holding him in position. He is combative

with us. He is naked and delusional. We are going to need some assistance in extricating him from the top of the hill here." Continuing in the recording, there is discussion between Deputy Barnes and Search and Rescue about getting a Stokes basket up there to bring the subject down. Deputy Barnes tells Search and Rescue they will have to use a game trail to get up to where the deputies and the subject are located. (Ex 22, Audio of Radio Traffic, starting at 7 minutes 32 seconds.)

72. At 11:59:50, Deputy Barnes radios that "subject is still combative." At 12:05:52, Deputy Barnes radios "have meds respond." Id. At 12:08:23, the Radio Log Summary Report notes Deputy Barnes telling the dispatcher "still trying to manage him, still delusional, and combative." (Ex 21, Radio Log Summary, p. 2.) Beginning at 10 minutes, 7 seconds on the Audio, Radio Traffic (Ex 22) there is audio discussion between Deputy Barnes and Search and Rescue, and Deputy Barnes advises Search and Rescue "We're still trying to manage him." The dispatcher says that meds (Rural Metro) wants to confirm that it is Code 4 (safe) for one of their units to respond to the scene. Deputy Barnes says "He's 26 (meaning 'detained'). We have a RIPP on him. He's still delusional and combative with us, but we do need some assistance up here." (Ex 22, Audio, Radio Traffic,starting at 10 minutes, 7 seconds; Ex 21, Radio Log Summary, p. 2 at 12:08:23.)

73. Pima County Sheriff's Office Search and Rescue Deputy Steven West thought Barnes was hoping maybe he was going to be able to get up there, calm the gentleman down and bring him down, but Barnes stated he was being combatant and was having issues, and Barnes was going to need help getting him off of the hill. (Ex 27, Steven West

1   Recorded Statement Transcript, p. 4:17-22.)

2   74.     After the deputies moved Cutler to the clearing, he kind of calmed down a

3   little bit more to the point where they didn't have to put hands on or any weight on him.  He

4

5   was wiggling and started kind of thrusting his hips into the ground, into the rocks.  He

6   started babbling again about something.  His breathing seemed normal.  (Ex 13, Deputy

7   Davenport Recorded Statement Transcript, p. 13:26-36.)

8   75.     Before Meds arrived to the hilltop, Deputy Barnes asked Deputy Dittmer to

9

10  video record Cutler with her cell phone.  (Ex 28, Barnes Deposition, p. 69:9-18.)  That

11  video footage taken by Deputy Dittmer shows Cutler on the ground thrashing about and

12  making unintelligible verbal noises.  (Ex 30A, 30B and 30C, short videos from Deputy

13  Dittmer's cell phone.)

14  76.     Deputy Davenport heard Deputy Barnes request Medical multiple times. (Ex

15

16  14, Deputy Davenport Deposition, p. 56:4-8.)

17  77.     The hospital and autopsy photos show numerous scratches and scrapes on

18  Cutler's body, and significant skin torn away from the bottoms of his feet from wandering

19

20  naked and barefoot in the rocky, brushy, terrain for about two hours between the time of the

21  Jeep fire until the time that Cutler was spotted by homeowner Kristen Powell and then was

22  encountered by Deputy Barnes.  (Ex 4, Hospital and Autopsy photos, excerpted.)

23  78.     Rural Metro arrived at the scene on top of the hill, and at 12:15:54 the Radio

24  Log Summary Report (Ex 21) notes a call from Deputy Barnes (362) that "meds gave him

25  meds."  On the Audio, Radio Traffic recording (Ex 22) at 12 minutes, 5 seconds Deputy

26

Barnes announced that "meds are on scene, just gave him some medication."

79.    When Rural Metro Paramedic Grant Reed arrived at the bottom of the hill, he observed Cutler at the top of the hill.  The deputies were trying to restrain Cutler, trying to hold onto him, basically.  The deputies had him suspended up off the ground, but Cutler was fighting them quite a bit.  The deputies were struggling to try to keep hold of him. (Ex 17,  Reed Deposition, p. 110:3-25.)  Cutler was "flailing back and forth, almost like trying to fold back and forth like a child throwing a temper tantrum.  Kicking, flailing, and definitely tossing them (deputies) around."  (Ex 17, Reed Deposition, p. 111:2-5.)

80.    The Rural Metro Patient Care Report shows Rural Metro received the call and was dispatched at 11:48:00; was on scene at 12:07:34 and at the patient's side at 12:13:00. It shows the patient was transported by Rural Metro at 12:35:00 and arrived at Tucson Medical Center at 12:54:00.  (Ex 23, Rural Metro Patient Care Report, p. 1.)

81.    After his arrival at the patient on the hilltop, Rural Metro Paramedic Reed injected Cutler with Ketamine.  Ketamine is a drug used for chemical sedation.  (Ex 17, Reed Deposition, p. 72:18-21.)

82.     Deputy West of Search and Rescue assisted in getting Cutler off the hill in a Stokes basket.  (Ex 27, Deputy West Recorded Statement Transcript, p. 7:18-21.)

83.    Cutler was pronounced deceased at Tucson Medical Center.  (Undisputed.)

84.    A summary of the timing of the Unknown Problem call and response is as follows:

11:32:13     Time Occurred  (Ex 19, PCSD CAD Master Call Table)

| | | |
|---|---|---|
| 1 | 11:33:52 | Kristen Powell called 911   (Ex 19, PCSD CAD Master Call Table) |
| 2 | 11:34:24 | Deputy Barnes, Radio Designator 362, en route  (Ex 21, PCSD Radio Log |
| 3 | | summary Report) |
| 4 | 11:39:50 | Deputy Barnes, 362, has sight of subject  (Ex 21, PCSD Radio Log Summary |
| 5 | | Report) |
| 6 | 11:46:59 | Deputy Barnes, 362, with subject on top of mountain  (Ex 21, PCSD Radio |
| | | Log summary Report) |
| 7 | 11:47:20 | Deputy Barnes, 362, c901 (call ambulance) (Ex 21, Radio Log Summary), |
| 8 | | "I'm going to need meds"  (Ex 22, Audio, Radio Traffic, at 4:30 minutes) |
| 9 | 11:48:00 | Rural Metro received call (Ex 23, Rural Metro Patient Care Report) |
| 10 | | |
| 11 | 11:48:00 | Rural Metro dispatched  (Ex 23, Rural Metro Patient Care Report) |
| 12 | 11:48:58 | Deputy Davenport, 757, west of one mountain, have sight on 362 (Barnes) |
| 13 | | (Ex 21, PCSD Radio Log Summary Report) |
| 14 | 11:49:00 | Rural Metro en route  (Ex 23, Rural Metro Patient Care Report) |
| 15 | 11:50:25 | Deputy Barnes, 362, Subject is delusional and has blood on face (Ex 21, |
| 16 | | PCSD Radio Log Summary) |
| 17 | 11:53:22 | Deputy Barnes, 362, roll down hill (Ex 21, PCSD Radio Log Summary) |
| 18 | 11:53:58 | Deputy Davenport, 757, with 362 Deputy Barnes (Ex 21, PCSD Radio Log |
| 19 | | Summary) |
| 20 | 11:58:49 | Deputy Barnes, side of cliff, holding him in position, naked and delusional, |
| 21 | | need extricating from top of hill  (Ex 21, PCSD Radio Log Summary) |
| 22 | 11:59:50 | Deputy Barnes, 362, subject is combative (Ex 21, PCSD Radio Log |
| 23 | | Summary) |
| 24 | 12:05:52 | Deputy Barnes, have Meds respond (Ex 21, PCSD Radio Log Summary) |
| 25 | 12:07:13 | Deputy Ernest, 774: have Meds turn on street directly ifo (in front of) them, |
| 26 | | will lead to units (Ex 21, PCSD Radio Log Summary) |

12:07:34      Rural Metro at scene  (Ex 23, Rural Metro Patient Care Report)

12:08:23      Deputy Barnes, 362, still trying to manage him, have grip on him, still delusional and combative (Ex 21, PCSD Radio Log Summary)

12:13:00      Rural Metro at patient's side  (Ex 23, Rural Metro Patient Care Report)

12:15:54      Deputy Barnes, 362, Meds gave him meds (Ex 21, PCSD Radio Log Summary)

12:25:25      Deputy Brian Boll, 381, Search and Rescue, CPR in progress (Ex 21, PCSD Radio Log Summary

12:35:00      Rural Metro Transport  (Ex 23, Rural Metro Patient Care Report)

12:35:32      Deputy Boll, 381, Search and Rescue, Patient loaded, headed down (Ex 21, PCSD Radio Log Summary)

12:54:00      Rural Metro Arrival at Tucson Medical Center (Ex 23, Rural Metro Patient Care Report)

12:57:00      Rural Metro, Care Transferred to TMC (Ex 23, Rural Metro Patient Care Report)

85.      There is no evidence that Deputy Barnes requested or instructed Rural Metro (Meds) to sedate the patient because he was being combative.  On Exhibit 22, the Audio of the Pima County Sheriff's Department radio transmissions, at 9:00 minutes, the following exchange takes place on the radio:

407:  (Deputy Steve West, PCSD Search and Rescue)  And, uh, Rescue 407, do we have, uh, meds responding?  Maybe they can give him something to relax him or?

Dispatcher:  10-4.  I advised them and they're gonna be holding off 'til they're advised to move in.

407: … I don't know why they're holding off.  They have four deputies up the hill trying to hold the guy down from hurting himself, so if we could have a paramedic start making his way up to, uh, the deputies, let 'em know that it probably needs to be a, an ALS, uh, paramedic, and may be they can give the guy something.

(Ex 22, Audio Recording, PCSD Radio Traffic at 9:00 minutes; Ex 31, Transcript of 911 Calls/Radio Traffic, p. 8:2-9.)

DATED this 4th day of September, 2020.

*AUDILETT LAW PC*

/s/ Daryl Audilett

_____

Daryl A. Audilett
Attorney for Defendants Napier and Barnes

CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Shaun T. Kuter, Esq.
Paul J. Vaporean, Esq.
Goldman & Zwillinger, PLLC
17851 N. 85th Street, Suite 175
Scottsdale, AZ 85255
**Attorney for Plaintiffs**

Scott Zwillinger, Esq.
Witthoft Derksen, P.C.
3550 North Central Avenue, Suite 1006
Phoenix, AZ 85012
**Attorney for Plaintiffs**

Scott Reynolds, Esq.
Galen H. Satterlee, Esq.
SATTERLEE GIBBS, PLLC
3133 W. Frye Road, Suite 101
Chandler, AZ 85226
**Attorneys for Rural Metro**
**Fire Department and Reed**

By /s/ Karen Audilett