Scott H. Zwillinger (019645)
WITTHOFT DERKSEN, P.C.
3550 North Central Avenue, Suite 1006
Phoenix, AZ 85012
szwillinger@wdlawpc.com
paralegal@wdlawpc.com
*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Robert Steven Cutler, *et al.*

          Plaintiffs,

  v.

Mark Napier, Sheriff Pima County, *et al.*,

          Defendants.

No.: 18-CV-00383-FRZ

**COUNTERSTATEMENT OF FACTS IN SUPPORT OF THE RESPONSE IN OPPOSITION TO DEFENDANT DEFENDANTS BARNES NAPIER'S MOTION FOR SUMMARY JUDGMENT**

       Plaintiffs Robert Cutler, individually and on behalf of the Estate of David A. Cutler, Deceased, and Renee L. Cutler ("Plaintiffs") hereby submit their Counterstatement of Facts ("CSOF__) to Defendants Barnes and the Pima County Sheriff's Office Motion for Summary Judgment.

       1.     At around 9:40 a.m. on June 5, 2017, a Jeep Wrangler was reported to be on fire in a residential neighborhood in unincorporated Pima County. The Jeep belonged to David Cutler, a 23-year-old fit and healthy man who had been off-roading when he struck a tree with sufficient force to cause his car to be engulfed in flames.  Exhibit 1.

       2.     The area at issue contains large homes on large-lots but is residential in nature, located minutes from the heart of Tucson.  Exhibit 2, deposition of Kristen Powell pp 134:13-135:5.

3. The hills in the area can be "climbed" at a "leisurely pace" in "5 to 10 minutes." Exhibit 2, p:134.

4. David was not located at the accident, and a search began to locate accident victims. Exhibit 3, Christopher Davenport deposition, pp 23:7-20.

5. At the time, it was a typical summer day and the temperature began to rapidly climb to 100 F. Exhibit 3, pp 48:1-2.

6. At around 11 a.m., Kristen Powell, a resident of the neighborhood, heard a man yell "somebody help me." Exhibit 2, pp 68:5-12; 79:25-82:11.

7. 'From his tone, Mrs. Powell surmised he was "desperate" and not "angry at all," but instead wanted "help." *Id.*

8. The area behind her home is one where, despite being in the "middle of her neighborhood," people regularly hike because "you can get quite a view from up there, and it's something that's in town and go for a little hike." *Id.*

9. Mrs. Powell readily ascertained that the situation was "pretty serious." Exhibit 2, pp 58 :7-24; 82:17-83:6.

10. However, because she did not see anyone, she resumed caring for her granddaughter and watering plants. *Id.*

11. A short while later, at approximately 11:30 a.m., she again heard a cry for help and this time saw a man walking up a hill behind her home. *Id.*

12. This was David and Mrs. Powell called 911. She did so not out of "fear or personal safety," but as she explained:"…as a woman, as a mother, as a grandmother—you know, there was nothing that set off alarms for me. I just knew I wanted to get him help." *Id.*

13. While on the 911 call, Mrs. Powell observed that David was naked and walking up a path that was used by hikers. Exhibit 2, pp 87:2-4.

14. At the time it was hot and sunny. Exhibit 3 pp 23:7-20.

15. It is quite common for those under environmental stress to remove their clothing. Exhibit 4, deposition of Stephen Thornton, M.D. p 48-49.

16.     Thereafter, Defendant Barnes, who was usually assigned to Sabino Canyon High School ("SCHS") as a resource office responded to Mrs. Powell's call.  Exhibit 5, Deposition of Keith Barnes, pp 15:11-15; 12:4-8.

17.     The area was one that Barnes knew. *Id.*

18.     At the time, Barnes was in a convenience store after having responded to the Jeep fire and needing a drink to cool down from the conditions. Exhibit 5, pp 32:23-33:8.  Exhibit 10, deposition of Roy Taylor, pp 45:24-46:3.

19.     Barnes drove to the scene with his lights and sirens activated believing Mrs. Powell had spotted a victim of the accident and thus presenting an emergency situation because of both the car accident and heat. Exhibit 6, Transcript of statement of Keith Barnes, page 3, Exhibit 5, p:40:3-20.

20.     In regard to heat emergencies, Barnes had been trained on the "effects of heat on the body," and the urgent need for water, application of cool packs and the removal from the hot environment.  Exhibit 7.

21.     Barnes was further trained that heat exhaustion can progress to heat stroke which could lead to "altered mental status" and death.  Exhibit 7.

22.     Barnes also had been certified as an EMT and received training on heat emergencies in the US Air Force. Exhibit 5, pp 16:14-18:14.

23.     He was assigned to Saudi Arabia and monitored service members who were dealing with heat emergencies and personally moved such soldiers to shade and provided them fluids Exhibit 5, *id.*  Exhibit 9, Expert report of Roy Taylor.

24.     Heat stroke is caused by severe hyperthermia and is a life-threatening emergency that leads to rapid dysfunction and multiple organ damage. Exhibit 8, Expert report of Stephen Thornton, M.D., page 17.

25.     David demonstrated nearly every sign and symptom of heat stroke that Barnes had been trained on. Exhibit 8, page 19, Exhibit 7.

26.     Prompt institution of cooling measures would have saved David's life. Exhibit 8, page 17.

27.     David was suffering from an obvious heat emergency because he demonstrated nearly every sign and symptom of heat stroke that Barnes had been trained on. Exhibit 8, page 19.

28.     After Barnes arrived and parked in Mrs. Powell's driveway, he began to walk up the hill at a "normal" and unhurried pace. Exhibit 2, page 94;

29.     Barnes drew his baton and pepper spray as he walked up the hill. Exhibit 5; 42:3-13.

30.     When Barnes arrived at the top, Barnes observed that David was thin and bleeding from numerous abrasions. Exhibit 5, pp 46:20-47:6, Exhibit 3 pp 49:3-6.

31.     Despite having rubber gloves in his car, Exhibit 5, pp 22:22. Barnes did not wear gloves at any time while on the hill Exhibit 5, pp 90:10.

32.     At that point Barnes knew that David had been in an accident, was crying for help, and was unsure if the blood was caused by the accident, cactus needles and rocks or both. Exhibit 5, pp 46:20-48:5, Exhibit 6, page 3.

33.     Barnes also observed that David's stomach, chest and face were sunburned (Exhibit 6, page 15) and described David as "beet red, as red as a firebox" Exhibit 6, page 8.

34.     Barnes further noted that David's skin was dry and not sweaty.  Exhibit 6.

35.     Each of these are signs of a heat stroke emergency. Exhibit 10, pp 36:8-23.

36.     For his part, David turned towards Barnes and was alert, communicative and cooperative. Exhibit 6, page 7.

37.     For example, Barnes reported that David said something to the effect of "Hey, Deputy Barnes", stated his name was David, discussed his car and the accident ("…he said yeah, he got into an accident or something" and then referenced SCHS. Exhibit 6, pages 7, 14, 16, Exhibit 5, pp 45:5-22

38.     Barnes then told David to turn around so he could be placed in handcuffs. (Barnes Exhibit 6, page 14, Exhibit 5, pp 45:10-16.

39.     David complied, turned around on his own accord and stood there waiting to be cuffed. *Id.*

40. Barnes then handcuffed David without incident, including double locking the handcuffs which could not be done on a struggling person. *Id.*

41. At no point was David combative or threatening in any manner. *Id.*

42. Ms. Powell saw Barnes and David speaking and from their body language, tone and volume concluded that it was not a "life and death situation": "…it just looked like…standing…close to each other having a conversation…I didn't see anything that alarmed me, any physical actions or even arguing." Exhibit 2, pp 139:2-25.

43. Mrs. Powell was then called away but when she returned David was now on the ground with Barnes standing "away from him." Exhibit 2, p. 97

44. Critically, at this point, Mrs. Powell observed that David was ***still*** calm. Exhibit 2, pp 96:21-97:25.

45. This is because at this point David was not yet in heat stroke, was acting "relatively normal" and had not yet begun to experience altered mental status and end organ dysfunction. Exhibit 4, pp 64:4-18.

46. Dr. Thornton, a board certified emergency room physician and toxicologist, testified "At that point, in my opinion, he's not met the definition of heat stroke yet. Heat stroke implies end organ dysfunction, which you're kind of getting around to, which, as you're implying, the brain, the altered mental status. But, again, it's a spectrum, and it begins -- heat stroke just doesn't begin like that (snaps fingers). It's --obviously there's an exposure. There's stress. You go through different stages. Severe heat stroke, yes, you know, which is -- the end stage of that's environmental stress, you will have the dysfunction, the altered mental status. But I agree with you, at this point David Cutler is demonstrating that he's -- at least to that point, he's basically being able to sort of deal with the stress that the environment is putting on him as far as protecting the function of his brain." Exhibit 4, pp 56:1-57:1.

47. Dr. Thornton further testified: "At that point, I believe that he is not demonstrating end organ dysfunction, i.e., profound altered mental status. Again, he's just been in a car accident. I can't say that he's acting 100 percent rationally. From the -- what we know of his

interaction with Deputy Barnes, it seems like a very rational, following commands, doing what he's told, saying hello, that all seems very normal to me." Exhibit 4 pp 58:14-22

48.     From the -- what we know of his interaction with Deputy Barnes, it seems like a very rational, following commands, doing what he's told, saying hello, that all seems very normal to me. *Id.*

49.     At this point, David "was still in a condition that was savable, that his life could have been saved." Exhibit 4, pp 74:4-7.

50.     David's health deteriorated rapidly because of in large part the actions of Barnes who knew at this point that David:

- had been in a car accident severe enough to cause a car fire;

- had committed no crime;

- was communicative and indeed Barnes thought he recognized David as a former high school student who was not a troublemaker "He wasn't a troublemaker, no" pp 46:5-6]

- was compliant with his commands;

- had been exposed to the extreme heat of the desert for more than two hours; and

- was exhibiting signs of heat exhaustion and heat stroke that he was trained on by both the Pima County Sheriff's Office and the Military and as such desperately needed cooling and fluids.   Exhibit 8.

51.     Barnes repeatedly used force to drive David to the ground and pin him against cactus needless and burning hot jagged rocks that exceeded 140 F. Exhibit 4 pp 42:12-43:2.

52.     Repeatedly Barnes pulled David to the ground by his arms and used his boot to pin David's head and body against burning rocks and cactus needless. Exhibit 6, pages 7, 8.

53.     The evidence also suggests that Barnes used a leather necklace around David's neck to pull him to the ground and restrain him. Ex. 11, deposition of David Winston, M.D. pp. 53:12-24 and photographs, Exhibit 17.

54.     Pinning David to burning rocks and cactus needles worsened the emergency and David progressed from heat exhaustion to heat stroke.  Exhibit 8.

55. As the emergency progressed, for the first time David began to struggle but still did not kick or hit or otherwise threaten Barnes. Exhibit 6, page 8.

56. Instead, David simply tried to stand up undoubtedly to alleviate the pain he was experiencing. Exhibit 8.

57. Yet, at every turn, he was met with the brute force of Barnes. Exhibit 6.

58. Thornton further testified: Exhibit 4, pp:74:21-76:9 Tragically, "instead of intervening and doing the appropriate things, which would have taken very little effort on his part, they do the one thing that could make it worse, which is to restrain him, exacerbates the situation, get him agitated…He's now exposed to the ground soaking up that heat in a much larger surface area, and it just tips him over. And that's, unfortunately, why he is ends up dying."

59. At the same time, Barnes requested help but his words and actions labeled David as "combative" and suggested a dangerous situation that did not exist—Barnes fighting with a combative and violent individual--and ignored the real danger presented—the heat emergency that took David's life. Exhibit 4, pp 74:21-76:1, Exhibit 5, 58:5-20.

60. Barnes rather than reporting a heat emergency and seeking the tools needed to address that emergency that could have easily been brought to him—water and blankets (Exhibit 4, p 72) including the emergency blanket in his SUV Exhibit 5, p 22:2-9)--Barnes labeled David as combative and that Barnes was exhausted and in a dangerous situation. Exhibit 5, pp 78:18).

61. This labeling infected the other deputies and Rural Metro employees who in responding to the situation prepared to use force rather than render aid. Taylor Report 113 Reed stated "QUOTE ON QUICK AND EASY". Exhibit 14, statement of Grant Reed, page 7.

62. This is because the term combative suggests "aggressive assaultive behavior" that poses a danger to others. Exhibit 10, p 87; 94.

63. Yet, at no point did David threaten or "attack" the deputies. Exhibit 3, p 59:19-60:1.

64. A few minutes later, Deputy Davenport arrived at the scene and took over restraining David and pinning him to the ground Exhibit 6, page 8, Exhibit 3, p 59:19-60:1.

65. Two other deputies followed, Dittmer and Ernest. Exhibit 3, 54:4-55:11.

66. Before she walked up the hill, Barnes asked Dittmer to bring a RIPP restraint—and nothing else. *Id.*

67. After walking up the hill, Dittmer and Ernest assisted with restraining David and pinning him against cactus needless and burning rocks. *Id.*

68. Tragically, despite the fact that David had gone from compliant and communicative to disoriented and non-responsive, neither Barnes nor anyone attempted to hydrate, cool, shade or protect David from the burning hot rocks and cactus needles. Exhibit 8.

69. For example, despite asking Dittmer to bring the RIPP restraint, Barnes did not ask for the emergency blankets that he and other deputies have in their vehicles which could have provided shade and protected David from the rocks and needles.  Exhibit 6, Exhibit 3 pp 54:4-11.

70. Nor did Barnes seek water from the various deputies and responders or even Mrs. Powell--who would have readily provided Barnes with either. Exhibit 5, Exhibit 2, pp 85.

71. Indeed, Mrs. Powell to this day is troubled by the fact that neither Barnes, Reed nor anyone else brought David water. Exhibit 2, p 103, 107, Exhibit 12.

72. Nor did the deputies try to move David to the palo verde trees nearby for shade. Exhibit 10, pp 19:4-19; Exhibit 4 pp 69:24-74:22.

73. A reasonable officer would have recognized the obvious heat emergency and been "able to go down and…get water or blankets to…protect David from the environment and…begin some first aid treatment." *Id.*

74. This is because David "was demonstrating almost every sign and symptom that the Pima County Sheriff's Department own training on heat stroke listed…had no capacity to care for himself and was at the mercy of the paramedics and law enforcement officers to render appropriate treatment."  Exhibit 4, pp 70:1-71:5.

75. Instead, Barnes further exacerbated David's heat emergency and excruciating pain by instructing Depute Davenport to bring only a RIPP restraint (Exhibit 6, page 8) so David could be hog-tied and could not use his feet to get up off the ground (Exhibit 6, page 9).

76.     Yet, even when he was secured by handcuffs, the RIPP restraint and four deputies, Barnes again characterized David as "combative" and made no mention of the heat emergency or what he needed to address it.  Exhibit 5, pp 58:5-20.

77.     Barnes' actions not only affected the deputies' response but also perverted the medical response to David's heat emergency by causing Defendant Reed and others associated with Rural Metro to delay their response and suggest that David could not be treated and needed instead to be sedated.  Exhibit 13, Statement of Vince Figueroa page 2, Exhibit 10, p 13.

78.     Reed and Rural Metro were told multiple times to hold off and not respond because of the supposed danger. Exhibit 3:56:4-14, Exhibit 14, Statement of Grant Reed, page 1, Exhibit 15, Deposition of Grant Reed, pp 93.

79.     Indeed, Reed and his partner stayed inside the ambulance when they arrived at the scene. Exhibit 15, p 93.   As Davenport stated "…they were taking time to get there." Exhibit 3, 56:4-14.

80.     Reed's lights and sirens were not activates as he responded to the incident. Exhibit 2.

81.     Reed was told to respond but advised even then that the Pima County Sheriff's deputies wanted David sedated. Exhibit 6, page 17, Exhibit 14, page 1).

82.     Indeed, at approximately 11:59 Barnes radioed: "I don't know why they are holding off. There are four deputies holding him down to keep him from hurting himself. Have a paramedic make his way up to give the guy something."  Exhibit 16, radio call log.

83.     That David was combative was repeated to Reed when he reached the top of the hill despite the fact that David was hand cuffed, hog-tied, restrained by four deputies, not moving a lot, yelling a little bit and rapidly breathing.  Exhibit 14, page 2, Exhibit 13, page 3-4.

84.     That Barnes' actions affected the medical response is further evident from the observations of Mrs. Powell who never saw anyone running, jogging or even "moving quickly up the hill." Exhibit 2, p 128 Instead, she saw a "quiet scene," heard no calls for water or anything else, and saw that no one was "verbally or physically like hustling up." Exhibit 2, p 129.

85.     Mrs. Powell plainly stated, the responders' actions did not convey a "life or death situation." Exhibit 2, p 130; p 139.

86.     Barnes' actions rapidly accelerated the life-threatening heat emergency David was experiencing and deprived him of the ability to communicate or voluntarily respond further. Exhibit 8.

87.     As Dr. Thornton testified …he is exposed to the environment for 2½ hours. He climbs to a high point. He calls for help, which seems very rational. Calls for help. He meets a police officer. He greets that police officer by name. He complies with that police officer to become handcuffed, and then from that point -- again, we have somebody who's compliant, talking, conversing. From that point he is restrained. He is put on the ground. He becomes more and more agitated as he is basically being restrained and, again, put on the ground that is estimated to be 140°. Becomes more and more agitated. There is no intervention performed as far as trying to calm him down, cool him, any of those things.  And he becomes more agitated. They call for medical assistance. EMS arrives. He is given a dose of intramuscular ketamine. Seems to transiently improve, and then he stops breathing and dies.  Exhibit 4, pp 42:12-43:8

88.     Indeed, in part as a result of Barnes' action, Reed believed he was facing a quick and easy call and walked up the hill with nothing more than a needle filled with Ketamine to, as Defendants' requested, sedate David. Exhibit 14, page 7.

89.     At no point did Reed assess David or take any steps to treat David's heat emergency.  Exhibit 8.

90.     As a result of the actions of Barnes, Reed and the other responders, David needlessly died. Exhibit 8, Exhibit 9.

91.     It appears around 1 a.m. that David took a small dose of LSD. Exhibit 8.

92.     While LSD is an illegal drug that can cause hallucinations, it did not cause his death and indeed there is no evidence that it was still active in his system the next morning when he left his apartment, drove through Monday morning Tucson traffic, and headed east to go hiking—let alone when he had a car accident, potentially sustained injury, and sought help during the summer heat over the next three hours.   Exhibit 8.

93. Indeed, it is Dr. Thornton's opinion that David's behavior was inconsistent with LDS intoxication. Exhibit 4, p 41; 67.

94. Among other things, this is because the peak effects of LSD are typically seen with the first six hours of use and rapidly decline from there. Exhibit 4, Exhibit 8.

95. Moreover, it is rare that the effect would last 12 hours or more and indeed the amount of LSD in David's system was so small that it "would be expected to cause little if any symptoms" at the time of the accident. Exhibit 8, pages 14-15.

96. Perhaps more importantly, after the accident David exhibited rational behavior inconsistent with LSD intoxication because he "was completely lucid, following commands, talking and then becomes stressed, altered, agitated." Exhibit 4, p 67.

97. Moreover, LSD could not cause David's hyperthermia as doses ten-times larger have resulted in less than a two-degree rise in body temperature. Exhibit 8, P 15.

98. Dr. Winston testified at his deposition as that he would defer to a toxicologist regarding LSD's effect on the body. Exhibit 11, pp 75:21-90:1.

99. He further testified that how or if LSD affected David is uknown. *Id.*

100. LSD is used to treat depression in small doses. *Id.*

101. The main cause of David's death was hyperthermia. *Id.*

102. Dr. Winston did not know how much LSD contributed to David's death but agreed it could be one percent or less. *Id.*

103. Small doses of LSD do not meaningfully raise body temperature. *Id.*

104. Dr. Winston does not know if Ketamine is appropriate for someone in a similar situation and/or condition to David Cutler. *Id.*

105. The autopsy photographs demonstrate that pressure was put around David Cutler's neck. *Id.*

106. The marks on David Cutler's neck are consistent with the necklace he wore. *Id.*

107. Robert Cutler is the personal representative of David Cutler's estate. Exhibit 17.

108. Roy Taylor testified: I don't recall any that indicated first-, second- or third-degree burns. But, you know, given the actions when they're holding him down on these hot rocks, that

would certainly be a rational explanation for why his body is moving, is that he's being pressed down on a hot and uneven surface with, you know, objects that could easily, you know, cause pain. So it's not unreasonable that he was moving around or flailing around trying to get into a position of comfort when he's got four deputies pushing down on him trying to restrain his movements. Exhibit 10, p. 97: 9-19.

109. Barnes use of force was excessive. Exhibit 10., p. 73:4-24

110. Not only did Barnes use force to unnecessarily inflict pain on David but he repeatedly ignored the simplest of opportunities to end that pain and render aid. Exhibit 10, p. 105:21-106:18

111. As explained by expert Roy Taylor, "somebody should have been able to go down and…get water and blankets…to protect David from the environment…and begin some first aid." Exhibit 10, p. 19.

112. Barnes approached the matter with weapons drawn demonstrating a pre-determined mindset to use force that was not proportional to the situation presented. Exhibit 10, p. 64-65.

113. This mindset not only infected the actions of the other deputies who responded to Barnes' labeling of David as "combative" but needlessly escalated the situation. Exhibit 10, P 65; 86:16-87: 7; P. 94: 14-22

**RESPECTFULLY SUBMITTED** this November 2, 2020.

**WITTHOFT DERKSEN, P.C.**

*/s/ Scott H. Zwillinger*
Scott H. Zwillinger
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on this November 2, 2020 I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on all counsel of record via the Court's CM/ECF system.

*/s/ L. Simonini*