**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Steven Cutler, | No. CV-18-00383-TUC-JCH |
| Plaintiff, | **ORDER** |
| v. | |
| Christopher Nanos, et al, | |
| Defendants. | |

Before the Court is Defendants [Nanos's][1] and Barnes's Motion for Summary Judgment ("Motion"). (Doc. 125.) The Motion is fully briefed. (Response, Doc. 133; Reply, Doc. 145.) The Court will grant the Motion.[2]

## I.    INTRODUCTION

On the morning of June 5, 2017, David Cutler ("David") reached the top of a hill in Pima County, Arizona. The hill was rocky, rugged, sheer in some places, and covered with cacti and brush. David was naked, barefoot, covered in abrasions, and high on LSD.[3] The weather was hot.[4] A neighbor saw David and called 9-1-1. Deputies from the Pima County Sheriff's Department ("PCSD") and paramedics from Rural Metro Fire Department

---

[1] Pima County Sherriff Christopher Nanos has been substituted in place of former Pima County Sheriff Mark Napier. (Order, Doc. 153.)

[2] The Court finds the matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b).

[3] Lysergic acid diethylamide (David Winston, M.D., Ph. D., Deposition Tr., Doc. 126-1 at pp. 3-38.) LSD is often the drug that people are referring to when talking about "having a trip, getting high, having hallucinations." *Id*. at p. 38.

[4] The Tucson International Airport recorded the temperature at 11:30 a.m. that day to be "about 100 degrees Fahrenheit." (Report of Robert C. Curry, M.D., Doc. 145-1 at p. 9.)

("RM") responded to help David. But, tragically, David died. David's autopsy report gives his cause of death as hyperthermia[5] due to LSD toxicity, exposure to the elements, and "[t]ympanic[6] temperature 102.9 F at scene[.]" (Autopsy Report, Doc. 126-1 at p. 6.) Defendants Pima County Sheriff Christopher Nanos and Pima County Sheriff Deputy Keith Barnes ask the Court to find that Deputy Barnes was not deliberately indifferent in his rescue efforts and did not unlawfully interfere with David receiving medical treatment. Also, they assert that under the circumstances Deputy Barnes is entitled to qualified immunity. Finally, they seek judgment as a matter of law on Plaintiffs' state law wrongful death claim.

## II. FACTS

The facts are predominantly established through statements or testimony given by the responding deputies and RM responders, David's autopsy report, and the testimony of Pima County Medical Examiner, Dr. David Winston. The material facts are mostly undisputed. (*Compare* Defs. [Nanos's] and Barnes's Separate Statement of Facts in Support of Mot. for Summary J., Doc. 126, *with* Pls.' Controverting Statement of Facts, Doc. 135.)

### a. The Jeep Fire Call

On June 5, 2017, at approximately 9:40 a.m., PCSD units were dispatched to a possible structure fire in the vicinity of Melpomene and 22nd Street on the far east side of Tucson. (Doc. 126 at p. 9, ¶ 33; Doc. 135 at p. 2, ¶ 33.) There was a fire behind the property at 11260 E. Twin Hills Trail. (Doc. 126 at p. 10, ¶ 34; Doc. 135 at p. 2, ¶ 34.) But instead of a structure fire, the deputies found a burning Jeep Wrangler. (Doc. 126 at p. 10, ¶ 35; Doc. 135 at p. 2, ¶ 35.)

Deputy Christopher Davenport traced the Jeep's tire tracks and determined the Jeep had been driven through bushes, over cacti, and through a steep wash. (Doc. 126 at p. 10, ¶ 35; Doc. 135 at p. 2, ¶ 35.) The Jeep crashed into a palo verde tree, rolled backward, and caught fire, destroying it. (Doc. 126 at p. 10, ¶ 36; Doc. 135 at p. 2, ¶ 36.) Deputy Barnes

_____

[5] Increased body temperature. *Id*. at p. 37.
[6] Ear temperature. *Id*. at p. 38.

responded to the Jeep fire call and was on the scene for more than an hour. (Doc. 126 at p. 10, ¶ 37; Doc. 135 at p. 3, ¶ 37.)

RM paramedic Grant Reed ("Reed") and RM emergency medical technician Vince Figueroa also helped extinguish the Jeep fire. *Id*. (Doc. 126 at p. 10, ¶¶ 38-39; Doc. 135 at p. 3, ¶¶ 38-39.) The responding PCSD deputies searched for the Jeep's driver but found no one; it was later determined that the Jeep belonged to David. (Doc. 126 at p. 11, ¶ 39; Doc. 135 at p. 3, ¶ 39.)

**b. The Rescue Call**

At approximately 11:32 a.m., just under two hours after the Jeep fire call, Kristen Powell ("Powell") called 9-1-1 to report someone on the hill behind her home yelling for help. Powell reported that the person (later determined to be David) was naked. (Doc. 126 at p. 11, ¶ 40; Doc. 135 at p. 3, ¶ 40.)

Deputy Barnes saw on his patrol unit computer an "unknown problem" being input referencing the same area where the Jeep fire had been. Then there was a radio broadcast about a naked man standing on a hill east of the Powell residence yelling for help. Deputy Barnes assumed this naked man "call" was related to the fire call from two hours earlier and he responded with lights and siren. (Doc. 126 at p. 11, ¶ 41; Doc. 135 at p. 3, ¶ 41.) When Deputy Barnes reached the Powell residence, he saw David atop a hill naked and standing with his arms out in what appeared to him like a "Jesus-on-the-cross" pose. (Doc. 126 at p. 11, ¶ 43; Doc. 135 at p. 3, ¶ 43.) PCSD call logs establish the following timeline, which is undisputed:

11:33:52 Powell calls 9-1-1
11:34:24 Deputy Barnes is en route to the call
11:39:50 Deputy Barnes sees David on top of the hill
11:46:59 Deputy Barnes is with David on top of the hill
11:47:20 Deputy Barnes requests an ambulance and tells dispatch "I'm going to need meds"
11:48:00 Rural Metro receives the call and is dispatched
11:48:58 Deputy Davenport is west of the hill and has Deputy Barnes in sight
11:49:00 Rural Metro is en route

11:50:25 Deputy Barnes reports that David is delusional and has blood on his face
11:53:22 Deputy Barnes reports David is trying to roll down the hill
11:53:58 Deputy Davenport is with Deputy Barnes and David at the top of the hill
11:58:49 Deputy Barnes reports that he is on the side of a cliff, holding David in position and that David is naked, delusional and needs extricating from the top of hill
11:59:50 Deputy Barnes reports that David is "combative"
12:05:52 Deputy Barnes requests again that "meds," *i.e.*, Rural Metro, respond
12:07:13 Deputy Ernest arrives and requests to have Rural Metro turn on street directly in front of them so he can lead them to the scene
12:07:34 Rural Metro arrives on scene
12:08:23 Deputy Barnes reports he is still trying to manage David, that he has a grip on him, and David is still "delusional" and "combative"
12:13:00 Rural Metro is at David's side
12:15:54 Deputy Barnes reports that Rural Metro gives David medication
12:25:25 Deputy Brian Boll with Pima County Search and Rescue records CPR is in progress
12:35:00 Rural Metro transports David
12:35:32 Deputy Boll reports David is in the ambulance
12:54:00 Rural Metro arrives at Tucson Medical Center
12:57:00 Rural Metro transfers David's care to Tucson Medical Center

(Doc. 126 at pp. 24-25, ¶ 84; Doc. 135 at p. 4, ¶ 84.) David was declared dead in the Tucson Medical Center emergency room at 1:08 p.m. (Dr. Stephen Thornton Report, Doc. 134-8 at p. 14.).

### c. The Autopsy

On June 7, 2017, Pima County Medical Examiner David Winston, M.D., Ph. D, conducted an autopsy on David's body. (Doc. 126-1 at pp. 5-16.) Dr. Winston's pathologic diagnoses were hyperthermia from exposure to the elements, LSD toxicity, and "tympanic temperature 102.9[]F at scene[.]" *Id*. at p. 6. Dr. Winston opined:

> In consideration of the known circumstances surrounding this death, the available medial history and the examination of the body, the cause of death for David Cutler is ascribed to hyperthermia due to exposure to the elements and lysergic acid diethylamide toxicity.

(Doc. 126-1 at p. 6.) The autopsy toxicology report established that David's blood tested positive for Naloxone, LSD, and Ketamine. (Axis Forensic Toxicology Report, Doc. 126-1 at pp. 18-19.) David's blood LSD concentration is recorded as 0.12 ng/ml. *Id*. at p. 19. Dr. Winston discussed whether to include Ketamine as the cause of death with Plaintiff Robert Cutler, David's father, but declined to do so. (Doc. 126-1 at p. 44.) Dr. Winston testified that he is "absolutely" confident LSD was a factor in David's death. *Id*.

Dr. Winston recorded abrasions on David's face and neck. *Id*. at p. 8. No skull fractures or neck muscle hemorrhages were found. *Id*. Dr. Winston recorded abrasions on David's chest, abdomen and back. *Id*. at p. 9. David had abrasions and contusions on both upper extremities as well as blisters on his hands and feet. *Id*. Dr. Winston recorded no abnormalities of David's neck soft tissues, strap muscles and large vessels. *Id*.

## III. THE FIRST AMENDED COMPLAINT

Plaintiffs are David's parents suing in their individual capacity. David's father is also suing as administrator of David's estate. (First Amended Complaint, Doc. 55.) Pursuant to 42 U.S.C. § 1983, Count One claims a violation of the Eighth Amendment's prohibition on cruel and unusual punishment, a Fourth Amendment excessive force violation, and a Fourteenth Amendment deliberate indifference claim. Plaintiffs allege Deputy Barnes was deliberately indifferent by (1) subjecting David to excessive force during his rescue efforts and (2) depriving him of medical care. Count Two alleges wrongful death in violation of Arizona law. *Id*. at pp. 12-13. Plaintiffs allege Deputy Barnes breached his duty of care to David by using excessive force, failing to provide immediate medical care to David, and requesting sedation when he knew or should have known it was unnecessary and potentially dangerous. *Id*. at p. 12, ¶ 118. Plaintiffs also seek an award of punitive damages. *Id*. at p. 13.

## IV. THE MOTION FOR SUMMARY JUDGMENT

Deputy Barnes and Sheriff Nanos seek summary judgment on all claims. (Doc. 125 at pp. 10-18.) Deputy Barnes argues the Eighth Amendment does not apply because David was not a convicted prisoner. *Id*. at p. 11. He argues Plaintiffs cannot recover under the Fourth Amendment because an excessive force claim cannot be asserted vicariously. *Id*. at

p. 10. He argues the Fourteenth Amendment claim fails because his conduct on June 5, 2017, was objectively reasonable and he is entitled to qualified immunity. (Doc. 125 at pp. 11-13.) He argues Plaintiffs' state law wrongful death claim fails because there is no evidence that he breached a duty to David. *Id*. at pp. 14-17. Sheriff Nanos is alleged to be vicariously liable for Deputy Barnes's conduct with respect to the state law wrongful death claim[7] such that if Deputy Barnes is entitled to summary judgment so is Sheriff Nanos.

## V. SUMMARY JUDGMENT STANDARD

A motion for summary judgment is used "to isolate and dispose of factually unsupported claims." *Celotex Corp v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Summary judgment is appropriate when there is no genuine issue as to any material facts thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute of a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. "If the moving party fails to meet its initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence." *Eldridge-Murphy v. Clark County School Dist.*, No. 2:13-cv-02175-JCM-GWF, 2015 WL 224416, at *2 (D. Nev. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970)). "If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists." 2015 WL 224416, at *3 (D. Nev. 2015) (citing *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).

---

[7] Vicarious liability is inapplicable to § 1983 suits. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)).

"To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor." *Eldridge-Murphy,* 2015 WL 224416, at \*3. "It is sufficient that 'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* (quoting *T.W. Elec. Serv., Inc. v. Pac. Elev. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987)). At the summary judgment stage, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in the nonmovant's favor. *Eldridge-Murphy,* 2015 WL 224416, at \*3 (citing *Anderson*, 477 U.S. at 249). "But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted." *Eldridge-Murphy,* 2015 WL 224416, at \*3 (citing *Anderson*, 477 U.S. at 249–50). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the nonmovant. *Anderson*, 477 U.S. at 252.

## VI. THE EIGHTH AMENDMENT CLAIM

The cruel and unusual punishment clause of the Eighth Amendment does not apply until an individual has been convicted. *See City of Revere v. Massachusetts General Hosp*., 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L .Ed. 2d 605 (1983). David was not a convicted prisoner. Accordingly, summary judgment on this claim follows.

## VII. THE FOURTH AMENDMENT CLAIM

"Fourth Amendment rights are personal and may not be asserted vicariously." *Adame v. City of Surprise*, No. CV-17-03200-PHX-GMS, 2019 WL 2247703, at \*2 (D. Ariz. May 24, 2019), *rev'd and remanded sub nom. Adame v. Gruver*, 819 F. App'x 526 (9th Cir. 2020) (citing *Alderman v. United States*, 394 U.S. 165, 174 (1969)). "Fourth Amendment standing law applies to claims made against public officials and entities." *Adame v. City of Surprise*, 2019 WL 2247703, at \*2 (citing *Longoria v. Pinal Cty*., No. CV-15-00043-PHX-SRB, 2015 WL 13654010 at \*2 (D. Ariz. April 15, 2015)). Where plaintiffs bring § 1983 actions, "the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action." *Adame v. City of Surprise,*

2019 WL 2247703, at *2 (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998)).

Arizona law authorizes a survival action by a personal representative of the decedent's estate. *See* ARIZ. REV. STAT. § 14-3110. If a representative of the decedent's estate does not bring the claim under the Fourth Amendment, that claim cannot proceed. *Adame*, 2019 WL 2247703, at *2 (citing *Smith v. City of Fontana*, 818 F.2d 1411, 1417 (9th Cir. 1987) ("The children were not directly subjected to the excessive use of state force and therefore cannot maintain personal causes of action under section 1983 in reliance on this Fourth Amendment theory."), *overruled on other grounds, Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999) (*en banc*)).

Here, Plaintiff Robert Cutler is suing as Administrator of the Estate of David Cutler. (Doc. 55.) Thus, David's estate can assert a Fourth Amendment claim. However, Deputy Barnes and Sheriff Nanos point out that ARIZ. REV. STAT. § 14-3110 provides that "upon the death of the person injured, damages for pain and suffering of such person shall not be allowed." They contend there is no evidence of economic loss to David's estate upon which a jury could base an award. Plaintiffs do not point to any evidence of economic loss to David's estate or address Defendants' argument. *See* Doc. 133. The Court finds no evidence of economic loss in the record and so summary judgment is appropriate. Also, as explained below, the Court finds that Deputy Barnes's use of force was objectively reasonable as a matter of law which is a separate basis for granting summary judgment. Finally, the Court finds below in Section VIII(d), that Deputy Barnes is entitled to qualified immunity and this is a third ground for summary judgment. Accordingly, the Court will grant summary judgment on the Fourth Amendment claim.

## VIII.  THE FOURTEENTH AMENDMENT CLAIM

Plaintiffs' allegations against Deputy Barnes on this claim are twofold: They allege (1) he used excessive force in his efforts to restrain David; and (2) his actions (or lack of action) with regard to David's medical needs were unlawful. Plaintiffs' medical needs claim is itself twofold. First, Plaintiffs argue Deputy Barnes failed to provide David with "the most basic of first aid … by failing to cool David via shade and water until additional

help could arrive." (Doc. 133 at p. 14.) Second, they argue Deputy Barnes caused David to receive delayed medical care by labeling him as "combative" and presenting a danger. *Id.* at p. 16. They claim that as a result of labeling David combative, Deputy Barnes "at least contributed to [RM paramedic] Reed's decision to ignore the obvious heat emergency and inject David with the powerful sedative Ketamine." *Id.* at pp. 16-17.

The Court begins with the excessive force claim and then addresses the medical care claim.

### a. Excessive Force Facts: Deputy Barnes's Restraint of David

At 11:33:52, homeowner Powell called 9-1-1. Pima County dispatch classified Powell's 9-1-1 call as an "unknown problem" call. At 11:34:24, Deputy Barnes is "en route" to the call.

At 11:39:50, Deputy Barnes gained sight of David on the hill behind Powell's home. He tried to use his PA system to order David to walk down to him, but the PA system did not work. So, Deputy Barnes yelled to David, identifying himself as a sheriff's deputy, said that he was there to help, and asked David to come down. Rather than come down, David headed east from the top of the hill away from Deputy Barnes. Deputy Barnes could hear David yelling but could not understand what he was saying. (Doc. 126 at p. 12, ¶ 44; Doc. 135 at p. 3, ¶ 44.)

Deputy Barnes started to climb the hill maneuvering about a quarter mile through brush, cacti, and loose rock. Deputy Barnes could not maintain visual contact with David, so he would walk for a period of time and then stop to catch his breath and look up to find David. (Doc. 126 at p. 12, ¶ 45; Doc. 135 at p. 3, ¶ 45.) While ascending, Deputy Barnes would yell "sheriff's department, come back towards me, I'm here to help." At one point, David looked over towards Deputy Barnes and Deputy Barnes realized David was naked. Deputy Barnes yelled at him to stop, come down, and walk towards him. David did not come down or walk towards Deputy Barnes. (Doc. 126 at pp. 12-13, ¶ 46; Doc. 135 at p. 3, ¶ 46.)

At 11:46:59, Deputy Barnes reached the top of the hill. His ascent took approximately 7 minutes and 9 seconds. At the top of the hill he announced, "sheriff's

department" and asked David to come towards him. David stopped and put his head down and while looking down started yelling, "Just decapitate me, just decapitate me." (Doc. 126 at p. 14, ¶ 52; Doc. 135 at p. 3, ¶ 52.) Deputy Barnes put his baton away, pulled out his pepper spray and told David, "Don't make me spray you." Deputy Barnes told David that he wanted to handcuff him. David complied and Deputy Barnes handcuffed him. (Doc. 126 at p. 14, ¶ 53; Doc. 135 at p. 3, ¶ 53.) Deputy Barnes thought he may have recognized David from a prior contact. David said, to the effect, "Hey, Deputy" or "Hey Deputy Barnes." Deputy Barnes said, "Hey, what's going on?" and David said something about his car. It turned out that David was not the person about whom Deputy Barnes was thinking. (Doc. 126 at p. 15, ¶ 54; Doc. 135 at p. 3, ¶ 54.)

At 11:50:25, three and a half minutes after reaching David at the top of the hill, Deputy Barnes announced to dispatch, "I'm not quite sure how I'm going to get him down. He's delusional and bleeding from the face." (Doc. 126 at p. 15, ¶¶ 55-56; Doc. 135 at p. 3, ¶¶ 55-56.) David was covered with blood from head to toe. Deputy Barnes asked him if he was able to walk back. David said, "I don't want to go back, I don't want to go back," pulled away from Deputy Barnes and motioned like he was going over the other side of the hill. Deputy Barnes grabbed David's arm and took him to the ground. (Doc. 126 at p. 15-16, ¶ 57; Doc. 135 at p. 3, ¶ 57.)

Once on the ground David started shaking, yelling, and saying something about bombing Iraq. David said he was "sorry for his parents" and that he "wants to say goodbye to his mom." He started talking about the devil and said, "if we don't kill the devil, we'll never be able to finish the wars." (Doc. 126 at p. 16, ¶ 58; Doc. 135 at p. 3, ¶ 58.[8])

At 11:53:22, Deputy Barnes radioed to dispatch, "He's trying to roll down the hill now." In an effort to prevent David from rolling down the hill Deputy Barnes grabbed David's arm and David stood up. Deputy Barnes then grabbed David's other arm and

---

[8] Plaintiffs' dispute this statement but fail to comply with LRCiv 56.1(b)(1)'s requirement that in disputing a fact, a party is required to cite to the precise portion of the record that disputes the fact. Plaintiffs cite to Dr. Stephen Thornton's entire report in dispute of Deputy Barnes's account that David started shaking, yelling, and talking nonsense. The Court finds that Dr. Thornton's report does not create a genuine dispute of material fact.

directed him to the ground. There was no shade to put David under. Deputy Barnes described David as "red as a firebox." (Doc. 126 at p. 16, ¶ 59; Doc. 135 at p. 3, ¶ 59.[9])

Once back on the ground, David began banging his head on the rocks, so Deputy Barnes put his foot under David so that David was banging his head on Deputy Barnes's right boot. By banging his head on both the ground and Deputy Barnes's boot, David opened up a gash by his right eye that, according to Deputy Barnes, "was bleeding pretty good." (Doc. 126 at p. 16, ¶ 60; Doc. 135 at p. 3, ¶ 60.[10]) As a result, Deputy Barnes "start[e]d trying to stabilize [David] again." David started kicking and flailing and tried to roll down the hill again a couple of times. (Doc. 126 at p. 17, ¶ 61; Doc. 135 at p. 3, ¶ 61.[11])

At 11:53:58, Deputy Davenport arrived at the scene after hiking from the Jeep fire scene. According to Deputy Steven West, Pima County Sheriff's Office Search and Rescue ("Search and Rescue"), the Jeep fire scene was about a half mile, if not further, away. Deputy Davenport said David was trying to get up and run and they wanted to prevent him from doing that. Deputy Davenport also reported that David kept trying to roll down the hill. (Doc. 126 at p. 17, ¶ 62; Doc. 135 at p. 4, ¶ 62.)

Deputy Davenport described David as "combative" because he was not listening to commands, kept trying to get away to roll down the hill, and was thrashing his feet and legs about. Whether or not David was trying to kick the deputies, Deputy Davenport did not know. (Doc. 126 at p. 17, ¶ 63; Doc. 135 at p. 4, ¶ 63.)

Thereafter, Deputy Nadeen Dittmer arrived with a RIPP[12] restraint to control David's feet and legs. Even though Deputy Barnes was holding David's feet, David was "just flipping around like a, a gator." (Doc. 126 at p. 17, ¶ 64; Doc. 135 at p. 4, ¶ 64.)

---

[9] Plaintiffs' dispute this statement but fail to comply with LRCiv 56.1(b)(1). Plaintiffs cite to Dr. Thornton's entire expert report, Dr. Roy Taylor's entire expert report, Dr. Winston's entire autopsy report and Powell's entire deposition excerpt in dispute of Deputy Barnes's account that David was trying to roll down the hill, that there was no shade, and that David was red. The Court has reviewed all of the referenced materials and finds that none of them create a genuine dispute of material fact.

[10] *Id.*

[11] *Id.*

[12] A "RIPP" is a restraining device applied to a person's legs. *See* RIPP™ RESTRAINTS INTERNATIONAL, INC., https://www.rippinternational.com/about-ripp-restraints.html (last visited June 29, 2021).

Deputy Davenport held David's upper body while Deputies Dittmer and Barnes "put the loop around [David's] ankles" and then "attached the clip to the handcuffs." (Deputy Christopher Davenport Recorded Statement, Doc. 126-2 at p. 7.) According to Deputy Barnes, after the RIPP restraint was applied, it was not possible for the three deputies to carry David down the hill because he kept kicking and bucking. The three deputies—Barnes, Davenport, and Dittmer—carried David about ten feet but they started losing footing and traction on the hillside and were unable to proceed further. (Doc. 126 at p. 19, ¶ 66; Doc. 135 at p. 4, ¶ 66.[13]) David continued to attempt to roll down the hill. He rolled into a really thick, thorny bush which contacted his genital area, and he did not react to it. At 12:07:13, Deputy Ernst arrived on the scene. (Doc. 126 at p. 19, ¶ 67; Doc. 135 at p. 4, ¶ 67.)

While waiting for Rural Metro and Search and Rescue to arrive, the deputies were able to move David about 15 or 20 feet to a clear area free of cactus and things that might hurt him. (Doc. 126 at p. 20, ¶ 68; Doc. 135 at p. 4, ¶ 68.) The deputies believed the assistance of Search and Recuse was necessary because of their expertise and the location of the incident on the hill. (Doc. 126 at p. 20, ¶ 69; Doc. 135 at p. 4, ¶ 69.) Deputy Dittmer described the ground terrain as "rocky, very slippery, with a lot of [...] brush and cactus." Deputy Davenport described the ground terrain as "very rocky," "[s]uper rocky," "[a] lot of brush," "thick thorny brush," "definitely not soft ground at all," "definitely an incline," "about 20 degrees," "fairly steep," and that he was slipping "all sorts" on the rocks. Deputy West with Search and Rescue described the terrain as "fairly steep," and "probably about a 30 foot, 30-degree angle, loose rocks, [and] lots of cactus." (Doc. 126 at p. 20, ¶ 70; Doc. 135 at p. 4, ¶ 70.)

At 12:07:34, Rural Metro arrived at the bottom of the hill. Paramedic Reed's Patient Care Report establishes that Reed was at David's side at 12:13:00. (Rural Metro/Pima Patient Care Report, Doc. 126-2 at p. 53.) The PCSD Radio Log Summary Report reflects

_____

[13] Plaintiffs' dispute this statement but fail to comply with LRCiv 56.1(b)(1). Plaintiffs cite to Dr. Taylor's entire expert report and Dr. Taylor's entire deposition testimony excerpt. The Court has reviewed the materials and finds they do not create a genuine dispute of material fact.

that Deputy Barnes stated to dispatch that "meds gave him meds." The Radio Traffic audio records Deputy Barnes announcing that "meds are on scene, just gave him some medication." (Doc. 126 at pp. 20-23, ¶¶ 71-72, 78; Doc. 135 at p. 4, ¶¶ 71-72, 78.) Deputy Barnes was referring to RM Reed injecting David with Ketamine.[14]

### b. Excessive Force Standard

The reasonableness of a particular use of force is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). The reasonableness calculus considers that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force necessary in a particular situation. *Id.* To assess the reasonableness of the officers' action, the court must compare the amount of force used with the government interests at stake. *Id.* at 396. Whether a particular use of force is objectively reasonable depends on several factors, including the severity of the crime that prompted the use of force, the threat posed by a suspect to the police or to others, and whether the suspect is resisting arrest. *Id. See also, Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015) ("Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." (citing *Graham,* 490 U.S. at 396, 109 S. Ct. 1865.").

The most important *Graham* factor is whether the suspect poses an immediate threat to the safety of the officer or others. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). The United States Court of Appeals for the Ninth Circuit has also held, "[t]hese factors, however, are not exclusive." *Id.* "Rather, [the court] examines the totality of the circumstances and considers 'whatever specific factors may be appropriate in a particular

---

[14] Ketamine is a drug used for chemical sedation. (Doc. 126 at p. 23, ¶ 81, 78; Doc. 135 at p. 4, ¶ 81.)

case, whether or not listed in *Graham*.'" *Id*. (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994))). *See also, Kingsley*, 576 U.S. at 397, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (holding the enumerated factors are "only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force").

"At the summary judgment stage, once the Court has 'determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record,' the question of whether an officer's actions were objectively reasonable … is 'a pure question of law.'" *Krause v. Cnty. of Mohave*, No. CV-17-08185-PCT-SMB, 2020 WL 2541728, *5 (D. Ariz. May 18, 2020) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8, 127 S. Ct. 1769, 167 L .Ed. 2d 686 (2007)). *See also, Whitaker v. Pima Cnty.*, 640 F. Supp. 2d 1095, 1102-03 (D. Ariz. 2009) (where the essential facts are undisputed, the reasonableness of the officer's actions is properly determined by the court (citing *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1099 (9th Cir. 1995)).

### c. Deputy Barnes's Restraint of David Was Objectively Reasonable

When Deputy Barnes reached the top of the hill, he saw that David was naked, barefoot, and covered in abrasions and blood. David was initially cooperative, and Deputy Barnes put away his baton. He handcuffed David without incident. Deputy Barnes radioed to dispatch and questioned how he was going to get David off the hill.

Plaintiffs assert that after being handcuffed David began resisting because Deputy Barnes made him sit on the ground. However, the record establishes that immediately after Deputy Barnes asked David if he could walk down the hill David said that he did not want to go down and then tried to go over the side of the hill. David was delusional. Plaintiffs' assertion that David began resisting because Deputy Barnes made him sit on the ground is unsupported by the record and speculative at best.

Plaintiffs argue that "[Deputy] Barnes chose to repeatedly take David to the ground by his arms and the leather necklace he wore despite knowing that the burning jagged rocks and cactus needles on the desert floor would inflict pain." (Doc. 133 at pp. 11-12.) They urge the evidence establishes that when David "reflexively reacted by attempting to get up

and stop the pain, Barnes used that reflex to justify even more force—such as directing three other deputies to forcibly pin David to the ground and hobbling him with a RIPP restraint." *Id*. at 12. As explained below, Plaintiffs' speculative averments are unsupported by the record.

Dr. Winston did not find bruises on David's neck. (Doc. 126-1 at p. 8, "The neck musculature is without hemorrhage."). Dr. Winston testified no blunt trauma contributed to David's death. *Id*. at pp. 38-39. Dr. Winston concluded David was not strangled, that he "ruled [strangulation] out because he did not see any hemorrhage in his neck[,]" and that the mark on David's neck was "just scraping of the skin." *Id*. at pp. 39, 41. There is no evidence to support Plaintiffs' claim that Deputy Barnes repeatedly took David to the ground by his leather necklace. But he did take him to the ground repeatedly in some fashion and, to the extent that he did, that was reasonable to prevent David from going off the side of the hill or fleeing into the desert. Deputy Barnes was trying to protect David from further hurting himself and get him off the hill and into an ambulance.

Plaintiffs also allege that Deputy Barnes held David's head down with his boot. Dr. Winston found no skull fractures or bleeding around David's brain. (Doc. 126-1 at p. 39.) Dr. Winston testified that his examination of David's head revealed only "scrapes of the skin" and "skin disruption." *Id*. Plaintiffs' assertion that Deputy Barnes held David's head down with his boot is contrary to the medical examiner's undisputed testimony. And none of the witnesses testified that this happened. The undisputed testimony is that David was banging his head on the ground and Deputy Barnes put his right boot under David's head to protect David from the rocks.

Plaintiffs argue Deputy Barnes pinned David to "hot jagged rocks and cactus needles." (Doc. 133 at p. 10.) Again, no testimony supports this claim and Dr. Winston did not see any burns on David consistent with David being held down on the ground or hot rocks. (Doc. 126-1 at p. 40.) Dr. Winston testified that David's feet "were more dirty than burnt." *Id*. Plaintiff's expert Dr. Roy Taylor testified that he did not recall any evidence that indicated that David suffered first-, second- or third-degree burns. (Dr. Roy G. Taylor, Deposition Tr., Doc. 134-10 at p. 13.) RM paramedic Reed testified that he saw four PCSD

deputies holding David, "basically suspended up off the ground." (Grant Reed Deposition Tr., Doc. 126-2 at p. 36.) Reed further testified, "I would assume to not allow him to be face down on the ground burning … My assumption would be that they were holding him up because if he was on the ground, he would be pretty uncomfortable." *Id.*

Other courts have found similar officer conduct to objectively reasonable, i.e., not deliberately indifferent, as a matter of law. For instance, in *Abbey v. City of Reno*, No. 3:13-CV-0347-LRH-VPC, 2015 WL 13547828, at *6 (D. Nev. Mar. 30, 2015), *aff'd*, 690 F. App'x 538 (9th Cir. 2017), officers faced "a serious safety issue" when they confronted an individual who claimed to be hearing voices and had caused himself physical injury. The individual actively resisted the officers' attempts to restrain him and attempted to flee and escape through a window. *Abbey*, 2015 WL 13547828, at *6. When the individual's escape was unsuccessful, he fought with the officers for 15 minutes and "[d]uring that time he continuously struggled with the officers, kept pulling his hands beneath him, and tried to buck the officers off of him so that he could try and stand." *Abbey*, 2015 WL 13547828, at *6. After allowing his hands to be handcuffed behind his back he continued to struggle with the officers, flailing his legs about. The officers' use of force was found to be objectively reasonable under the totality of the circumstances. *Id.* (citing *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2003)).

*Abbey* relied upon *Tatum v. City and Cnty. of San Francisco*, 441 F.3d 1090 (9th Cir. 2006). In *Tatum*, the record established the suspect was kicking a police station door for "no reason," that he refused to obey an officer's commands to stop, and that he resisted arrest by spinning away from the officer. *Id.* at 1096. The record also established that the suspect died as a result of cocaine toxicity. *Id.* The court of appeals held the officer's use of a control hold on the suspect was objectively reasonable under the circumstances. *Id.* The appeals court noted that "[w]hile the criminal conduct underlying Fullard's arrest was not severe, he posed a threat to himself, to the police, and possibly to anyone who passed by him." *Id.* at 1096-97.

The Court is persuaded by *Abbey* and *Tatum*. Upon reaching David at the top of the hill Deputy Barnes saw that he was delusional, naked, covered in abrasions and bleeding.

Deputy Barnes was able to initially communicate with David. However, after Deputy Barnes asked David if he could walk down, David said he did not want to go and attempted to "go off" the side of the hill. Deputy Davenport tried to talk to David and get his name, but he "didn't hear a single English word [come] out of [David's] mouth [that he] could comprehend or understand." (Doc. 126-2 at p. 6.) Deputy Dittmer described David as, "not making out any words but he definitely [was] moaning, making noises … act[ing] like he was intoxicated[]" and "… doing things that a reasonable person would not be doing." (Recorded Statement of Nadeen Dittmer, Doc. 126-2 at p. 85.)

All deputies who assisted in the rescue effort uniformly describe the hill as steep, rocky, and cliff-like. The Court has reviewed the drone footage of the area and agrees with this characterization. The area is rugged and at the top of the hill there are rocky areas that are cliff-like. Homeowner Powell also testified that the hill is "more dense than the aerial looks." (Kristin Powell Deposition Tr., Doc. 134-2 at p. 5.) David plainly needed help and medical assistance.[15] Given the challenging location and David's physical and mental condition, Deputy Barnes acted reasonable by restraining David so that he would not further injure himself or flee.

The Court is also persuaded by *Ames v. King Cnty., Washington*, 846 F.3d 340, 348-49 (9th Cir. 2017), where the United States Court of Appeals for the Ninth Circuit held the *Graham* factors weighed in favor of the deputy on the plaintiff's excessive force claim. In *Ames*, the plaintiff came home to find her son slumped over and evidence around him suggested he had made a suicide attempt. *Id*. at 343. A 9-1-1 call was placed, and the plaintiff, using her vehicle, interfered with medical personnel's efforts to enter the scene and help her son. *Id*. at 344. The responding deputy pulled the plaintiff from her truck, slammed her head three times, and pinned her to the ground in order to subdue her. *Id*.

The court of appeals noted that the deputy was responding to a 9-1-1 call and acting in her capacity as community caretaker. *Id*. at 348. Framed this way, the court of appeals

---

[15] Within seconds of reaching David at the top of the hill Deputy Barnes radioed to dispatch that he was "going to need meds." (Doc. 126-2, Ex. 22 at 4:18-4:24.) *See also*, pp. 25-27, *infra*.

held the first *Graham* factor—the severity of the crime at issue—weighed in the deputy's favor because the focus was on the seriousness of the medical situation that was unfolding rather than on "the misdemeanor crime of obstruction" allegedly being committed by the plaintiff. *Id*. at 349. As to the second *Graham* factor—whether the plaintiff posed a danger to the deputy or others—the court held the plaintiff was most certainly a danger to the apparent suicide victim whose access to medical care she was delaying. *Id*. Lastly, the court of appeals held the government interests at stake—the victim's need for emergency medical care and the need to protect the first responders from potential harm—outweighed any intrusion on the plaintiff's Fourth Amendment rights. *Id*. Thus, the deputy's use of force was reasonable under the circumstances.[16] *Id*. at 350.

  *Ames* is instructive here. Plaintiffs point out the first *Graham* factor speaks to the "severity of the crime at issue" and, given that David had committed no crime, they contend that this factor should weigh against the PSCD Defendants. It is true that David was not accused of committing any crime when Deputy Barnes reached him at the top of the hill. However, as noted by the court of appeals in *Ames*, when an officer is performing in their community caretaking role the focus of the first *Graham* factor is more appropriately framed as the severity of the medical condition in issue—here, David's—and David's resistance to the deputies' efforts to get him down the hill to treat his medical emergency. When viewed in this manner, the Court finds the first *Graham* factor weighs in Deputy Barnes's favor.

  The second *Graham* factor—whether David presented a danger to others—also weighs in Deputy Barnes's favor. David clearly presented a high danger to himself. David was in distress and unable to care for himself because he was delusional. He attempted to "go off" the side of the steep and rocky hill more than once. Not only did David present a danger to himself, but he also presented a danger to the RM paramedics and deputies responding to the 9-1-1 call. Indeed, the record is undisputed that Deputy Barnes told Deputy West of Search and Rescue that he and the other deputies were holding David to

---

[16] The Ninth Circuit also determined the deputy was entitled to qualified immunity for her actions. *Id*. at 350.

prevent him from going over the side of a cliff and they needed help in getting him down from the hill. As to the last *Graham* factor—the government's interest at stake—the Court determines that David's need for emergency medical care and the need to protect the deputies and RM paramedics from potential harm outweighs any intrusion on David's constitutional rights that occurred.

Plaintiffs rely solely on *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). (Doc. 133 at pp. 12-13.) There, the trial court granted a directed verdict in favor of the defendant officers because Santos could not recall the precise manner in which his injury (a broken back) occurred. *Id*. at 851, 852. The court of appeals found error because there was circumstantial evidence from which the jury could conclude that the officers' applied excessive force reasoning:

> [P]articularly in cases in which the plaintiff was not forcibly resisting, the severity of the injuries may support the inference that the force used was substantial. Here, a jury could reasonably draw the inference that the use of force sufficient to break Santos's back […] was excessive.

287 F.3d at 855.

*Santos* is distinguishable. Here, unlike the defendant in *Santos*, David was resisting the deputies' efforts to get him down the hill. All of the deputies stated that David was resisting and that they could not get sufficient control of him to simply carry him down the hill. Additionally, RM paramedic Reed testified:

> A. From – from what I recall, they were trying to restrain [David]. Trying to keep him from – they were trying to hold on to him basically.
> Q. But so physically describe what you saw.
> A. So I could see – again, this is from what I remember. He was up on top of the hill with several – several deputies. I don't remember how many deputies, but they had him basically suspended up off the ground. I would assume to not allow him to be face down on the ground burning. It was very hot outside. So I remember seeing them. They had him restrained. He was, I believe, face down from – it's – it's quite a distance, so not 100 percent on that. But he was fighting them quite a bit.
> What I do recall very clearly that they were struggling to try and keep ahold of him.

- 19 -

Q. When you use the word fighting, what are you trying to communicate?
A. Have you ever seen a bucking horse?
Q. Sure.
A. That's what he looked like.

(Grant Reed Deposition Tr., Doc. 126-2 at p. 36.)

Plaintiffs also rely on certain testimony from Stephen L. Thornton, M.D., one of their experts. Dr. Thornton testified that Deputy Barnes's account of the events supported the conclusion that right after Deputy Barnes asked David if he could walk down the hill David expressed that he did not want to go back and began resisting. (Stephen L. Thornton, M.D., Deposition Tr., Doc. 134-4 at pp. 11-12.) Despite this testimony, Plaintiffs argue that Deputy Barnes made David sit on the ground and that *this* is the reason David began resisting. In support, they focus on the following opinion from Dr. Thornton:

Q. You're not aware that after placing him on the ground he never complains of the rocks or the heat from the rocks? He never says, "Ouch, that hurts. I need to stand up. It's too hot."
He never says anything like that, does he?
MR. ZWILLINGER: Form.
A. None of that's ever documented.
Q. Are you suggesting he said those things and the deputies left it out of the reports?
A. I'm merely suggesting that he could have been screaming ow and they not understand that he's saying ow. I'm just telling you it was not documented. So[,] whether it happened or not, it's not documented.

(Doc. 134-4 at p. 12.) Dr. Thornton's testimony that David began resisting Deputy Barnes's efforts to get him down the hill because he was uncomfortable as a result of being made to sit on the ground is speculation. "Mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) (citing *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995)). Dr. Thornton's testimony fails to create a genuine issue of material fact on whether Deputy Barnes's effort to get David down the hill was objectively reasonable.

The Court is similarly unpersuaded that Powell's testimony creates a genuine issue of material fact about whether Deputy Barnes's conduct was objectively reasonable. Powell testified that it was a "quiet scene" and the inference that Plaintiffs would have a factfinder draw from her "quiet scene" statement is that the situation was not being treated as an emergency. (Doc. 134-2 at pp. 11, 15.) However, it is undisputed that Powell was always at the bottom of the hill. Powell was even sometimes inside her house caring for her 1 ½ year old granddaughter. *Id*. at p. 9. She was never at the top of the hill with any of the deputies. She testified that she could not make out what the deputies said and that she was not privy to any conversation between the deputies and paramedics. Powell's testimony that it was a quiet scene fails to create a genuine issue of material fact on whether Deputy Barnes's effort to restrain David at the top of the hill was objectively reasonable. *See Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1106 n.3 (9th Cir. 2008) (no genuine issue of material fact created by witness testimony where witness "stood outside the studio and did not witness the confrontation" between the officers and Gregory).

Dr. Roy Taylor, another of Plaintiffs' experts, opined that "the deputies should have viewed this as a medical emergency…" (Dr. Roy G. Taylor Expert Report, Doc. 134-9 at p. 7.) The inference being that the deputies did not view the 9-1-1 call as a medical emergency and, instead, used excessive force in their effort to restrain David. However, it is undisputed that Deputy Barnes radioed dispatch for medical to respond within seconds of reaching David at the top of the hill and that he also asked for Search and Rescue to respond and assist in extricating David from the top of the hill. Moreover, even accepting Plaintiffs' position that the officers should have recognized that David was suffering from a medical emergency—which the evidence in fact establishes—Deputy Barnes's efforts to keep David safe and from further hurting himself until Search and Rescue could arrive and assist in extricating David were objectively reasonable. *See Gregory*, 523 F.3d at 1108 (rejecting argument by decedent's estate that, because the officers knew that decedent was "possibly high on drugs," and that he was "talking loudly about God" when they arrived, the officers were objectively unreasonable in failing to recognize that the decedent was in a state of excited delirium; even accepting that decedent was in such a state and the officers

should have recognized it, the officers' response to the threat the decedent posed—first confronting him verbally, and only then attempting to disarm and to restrain him—still was objectively reasonable).

The record is undisputed that David was delusional and incoherent. As mentioned, Deputy Davenport tried to talk to David and get his name, but he "didn't hear a single English word [come] out of [David's] mouth [that he] could comprehend or understand." (Doc. 126-2 at p. 6.) Deputy Dittmer described David as "not making out any words," "moaning," "making noises," "act[ing] like he was intoxicated," and "doing things that a reasonable person would not be doing." *Id*. at p. 85. Deputy Barnes described David as saying that he "want[ed] to say goodbye to his mom," "talking about the devil," and saying, "other nonsensical stuff like that." *Id*. at p. 29. Neither Dr. Winston's autopsy report nor the contemporaneous statements given by the deputies undermines the credibility of any witness who was at the top of the hill trying to rescue David that day. As a result, Plaintiffs may not rely on mere allegations and speculation to defeat summary judgment. *See Marquez v. City of Phoenix*, 693 F.3d 1167, 1175 (9th Cir. 2012) (upholding summary judgment in favor of defendant officers on excessive force claim where "[n]othing 'in the record, such as medical reports, contemporaneous statements by the officer[s] [or] the available physical evidence […] undermine[d] the officers' credibility[,]" quoting *Gregory*, 523 F.3d at 1106-07 n.3).

In sum, in light of the factors enumerated in *Graham* and *Kingsley*, based on the totality of the circumstances, judged from the perspective of a reasonable officer on the scene on June 5, 2017, rather than in hindsight, the Court finds that Deputy Barnes's efforts to help David were objectively reasonable.

### d. Qualified Immunity on the Excessive Force Claim

"Qualified immunity protects public officials from a court action unless their conduct violated a constitutional right that was clearly established at the time." *Felarca v. Birgeneau*, 891 F.3d 809, 815 (9th Cir. 2018) (citing *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611, 135 S. Ct. 1765, 1774, 191 L. Ed. 2d 856 (2015)). "The relevant inquiry requires [the court] to ask two questions: (1) whether the facts, taken in

the light most favorable to the non-moving party, show that the officials' conduct violated a constitutional right, and (2) whether the law at the time of the challenged conduct clearly established that the conduct was unlawful." *Felarca*, 891 F.3d at815 (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). The court may address the steps in either order. *Felarca*, 891 F.3d at 815-16 (citing *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)).

"A plaintiff must prove both steps of the inquiry to establish the officials are not entitled to immunity from the action." *Felarca*, 891 F.3d at 815 (citing *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1152 (9th Cir. 2012)). *See also, Krause*, 2020 WL 2541728, at *10 ("To overcome an officer's assertion of qualified immunity, a plaintiff must show that [the] two prongs are satisfied…[.]"); *Hyde v. City of Willcox*, No. CV 20-00100-TUC-JGZ, 2021 WL 267868, at *4 (D. Ariz. Jan. 15, 2021) (same).

As explained above, the Court finds that Deputy Barnes's conduct in restraining David was objectively reasonable—i.e., his actions did not constitute excessive force. *See* pp. 13-22, *supra*. Since the Court finds that no constitutional violation occurred, it need not address the second prong in the qualified immunity analysis. Nevertheless, the Court examines whether the second prong of the qualified immunity analysis is established here.

As mentioned, qualified immunity "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018) (quoting *White v. Pauly,* 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017) (*per curiam*)) (alterations and internal quotation marks omitted). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (quoting *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (*per curiam*)). Although "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551) (internal quotation marks omitted).

"In other words, [qualified] immunity protects all but the plainly incompetent or those who knowingly violate the law." *Kisela*, 138 S. Ct. at 1152. The United States Supreme Court has "'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" *Kisela*, 138 S. Ct. at 1152 (quoting *City and Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 612, 135 S. Ct. 1765, 1775–76, 191 L. Ed. 2d 856 (2015)) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)); *see also Brosseau,* 543 U.S. at 198–199, 125 S. Ct. 596. The United States Supreme Court has also held that "[w]e have not yet decided what precedents—other than our own—qualify as controlling authority for purposes of qualified immunity." *See Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 591 n.8, 199 L. Ed. 2d 453 (2018).

As explained below, this Court finds the caselaw relied upon by Plaintiffs to establish the second prong of the qualified immunity analysis distinguishable. (Doc. 133 at pp. 17-19; Pls.' Not. of Subsequent Authority, Doc. 154 at pp. 1-2.) Plaintiffs rely on caselaw that addresses officer conduct that arose under circumstances that were not present in this case. For example, *Rice v. Morehouse*, 989 F.3d 1112, 1127, 2021 WL 853301, at *11 (9th Cir. 2021), held the right to be free from "the application of non-trivial force for engaging in mere passive resistance" was clearly established. Here, as laid out above, the undisputed facts establish that David was not engaged in passive resistance.

Other caselaw relied upon by Plaintiffs involved claims that an arrestee's complaints of pain were ignored by officers. For instance in, *Kinney v. Brazelton,* No. 1:14-CV-00503-AWI-MJS (PC), 2016 WL 4417690, at *8 (E.D. Cal. Aug. 18, 2016), *report and recommendation adopted*, No. 1:14-CV-00503-AWI-MJS(PC), 2016 WL 8731197 (E.D. Cal. Sept. 23, 2016), the plaintiff inmate failed to follow prison officers' orders after a prison riot and was ordered to kneel on hot pavement for ninety minutes under the threat of being shot. There, the court held that a reasonable officer "could not believe such conduct was lawful in light of clearly established law regarding conditions of confinement." *Id*. Here, there is no issue regarding Eighth Amendment conditions of confinement, no evidence David was arbitrarily forced to kneel on the ground for an

extended amount of time, no evidence that any PCSD deputy threatened to shoot David, and no evidence that he complained of pain.

*Managed Protective Servs., Inc. v City of Mesa, Arizona*, 654 F. App'x 276, 277 (9th Cir. 2006), is distinguishable for a similar reason. In that case, the court of appeals held "it was clearly established that the Fourth Amendment prohibits the continued use of force against an arrestee who is restrained and no longer resisting," and that "ignoring an arrestee's complaints of pain violates the Fourth Amendment." *Id*. Here, there is no evidence that David was "no longer resisting" such that the PCSD deputies could get him safely down the hill. Moreover, during the deputies' effort to restrain David, there is no evidence that David complained of pain even though when Deputy Barnes found him, and during the deputies' efforts to subdue him, he *should have* been complaining of pain. In *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 992 (8th Cir. 2009), the United States Court of Appeals for the Eighth Circuit held "[a]s of 2002, it was clearly established that the Fourth Amendment was violated if an officer unreasonably ignored the complaints of a seized person…" Again, there is no evidence that the deputies ignored any complaints from David.

Additionally, none of the caselaw relied upon by Plaintiffs is from the United States Supreme Court. *See Wesby*, 138 S. Ct. at 591 n.8 ("We have not yet decided what precedents—other than our own—qualify as controlling authority for purposes of qualified immunity.").

The Court is unable to find that there is a "robust consensus of persuasive authority" that it was clearly established in 2017 that Deputy Barnes's conduct in restraining David in an effort to help him was unlawful under the unique circumstances presented here.

In sum, the Court finds that Deputy Barnes's conduct in restraining David did not constitute excessive force as a matter of law. And, even if it did, Plaintiffs have not established that Deputy Barnes's conduct violated then existing clearly established law. Thus, even if Plaintiffs had established a colorable excessive force claim, Deputy Barnes would be entitled to qualified immunity.

### e. Medical Care Facts: Deputy Barnes's Decisions Regarding Water, Blankets and Labeling David "Combative"

At 11:47:20, within seconds of reaching David at the top of the hill, Deputy Barnes requested "meds" from dispatch. (Audio Recording, Doc. 126-2, Ex. 22 at 4:18-4:24.) At 11:49:00, Rural Metro is en route to the scene. (Rural Metro Patient Care Report, Doc. 126-2 at p. 53.) Over the next couple of minutes, Deputy Barnes told dispatch that he was not sure how he is going to get David down the hill, David was delusional, and he was bleeding from his face. Deputy Barnes asked dispatch to "get Search and Rescue to us[.]" (Doc. 126-2, Ex. 22 at 4:52-5:15.

Approximately two minutes later, Deputy Barnes asked dispatch to confirm that Search and Rescue is on the way and asks them to talk to them. *Id*. at 7:24-7:32. Deputy Barnes tells Deputy West of Search and Rescue: "We are on the side of a cliff here. We are currently holding him in position as he's combative with us. He's naked and delusional. We're going to need assistance in extricating him from the top of the hill here." *Id*. at 7:33-7:50. Deputy West advised Deputy Barnes they are coming from "the hanger with a Stokes basket so we have a little bit of an ETA" and asked if they should go "Code 3." (Doc. 126-2, Ex. 22 at 8:10-8:19.) Deputy Barnes tells Deputy West to "go code 3[.]" *Id*. at 7:20-8:22.[17]

The record establishes that Rural Metro was en route from 11:49:00 to 12:07:34. (Doc. 126-2 at p. 53.) Reed testified that he received updates as he was responding to the call. (Reed Deposition Tr., Doc. 126-2 at p. 35.) In his recorded statement, Reed explained that his "[c]aptain had talked to dispatch and said that dispatch was contacted by PCSO, asking if we could come up and assist with the patient and get him sedated…" (Reed Recorded Statement, Doc. 134-14 at p. 2.) At that point, Reed "pulled close to the scene[.]" *Id*.

At 12:05:52, Deputy Barnes again told dispatch to have Rural Metro respond. (Pima County Sheriff's Department Call Log Summary, Doc. 126-2 at p. 49.) At 12:07:13,

---

[17] Code 3 means lights and sirens. (Deputy Barnes Deposition Tr., Doc. 126-2 at p. 82.)

Deputy Ernest tells dispatch to have Rural Metro turn on the street directly in front of them. *Id*. Reed arrived at the scene at 12:07:34 and was at David's side by 12:13:00. (Doc. 126-2 at p. 53.)

Reed could see four PSCD deputies trying to restrain David. Reed stated that when he reached David at the top of the hill, he followed his "administrative orders for excited delirium … and administered Ketamine." (Doc. 134-14 at p. 3.) Reed further stated that "because of the limited access up there to him…we're not gonna bring a lot of our equipment with us, because, it's more about trying to get the patient out of the elements…" *Id*. at p. 8

Deputy Barnes testified that he did not have water on his person, or in his patrol vehicle. When Deputy Barnes received the "unknown problem" call he was at QT.[18] (Doc. 126-2 at p. 25.) He did not ask another deputy or Search and Rescue to bring water to the hilltop. Nor did he ask Powell to bring water or blankets to the top of the hill. When questioned about not asking anyone to bring water or blankets, Deputy Barnes testified:

> At that point I need people up there. We don't have time to go and interview people. It's a dynamic situation there's lots of inputs coming in, a lot of stimulus going on, so to stop and say, hey, my focus right now is to get him off the mountain so we get him into an ambulance where they're going to have the necessities that they need in that situation. If I can get him off the hill faster, that's going to be better, in my mind to get him into that ambulance, get that medical care given to him, than trying to administer water to him on the side of the hill or trying to do any type of extensive first aid to him that he needs. He needs to be off the side of the hill and in the ambulance so that he can get that medical care.

When asked about the purpose of a RIPP restraint, Deputy Barnes testified:

> I thought if I could secure his feet and keep him from bucking, kicking, that we would then be able to have a better chance of being able to get him from that spot down to the bottom down to where an ambulance can treat him.
> **********

---

[18] QT is short for QuickTrip Corporation, and chain of convenience stores that operates in Arizona and other states. *See* QuickTrip, https://en.wikipedia.org/wiki/QuikTrip last visited June 15, 2021.

> Without him being able to flail, I was hoping that the three of us would have been able to manage him, one holding his feet, the other two holding arms maybe and carry him down the side of the hill trying to get him down there. Again, the focal point is we need him off that side of the hill so he can get that treatment that he needs and we're not going to be able to provide it. The four deputies up there are not going to be able to provide that treatment on the side of the hill.

(Doc. 126 at p. 18-19, ¶ 65; Doc. 135 at p. 4, ¶ 65.)

### f. Legal Standard Regarding Medical Care

"[C]laims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." *Gordon v. Cnty. of Orange,* 888 F.3d 1118, 1124–25 (9th Cir. 2018) (citing *Castro v. Cnty. of Los Angeles,* 833 F.3d 1060, 1070 (9th Cir. 2016)). The elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries. *Gordon,* 888 F.3d at 1125 (quoting *Castro,* 833 F.3d at 1071) (additional citations and quotations omitted).

As explained below, the Court finds that Deputy Barnes took reasonable measures to abate the risk of harm to David.

### g. Deputy Barnes' Actions Regarding Blankets and Water Were Reasonable

The undisputed evidence establishes that David was resisting and in the course of doing so inflicting injury on himself. The area was rugged, rocky, and steep. Deputy Barnes testified his focus was on getting David down the hill and into an ambulance.

Plaintiffs argue Deputy Barnes is a certified emergency medical technician who cared for airmen suffering heat emergencies in Saudi Arabia. (Doc. 133 at p. 14.) They contend that he "thus knew how to identify and care for a heat emergency, and why doing so with shade and water as quickly as possible was somewhat simple but yet vital to preventing a catastrophe." *Id.* at pp. 14-15. Significantly however, the evidence fails to establish that getting David to shade and water "was somewhat simple." To the contrary, the undisputed evidence establishes that David was atop a rugged, steep, and cliff-like hill and resisting the four deputies' efforts to restrain him.

Within 30 seconds of reaching David at the top of the hill Deputy Barnes recognized that he was going to need medical to respond and the help of Search and Rescue. In the course of the deputies' efforts to rescue David, Deputy Barnes explained to Search and Rescue that he and the other deputies were on the side of a cliff holding David so that he would not go over it. Moreover, even Plaintiffs' expert testified that orally hydrating David under the circumstances "would take a while." (Dr. Stephen Thornton Deposition Tr., Doc. 134-4 at p. 16.) Under these unique and undisputed circumstances, Deputy Barnes's conduct in failing to offer David water or a blanket were reasonable.

Plaintiffs rely upon *Howard v. Kansas City Police Dep't*, *supra*, arguing that Deputy Barnes's "failure to yell or radio for a blanket and water and to move David to shade are the precise type of reasonable available measures that demonstrate deliberate indifference." (Doc. 133 at p. 15.) There, the United States Court of Appeals for the Eighth Circuit held "[a]s of 2002, it was clearly established that the Fourth Amendment was violated if an officer unreasonably ignored the complaints of a seized person." 570 F.3d at 992. Here, there is no evidence David was complaining of pain or thirst. To the contrary, the evidence establishes that he was inflicting pain on himself and not reacting.

Furthermore, in that case, Howard, a victim in a car chase and shooting, was initially forced onto hot asphalt when officers arrived at the scene. *Id.* at 989. The officers were made expressly aware of Howard's complaints of pain and his efforts to move his arms and back off the asphalt. *Id.* at 991. The court of appeals held there was no evidence that other officers were unable to prevent Howard's injuries. There was likewise no evidence the

officers were reasonably prevented from directing another officer to retrieve the blanket because of other necessary responsibilities. *Id*. at 992. Thus, the court held the officers were not entitled to qualified immunity on Howard's excessive force claim. *Id*.

In contrast to *Howard*, here, four deputies were at the top the hill holding David so that he would not hurt himself. The plan was to keep David safe and then use all available manpower to take David down the hill for medical treatment. There is no evidence that a deputy could have retreated down the hill and brought up water or a blanket without compromising this plan.

Given the totality of the circumstances, the Court finds that Deputy Barnes' conduct in failing to offer David water or a blanket were objectively reasonable.

### h. Labeling David "Combative" Was Objectively Reasonable

Plaintiffs argue that by labeling David "combative" Deputy Barnes impeded his access to medical care thereby leaving him in a more dangerous situation. (Doc. 133 at p. 16.) They insist Deputy "Barnes'[s] actions in accelerating David's decline and suggesting that he was combative and dangerous at least contributed to Reed's decision to ignore the obvious heat emergency and inject David with the powerful sedative Ketamine." (Doc. 133 at pp. 16-17.) They rely upon *Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1081-83 (9th Cir. 2013). *Id*.

In *Maxwell*, a man shot his wife, Kristin, in the jaw with a pistol at approximately 10:50 p.m. 708 F.3d at 1079. Kristin was able to call 9-1-1 and an officer was dispatched to the scene and arrived at about 10:53 p.m. *Id*. At about 11:00 p.m., other officers and a fire truck arrived at the scene. *Id*. at 1080. At about 11:08 p.m. an ambulance arrived. *Id*. Kristin was placed in the ambulance between 11:18 p.m. and 11:25 p.m. *Id*. at 1081. One officer present refused to let the ambulance leave immediately and delayed it from leaving until 11:30 p.m. *Id*. The court of appeals held the officer was not entitled to qualified immunity because it was well established "as of December 2006" that the danger creation exception applies where government officers "affirmatively place[] the [victim] in a position of danger." *Id*. at 1082. The court of appeals reasoned, "[i]t was obvious that delaying a bleeding gunshot victim's ambulance increased the risk of death." *Id*. at 1083.

The events in this case stand in contrast to those in *Maxwell*. Here, at 11:49:00 Rural Metro started en route to the scene. Reed testified, "[f]rom what I remember, we were told to hold off, and so we stayed inside the ambulance when we first got on scene. And then at some point we were cleared to move in." (Reed Deposition Tr., Doc. 134-15 at p. 3.) At 12:07:34 Reed arrived at the scene and at 12:13:00 he was at David's side. (Doc. 126-2 at p. 53.) In other words, it took Reed 5 minutes and 36 seconds after he arrived at the scene to exit the ambulance, climb the hill, and reach David's side.[19]

Moreover, in *Maxwell*, the court of appeals determined there was no justifiable reason for preventing the ambulance from leaving the scene for approximately 12 minutes. Here, there was a justifiable reason for Reed staying at the bottom of the hill until dispatch cleared him to come up. Reed testified that four deputies were holding David and that, despite the deputies' efforts, David was bucking like a horse. Deputy Davenport testified that he considered David's conduct "combative" and described David as "abnormally strong." *See,* Doc. 126-2 at pp. 5, 15.

Plaintiffs' expert, Dr. Taylor, testified: "'Combative' to me means that the person is intentionally trying to inflict harm on someone, and I don't think a person in a psychological medical emergency is intentionally trying to do harm." (Doc. 134-10 at p. 10.) Dr. Taylor continued: "So it's, you know, a situation where it's not combative, it's a medical emergency. But by saying 'combative' to law enforcement or to emergency medical personnel, that, to them, is saying, 'This is an aggressive assaultive behavior and we're not going to come in there until it's safe for us to do so.'" *Id.* at p. 11. Dr. Taylor testified that "had he said, 'The person is agitated, the person won't stop moving, but we need Meds to get up here as quickly as possible,' that would have made it a little bit more clear." *Id.* Dr. Taylor's testimony that if Deputy Barnes had labeled David "agitated" the situation would have been "a little bit more clear" is vague and fails to create a genuine issue of material fact.

---

[19] Reed's ascent was almost a minute and a half faster than Deputy Barnes's ascent. *See*, p. 9, *supra*.

Notwithstanding Dr. Taylor's testimony that labeling David "agitated" would have made the situation "a little bit more clear," the timeline fails to establish that the "combative" label subjected David to an unreasonable delay in receiving medical care. For instance, Dr. Taylor's report states, "Fire Captain David Randolph stated while his staff was responding they received information on their mobile computers that the person was combative. He then ordered the fire apparatus and ambulance to stage and wait for the scene to be safe before proceeding." (Doc. 134-9 at p. 7.) There is no testimony from Fire Captain Randolph in the record. Nor are there any statements or reports from Captain Randolph in the record. Nor have the parties pointed to any evidence in the call logs that document the length of time that, pursuant to Captain Randolph's order, Reed and his partner staged. Further, there is no evidence that Deputy Barnes instructed Reed to "stage" or wait. He simply described David as "combative" and that description was reasonable under the circumstances.

However, Dr. Taylor testified to a "seven- or eight-minute" delay and that those seven or eight minutes were "partially part of the problem" and "sealed his fate." (Doc. 134-10 at p. 12.) Dr. Taylor is a "Criminal Justice Ph. D candidate," not a medical doctor. (Doc. 134-9 at p. 3.) He was engaged to opine on "whether the Defendants acted in accordance with established law enforcement standards." (Doc. 134-9 at p. 2.) Dr. Taylor's testimony that a seven- or eight-minute delay "sealed his fate" is inadmissible. *See, e.g., Rebel Oil Co., Inc. v. Atlantic Richfield Co*., 51 F.3d 1421, 1435 (9th Cir. 1995) (expert opinion is admissible and may defeat summary judgment only if it appears affiant is competent to render expert opinion); *Whitaker v. Pima Cnty.*, 640 F.Supp.2d 1095, 1099 n.11 (D. Ariz. 2009) (same).

Regardless, the Court finds that as a matter of law, under the circumstances of the case, a seven- or eight-minute delay in Rural Metro's arrival is not unreasonable as a matter of law. *See, e.g., Green v. Cnty. of Sacramento*, No. 3:13-cv-0949-TLN-KJN, 2016 WL 374561, at *12 (E.D. Cal. Jan 29, 2016) (distinguishing *Maxwell* where the undisputed facts of the case—including the video footage and the relevant radio communications—did not raise a triable issue as to whether the defendant officers exposed Green to an

unreasonable risk where "[r]oughly ten minutes had passed from the time the vehicle Green was in was pulled over until the ambulance left the scene with Green for the hospital"); *Morales v. City of Delano*, 852 F. Supp. 2d 1253, 1258 (E.D. Cal. 2012) (where plaintiffs alleged that officers should have called paramedics sooner and should have attempted to administer care while waiting for the paramedics to arrive, district court held that it was unreasonable to hold any defendant officer liable for a 20-30 minute delay in the arrival of paramedics).

In sum, the Court finds that Deputy Barnes's actions regarding water, blankets, and labeling David were objectively reasonable as a matter of law.

### i. Qualified Immunity on the Medical Care Claims

As with the excessive force claim, the Court finds that Deputy Barnes's conduct regarding David's medical care were objectively reasonable and thus no constitutional violation occurred. As a result, it need not address qualified immunity. However, as the Court did with Plaintiffs' excessive force claim, the Court examines the second prong of the qualified immunity analysis.

Plaintiffs rely upon the same caselaw in support of their excessive force claim to support their argument that the law regarding the "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted" prong of the qualified immunity analysis. As explained above, these cases are distinguishable. *See* pp. 23-25, *supra*.

The Court finds that Deputy Barnes's conduct did not violate David's right to medical care as a matter of law. Even if it did (and the Court determines it did not), it has not been established that Deputy Barnes's conduct violated then existing clearly established law. Thus, Deputy Barnes would be entitled to qualified immunity on Plaintiffs' medical care claims.

### IX. THE STATE LAW WRONGFUL DEATH CLAIM

Under Arizona law, a claim for negligence requires proof of four elements: "(1) a duty requiring the defendant to conform to a certain standard of care; (2) breach of that standard; (3) a causal connection between the breach and the resulting injury; and (4) actual

damages." *Dinsmoor v. City of Phoenix*, 249 Ariz. 192, 196, 468 P.3d 745, 749 (Ct. App. 2020), *review granted* (Dec. 15, 2020) (quoting *Quiroz v. ALCOA Inc.*, 243 Ariz. 560, 563–64, ¶ 7, 416 P.3d 824, 827–28 (Ariz. 2018)). Plaintiffs' wrongful death claim is premised on allegations of intentional and negligent conduct. Plaintiffs allege Deputy Barnes breached a duty of care to David by "using excessive and unjustified force, not providing immediate care for David's heat-related distress[] and requesting sedation when he knew or should have known it was unnecessary and potentially dangerous." (Doc 55 at p. 12, ¶¶ 117-18.) Sheriff Nanos's liability is vicarious. *Id.* at ¶ 119.

### a. Plaintiffs' Cannot Assert a Negligence Claim Based on Intentional Conduct

Section 611, Title 12, ARIZ. REV. STAT., entitles Plaintiffs to maintain an action that was caused by Deputy Barnes's "wrongful act, neglect or default." *See Harrelson v. Dupnik*, 970 F. Supp. 2d 953, 977 (D. Ariz. 2013) (citing ARIZ. REV. STAT. § 12-611). While not addressed by either party, the Court notes that the United States Court of Appeals for the Ninth Circuit has held that, "[i]n Arizona, plaintiffs cannot base a negligence claim on an intentional use of force nor on a law enforcement officer's negligent 'evaluation' of whether to intentionally use force." *Liberti v. City of Scottsdale*, 816 Fed. App'x. 89, 90 (9th Cir. 2020) (quoting *Ryan v. Napier*, 245 Ariz. 54, 425 P.3d 230, 236 (Ariz. 2018)). "Any negligence claim must be based on conduct independent of the intentional use of force." *Liburti,* 816 F. App'x at 90 (citing *Ryan*, 425 P.3d at 238). Part of Plaintiffs' wrongful death claim stems from the same conduct as their excessive force claim.

Deputy Barnes is entitled to summary judgment on this portion of Plaintiffs' wrongful death claim.

### b. There is No Evidence That Deputy Barnes Directed Reed to Administer Ketamine

When Deputy Barnes saw David at the top of the hill, he asked dispatch to call for "meds" and said, "maybe they can give him something." It is undisputed that later in the rescue effort, Deputy West said to dispatch, in part, "…so if we could have a paramedic start making his way up to, uh the deputies, let 'em know that it probably needs to be a, an

ALS, uh, paramedic, and maybe they can give the guy something." Reed stated that when he got to the top of the hill, he followed his administrative orders for excited delirium and administered Ketamine. Dr. Winston determined David's cause of death to be hyperthermia due to LSD toxicity and exposure to the elements—not Ketamine.

In light of the undisputed facts, the Court finds that Deputy Barnes's statement to *dispatch* that "*maybe* they can give him *something*" is insufficient to create a genuine issue of material fact on Plaintiffs' state law wrongful death claim based on the allegation that Deputy Barnes asked Reed to administer Ketamine. The undisputed evidence is that Reed used his own independent judgment and followed RM's administrative orders when Reed decided to administer Ketamine. Deputy Barnes is not responsible for Reed's decisions. Deputy Barnes is entitled to summary judgment on this portion of Plaintiffs' wrongful death claim.

### c.  Failure to Provide David Immediate Medical Care

Lastly, Plaintiffs assert Deputy Barnes failed to provide "immediate care for David's heat-related distress" and he is therefore liable under Arizona's wrongful death statute. They claim, "the same fact issues that preclude summary judgment on Plaintiffs' federal law claims preclude such a finding under state law[…]" (Doc. 133 at p. 20.) As laid out above, the evidence is undisputed that Deputy Barnes radioed for "meds" almost immediately upon seeing David at the top of the hill and that Deputy Barnes's efforts were focused on keeping David from further harming himself until David could be taken down the hill for medical care.

While not discussed by either party, ARIZ. REV. STAT. § 12-820.02(A)(11) provides that a public employee is not liable for "[a]n injury caused by a peace officer if the injury was caused by any act or omission while rendering emergency care at the scene of an emergency occurrence" unless the public employee intended to cause injury or was grossly negligent. *See* ARIZ. REV. STAT. § 12-820.02(A)(11). Plaintiffs have alleged that Deputy Barnes's conduct failed to exercise ordinary care towards David. (Doc. 55 at ¶ 117.) Moreover, the Court has determined that Deputy Barnes's efforts to get David down the hill and into an ambulance for medical care were objectively reasonable as a matter of law.

Deputy Barnes is entitled to summary judgment on this portion of Plaintiffs' wrongful death claim.

In sum, the Court finds Deputy Barnes is entitled to judgment in his favor on Plaintiffs' state law wrongful death claim. Because Sheriff Nanos's liability flows from Deputy Barnes's liability he is also entitled to judgment in his favor on Plaintiffs' state law wrongful death claim.

## X. CONCLUSION

It is tragic that the efforts to rescue David failed and he died. But given the totality of the difficult and dynamic circumstances facing Deputy Barnes the Court finds Deputy Barnes's conduct was objectively reasonable as a matter of law. For the foregoing reasons,

**IT IS HEREBY ORDERED GRANTING** Defendants [Nanos's] and Barnes's Motion for Summary Judgment (Doc. 125). The Clerk of the Court is directed to enter judgment in favor of these Defendants.

Dated this 29th day of June, 2021.

_____
Honorable John C. Hinderaker
United States District Judge