# Exhibit 1

Guillermo Haro
February 13, 2020

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Robert Steven Cutler, individually ) Case No.:
and as Administrator of the Estate ) 18-CV-00383-TUC-FRZ
of David A. Cutler, deceased, on )
behalf of himself and on behalf of )
all beneficiaries of the Estate of )
David A. Cutler, deceased, and )
Renee Luddington Cutler, )
                               )
             Plaintiffs, )
                               )
vs. )
                               )
Mark D. Napier, Sheriff of Pima )
County, Arizona, in his official )
capacity; Rural/Metro Fire Dept., )
Inc., an Arizona for profit )
corporation, Keith Barnes and Jane )
Doe Barnes, his spouse, Grand Reed )
and Brittany Reed, )
                               )
             Defendants. )
_____)



VIDEOTAPED DEPOSITION OF GUILLERMO HARO


Chandler, Arizona
February 13
10:02 a.m.


                              BARTELT|NIX COURT REPORTERS
                              RRF No. 1028
                              111 W. Monroe Street, Suite 425
Prepared by:                 Phoenix, Arizona  85003
Helen Pasewark, CR, RPR   Phone:  (602) 254-4111
Certificate No. 50905    Fax:    (602) 254-6567

Guillermo Haro
February 13, 2020

Page 6

1      Q.   Mr. Haro, it's my understanding that you have

2   been designated as the paramedic standard of care in

3   this case on behalf of the plaintiffs.

4      A.   Yes, I have.

5      Q.   Tell me from your perspective what is the

6   standard of care that applies to this case?

7      A.   The standard of care is to act as a paramedic

8   either -- also that's regulated by the State of Arizona.

9   What you need to do is go through an accreditation --

10  accredited paramedic school, which we are in the

11  Maricopa County.  All the community colleges that offer

12  paramedic programs are accredited.

13          You also have to go through a total of 500 to

14  600 hours of either split between classwork or actually

15  not tutoring, but internship associated with it.  And

16  afterwards you need to do a skills test that's rigorous

17  through all the skills that a paramedic needs to have.

18  And also there's a testing by a national registry, which

19  is a national organization that you go through.

20     Q.   So maybe I just missed it.  What is your

21  definition of the standard of care as it --

22     A.   The standard of care for what exactly?

23     Q.   Wait.  Wait.  Wait.  So I'm trying to figure

24  out what your definition is that you are relying upon in

25  connection with your opinions.  What is your definition

Guillermo Haro
February 13, 2020

Page 7

1  of the standard of care that governs the facts and the

2  actions in this case?

3              MR. ZWILLINGER:  Object to the form of the

4  question.

5              THE WITNESS:  The standard of care is

6  particular to every situation, to every medical or

7  trauma call, there's a standard of care associated with

8  it.  It's not -- the standard of care is to act as a

9  paramedic.  You've been trained as a paramedic.  Your

10  certification is a medical emergency technician or EMT

11  is the standard of care associated with working under

12  that care itself.  That's defined by accreditations,

13  schools, testing.  That's where it's defined.  That's my

14  definition.  I take my definition from who tests you,

15  who vets you.  That's my standard of care.

16  BY MR. SATTERLEE:

17      Q.  If I were to tell you that in Arizona as it

18  relates to a professional liability case, the standard

19  of care is a minimal standard of care, have you heard

20  that before?

21      A.  No.

22      Q.  And I appreciate your definition.  I think I'm

23  a little lost, but it's important to establish the

24  baseline, because I don't think we can really have a

25  conversation or I can ask questions about any deviation

Guillermo Haro
February 13, 2020

Page 8

1    from the standard of care unless I really understand

2    what you're saying.

3        A.    Okay.  So we start talking about deviation of

4    the way you can care, which our duties, actually, the

5    standard of care was in that regard would be actually

6    did you follow your protocols, did you follow your

7    administrative orders, did you go through the steps that

8    have been established by your medical director that this

9    is the proper care for any particular situation.

10       Q.    Would you agree that the protocols and

11   policies as it relates to EMS services generally flow

12   from a base hospital?  In this case that would be

13   Northwest Medical Center.

14       A.    In general, yes, that's -- that's how most

15   people in Arizona run that system.  Yes, I agree.

16       Q.    And medical direction comes from typically a

17   physician that works at the --

18       A.    Yeah.

19       Q.    -- emergency room.  Wait until I'm done.

20             Medical direction typically originates from

21   the hospital, the base hospital, via a medical director

22   or, pardon me, a physician in the ER; is that right?

23       A.    Yes.  We work under a physician's license and

24   that's the medical director.  Keep in mind that most of

25   the medical direction is coming from an emergency room,

Guillermo Haro
February 13, 2020

Page 20

1   E-mail had changed, I think -- no -- or my cell phone at
2   that time.  Let's see.  What else here?  Actually,
3   there's not much change from my last one.  It doesn't
4   look like it.  Looks like everything is pretty much what
5   was in the last ten years or so.
6        Q.   Let's start at the top.  It reflects your
7   experience as a firefighter/paramedic with the Glendale
8   Fire Department in Glendale, Arizona?
9        A.   Yes.
10        Q.   How long were you with the fire department
11   there?
12        A.   I started in 1979, August of '79, and I was
13   retired in September of 2006.
14        Q.   The dates that you've listed here reflect 1978
15   to 2007.  Are those wrong?
16        A.   That's right.  I became a medic in '79, August
17   '79.  I got hired in August of 2000 -- I mean '78.
18   Yeah, that's right.
19        Q.   Because I noticed in your report that when you
20   were detailing your background, it said you retired from
21   the Glendale Fire Department in 2006.
22        A.   Em-hmm.
23        Q.   So was it 2006 or 2007?
24        A.   No.  It was 2006.
25        Q.   So to the extent your curriculum, which has

Guillermo Haro
February 13, 2020

Page 23

1          In 2000 I started teaching for community

2     college, Glendale, specifically Glendale Community

3     College, and working in their medic programs.  It was

4     all part time while I was working.  Gained more

5     experience there.

6          Teaching is a great tool to keep sharp on your

7     skills and your base knowledge.  And so I was able to

8     start doing that.  And that was an enjoyable process

9     too.

10          After I retired I got picked up by -- I was

11     in-house.  I didn't really retire.  I was off about six

12     months and I got a cold call in the spring from the

13     University of Arizona from Daniel Spait.  He's the

14     emergency chair for the College of Medicine at U of A

15     and they were going to do a project called RAMPART,

16     which is a combination of -- they wanted to find out if

17     midazolam IM, in muscular, would be equal to or more

18     effective than IV Lorazepam.  They're both

19     benzodiazepines, but they both work just a little bit

20     differently.  And they understood that the drug of

21     choice was Lorazepam in the emergency room, but they

22     didn't really know if that was effective in the field

23     for paramedics.  And so it was a fascinating study.

24          Q.   Let me cut you off there.  Not that I don't

25     want to hear about that, but my question was just about

Guillermo Haro
February 13, 2020

Page 27

1      Q.   I'm just trying to figure out -- you mentioned

2  lead, used the term lead.

3      A.   Yeah.  And basically they're heading up a

4  project.  And RAMPART, it was actually a hub from a

5  national study.  So that was based out of Michigan.  It

6  was the National Institute of Health study.  And so we

7  were the University of Arizona hub.  And so Dan Spait

8  and -- I can't remember the other -- almost on the tip

9  of my tongue, but I can't quite remember.  Dan Spait was

10  actually the medical lead who was on that hub for

11  RAMPART.  Okay.

12      Q.   And then who were the -- who was the lead or

13  the leads on the EPIC project?

14      A.   Dan Spait and Ben Bobrow.

15      Q.   Both of them were?

16      A.   Yeah.  They were the main physicians

17  associated with that.  And it really wasn't a study.  It

18  was more of an educational elevation of traumatic brain

19  injury to the pre-hospital field.

20      Q.   Dr. Spait and Dr. Bobrow are both, I think,

21  widely regarded as the leading scholars, at least in

22  Arizona, as it relates to EMS?

23      A.   I agree.

24      Q.   So the RAMPART study, you participated in

25  that, it looks like, or at least according to this, from

Guillermo Haro
February 13, 2020

Page 29

1    the RAMPART study closing and the EPIC project

2    beginning?

3        A.    Months.

4        Q.    And what was it -- like did you stay on staff

5    with the University of Arizona --

6        A.    Yes.

7        Q.    -- even if there wasn't a project to work on?

8        A.    Yes.  There was enough money to keep me on and

9    before -- actually, no.  There was a break.  There was a

10   small break in between there.  After RAMPART, the money

11   ran out for my position and then I was picked up again

12   and it may have been as much as months to -- I don't

13   think it was a year, but it was I would say months in

14   between there when the EPIC project started and the

15   money came in.  And that was -- I was brought in as an

16   instructor for the EPIC project to teach other

17   paramedics how we're going to do this education process.

18       Q.    From the time you were initially employed with

19   the University of Arizona, have you always been referred

20   to as a senior research specialist?

21       A.    I think that came a little bit later.  That

22   wasn't -- for the RAMPART project I was actually a

23   paramedic coordinator.  That's what that was called.

24   That position was -- they needed a paramedic

25   coordinator, but primarily it was about the education of

Guillermo Haro
February 13, 2020

Page 30

1    implementing the RAMPART project.

2           The EPIC was an education process.  It was to

3    actually bring more awareness to the traumatic brain

4    injury standards and from emergency physicians and

5    actually start applying them in the field.

6         Q.   Was your title during the course of the EPIC

7    project, was it senior research specialist?

8         A.   I think that's what they called it, yes.

9         Q.   Because on the website for the EPIC project,

10   it reflects that you were the or a one of three EMS

11   educators.

12        A.   Yes.

13        Q.   Is that accurate?

14        A.   Yes.  The thing is that -- I'm not sure how

15   the categorization goes, but my job was mainly

16   education.

17        Q.   And describe what you mean in that regard with

18   respect to your work on the EPIC project.

19        A.   Okay.  That was -- that was a big project

20   because it required educating most of Arizona paramedics

21   and EMTs and getting the traumatic brain injury

22   guidelines that had been vetted by emergency physicians

23   for like almost around 2000, but those guidelines

24   weren't really being implemented in the paramedic world

25   or in the field.  When I say "the field," what I'm

Guillermo Haro
February 13, 2020

Page 34

1    correct?

2         A.   Yeah.  That's a few months off, yes.  I agree.

3         Q.   And when did you prepare this document?

4         A.   That's hard to say.

5         Q.   I think the initial report that we got, a

6    preliminary report from you, came out in May of 2019,

7    which I believe is what you just said is --

8         A.   Yes.

9         Q.   -- when your employment stopped --

10        A.   Right.  Right in there somewhere.

11        Q.   Please wait until I'm done.

12        A.   Sorry.

13        Q.   So is it my understanding that you stopped

14   working with the University of Arizona in May of 2019?

15        A.   That wasn't my choice.  The money for that

16   grant had run out right about that time.  Yes.

17        Q.    In other words, you were being paid out of a

18   grant connected with the EPIC project?

19        A.   The EPIC project.  And -- sorry, didn't list

20   that, but it's not on here.  I was working with the

21   Phillips project at that point too and that money was

22   coming from Phillips monitors and that had to do with

23   the effectiveness of cardiac compressions in the field.

24   And the Phillips monitor had this unique ability at that

25   point to be able to record a lot of data.  And so we

Guillermo Haro
February 13, 2020

Page 35

1  were actually doing a small study on how effective

2  compressions were done in the field.  And so I missed

3  that.  That should have been in there.  But that was a

4  really good experience, because we coupled it with a

5  capnography and a pulse oximetry associated with it,

6  which told us the effectiveness of how good compressions

7  were actually done in the field and what rate was

8  actually a really good rate to actually have better

9  outcomes.  But that was really presented by Phillips.

10 That was a small Phillips grant associated with it.  And

11 at that time I was kind of like working off the EPIC and

12 into EPIC and going into that Phillips grant.

13       Q.   So was the Phillips project that you worked

14 on, was that affiliated with the University of Arizona?

15       A.   Yes.  Yes.

16       Q.   And so --

17       A.   That's under Bruce Barnhart too.

18       Q.   And Bruce Barnhart, from what I gathered in

19 terms of his involvement on the EPIC project, was your

20 immediate supervisor; is that right?

21       A.   Yes.

22       Q.   Is there anything else -- you mentioned the

23 Phillips project is not reflected on your CV.  Is

24 there --

25       A.   Yeah.  I'm really disappointed --

Guillermo Haro
February 13, 2020

Page 39

1    Valley Community College?

2        A.    I think they call it EMT tutor.  I think

3    that's a classification they have.

4        Q.    Okay.  On your curriculum vitae here, which is

5    marked again as Exhibit 1, it solely identifies Paradise

6    Valley Community College --

7        A.    Em-hmm.  Yes.  I'm sorry.

8        Q.    -- as the college that you were affiliated

9    with in a teaching capacity.  You agree that's what it

10   says?

11       A.    Yeah.  Yeah.  I would say the month is a split

12   between Glendale, which is kind of like I was still

13   working in 2000 with Glendale Fire, so I started

14   teaching with that paramedic program occasionally on

15   different subjects and because I was still working full

16   time with Glendale Fire and that started right around

17   2000.  My primary job with that was essentially anatomy

18   and physiology for paramedics.

19           Right around -- right around after I retired

20   from Glendale Fire in 2006, I was available to actually

21   teach more and so in 2007 I was teaching for Glendale

22   Community College primarily in their paramedic program

23   all the way up until even through RAMPART I was still

24   teaching for Glendale Community, and when EPIC was still

25   going on, I was still doing a little teaching for

Guillermo Haro
February 13, 2020

Page 43

```
1        Q.   And how much time do you estimate --
2        A.   That's two days --
3        Q.   -- you put in?
4        A.   -- days of testing.
5        Q.   How many hours each day?
6        A.   It could be all day.
7        Q.   When -- when does the test take place?
8        A.   It takes place within a month after the
9   students graduate.
10       Q.   And -- but it only happens once a year?
11       A.   Yeah.  About once a year.
12       Q.   And the reason I ask is, at least from my
13  experience with community college, they have people that
14  are completing programs, you know, say at the end of
15  December and then again maybe there may be some in the
16  end of spring.
17       A.   The paramedic program that we have is between
18  14 and 15 months, so it goes until past the year.  So on
19  average it ends up being once a year that we test for
20  it.
21       Q.   Describe, generally speaking, your teaching
22  responsibilities at Paradise Valley Community College.
23  I'm really interested in the 2016 and 2017 time frame.
24       A.   Okay.  My teaching -- they brought me in for
25  anatomy and physiology.  They also brought me in for the
```

Guillermo Haro
February 13, 2020

Page 44

1   pathophysiology for the paramedics.  I do work with

2   pharmacology, but not as much as the other two.

3           What we really spend a lot of time with is

4   scenario work.  And that's not -- where we actually put

5   emergencies in front of them and moulage people and

6   bring other students in to act as patients, where we

7   bring like a hypoglycemic patient or an overdose patient

8   or a traumatic patient or a cardiac event patient.  All

9   those -- whatever scenario you can think of, emergency

10  in the field, we bring them out and we move the students

11  through these scenarios.

12          The reason we do that is that it's not just

13  about giving them all the textbook information that you

14  see in those two volumes on the table.  It's about

15  applying it.  And that's -- that is the critical work of

16  their education as far as now they start bringing all

17  their ACLS, which is cardiac class support for -- you

18  bring in pediatric advanced life support.  You start

19  thinking about medical, all the medical calls where --

20  difficulty breathing.  You bring all those things into

21  and you teach them all the skills on how to do it, but

22  now you're applying it to somebody.

23          It's like a mock patient that we're doing.

24  And so that requires a lot of setup and it requires

25  listening, asking questions later on, all of the review

BARTELT | NIX REPORTING, LLC
602-254-4111

Guillermo Haro
February 13, 2020

Page 45

1  afterwards.  Those we run all day, you know, because

2  each scenario almost takes a full hour to get done.  So

3  it's a pretty busy time.  That's where -- I think that's

4  where my expertise comes in.

5      Q.    Again, focusing on that 2016 and 2017 time

6  frame, tell me specific classes that you taught.

7      A.    Airway management, IV insertion, IO insertion,

8  cadaver labs and go into airway again.  We'd go into

9  crikes, cricothyrotomies.  We'd go into needle

10 thoracotomies.  We would go into intubations, but most

11 of the blades are Mac or the Miller.  We also would go

12 into King Vision.  We would have that available to them.

13     We start teaching them not only about the

14 anatomy approach on airway but what pitfalls to look

15 for, what areas to -- how to actually augment for a good

16 outcome or special tricks on how to use your hands and

17 pressure to actually view on the airway to get a good

18 intubation.

19     We go into super-glottic airways, how to

20 place, what are the pitfalls associated with them.  We

21 go into the binding, bandaging, hare traction splints

22 for femur fractures, also backboard applications, IVs,

23 what kind of fluid would you use on particular patients.

24 There's a lot more, but...

25     Q.    I'm more interested in, if you know -- and I

Guillermo Haro
February 13, 2020

Page 46

1   assume you would if you were the lead instructor --

2   what, like the specific class, was it EMS 101?  Do you

3   know what the call sign was for it?

4        A.   Oh.  Now, Rob Dotterer and Kevin Taussig are

5   both -- Kevin Taussig is actually the lead paramedic.

6   He runs the program from his side.  I'm one of his

7   instructors under him.  Bob Dotterer is the

8   administrator over the whole program at Paradise Valley.

9   So what they bring me in is -- when they bring me in

10  from classes, that's under the umbrella of a whole

11  section of instruction for the paramedicine.  I can't

12  tell you what number it falls under.  That's not what

13  I'm brought in for.  What I'm brought in for is specific

14  instructions under that umbrella what they're covering

15  in that particular section.

16       Q.   So what I'm imagining is you're effectively --

17  I have kids in elementary school, but we have like a

18  teacher's assistant.  Rob Dotterer is the lead

19  instructor, you are effectively --

20       A.   No.  I teach.  I teach because -- and Rob

21  Dotterer doesn't really do the teaching.  When he asked

22  me to come and do pathophysiology, I'm doing the

23  instruction.  When he asked me to handle airway

24  instruction on this particular class, I'm handling the

25  airway instruction.  I don't have any oversight on that.

Guillermo Haro
February 13, 2020

Page 47

1    He trusts me that I could deliver good information.

2        Q.    So my question was, and I'll ask it again:

3    What specific classes were you teaching?

4                MR. ZWILLINGER:   Form.

5    BY MR. SATTERLEE:

6        Q.    Do you know?   I mean, EMS 101?   I assume there

7    are call signs that coincide with that.

8        A.    Yes, but -- no.   I'm not listed as instructor

9    under that umbrella, but I'm not coming into -- like if

10   he asked me to do pathophysiology, then I'd come in and

11   I'd do two or three days of lecture under

12   pathophysiology, but that's -- I think that one's listed

13   as a subset, like an instructor or a class itself.   I

14   think that one's listed.   But as from as airway

15   management, that's part of a bigger umbrella under the

16   instruction and that falls under another section.

17       Q.    So if I were to go to Paradise Valley

18   Community College and ask them for their rundown of all

19   the classes that make up their paramedic program and ask

20   for a syllabus or syllabi for those respective classes,

21   am I going to find your name on any of those?

22       A.    You might find my name under the

23   pathophysiology.

24       Q.    Describe pathophysiology.

25       A.    Pathophysiology is all the deviants from

Guillermo Haro
February 13, 2020

Page 48

1   normal function in the body.  Like if you're hot, that's

2   hyperthermia.  We go into why you get hyperthermia.  If

3   you have a cardiac event, I go into why they got to that

4   cardiac event.  You start breaking it down.  It's a

5   disease state of a normal system.  That's what

6   pathophysiology is.

7           Q.    Apart from pathophysiology, do you believe we

8   would find your name attached to any other specific

9   courses being taught in the paramedic program at

10  Paradise Valley Community College?

11              MR. ZWILLINGER:  Form.

12  BY MR. SATTERLEE:

13          Q.    You can answer if you understood.

14          A.    Okay.  So American Advanced Cardiac Life

15  Support, I'm not sure they break in all the instructors,

16  but that's a whole 'nother subset.  Pediatric Events

17  Life Support, that's a whole section of training that

18  comes under the paramedic umbrella.  The tactical

19  training is another subset that comes under a bigger

20  umbrella also.

21              I don't know, but I know those are definite

22  courses that are applied, that are vetted nationally.

23  If they have actually subsets in their syllabus, I have

24  no idea.

25          Q.    Do any of the programs in which, whether it's

Guillermo Haro
February 13, 2020

Page 53

1   retesting at some period of time to make sure you're

2   still competent?

3        A.   Yes.

4        Q.   How frequently?

5        A.   Well, we teach a class at least once a year

6   and so part of teaching the class, again, you're

7   revaluated as an instructor, and so that's how that is

8   done.  That's done by another instructor or the one who

9   actually runs the program.

10       Q.   As a licensed paramedic and a teacher at

11   Paradise Valley Community College, do you subscribe to

12   any trade magazines?

13       A.   I get all sorts of magazines.  Most of my

14   information is coming from -- like I just read it on the

15   internet.  I don't subscribe to anything.  I just read

16   what's on the internet.

17       Q.   Do you stay updated and review any peer

18   reviewed journals?

19       A.   Again, it's like all the information that

20   we're looking at is current.  A lot of times when we

21   look at articles coming out of GEMS or Firehouse, those

22   are different articles that come out that are there,

23   they're available to you.

24       Q.   What would you describe as the most

25   authoritative journal or journals that govern the

Guillermo Haro
February 13, 2020

Page 54

1   practice of being a paramedic?

2       A.   I think GEMS is probably the one that comes up

3   more throughout.

4       Q.   And what does that stand for?

5       A.   I think it's General for -- I have never

6   really even looked at it -- General Emergency Medicine?

7   I'm guessing, but that's what -- but that was GEMS.

8       Q.   And how frequently do you study or take a look

9   at GEMS or anything else to make sure that you're

10  conversant with any updates or evolution as it relates

11  to being a paramedic?

12      A.   That's just an occasional thing of an article

13  that comes floating through.  A lot of times what

14  happens is that -- like a capnography article came out

15  through -- I'm not sure if it was GEMS or not, but what

16  they're regarding is essentially how effective is

17  capnography in predicting outcomes.  So, you know, those

18  are the kind of things that I read to keep up.

19      Q.   Have you ever published any article in any

20  journal or magazine or anywhere?

21      A.   For medicine?

22      Q.   Yeah.  As it relates to being a paramedic.

23      A.   No.

24      Q.   And how about with respect to emergency

25  medical services?

Guillermo Haro
February 13, 2020

```
                                                    Page 55
 1         A.    No.
 2              MR. SATTERLEE:  I'll have you mark another
 3     exhibit.
 4              (Exhibit 2 was marked for identification.)
 5              THE WITNESS:  Thank you.
 6     BY MR. SATTERLEE:
 7         Q.    Mr. Haro, I'm handing you what's been marked
 8     as Exhibit 2 to your deposition.  There is a few clips
 9     on top.  I'll try and help make sense of what we're
10     showing you.  It is, it is, but it's going to be easier
11     I think to try to go through it all together.
12              I'll represent to you at least the first -- I
13     believe first two pages is information that we were
14     provided by the Maricopa County Community College system
15     with respect to your employment there and the amount of
16     hours that you work.  I'll let you get hooked back up.
17         A.    Does that work?
18         Q.    And just so the record's clear, there's it
19     looks like two Bate stamps at the bottom.  I'll use the
20     top one.  It's Cutler RM 0815 and 0816.
21              Mr. Haro, have you seen the first two pages of
22     what we've marked --
23         A.    Yes, I remember seeing them in one of the --
24     one of the batches of information that came through,
25     yes.
```

Guillermo Haro
February 13, 2020

Page 76

1          A.   No.

2          Q.   And apart from those two jobs, did you derive

3     income from any other employment during the 2016 or 2017

4     time frame?

5          A.   No.

6          Q.   You mentioned a pathophysiology course you

7     teach once a year and you estimated it was roughly maybe

8     a three-day long, eight hours each day course; is that

9     right?

10         A.   Yes.

11         Q.   And I'm trying to distinguish your involvement

12    with that versus the other stuff that you do with

13    Paradise Valley Community College.  If you're not -- the

14    way I take that is that you are the lead instructor with

15    respect to pathophysiology?

16         A.   Yes.

17         Q.   You didn't mention any other specific classes

18    where you were the lead instructor; is that right?

19         A.   I agree.

20              MR. SATTERLEE:  Exhibit 4.

21              (Exhibit 4 was marked for identification.)

22              MR. SATTERLEE:  Do you need a break?

23              MR. ZWILLINGER:  No.

24    BY MR. SATTERLEE:

25         Q.   Mr. Haro, you've been handed what's been

Guillermo Haro
February 13, 2020

Page 77

1    marked as Exhibit 4 to your deposition.  I'll represent

2    to you that this is the preliminary report that we were

3    provided reflecting your opinions at that point in time.

4    Have you seen this document?

5        A.   Yes, I do.

6        Q.   Why don't you thumb through it and make sure

7    it looks complete.

8             MR. ZWILLINGER:  Are we going to power through

9    or take a break?

10            MR. SATTERLEE:  That's kind of what I was

11   thinking, but I defer to the people who are working

12   harder than me.  Go off the record real quick.

13            (Recess held.)

14            THE VIDEOGRAPHER:  This begins Media 2 in the

15   deposition of Guillermo "Willie" Haro.  We're on the

16   record at 12:00 p.m.

17   BY MR. SATTERLEE:

18       Q.   Mr. Haro, before we talk about what's been

19   marked as Exhibit 4, I wanted to make sure I understood

20   whether and to what extent you've ever participated as

21   an expert in a lawsuit before.

22       A.   No.

23       Q.   This is your first time?

24       A.   Yes.

25       Q.   Let's turn to Exhibit 4.  This is, as I think

Guillermo Haro
February 13, 2020

Page 79

1      Q.   Now, start from just so the high-level view,

2   it looks like you authored bullet point opinions on

3   pages 2 and 3 of the report.  Agree?

4      A.   Yes.

5      Q.   And I didn't see in any of those bullet points

6   that you identified that Mr. Cutler had ingested LSD.

7   Agree?

8      A.   I agree.

9      Q.   Why is that?

10     A.   Because I wanted to present a view from what I

11   knew as I approached David Cutler on the hill on that

12   day, what information did I have, what I would know,

13   what resources did I have available, what equipment did

14   I have available.  Those are the things I was thinking

15   when I presented this report initially, like what was my

16   viewpoint as a paramedic and my approach to the patient,

17   David Cutler.

18     Q.   So the first -- let's look at the first bullet

19   point.  You mention that David Cutler was suffering from

20   hyperthermia and you identified the primary cause as

21   environmental.  Agree?

22     A.   Yes.

23     Q.   Okay.  Do you, based upon your training and

24   experience, recognize that LSD can cause hyperthermia?

25     A.   Yes, it can.

Guillermo Haro
February 13, 2020

Page 80

1      Q.    And in fact, isn't it one of the more common

2  triggers for hyperthermia?

3      A.    I would say that's out of my realm.  I can't

4  really answer that question.

5      Q.    But if it's out of your realm, how can you

6  tell me what the primary cause was if you didn't

7  consider all the causes?

8      A.    Well, because the -- in my opinion, from my

9  background, the primary cause was it was June, it was a

10  hot day, the patient was lying on hot rocks, he was

11  completely unclothed, he looks red, he looks dry, he's

12  breathing at somewhere between 34 and 60 times a minute,

13  he is altered.  All those things point to hyperthermia

14  or a hyperthermia crisis.  Possibly I would say heat

15  stroke.

16      Q.    You identified the hyperthermia as -- this is

17  the second bullet point -- probably the underlying cause

18  of the altered level of consciousness.  What information

19  or evidence do you believe supports that conclusion?

20      A.    Because as you get hotter, your inability to

21  remove heat from your body is decreased or becomes

22  nonexistent.  Once the temperatures come up, your brain

23  starts -- starts to feel those effects.  It can't get

24  rid of the heat.

25            The brain is really sensitivity to several

Guillermo Haro
February 13, 2020

Page 81

1    things:   Does it have enough sugar?   Does it have enough

2    energy available to it?   Does it have enough oxygen

3    available to it and is it at the right temperature?   The

4    other thing we are kind of concerned about is whether

5    they can actually get rid of waste and do you have

6    enough of a blood pressure to actually profuse the

7    brain.

8             In this case it is a temperature problem that

9    is causing his altered level of consciousness.   As a

10   medic approaching this patient, David Cutler, the

11   environment -- I would be hot that day walking up that

12   hill.   I would realize that it was hot coming off the

13   rocks.   I know that he's totally exposed and has no

14   chance of protecting himself.   He isn't even trying to

15   protect himself.   His brain is telling me that it is too

16   hot based on what environment he is in at that time.

17   I'm not thinking of LSD.   I am thinking of the

18   environment.

19        Q.   But if -- I appreciate what you're saying,

20   that you're approaching this from the perspective of

21   what information would I have if I were a responding

22   paramedic.   That is my understanding what you're saying.

23   And to that point, you recognize that being a paramedic,

24   I think you referenced earlier, is a dynamic thing, no

25   two calls are alike.   Agree?

Guillermo Haro
February 13, 2020

Page 83

1      A.   That is somebody who cannot get off an area or

2   is in an area where it is on a trail or -- and I worked

3   in those areas.  I had a big park in my first do,

4   Thunderbird Park, and we had to use a Stokes basket

5   occasionally to get people from a broken ankle or a

6   heat-related event.  Yes.  That is -- it doesn't happen

7   every day.  It's just another tool.  We as

8   firefighters/paramedics, we deal in emergencies all the

9   time.  So when you ask that, yeah, it's not an everyday

10   occurrence, but it's something we're familiar with.

11      Q.   If you were, to the extent you can, give me an

12   estimate in your career as a firefighter, how many calls

13   did you use a Stokes basket?

14      A.   I would probably say a half a dozen times over

15   27 years.

16      Q.   That doesn't sound like a regular occurrence

17   to me then.

18      A.   I'm saying that it's nothing unusual.

19      Q.   If you were only using a Stokes basket in a

20   40-year career 6 times, that seems pretty unusual.  Do

21   you not agree with that?

22      A.   So is fighting a multi -- multistory fully

23   involved high-rise.  It doesn't happen all the time, but

24   we're trained to handle it.

25      Q.   And I agree.  I understand what you're saying.

Guillermo Haro
February 13, 2020

Page 84

1    But you told me it was a regular or frequent occurrence

2    earlier and now you're telling me it happened 6 times

3    over the course of a 40-year career.

4         A.   What I'm saying is in my respect it happens in

5    the valley quite frequently.  It is something that first

6    responders deal with quite a bit.  Just because I only

7    did it a half a dozen times doesn't mean it does not

8    occur.  Globally right around this area, the Sonoran

9    Desert, it's something that occurs.  People go down in

10   the desert while walking.

11        Q.   The use of ketamine obviously is part of this

12   case.  Do you have issues, as a paramedic, do you have

13   issues with the use of ketamine in the field?

14        A.   I have never used ketamine in the field.  I've

15   seen it used in the ED.  We -- I know how it works.  I

16   think it's a good drug, especially on kids.  I think it

17   does a really nice job of calming them down, but those

18   are specific circumstances that we're looking at.  You

19   know, I think ketamine is a good tool.

20        Q.   And you recognize that the drugs or the

21   medications that are available to a paramedic in the

22   field are directed from their medical direction and

23   their base hospital.  Agree?

24        A.   Yes.

25        Q.   So in this case the decision to use ketamine

Guillermo Haro
February 13, 2020

Page 85

1    or make it a valuable to paramedics to use in the field

2    was a decision that was made by Northwest Medical

3    Center?

4         A.   Yes.

5         Q.   You mention that you think it's a good tool in

6    the right situation; is that fair?

7         A.   That's fair.

8         Q.   What if any research have you done about the

9    use of ketamine in the field for paramedics?

10        A.   I've done some research.  I looked at

11   protocols and I've also looked at the profiles.  I

12   looked at the PowerPoint.  I can't remember which -- the

13   pharmacist out of Northwest Medical did the teaching

14   with -- for the paramedics before the ketamine came out.

15            I looked at NIH website.  There was a ketamine

16   article that was directed towards physicians.  I thought

17   that was a pretty nice little article.  They did a good

18   job as far as profiling it and how it is used.

19        Q.   Which article was that?  Was it one of the

20   articles referenced in a subsequent report?

21        A.   Yes.  It's in reference here.

22        Q.   When was the last time you responded to a 911

23   call?

24        A.   Probably -- well, might have been -- well, no.

25   I wasn't as a medic.  I'll let you know right now I

Guillermo Haro
February 13, 2020

Page 88

 1  already in the ambulance.  So now our focus was -- I was

 2  inside the vehicle trying to find out what the best

 3  access for, you know, to get an IV or an IO on her to

 4  actually get it started and to assess her pulse and see

 5  how she was breathing from the inside of the cab.

 6            I think that was probably the last time I

 7  really treated a 911 call.

 8       Q.   When was that?

 9       A.   I'd have to go back to Bruce Barnhart and have

10  him pull the records about when I did that class in

11  Prescott Valley, in the City of Prescott.

12       Q.   So but my question was specific to when you

13  were -- and maybe I'll clarify.  When was the last time

14  you were at the fire department or wherever -- wait

15  until I'm done -- employed as a paramedic and responded

16  to a 911 call and provided patient care?

17       A.   That was in 2006.

18       Q.   When you retired from the Glendale Fire

19  Department?

20       A.   Em-hmm.

21       Q.   That's a yes?

22       A.   Yes.

23       Q.   One of the bullet points in this opinion says

24  that ketamine given too rapidly can lead to respiratory

25  depression.  Do you agree with that?

Guillermo Haro
February 13, 2020

Page 89

1      A.    Yeah, I saw an article on it.  I agreed.  And

2  it's also -- it's in the article it's not only

3  bradycardia and tachycardia, but respiratory depression

4  and apnea can occur not only from the -- not only from a

5  high bolus but just from a normal bolus of ketamine you

6  can have those reactions or adverse reactions.

7      Q.    When was the last time you prepped medication

8  to use in the field as a paramedic?

9      A.    As a paramedic, as far as are you talking

10  about drawing ketamine specifically?

11      Q.    No.  I'm talking about any medication.

12      A.    Oh, I do that with classes every year.

13      Q.    That is not my question.  When was the last

14  time you prepared medication to administer in the field

15  as a paramedic?

16      A.    When I was at Glendale Fire Department.

17      Q.    The reference here to ketamine if given too

18  rapidly leading to respiratory depression, are you

19  suggesting that was the case here or is that just a

20  general statement you're saying?

21      A.    Okay.  My feeling -- okay.  When I saw -- when

22  I was reviewing the material, my feeling is this, is

23  that it is really tied with the time it was given, the

24  ketamine was given, and how fast David Cutler reacted

25  afterwards.  It was within a few minutes that he

Guillermo Haro
February 13, 2020

Page 90

1    starts -- his breathing started slowing down, his

2    responsiveness to any kind of stimuli decreased and also

3    they realized that they were actually -- Grant Reed and

4    Figueroa were trying to figure out is he breathing, does

5    he have a pulse.  To me it's like why did it happen so

6    quickly?  The only thing that came in between there was

7    the bolus of ketamine.

8        Q.   What's a bolus?

9        A.   Bolus means a rapid administration of

10   medication and that's, in this case, it was given

11   intramuscular.

12       Q.   There's two different ways to administer

13   medication or at least ketamine typically, right, IV or

14   IM?  What do those mean?

15       A.   IV is when actually you have inter -- you

16   actually throw a catheter into a vein.  Now, there's

17   actually a few more ways to do it.  You can go IO, which

18   means you are drilling into the bone and then giving the

19   bolus that way.  Some of the agencies you can actually

20   inhale it or actually put it in a mister and apply it

21   that way too.

22       Q.   And in this case it was done IM, which stands

23   for what?

24       A.   Intramuscular.

25       Q.   And of the different ways to administer that

Guillermo Haro
February 13, 2020

Page 91

1   you just identified, intramuscular is typically the way

2   for it to get into the body or the system the slowest;

3   is that fair?

4        A.   Of all of them that I mentioned, IM is

5   probably slower.   Really comes down to how well the

6   patient is profusing, how fast, but IV or IO I would say

7   are the fastest.

8        Q.   One of the documents that you relied upon in

9   connection with this preliminary report is identified as

10  a timeline summary of events.

11       A.   Yes.

12       Q.   Who authored that?

13       A.   He was from Scott's office.

14       Q.   But do you know who actually wrote it?

15       A.   No.

16       Q.   Did you do anything to independently verify

17  that the information that was contained within that

18  summary was accurate and consistent with the other

19  information?

20       A.   The Rural Metro report, the care report.

21       Q.   Did you cross-reference with any information

22  that originated from any of the Sheriff's deputies?

23  That's sort of a generic description.   I'm just trying

24  to figure out what that actually is.

25       A.   Well, Grant Reed's description and Figueroa,

Guillermo Haro
February 13, 2020

Page 92

1   Keith Barnes, Nadeen Dittmer, she had -- she was pretty

2   detailed.

3        Q.   Right.  So I see that.  You're looking at

4   sections -- I'm talking about No. 1.  It says "Timeline

5   Summary of Events."

6        A.   Yes.

7        Q.   Who authored that?  You don't know?

8        A.   I really don't know.

9        Q.   Did you rely upon that in connection with the

10  opinions you are expressing in this preliminary opinion?

11       A.   It's part of it.  It's not all of it.

12       Q.   There's another bullet point here now,

13  switching back to page 2.  And the bullet point says:

14            "Question whether prehospital

15       personnel had all their requisite basic life

16       support and advanced life support EMS equipment

17       when they encountered David."

18            What does that mean?

19       A.   It means did he have his ALS equipment, which

20  included his IV, IO equipment, his fluids to run through

21  that IV or IO?  Did he have an oxygen tank?  Did he have

22  a non-rebreather?  Did he have a nasal cannula?  Did he

23  have an OPA or did he have a oropharyngeal airway or did

24  he have any super-glottic devices or was he prepared to

25  intubate?  Did he have a monitor to monitor the

Guillermo Haro
February 13, 2020

Page 93

1    patient's heart rhythm and also a blood pressure cuff, a

2    thermometer to measure David Cutler's temperature?  All

3    the standard equipment you need as a paramedic to

4    provide advanced life support, along with your basic

5    life support equipment, which would include a simple bag

6    valve mask also included on that too.

7         Q.   Is it your opinion in this case that every one

8    of those items you just referenced should have been

9    brought up the hill to David Cutler?

10        A.   Yes.

11        Q.   And so then I guess, by extension, in

12   connection with your employment as a firefighter and

13   paramedic, are you telling me on every call you've ever

14   made, you brought every piece of equipment with you into

15   that call?

16             MR. ZWILLINGER:  Form.

17             THE WITNESS:  What I'm saying --

18   BY MR. SATTERLEE:

19        Q.   Well, no.  That's the question.  I'm asking

20   the question.

21        A.   Okay.

22        Q.   Are you telling me that on every call you ever

23   made you brought every piece --

24        A.   On every call?

25        Q.   Every call.

Guillermo Haro
February 13, 2020

Page 97

1   see it treated in the field as paramedics.

2           So those orders are -- it's like I tell my

3   students, do not deviate from your standing orders, your

4   paramedic orders, unless you have a really, really good

5   reason and then you can have a good rationale why you

6   deviated from those orders.

7           The reason they're given is because these are

8   orders that actually, for the most part, these are good

9   standing orders or protocols, however you want to name

10  it, or administrative, however you want to name them.

11  It gives you a float sheet about what needs to be taken

12  care of to keep the medic focused on what the problem is

13  in front of him and how to treat it.

14          The Northwest Medical orders are okay.  They

15  do a good job of explaining what needs to be done.

16      Q.   So what's the difference between a standing

17  order and an administrative order?  You don't know?

18      A.   I don't think there's any difference.

19      Q.   Okay.  Is it your position in this case that

20  when Grant Reed walked up that hill and even before

21  that, when he saw -- you recognize that his testimony is

22  that he saw Mr. Cutler on top of the hill?

23      A.   Yeah.

24      Q.   And he was told leading up to his leaving and

25  seeing him for the first time while staged, that he was

Guillermo Haro
February 13, 2020

Page 98

1    combative.  That is the testimony in this case.  Do you

2    agree with that?

3        A.   You know, sorry.  My hearing aids just did a

4    little beep here on the side.  Sorry.  Repeat the

5    question again.

6        Q.   Sure.  Upon exiting the ambulance and based

7    upon the information that was supplied, as the ambulance

8    reached the staging area where it was located at the

9    base of the hill, Mr. Reed noticed, which confirmed the

10   information he was provided, that Mr. Cutler was acting

11   in a combative and irrational manner.  Do you agree or

12   disagree with that?

13       A.   I don't know what information -- what he

14   actually saw.

15       Q.   Did you read his deposition?

16       A.   Yeah, I read it, but it's just like what are

17   we talking about, combative?  Was it flailing?  Is it

18   jumping off?  Is it a fight?  What are we talking about?

19   You know, it's a pretty general term.

20       Q.   How do you define it?

21       A.   I define combative that somebody is actually

22   trying to take you down, somebody is throwing punches,

23   somebody is kicking at you, somebody's trying to get on

24   top of you and hurt you.  That's combative.

25       Q.   And have you not seen any information in this

Guillermo Haro
February 13, 2020

Page 99

1   case that suggests that's the way Mr. Cutler was

2   behaving?

3        A.   I'm not -- you'll have to ask Mr. Reed

4   about -- I saw that information.  It's hard for me to

5   interpret how he saw what he saw on what he said.

6        Q.   Well, if that's his testimony, do you have any

7   reason to disagree or dispute it?

8        A.   No, but I'm just saying I'm not sure how he

9   sees it, what he means by combative.  You know, he could

10  mean something differently to him entirely.

11       Q.   Let's assume for the sake of today's

12  conversation that Mr. Cutler was combative.  You would

13  agree with me that you can't do any meaningful

14  assessment of a patient who's not compliant.  Agree?

15       A.   Yes, but I'd also like to point out is --

16       Q.   It's a simple yes or no.

17       A.   Right.  Okay.

18       Q.   You agree or disagree?

19       A.   It is difficult.  It's not impossible.  I

20  agree.  I agree it's difficult, but it's not impossible

21  to assess a patient.

22       Q.   But don't you think it would be a more

23  meaningful assessment, a more accurate assessment, if

24  you were to use the tools that you have, in this case

25  ketamine, to sedate the patient so you could actually do

Guillermo Haro
February 13, 2020

1     a meaningful assessment?

2          A.    No, I don't agree with that.

3          Q.    So if I understood your testimony earlier,

4     when Mr. Reed got to the top of the hill, he should have

5     put a blood pressure cuff on, he should have checked the

6     O² stats, he should have been able to do all those

7     things despite the way in which Mr. Cutler was behaving?

8          A.    My impression is this, is Vince Figueroa was

9     asked --

10          (Reporter clarification.)

11          THE WITNESS:    EMT Figueroa was asked a

12     question and in one of the depositions or statements

13     that -- and they showed him the Dittmer videos of David

14     Cutler and they asked him this question, "Is this how

15     David Cutler looked when you approached?"

16          What I'm seeing in those videos is this

17     is a manageable patient without any medication, that I

18     can approach him, that I can touch him, I can get a

19     pulse.  And they got a pulse.  I can try to speak to him

20     and see how much -- how much information he can give me.

21     I can speak to one of the deputies:  Did he say

22     anything?  Is this how he's looked all this time?  And

23     gathered more information.

24          It's obvious from the video that David

25     Cutler is not speaking very well.  He's saying some

Guillermo Haro
February 13, 2020

Page 101

1  things but he's incoherent and he's altered.  But it's

2  also apparent that all of the movement is controlled.

3                    The deputies have already called this a

4  Code 4.  That means everybody's good, everybody's safe,

5  come on up.  Why do I have to actually make him

6  completely unconscious and unresponsive so I can treat

7  him?  I don't need to do that.  I can try to approach

8  him.  I can see what he responds to.  I can touch him,

9  feel how hot he is.  I can observe his body a little bit

10  closer.  I can actually palpate his body, because his

11  hands are already restrained and his legs are

12  restrained.  So I can do a good physical assessment

13  without treating him with ketamine.

14       Q.    What's your understanding of excited delirium?

15       A.    My experience with excited delirium is this is

16  an uncontrolled individual who is, for any reason,

17  doesn't matter what the reason is really, is

18  uncontrolled behavior and where the patient is about to

19  harm himself or harm somebody else.  That is my

20  explanation of excited delirium.

21       Q.    Do you think David Cutler had signs and was

22  showing signs of excited delirium?

23       A.    I wouldn't call them excited delirium at that

24  point.

25       Q.    At what point?

Page 102

1      A.   At the point of the video when Dittmer started

2   filming, no.   What I see is somebody who is on hot

3   rocks, possibly in pain, who is altered.

4      Q.   When's the last time you treated a patient

5   that had excited delirium?

6      A.   That's been some time.   Probably sometime in

7   2006.   That's a guess.

8      Q.   But it would have been during your employment

9   with Glendale Fire Department?

10     A.   Glendale Fire, yes.

11     Q.   Do you have any issues with, to the extent a

12  diagnosis of excited delirium was identified, that the

13  use of ketamine was the appropriate thing to do in

14  response to that?

15     A.   Not if you looked like David Cutler.

16     Q.   What do you mean?

17     A.   I mean, if he was presenting like in the

18  videos like he was at that point, ketamine is out of the

19  picture.

20     Q.   So you mentioned Vince Figueroa.   Do you

21  also -- I assume if you read his transcript, much like

22  Grant Reed said that Mr. Cutler, they described it as

23  bucking, kicking when they first arrived at the staging

24  area.   Did you see that?

25     A.   Yeah, I did see that.

Guillermo Haro
February 13, 2020

Page 103

1      Q.   Would you describe that as behavior of a
2    compliant patient?
3      A.   No.   What I would explain that as somebody who
4    is being difficult who is having effects from
5    hyperthermia.
6      Q.   And remind me when what you think caused the
7    hyperthermia?
8      A.   The environment, the hot sun, over a hundred
9    degrees, him being exposed to the sun for several hours,
10   walking, exerting himself off in the desert and he's
11   altered.
12     Q.   And you don't think LSD and/or in combination
13   with caffeine can lead to that outcome?
14     A.   I would say that's a toxicology call.  It's --
15   to me it's -- to me those two things, the caffeine and
16   the LSD, if I was treating this patient, would not alter
17   my treatment of him.  I would still treat him for
18   hyperthermia, elevated temperature, being hot, being
19   altered, exposed to the environment and still being
20   exposed to the environment because he's laying on the
21   rocks.  He's gaining temperature every second he's
22   sitting there.
23     Q.   Right.  So you should get him off the hill and
24   into the back of the ambulance?
25     A.   Right.  Or better yet, get him off the floor

Guillermo Haro
February 13, 2020

Page 104

1   of the desert.   Put him somewhere where he can.

2            What kind of bothers me a little bit here is

3   that there are simple things that could have been done.

4   Why didn't we put him on the bag, the go-bag or whatever

5   bag that he's on, and take that and put hit butt on

6   there, at least get him off the floor and set him up.

7            Why didn't anybody start thinking about

8   fanning him with whatever they had around him to see if

9   they could have some air movement to start cooling him

10  down?

11           The event, what happened, is because Grant

12  Reed failed to take all his equipment up with him and he

13  limited what he could do.   He handcuffed himself in this

14  process.

15       Q.   Did you have or do you have any opinions about

16  Mr. Cutler's behavior in the immediate aftermath of the

17  fire that the Jeep he was involved in?

18       A.   I don't know what happened to David after the

19  fire.

20       Q.   You are aware that several first responders

21  looked in the surrounding area and were unable to locate

22  him.  Agree?

23       A.   Okay.  So we're going back --

24       Q.   Yes or no.  I'm just asking if you agree or

25  disagree.  It's a --

Guillermo Haro
February 13, 2020

Page 110

1      Q.   You stand by that?

2      A.   Yes.

3      Q.   And the next sentence states:

4               "This constitutes gross negligence."

5      A.   Yes.

6      Q.   Do you stand by that?

7      A.   Yes.

8      Q.   What is gross negligence?

9      A.   First of all, did he have a duty to act.  He

10   does.  He's a sworn member like Barnes was a sworn

11   member of law enforcement, Paramedic Grant Reed is a

12   sworn member.

13     Q.   Of?

14     A.   Of fire service.  So when you take that oath,

15   you are saying you are willing to what?  Put your life

16   at jeopardy for somebody else or do the best you can to

17   help them.

18              The other thing I would say is that -- and

19   it's not really spelled out, is that in somebody like

20   David Cutler's condition where he can't take care of

21   himself, that you will advocate for that patient because

22   he can't decide what's going to happen to him.  He has

23   no control about what's going to happen to him.  So your

24   job is to advocate for him.

25     Q.   But if he's a compliant patient as you

Guillermo Haro
February 13, 2020

Page 111

1  described earlier, why would he not be able to advocate

2  for himself?

3      A.   Because he's altered.   It's really simple.

4  He's altered.   His brain is not working the way it

5  should be.   So I can't take what he says as being in his

6  best interests.   What I have to do is act in his best

7  interests.

8      Q.   And back to the definition of gross

9  negligence, what is it?

10     A.   He had a duty to act.   And he went up there, I

11 agree.   Where he failed is that he was unable to

12 determine what the problem was and then once he

13 determined that it was something else, he gave an

14 inappropriate drug which harmed the patient.

15     Q.   Why is it inappropriate?

16     A.   It's inappropriate because he's not a

17 combative patient and he's not excitable delirium.

18     Q.   It's excited delirium; right?   What is the

19 definition -- what are the elements of excited delirium?

20     A.   Where the patient is flailing, thrashing,

21 trying to either hurt himself or in the process of

22 trying to hurt somebody else.

23     Q.   And you don't think there is any evidence or

24 information in this case that supports that condition?

25     A.   Not from the videos that I've seen.

Guillermo Haro
February 13, 2020

Page 112

1        Q.    I didn't ask about the videos.  I'm asking in

2    general.  You don't think there is any evidence or

3    information that supports the conclusion that Mr. Cutler

4    was experiencing excited delirium?

5        A.    I agree that Grant Reed calls it excited

6    delirium.  I saw that in his report.  I saw where Barnes

7    reported that it was -- that he was delusional and

8    combative.  Okay.  I saw that.  But I did see what is

9    this, is that when David is already restrained, then

10   Barnes, I believe, is the one who says -- who calls down

11   and goes, Hey, yeah, he's still delusional, but -- and

12   combative.

13           And so what I'm seeing on the footage is a

14   patient that is just basically flailing every once in a

15   while and speaking and not being totally coherent.  I

16   don't see a patient who's either combative or in

17   excitable delirium when I see those videos.  So, I see

18   conflicting information from what Barnes says and what

19   Grant Reed says and what I see on the video.

20       Q.    Do you not think it's a reasonable conclusion

21   for them to draw based upon what they heard -- they

22   being Vince Figueroa, Grant Reed upon arrival -- that

23   they've heard that he's combative -- he being

24   Mr. Cutler -- that he's altered, that he's delusional,

25   that he's irrational, and then when they get out of the

Guillermo Haro
February 13, 2020

Page 113

1    ambulance, they see them, in their words, bucking on the

2    top of the hill, you don't think that is a reasonable

3    conclusion for them to draw at that point that this is

4    likely a case of excited delirium based upon the

5    information they have at that time?

6         A.    If I saw that, I would -- I would still think

7    about this, is that I'm not going to make a big decision

8    on this until I get there and assess the patient for

9    myself.

10             I am observing something, yeah, looks like

11   he's combative or like he's bucking around.  So, why?  I

12   don't know.  I got to get closer to make an assessment

13   to find out what is really wrong with him and ask Deputy

14   Barnes what's going on, ask the patient what's going on.

15        Q.    So to that end, should they have delayed

16   treatment until they had an adequate debrief with the

17   officers and Sheriff's deputies?

18        A.    No.  That happens all at the same time.  I'm

19   asking questions as I'm looking at him.  I'm asking

20   Deputy Barnes as I reach down to take a pulse.  Do you

21   understand?  I reach down and I see his breathing as I'm

22   talking to Deputy Barnes.  All that is going on

23   simultaneously.  I don't have to stop and do one thing

24   and then do another.

25        Q.    Let's -- again, let's round out the gross

Guillermo Haro
February 13, 2020

Page 114

1   negligence piece.   You talked about a duty to act.

2        A.   Em-hmm.

3        Q.   Define gross negligence.

4        A.   He failed to act.

5        Q.   And that's your definition of gross

6   negligence?

7        A.   And then the -- and then the defendants

8   actually had a definite impact on the patient.

9        Q.   What are you relying upon, what information,

10  resource, et cetera as it relates to the definition of

11  gross negligence?

12       A.   I had a little bit of a talk with Scott last

13  week and he was kind of rounding up what gross

14  negligence was, so I have an idea that -- and what I'm

15  looking at -- and also Paul, Paul Vaporean, you know,

16  because he goes, "This is what it looks like.   This is

17  what the definition is."

18            And my feeling is that Grant Reed had a duty

19  to act and he was there, but then he didn't.   What

20  happened was that -- is that instead of recognizing what

21  the problem was in front of him, he deviated into this

22  excited delirium thing and the only reason he really

23  started -- stayed in that place is why?   Is because now

24  he has already drawn this medication and he has it with

25  him and he has a little bit of something in his bag, $O_2$,

Guillermo Haro
February 13, 2020

Page 115

1    maybe non-rebreathe and OPA, but he doesn't have all his

2    equipment associated to help him give this medication.

3    So, actually, he puts the patient in harm's way by

4    acting the way he did.

5             The risk and benefit ratio associated with

6    this was not anywhere close.  I see David Cutler in this

7    condition where I don't have to restrain anymore because

8    it's Code 4.  I have four deputies on -- on the hill

9    with me, capable people of restraining somebody who's in

10   trouble, wasn't going to give him any problem.

11            I had Vince Figueroa, a big man.  I don't know

12   how big he is, but do you understand?  He's a

13   firefighter.  He's gone through some things.  He should

14   be able to do that job.

15            Grant Reed is there.  He's a trained paramedic

16   and has been trained to do what?  To recognize this

17   condition and treat it appropriately.  And then what

18   does he do?  He gives him a medication that this patient

19   doesn't even need.  That is where the problem is, is

20   that why are we wasting time on something he doesn't

21   need when I'm not doing what I need to do, which is,

22   exactly, is cool this patient down, start fanning him

23   down, get him off the hot rocks and now start treating

24   him for what the problem is.  Cool him down.  He never

25   even took a temperature.  Why are we doing this?  Why

Guillermo Haro
February 13, 2020

Page 116

1  are we giving him this drug when it's not needed?

2       And there's adverse effects associated with

3  this drug, ketamine.  One of them being what?  He stops

4  breathing.  And it drops his blood pressure and it

5  raises his blood pressure.  His heart rate could go too

6  fast or go too slow and he wouldn't be able to recognize

7  it at all.  Because why?  He doesn't have an essential

8  part of his equipment, which is all his airway equipment

9  because in case he goes into respiratory depression, and

10  he doesn't have any clue about what his heart is doing

11  because all that equipment is downhill.

12       Whose decision was that?

13     Q.   But I'm still trying to get the definition of

14  gross negligence.  You mentioned that you had a

15  conversation with Mr. Zwillinger last week; correct?

16     A.   Yes.

17     Q.   This report was authored in May of 2019.

18     A.   Right.  Yes.  And I had my view what gross

19  negligence was.  And my view is this, is that his

20  failure to recognize -- he had a duty to act.  He went

21  up there, but when he went up there, he -- it would have

22  been -- why don't we just send somebody who's not

23  trained up there?  He doesn't have all the equipment.

24       He had all the time to take his equipment with

25  him that he knew he probably needed because he's given

BARTELT | NIX REPORTING, LLC
602-254-4111

Guillermo Haro
February 13, 2020

Page 117

1    this drug and so now not only did he have a duty, he

2    goes up there and what does he do?  He gives him this

3    drug instead of, what, treating him for what he needs to

4    treat.  He never recognized what the problem was.  And

5    then he gave him the wrong drug, a bad drug that

6    actually made this patient worse.

7         Q.    So what's the difference between gross

8    negligence and negligence?

9              MR. ZWILLINGER:  In his opinion.

10             MR. SATTERLEE:  Yeah.

11             THE WITNESS:  I feel that if he -- if he went

12    up there with all his equipment and he was ready and

13    then decided that, you know what, this is -- this is a

14    chemical problem, an LSD problem or intoxication

15    problem, and started treating him for that, okay, but

16    didn't get to the core of the problem, which was his

17    hyperthermia and the heat stroke and failed to treat

18    that, I would say that, okay, he went up there, he made

19    a mistake on what the problem was with the patient and

20    started treating him for something else.  His negligence

21    was this, he failed to recognize what the problem was.

22                   What happened with Grant Reed is that he

23    didn't even help himself on this.  He didn't bring up

24    all the equipment that he needed to actually do a good

25    job for his patient, to be an advocate for his patient.

Guillermo Haro
February 13, 2020

Page 118

1    He failed in that regard.  And to me that's just grossly

2    negligent.

3    BY MR. SATTERLEE:

4        Q.   But so what's negligent?  You're just

5    saying --

6        A.   I just explained it to you the best I could.

7        Q.   Okay.  So you're saying a misdiagnosis, in

8    your view, is negligence, the failure to bring up

9    supplies is gross negligence?  Is that how you are

10   distinguishing this?

11       A.   No.  What I'm saying is that -- is that --

12   kind of.  I'll say that.  I'll say kind of that's what

13   I'm trying to say.  You know, it's like I'm trying to

14   get through this as best as I can, so -- but I feel

15   that -- is that if he makes a mistake and doesn't

16   correct it or has the inability to correct it, then it

17   gets gross negligence.  Do you understand?

18            It's like I didn't recognize the mistake, it's

19   negligence.  But to recognize that there's something

20   wrong and not have what I needed to take care of it is a

21   problem.  Do you understand?

22       Q.   Well, you know, part of my, we'll call it

23   confusion -- whatever, I don't know what the appropriate

24   word is -- is we go from the preliminary opinion here

25   and you mention, at the end, you mention that this,

Guillermo Haro
February 13, 2020

Page 119

1   which I guess is a general failure to comply with

2   standard of care constitutes gross negligence, and then

3   in the report that you subsequently authored, we go from

4   1 reference to gross negligence to 17 references of

5   gross negligence.

6          A.   Well --

7          Q.   Just wait.   And I'm trying to figure out,

8   because we go from, you know, this first report to the

9   second report and it gives me the impression that

10  literally from the time they turn the ambulance on to go

11  to this call, everything they did was not only wrong but

12  deviated so far from the applicable standard of care,

13  that everything was grossly negligent.

14         A.   Well, I had more time to review the material

15  between those two reports.   I have more material to

16  review.

17         Q.   But my question is:   As you're sitting here

18  today, is it your testimony that literally everything

19  from the time that Grant Reed and Vince Figueroa went to

20  the scene of this particular call until the time they

21  left the hospital after dropping off Mr. Cutler was

22  grossly negligent?   Because that's the impression I'm

23  left with.

24         A.   I'm sorry you got the impression, but that was

25  not my intent.   There was a cascade of events where

Guillermo Haro
February 13, 2020

Page 120

1    there was grossly negligent, I agree with that, but --

2         Q.    Seventeen different acts?

3         A.    He's the one who did them.  Yes.

4         Q.    Okay.  Let's turn to -- I guess we're on 5.

5               (Exhibit 5 was marked for identification.)

6               MR. ZWILLINGER:  Do you mind if we take a

7    break?

8               THE VIDEOGRAPHER:  Off the record at

9    12:57 p.m.

10              (Recess held.)

11              THE VIDEOGRAPHER:  On the record at 1:08 p.m.

12   BY MR. SATTERLEE:

13        Q.    Mr. Haro, before I go into Exhibit 5, a couple

14   of sort of backdraft questions.  You would agree that --

15   and we touched on this a little bit earlier, but

16   generally speaking, as a paramedic you go into a call

17   not always having, rarely having, complete information

18   about what's going on.  Agree?

19        A.    Not complete information.  You have a good

20   idea about what you're approaching most of the time.  I

21   think, even with Rural Metro, I think they use the CAD

22   system where basically the information is set up in

23   their cab where it tells you a general call, what it is.

24   And if I remember right, I think this was an unknown

25   incident or unknown problem with an individual.  I think

Guillermo Haro
February 13, 2020

Page 145

1    general opinions you have, but I did notice and I

2    mentioned earlier that you made reference throughout

3    your opinions about this and your supplemental report

4    and I counted I think 17 separate times you identified

5    Mr. Reed's conduct as grossly negligent.  And those are

6    position and opinions you stand by?

7        A.   Yes.

8        Q.   And I, admittedly, I still don't understand

9    your definition of the standard of care because you kind

10   of looked like a moving target.  You mentioned what a

11   reasonable paramedic would do sometimes in this report.

12   Just define what that means.

13       A.   Standard of care?

14            MR. ZWILLINGER:  Form.

15   BY MR. SATTERLEE:

16       Q.   No.  Paramedic -- what is a reasonable

17   paramedic, what is that standard that you are

18   benchmarking against?

19       A.   One who's been trained in an accredited

20   program, one who has actually been tested in the

21   National Registry and one who has been working in an EMS

22   system and has gained a significant amount of experience

23   to apply his craft.

24            Now, we can test everybody and we can train

25   and you can get through the test, but once you take on

Guillermo Haro
February 13, 2020

Page 146

1    the role as a paramedic, you have to start wondering

2    if -- how are -- how are we going to conduct ourselves,

3    what are we measured by.  And so the only thing that we

4    can go by is what you write on your report.  Did you

5    provide the care that was needed at the appropriate

6    time?  Did you have what you needed to provide the

7    appropriate care?  That's kind of like what would a

8    reasonable paramedic do.  And then if we were

9    experiencing the same call, what are the expectations?

10   What is the training?  What are the standards or the

11   protocols associated with it?  Those -- those -- those

12   are the skills that are actually defined in the books.

13   It's kind of like, you know, it's like what do we expect

14   out of a paramedic?  How is he going to conduct himself?

15        Q.   To that point, when you're referencing that's

16   how you're trained or educated in accordance with the

17   books --

18        A.   The National Registry too.

19        Q.   Okay.  Where is that listed in your documents

20   that you reviewed?

21        A.   Well, it's actually in mine.  If you look

22   through, it's probably under -- and I'm not sure, but I

23   would think under Nancy Caroline's Emergency Care in the

24   Streets, which I brought here.  There's a standard of

25   care associated with everything that we do.

Guillermo Haro
February 13, 2020

Page 147

1        Q.    Is it your testimony that Nancy Caroline's

2   Emergency Care in the Streets 7th edition is

3   authoritative as it applies to paramedics?

4        A.    Yeah.   It's a good volume.   It's a good book.

5   It's pretty comprehensive.   It's been vetted by several

6   different physicians.   National Registry has admitted

7   it.   Accreditation has said, okay, this is the volume

8   that -- this is one of the volumes that we are going to

9   use when teaching.

10       Q.    Is there a reason that you're not using the

11  most recent edition of that book?

12       A.    That's just the one I had at home.

13       Q.    Do you know when that was copyrighted?

14       A.    It's the 7th edition.   I'm not sure what we're

15  up to.   Maybe probably -- I'm not sure how far up.

16  Maybe as much as -- I don't know, to tell you the truth.

17       Q.    The other resource materials that you

18  referenced -- and we may have touch on this earlier.

19  One of them was the Dr. Salek provided some PowerPoint

20  slides?

21       A.    Yes.

22       Q.    And two were affiliated with Northwest Medical

23  Center?

24       A.    Yes.

25       Q.    You saw those?

Guillermo Haro
February 13, 2020

Page 148

1          A.   Yes.
2          Q.   And that provided some perspective or outline
3     of ketamine?
4          A.   Yes.
5          Q.   And then, likewise, it looked like you
6     referred to a resource material about ketamine
7     StatPearls, NCBI bookshelf?
8          A.   National Institute of Health, yes.
9          Q.   And that, again, was more of just sort of a
10    kind of a description of ketamine and its application
11    and pharmacology?
12         A.   Yeah.  It's an application, gives you a
13    background, it gives you dosages, counterindications,
14    indications, adverse effects.  It gives you tendencies.
15    It has some -- it has actually a great section on --
16    it's only about a paragraph, but team building,
17    modalities associated with it, which I thought was
18    really good because it really brings out the play that
19    if you are thinking about using ketamine, that you got
20    to have all the resources available to you around you
21    immediately to intubate the patient or handle an airway
22    problem.  That -- to me that was like -- it was really,
23    really valuable.
24              It's like not only do I see it when -- on
25    textbooks about when we're giving benzodiazepines or

Guillermo Haro
February 13, 2020

Page 150

1   have an adverse reaction, because I don't know David

2   Cutler.  I don't know his past history.  I don't know

3   anything about him.  I'm reaching him cold.  He can't

4   even tell me what the problem is.  So now I'm going to

5   give him this drug.  I need to be ready to what?  Handle

6   any complications associated with the drug.

7           I haven't seen David Cutler and gave him

8   ketamine.  I don't think I would have given him ketamine

9   in this case, because he didn't present like somebody

10  who needed it.

11      Q.   You agree, though, that is a judgment call on

12  scene?

13      A.   That's right.  That's medicine.  I agree.

14  It's medicine.  It's a judgment call.  And so you look

15  at that and go am I really going to push ketamine on

16  this guy, on David?  And I go, I can.  If you think your

17  judgment that this is excitable delirium, okay.  If you

18  think this guy's combative when he's basically tied down

19  and laying on the ground, okay, maybe so.  But the thing

20  is this, if I'm going to push that drug, I don't have

21  any business pushing it unless I have all the

22  resuscitative equipment around me.

23      Q.   Let me -- let's jump into your opinions and

24  I'm going to, like I said, kind of skip around here.  So

25  we're back under I guess this is page 6, ending 000011.

Guillermo Haro
February 13, 2020

Page 151

1        A.    Okay.

2        Q.    You made a reference in the middle of

3   subsection (a) that Mr. Cutler may have been suffering

4   from a traumatic brain injury or other trauma from the

5   Jeep crash and/or fire.  What evidence do you have to

6   support that conclusion?

7        A.    Okay.  I can't remember what deposition I

8   remember reading it in.  I don't know if it was

9   Figueroa's deposition or Grant's deposition, but

10  somewhere along the line, the captain made reference he

11  talked to the crew and says, "Do you think this guy's

12  from the fire?  Do you think it's the same guy?"  Okay.

13  So even in Grant Reed's report he puts what?  We believe

14  that -- I'm paraphrasing -- we believe that this is

15  the -- this is the driver from the Jeep.  So even Reed

16  felt that was the same guy.

17       Q.    So just to short-circuit, my question is what

18  evidence do you have to support that Mr. Cutler was

19  suffering from a traumatic brain injury?

20       A.    Okay.  So he's in an accident.  All right.  We

21  have a good idea that David Cutler was the one in the

22  accident.  We all believe that, right?  So let's say he

23  was in the accident, all right?

24            Now, if he was in an accident, he could have a

25  traumatic brain injury from the accident itself.  He has

Guillermo Haro
February 13, 2020

Page 152

1    cuts and bruises all over his face and all the rest

2    around his hands and knees.  He's fallen down.  So

3    that's not such a big jump.  That is not a very big jump

4    at all, because if I'm thinking that he's from the crash

5    site, now I'm going why did he wander around, is it now

6    a traumatic brain injury, that's why he's wondering

7    around, that he's been gone for several hours?  So when

8    I encounter him, I'm not only thinking environmental, he

9    could also be a traumatic brain injury victim.

10        Q.    Apart from you drawing that conclusion in your

11   report, can you point me to an autopsy report or any

12   other resource as it relates to the facts of this case

13   that supports that Mr. Cutler sustained a traumatic

14   brain injury?

15        A.    Only from Grant Reed assuming that he was the

16   driver, Barnes assuming that that was the driver from --

17   and they were at the wreckage, so there was enough

18   impact at the Jeep site for somebody to get hurt.

19            Now I'm going to let you know from the EPIC

20   study, is that -- is that you can have a GCS -- remember

21   we talked about GCS, and he came in at 10 initially,

22   okay, David Cutler did, but what they've been finding

23   out -- and you can look at Dan Spait's EPIC reports on

24   traumatic brain injury and go through the process -- is

25   that 50 percent or almost 50 percent of patients who

Guillermo Haro
February 13, 2020

Page 153

1    have a traumatic brain injury have a GCS of 50, means

2    they're perfect, there's no problem, they answer all

3    your questions, they can do everything they need to do.

4          So now I see David and I'm assuming he's the

5    driver and he is acting like this, not only is it that

6    I'm thinking it's an environmental problem, this could

7    be a traumatic brain injury victim too.

8          No, there was probably nothing found in

9    postmortem.  They probably didn't find anything there,

10   but my assumption as a competent paramedic is that if

11   I'm linking these two events together, he could be a TBI

12   and now I also have, what, a hyperthermic problem.

13        Q.    Are you telling me that traumatic brain

14   injuries lead to hyperthermia?

15        A.    No.  What I'm saying is that they're two

16   different things, but now they are showing up in the

17   patient themselves.

18        Q.    How is your conclusion that Mr. Cutler may

19   have sustained a traumatic brain injury anything other

20   than pure speculation?

21        A.    We do that all the time on the event of what

22   happened.  Just because -- let's say -- let's say I come

23   up to David Cutler, he's involved in an auto accident,

24   okay?  He comes out, all right?  I see there's enough

25   force, he's coming injured and he acts a little bit

Guillermo Haro
February 13, 2020

Page 154

 1   altered.  My assumption is that he has suffered a

 2   traumatic brain injury victim.  I will start treating

 3   him in that direction just because of the way he's

 4   presenting.

 5          I don't have a CAT scan, I don't have an

 6   X ray.  What I'm assuming is that force of the vehicle,

 7   what I saw as far as damage, also how David's acting and

 8   his GCS, is he in 50 normal or he's just a little bit

 9   slower to respond.  I'm going to treat him as a

10   traumatic brain injury victim.

11       Q.   I saw a reference within one of these and I

12   can't pinpoint it right now, but you stated that

13   effective chest compressions cannot be done while moving

14   a patient down the hill.  Is that true?

15       A.   That's true.

16       Q.   So it's your testimony that there is no

17   research out there to show that if a patient is on a

18   Stokes basket --

19       A.   I don't know --

20       Q.   Wait until I'm done.

21       A.   I'm sorry.

22       Q.   I want to make sure I understand, because

23   that's an opinion that --

24       A.   Start from the beginning, please.

25       Q.   Yes.  So you are telling me that you cannot

Guillermo Haro
February 13, 2020

Page 155

1    perform effective chest compressions with a patient who

2    is being moved on a Stokes basket?

3         A.    Yes.

4         Q.    And your opinion or testimony as a designated

5    expert in this case is that there's no research that

6    would support otherwise?

7         A.    I don't know if there's any other research out

8    there.

9         Q.    You haven't looked?

10        A.    No.

11        Q.    So what is that conclusion that you are

12   drawing in this case based on?

13        A.    Based on my experience -- based on my

14   experience as far as -- and not only a Stokes basket,

15   because I never really actually coded somebody on a

16   Stokes basket, but I'll let you know I know how a Stokes

17   basket works and how flexible it is.

18             The thing is is that when you're doing

19   compressions on somebody, you need a hard flat surface

20   to do effective compressions.  The reason you need that

21   is because you need to be able to push enough force on

22   the chest wall to bring it down far enough between two

23   and two and half inches so you have complete

24   compression.  And then the other thing is that you got

25   to let off completely so you have good filling time.

Guillermo Haro
February 13, 2020

Page 156

1            If that isn't done correctly, I don't care how

2     good your drug therapy is, I do not care how good your

3     electrical therapy is or your oxygenation, nothing is

4     going to happen.  You are losing in this game.

5            The single most important thing in cardiac

6     arrest is effective continuous compressions and you

7     cannot do that on a Stokes basket.  They flex too much.

8     If you're moving, you cannot do effective compressions

9     coming downhill.  There is just no way.  We've tried and

10    we tried to do that on just patients coming down

11    stairwells and have them on the backboard and trying to

12    get them down.  It's inefficient.  You can't do it.  You

13    don't have their proper positioning.  You can't get your

14    shoulders and weight over the top of the patient.  You

15    can't do -- you cannot actually do the proper numbers,

16    between 100 and 120 per minute.  There is just too

17    much -- it's too hard of work.  You just can't do it.

18            I don't care how many people you have around

19    trying to hold it stable, just the flexion on this

20    Stokes basket as you press down, that means your

21    compressions are ineffective.

22         Q.   I saw that you, I think, took issue with the

23    administration of naloxone, which is also typically

24    commonly referred to as Narcan.  Agree?

25         A.   Em-hmm.

Guillermo Haro
February 13, 2020

Page 167

1    would come back with a different opinion.

2         Q.   But let me round this out by finishing out the

3    last paragraph here.  It states:

4                   "My review of the prehospital records

5         do not find any deficiencies or negligence

6         whatsoever in the EMTs care, as they acted

7         appropriately and followed standing protocol in

8         their care for this patient."

9              Number one, did I read that correctly?

10        A.   Yes.

11        Q.   And you disagree with that based upon what

12   we've talked about?

13        A.   I don't agree with it.  I think it's -- I

14   think it's inaccurate.

15        Q.   I looked, out of curiosity -- Dr. Bobrow has

16   published 124 articles in peer review journals, most of

17   them related to prehospital care of patients in

18   emergency situations.  Do you have any reason to dispute

19   that?

20        A.   No.  I know he's really prolific on writing.

21   I understand that.

22        Q.   And research?

23        A.   And research, yes.

24        Q.   How many articles have you written on

25   prehospital care of patients in emergency situations?

Guillermo Haro
February 13, 2020

Page 168

```
 1        A.    Zero.
 2             MR. SATTERLEE:  I'll conclude with that for
 3   now.
 4             MR. AUDILETT:  Off the record.
 5             THE VIDEOGRAPHER:  This ends Media 2.  We're
 6   off the record at 2:10.
 7             (Recess held.)
 8             THE VIDEOGRAPHER:  This begins Media 3 in the
 9   deposition of Guillermo "Willie" Haro.  We're on the
10   record at 2:17 p.m.
11
12                      EXAMINATION
13   BY MR. AUDILETT:
14      Q.    Mr. Haro, my name is Daryl Audilett and I
15   represent Sheriff Napier in this case.
16             You indicated in your report, at least the
17   preliminary report, you talked about Mr. Cutler, I
18   think, being -- and you put this in quotation marks --
19   hogtied, end quote.  Do you recall that?
20      A.    Yes.
21      Q.    What is hogtied?
22      A.    At the time when I made this report, I didn't
23   have a really good understanding about what hogtied
24   means.  From gathering from the other depositions, it
25   seems like what they need to have is actually the knees
```

Guillermo Haro
February 13, 2020

Page 180

1    heat?

2        A.    That's an unknown.

3        Q.    Well, is somebody who drives in a vehicle from

4    the university a few miles to where he crashed his Jeep

5    and it caught on fire in these temperatures going to be

6    altered from the heat?

7        A.    What I am saying, I don't know what happened

8    prior to the crash.  I have no idea.  And -- but if you

9    say he crashed, what I'm saying is there's a possibility

10   that he was altered from a traumatic brain injury after

11   the crash.

12       Q.    Okay.  Let's set that aside for a moment and

13   let's not talk about possibilities.  Let's talk about

14   what we know.

15       A.    Okay.

16       Q.    And we know he drove from the university area

17   several miles to this hill which had no road leading up

18   to it.  He just took off into the desert in his Jeep,

19   tried to drive up this steep rocky hill, crashed his

20   Jeep into a Palos Verde tree and then it caught on fire.

21   And let's -- we don't know that there was brain injury.

22   What's the other possible explanation for him leaving

23   the scene, stripping off all his clothes and wandering

24   in the desert for two or three hours?

25       A.    Okay.  We're going to go past the accident.

BARTELT | NIX REPORTING, LLC
602-254-4111

Guillermo Haro
February 13, 2020

Page 181

1   He's out of the vehicle.  I don't know what happened

2   before or what condition he was in.  I have no -- I

3   don't have any idea why he drove there and crashed.  I

4   have no idea.  What I do know is that -- is that if he

5   was in that condition and it went into the side of a

6   Palos Verde tree, there's a possibility that he banged

7   his head.

8       Q.   But there is no evidence of that?

9       A.   Right.  Exactly.

10      Q.   But there is evidence that he had LSD in his

11  system; right?

12      A.   That's what the toxicology report says, yes.

13      Q.   Well, you don't doubt that?

14      A.   No, I don't, but --

15      Q.   Have you treated somebody under the influence

16  of LSD?

17      A.   Yes.

18      Q.   Tell me about that.  What was their behavior?

19      A.   Their behavior varies.  It just depends on

20  actually where they're located and what they're doing.

21  If they're in -- if they're in a loud environment or an

22  environment that is full of different stimuli, they can

23  actually react differently.  They can be a little bit

24  more excited, more a little bit -- you -- they're not

25  really processing reality very well.

Guillermo Haro
February 13, 2020

Page 182

1          Q.    That's kind of a general description.  Let me

2    ask you this.  In your experience in encountering people

3    under the influence of LSD, you have seen them lucid at

4    one moment and essentially out of their minds,

5    hallucinating the next?  Would you agree?

6          A.    Yeah, I've seen that.  Yeah.  You know, keep

7    in mind that I haven't seen a hundred LSD patients.

8          Q.    How many have you seen?

9          A.    My feeling is that it's somewhere between I

10   would say, a rough estimate, maybe 25 over the time that

11   I've worked for Glendale Fire.

12         Q.    Is it your opinion, now knowing that he had

13   some LSD in his system, is it your opinion from an

14   emergency medical, any sort of medical perspective, that

15   none of what happened to him had anything to do with the

16   LSD in his system?  Is that your opinion?

17         A.    My feeling is this --

18         Q.    No, no, no.

19         A.    Okay.

20         Q.    Is it your feeling, is it your opinion, that

21   the series of events from the time he crashed into the

22   Palos Verde tree and it caught on fire until he was

23   found a couple of hours later on top of the hill,

24   apparently lucid at that point, is it your opinion that

25   nothing in those series of events had anything to do

Guillermo Haro
February 13, 2020

Page 184

1       Q.   Let's try again.

2            Is it your opinion that LSD played no role in

3  the series of events that led him into crashing into the

4  tree, stripping off all his clothes, wandering in the

5  desert for several hours, climbing the hill and all the

6  way up to the point of his death, is it your opinion

7  that LSD played absolutely no role in those series of

8  events that I just described?  Is that your opinion?

9            MR. ZWILLINGER:  Form.

10           THE WITNESS:  What I'm saying is that I don't

11  know if LSD had an effect on that.

12  BY MR. AUDILETT:

13      Q.   And I get back to the question I asked a

14  little earlier:  It kind of makes sense, though, that

15  LSD did play a role in those series of events, doesn't

16  it, from a common sense perspective?

17           MR. ZWILLINGER:  Form.

18  BY MR. AUDILETT:

19      Q.   Just using your plain old common sense.

20      A.   I don't think it played a role when the medics

21  arrived.  That's all I'm going to say about that.  I

22  don't think it played a role when the medics arrived.

23      Q.   Common sense tells you it played a role up to

24  when they arrived?  Can you give me that?

25           MR. ZWILLINGER:  Form.

Guillermo Haro
February 13, 2020

Page 185

1          THE WITNESS:  I'm going to leave that up to

2   the toxicologist.

3          MR. AUDILETT:  Okay.

4     Q.   You described the conduct of the deputies as

5   gross negligence in the last sentence of that paragraph

6   numbered 7.

7     A.   Em-hmm.

8     Q.   Correct?

9     A.   Yeah.  No. 7 on page 10?

10    Q.   Yeah.  We're on page 10 and now we're at line

11  7.

12    A.   Em-hmm.

13    Q.   Is that yes?

14    A.   Yes.

15    Q.   You say:

16          "This gross negligence and reckless

17      indifference to David's obvious needs severely

18      worsened David's condition and also contributed

19      to his death."

20          Do you see that?

21    A.   Yes.

22    Q.   And the term "gross negligence," have you ever

23  used that term before this case?

24    A.   No.  This is my first time.

25    Q.   You've never spoken that term before, you've

# Exhibit 2

**Guillermo "Willie" Haro**
**11215 W Lower Buckeye Rd**
**Tolleson, AZ  85353**
**623-221-1828**
**ggharovb@gmail.com**

## SUPPLEMENTAL AND REBUTTAL REPORT

I have been retained by the Plaintiffs and the attorneys for Plaintiffs to provide an expert opinion and report regarding paramedic services, care, treatment and conduct in the matter of Robert Steven Cutler, *et al.* v. Mark Napier, Sheriff, Pima Cunty, *et al*., pending in the United States District Court, District of Arizona, Case Number CV-18-00383-FRZ.

My background includes 41 years of experience in Fire and EMS in the Phoenix, Arizona metropolitan area.  I retired as a firefighter from the City of Glendale in 2006 and have devoted the past 13 years to EMS education and research.  My primary focus has been paramedic education – both the initial training, as well as refresher courses.  I have the reputation for excellence in both my patient management, as well as my instructor skills.

I currently maintain my National Registry of EMTs Paramedic level certification, in addition to my AZ State Paramedic certification, which I have had since 1979.  I am an Advanced Cardiac Life Support Instructor, in addition to maintaining my Basic Life Support Instructor certification.  I am also a certified Instructor for Pediatric Advanced Life Support.  I also maintain my Tactical Emergency Casualty Care Instructor certification.  I primarily teach initial paramedic training courses through the Maricopa County Community College District.

The majority of my professional time since 2002 has been devoted to training and instructing paramedic students in the paramedic training program through Maricopa County Community College District.  The paramedic training programs through Maricopa County Community Colleges are accredited paramedic training programs.

Over the past 13 years, I have worked as an EMS coordinator and senior research coordinator in conjunction with the University of Arizona, College of Medicine, for three prehospital projects.  I was the lead for the RAMPART status epilepticus study to evaluate IM Midazolam versus IV Lorazepam for efficacy in managing status seizure activity.  The RAMPART Trial was published in the New England Journal of Medicine.  My agency, Glendale Fire, had the lowest protocol deviation rate out of the 10 research

1  hubs nationally.  The local success was attributed to my relationship with all the
2  participants and my dedication to excellence through education of the agency's
3  paramedics who participated in this groundbreaking prehospital study.

4  One of my other research projects is the EPIC (Excellence in Prehospital Injury Care)
5  Traumatic Brain Injury Project.  This project required significant initial training and
6  ongoing education of various agency Master Trainers, as well as individual EMS
7  personnel to ensure successful implementation of the nationally vetted TBI guidelines.
8  The project required extensive training, not only regarding the management of the TBI
9  patient, but also for "attention to detail" when properly documenting the patient
10 encounter.  My role as the State's Senior Master Trainer has taken me all over AZ and
11 allowed me to develop good working relationships with many EMS personnel and
12 hospital ED staff.  As various personnel heard my presentation, it led them to specifically
13 request that I provide this valuable training to their own respective agency personnel.  I
14 have trained over 90% of all the valley area fire departments, both BLS and ALS
15 employees, and I have trained 15-20 other agencies around the State.  I had initially been
16 training other personnel to be "Master Trainers", but the popularity of my classes has me
17 directly teaching many more personnel than I had anticipated.

18 The third project was in conjunction with Philips Healthcare.  I trained agency EMS
19 personnel to utilize the Q-CPR (puck) device to help ensure quality of compressions
20 during Cardio-Pulmonary Resuscitation (CPR).   There were 4 local fire agencies who
21 utilized the Philips MRx monitors and participated in this study.  The data collected from
22 their monitors allowed analysis of the CPR being performed and was/is an excellent
23 training tool to improve the quality of the compressions and help ensure the best possible
24 outcome for the patient.

25 As part of my review of the facts and my preparation of this report, I undertook a site
26 visit of the location at which the subject events occurred, in the "Twin Hills" area in Pima
27 County, Arizona, east of the city limits of Tucson.  During my visit, the temperature was
28 approximately 85 degrees, it was mid-day and the sky was cloudless.  I twice walked up
29 and down the subject hill to the east of the local resident, Kristen Powell (11405 E Calle
30 Catalina), who first reported seeing the subject of this case, the late David Cutler.  For
31 one of my trips up and down the hills, I wore a backpack with no less than 40 pounds of
32 weight in the backpack.  Walking up the hill with the 40-pound backpack and walking in
33 a slow but deliberative manner required 4 minutes and 45 seconds from the gravel

Haro000017

1  driveway to the Gomez residence (11407 E Calle Catalina) immediately to the east of
2  Mrs. Powell's residence.

3  Based on the information reviewed by me, my summary of the events of June 5, 2017 is
4  as follows:

5  Around 9:40 AM a vehicle (Jeep) fire was reported in a residential desert area east of
6  Tucson, but no driver was located.  Rural/Metro Fire Dept., Inc. ("Rural Metro"), the
7  Pima County Sheriff's Department ("PCSD") responded to the Jeep fire.  The Rural
8  Metro responding crews included Paramedic Grant Reed ("Reed") and Emergency
9  Medical Technician Vince Figueroa ("Figueroa").  The PCSD responding officers
10  included Deputy Keith Barnes ("Barnes") and Deputy Christopher Davenport
11  ("Davenport").  The Jeep was registered to Mr. David Cutler ("David"), then age 23
12  years.  It had been driven up a hill, struck a tree, and then caught on fire.

13  Mrs. Powell reported first hearing a man yelling for help at around 11:00 AM, but she did
14  not initially see anyone.  Soon thereafter she again heard the man yelling for help and
15  sighted him, later identified as David, naked and walking up the hill, one of the "Twin
16  Hills", to the east (behind) her residence.  Mrs. Powell placed a 911 call at approximately
17  11:30 AM.  Mrs. Powell's home was within a no more than 6-minute walk from the top
18  of the hill on which David was walking.  The 911 emergency dispatcher called Mrs.
19  Powell back to receive additional information.  Mrs. Powell continued to watch and keep
20  a lookout toward the hill.

21  Barnes had left the Jeep fire scene and was at a nearby convenience store.  He responded
22  to the call of the sighting of David with his lights and siren.  He reported that at the time
23  he assumed the person was involved in the earlier Jeep accident and fire.  Barnes reported
24  that on arrival at the scene, his PCSD vehicle registered the temperature as 108°F.
25  Barnes was the first emergency responder to make contact with David, at around 11:45
26  AM.  Once at David's side at the top of the hill, Barnes spoke with David.  It is noted that
27  during this initial contact, David was cooperative and followed Barnes' commands,
28  including by agreeing to Barnes' request to be handcuffed; David turned around with his
29  hands behind his back and allowed himself to be handcuffed by Barnes.  Barnes caused
30  David to go from standing on his feet to varyingly sitting and laying on the desert ground,
31  with no clothing and no other protection from the desert ground.  By the time of arrival of
32  Davenport, the second deputy at the scene with David, David is reported as making
33  noises, but not uttering any decipherable words.  Two more deputies, Nadeen Dittmer
34  ("Dittmer") and Jared Ernest arrived at the hilltop location with David, and David was
35  placed in RIPPS hobble restraints due to reports by Barnes of David having become
36  combative.  While restrained, David is lying fully exposed with his bare skin in direct
37  contact with the hot desert rocky ground.  There is no record of the deputies providing

3

Haro000018

protection between David's body and the ground or shade from the sun, and no report of any other cooling efforts and no report of providing water to David.  At approximately 12:05 PM, Dittmer took three short videos of David laying naked on the ground on his back, with the RIPPS hobble restraints in place, with rapid and labored breathing and in obvious pain.  Upon review of the audio of the Dittmer videos, David uttered several things which were decipherable.

Emergency medical services were called for at 11:48 AM but staged nearby due to the reports of combativeness by Barnes, awaiting notice that David was secured and the scene was safe for them to go to his location on the hill.  A Rural Metro ambulance, staffed by Reed and Figueroa, arrived at approximately 12:07 PM.  Reed reported he made contact with David at 12:13 PM.   According to Rural Metro's Patient Care Report, time-stamped at 6:52 p.m. on 6/5/17, David's vital signs initially were reported as a heart rate of 160 BPM and a respiratory rate of 34.  Since there was no report or documentation of his initial blood pressure, blood sugar, temperature, capnography, oxygen saturation, or ECG, it must be presumed that none of those assessments occurred at that time.  David was reported to have spontaneous eye opening, but he was reported to present with incomprehensible speech and withdrawal from pain.

There was no report of Reed debriefing or receiving any information from the four deputies who were with David when Reed arrived, so it must be assumed that Reed did not know that David was placed on the ground by the deputies, that he was compliant prior to being placed on the ground or that he was speaking clearly, even if allegedly partly delusional, prior to being placed on the ground.  Per Rural Metro's Patient Care Report, Reed reports he administered 150 mg of Ketamine intramuscularly in each deltoid of David (for a total of 300 mg of Ketamine), stating that he "followed administrative order for excited delirium" which references the "Northwest Medical Center (NWMC) Behavioral Administration Order".  Reed reported drawing 500 mg of Ketamine in the syringe and bringing only that to David's location on the hilltop.  Reed claims some was wasted during the injections.  At least one deputy reported Reed stating he administered 400 mg of Ketamine.  There exists no waste report for any of the 500 mg of Ketamine not injected by Reed into David's arms.  According to Reed's report, David had a "positive response to Ketamine administration." (Per Dittmer, shortly after the Ketamine administration, David became very still, and his respirations notably slowed.)

Once Reed noticed David's breathing had slowed, he had David raised from the prone position and placed in a seated position, still without any supportive oxygen or ventilatory assistance.  After he was raised to a seated position, the first effort to shield David's naked body was reported – a tarp or blanket under him in the seated position.  It was reported that as David was placed on a spine board and prior to moving him to a

Haro000019

Stokes basket (a single wheeled basket on which the spine board is placed for removal from rough terrain), he became apneic and pulseless and chest compressions were started. Chest compressions were interrupted for at least 5 minutes as David was wheeled down the hill in the Stokes basket.  Effective chest compressions would have been impossible while descending the hill.  Continuous effective chest compressions are necessary for survival of the patient.  Chest compressions do not instantaneously create sufficient blood pressure to circulate to the lungs and brain; once sufficient pressure is generated if it is stopped, the decline in pressure is not gradual, it is precipitous.  During this extrication time, intramuscular naloxone was administered despite the fact there were no indications of opioid use or toxicity prior to his collapse.  In the time it took them to descend the hill with David, there were no apparent airway, breathing, or circulatory lifesaving measures taken to address the cardiopulmonary arrest.  Such efforts are required to resuscitate a person in cardiopulmonary arrest as reported for David.

Upon arrival with David at the ambulance, assisted ventilation was reported.   A tympanic temperature of 102.9º F was reported.  Reed administered more naloxone intramuscularly and then at 12:36 PM David was intubated after an intraosseous line was obtained.  He was given multiple rounds of epinephrine (total of 4 mg), more naloxone (total of 6 mg) and amiodarone (300 mg).

Paramedic Grant Reed stated in his patient care report that he had intubated David at 12:36 PM, indicating that this intubation was performed during transport.  It required four intubation attempts to finally secure David's airway, per Paramedic Reed's documentation.  My concern is the apparent lack of appropriate preoxygenation of David Cutler in between each intubation attempt.  Based on Paramedic Reed's documentation, the only time David Cutler was appropriately managed with preoxygenation was only prior to the first failed intubation attempt.

The current national standard of care states that all patients requiring intubation be preoxygenated for two to three minutes prior to any intubation attempt.  Paramedic Reed's own documentation fails to indicate proper and timely preoxygenation prior to each of his remaining three attempts.  He stated that he successfully intubated and confirmed placement all in one minute, verifying the lack of appropriate oxygenation of David Cutler between his four attempts to secure this airway.

These prolonged intubation attempts could have been easily avoided by using a supraglottic device to manage David's airway.  The national standard teaches the placement and use of supraglottic airways to ensure rapid oxygenation and ventilation.

David was defibrillated once for an episode of ventricular tachycardia, but he developed pulseless electrical activity and then, asystole.  His blood sugar was checked at 12:40 and

5

Haro000020

1  reported to be 192 mg/dL.  During David's prehospital care by the Rural Metro
2  paramedics, there was no reference to them following the "Northwest Medical Center
3  Hyperthermia Order" but there are reports of water being poured on David and ice packs
4  being applied after he was at the ambulance and continued in cardiopulmonary arrest.

5  David was transported to Tucson Medical Center ("TMC"), reportedly "per Northwest
6  Medical Center Cardiac Arrest Administrative Order".  The Patient Care Report,
7  apparently incorrectly, identifies the "Name and Location of Facility" to which David
8  was transported as St. Joseph's Hospital.  It is believed that TMC is approximately 3.3
9  miles further away from the scene than is St. Joseph's.  After 15 minutes of resuscitation
10 effort at TMC, David was declared dead at 1:08 PM.

11 After the ambulance left the scene, several first responders went to Mrs. Powell's
12 property to get relief from the sun and heat, receiving shade and water.

13 The autopsy performed on June 7, 2017 by Dr. David Winston reported the cause of
14 death as "hyperthermia due to exposure to the elements and lysergic acid diethylamide
15 toxicity".

16 From this information and based on my education, training and experience, the following
17 are my opinions, to a reasonable degree of scientific paramedic certainty, on the
18 condition and care of David Cutler on June 5, 2017:

19 1) The use of Ketamine in treating David on June 5, 2017 was below the standard of care
20 and grossly negligent for several reasons:

21      A. David's condition and the circumstances at the time and location of Reed's
22         arrival at his side on the hill did not justify the use of Ketamine.  David was fully
23         restrained and in obvious acute physical distress due to his exposure to the
24         elements, and, possibly, due to injuries sustained in the Jeep crash and/or fire.  He
25         was hot and dry and not speaking clearly.  Everyone on scene correctly believed
26         that David was the victim of the Jeep crash and fire and that he had been in the
27         desert for more than 2 ½ hours by the time Reed administered the Ketamine.  No
28         reasonable medically trained person, including no reasonable paramedic or
29         emergency medical technician, would have concluded anything other than that
30         David was suffering from heat stroke, or, at minimum, hyperthermia, and that he
31         may have been suffering from head trauma/traumatic brain injury or other trauma
32         from the Jeep crash and/or fire.  Reliance on earlier, whether accurate or not,
33         claims that David was "combative" when he was observed in the condition as
34         depicted in the Dittmer videos, is grossly negligent and beneath the standard of
35         care.  Reed could and should have asked the deputies, including Barnes,
36         everything that they knew about David's condition and behavior before

6

considering administering Ketamine.  There existed no facts on which any reasonable paramedic could conclude that David's condition and behavior was caused by illicit drugs or any other cause of so-called "excited delirium".  Reed should have immediately initiated treatment for heat stroke, and he should have never administered Ketamine or any other sedative to David.  Administering Ketamine was grossly negligent conduct by Reed and below the standard of care.  The failure to immediately treat David for heat stroke and/or hyperthermia in place, on the hill, was grossly negligent conduct and beneath the standard of care.

B.  Even if it is claimed that Ketamine was appropriate, and I emphatically declare that it was not, the Rural Metro protocols under which Reed was operating, were not followed.  The "Northwest Medical Center Behavioral Administrative Order" begins with initiation of supportive care, including a primary and secondary survey/assessment of the patient prior to obtaining vital signs, temperature and blood sugar and placing the patient on a cardiac monitor and oxygen if needed.  Reed failed to adhere to this protocol and did not complete a secondary patient survey leading to his failure to recognize a patient in distress secondary to heat stroke, rather than the "excited delirium" patient he was expecting based upon the PCSD's report.  This too was gross negligence.

C. A blood pressure, oxygen saturation (ensuring maintenance of the oxygen saturations at 90% or higher), blood glucose and temperature were not obtained prior to administration of Ketamine.  These measurements of the patient vital signs are required elements of patient assessment to assist with establishing the patient's baseline status, thus helping to drive the appropriate treatment and management of the patient.  This essential part of patient assessment is taught to all emergency medical technicians, both EMTs and paramedics, in their initial training as well as during subsequent refresher training.  This was a failure to act by all the emergency medical personnel on scene with David, including Reed.  This contributed to their inability to recognize the actual nature of the problem that David was experiencing – heat stroke.

D. The only vitals that were taken upon patient contact were a pulse rate and a respiratory rate, because the only equipment taken up the hill to the patient's side was a syringe and Ketamine.  The failure of Reed and Figueroa to take BLS and ALS equipment and heart monitor to the patient's side contributed to Reed's failure to identify a life-threatening emergency and prevented him from beginning immediate and appropriate emergency care.  The proper equipment was in the ambulance at the bottom of the hill and could have been carried to David's side in no more than 5 minutes.

7

E. The use of Ketamine comes with adverse complications such as excessive salivation, laryngospasm, respiratory depression, bradycardia, tachycardia, hypotension, hypertension, and confusion.  Increased airway secretions from the Ketamine can compromise breathing.  David is noted by one of the deputies to be drooling after the Ketamine administration, yet immediate treatment (airway suctioning) was not available.  The cascade of events involved his subsequent respiratory depression, leading to apnea and cardiac arrest.  Treatment would require positive pressure bag-valve mask ventilation or intubation.  Any paramedic who uses Ketamine must know the indications, contraindications, and adverse effects of this drug.  Resuscitative equipment should be at the patient's side, before administering Ketamine, in case intubation is required.  To administer Ketamine in David's setting and to not have immediate access to life saving equipment was grossly negligent and below the standard of care.

2) The failure to quickly recognize acute respiratory distress and appropriately treat the patient was gross negligence and failure to follow the standard of care for both an EMT and a paramedic in Arizona.

Upon Reed's arrival at David's side, per Reed's own documentation, David's respiratory rate was 34.  However, upon my review of both Video 1 and 2 by Dittmer, it was apparent that the actual observed respiratory rate was between 56 and 68 times per minute.  Figueroa confirmed in his deposition that the condition of the patient, as seen in the videos, was an accurate depiction of the condition of David at that time.

Any patient with a respiratory rate of 30 or greater needs immediate lifesaving intervention.  The more rapid the rate, the more distressed the patient is and the greater the urgency of immediate lifesaving intervention.  At a minimum, David needed ventilatory assistance with a bag-valve-mask (BVM) and supplemental oxygenation to manage a ventilatory rate of 10-12 breaths per minute.  This treatment is a Basic Life Support skill that either Reed or Figueroa should have performed.  Their combined failures to recognize and appropriately treat this life-threatening emergency contributed to the death of David.  Even if they had recognized the medical emergency in front of them, they could not treat due to their failure to bring any BLS and ALS supportive equipment to the patient's location on the hill.

3) David developed cardiopulmonary arrest, yet he was never evaluated to see if his oxygen saturation was low, thereby requiring supplemental oxygen, or if his blood pressure was low, thereby requiring interventions other than Ketamine.  Both of these problems can lead to the rapid cardiopulmonary collapse that David developed.  Reed's gross negligence in failing to follow his established "Northwest Medical Center Cardiac Arrest Administrative Order" directly lead to David's death.

8

Haro000023

4) Once David went into cardiopulmonary arrest and chest compressions were necessary, he should not have been moved from the hilltop until the rescuers accomplished return of spontaneous circulation.  There is no record of any call via radio or otherwise to other rescuers down at the bottom of the hill, to bring up all the emergency medical equipment, so it must be assumed no such requests were made.  The terrain, including the relatively flat solid rock hilltop, has sufficient locations where effective chest compressions could have been undertaken.  Whether due to the earlier grossly negligent act/omission of failing to bring to David's side all necessary equipment, or due to other grossly negligent decision-making, the decision to descend the hill with David in the Stokes basket while attempting to perform chest compressions was grossly negligent.  With immediate and uninterrupted chest compressions, rather than the at least 5 minutes with no effective chest compressions, David would have, with a reasonable degree of paramedic certainty, been resuscitated and survived.  If Reed had kept David in place on the top of the hill with effective chest compressions being performed, the other already present first responders could have transported all other necessary equipment (the equipment which should have been with Reed before he administered the Ketamine) to the hilltop. Effective chest compressions are the single most important treatment in cardiac arrest. Without good quality compressions, drug therapy, oxygen, and defibrillation are ineffective at resuscitating a patient.  All paramedics are taught that without appropriate and adequate oxygenation, their patient will deteriorate due to hypoxia.  The decision to descend the hill with David in cardiopulmonary arrest equated to giving up any hope or expectation of resuscitating David.  This decision was grossly negligent.

5) David's temperature was not checked until well after the Ketamine administration and was found to be elevated yet there was no indication that the "Northwest Medical Center Hyperthermia Administrative Order for Heat Stroke" was followed.  There are reports of some cooling measures being taken but this occurred only after David's cardiopulmonary arrest.  The use of the term "malignant hyperthermia" by Bruce Evans is improper in this scenario.  This term is used for a genetic disorder that is triggered by anesthesia.  This misuse of medical terminology is concerning.

In my opinion, rapid recognition of this patently obvious hyperthermic emergency / heat stroke and institution of cooling measures and rapid fluid boluses via IV or IO would have saved David's life.  For Reed to not follow Rural Metro's "Northwest Medical Center Hyperthermia Administrative Order" was below the standard of care and grossly negligent.

6) The administration of multiple rounds of naloxone to David was grossly negligent and beneath the standard of care as naloxone is an antidote or reversal agent for the effects of opioids, such as heroin or fentanyl.  Opioids produce sedation and respiratory depression. In addition, a paramedic or EMT should have been able to recognize pinpoint pupils and

9

Haro000024

1   any evidence of respiratory depression initially, had this truly been an opioid overdose.
2   David was reported by the paramedic to be breathing at 34 times per minute.  Prior to his
3   cardiopulmonary arrest there was no indication that David was under the influence of
4   opioids nor was there any report that he had taken any.  Naloxone is not a reversal agent
5   for Ketamine nor is it treatment for heat stroke or hyperthermia.  The administration of
6   naloxone multiple times was grossly negligent and below the standard of care as it was
7   not indicated, and it harmed David as more beneficial, and obvious, therapies such as
8   assisted ventilation could have been performed during the time it took to administer the
9   naloxone.  All the time spent administering an unnecessary and unindicated drug
10  (naloxone), could have been better utilized providing the patient with rapid IV fluid
11  boluses and rapid cooling of the patient's body.  The approximate 16 minutes it took to
12  get David to this needed cooling down with ice packs and bolus fluid resuscitation via the
13  IO they established, also contributed to his death.  These failures to act by Reed were
14  grossly negligent and beneath the standard of care.

15  7)  I do have concern in respect to the reported carbon dioxide ($CO_2$) values documented
16  as determining appropriate tube placement in David's trachea.   Optimum compressions
17  and good ventilations should produce $CO_2$ values in the range of 10-20mm Hg. when a
18  patient is in cardiac arrest.   To see documented values of 36 and 32, without return of
19  spontaneous circulation, is unusual.  A patient that has no underlying perfusing heart
20  rhythm will not produce $CO_2$ levels in the 30's.

21  8) PCSD's treatment of David after he was handcuffed and hobbled by the RIPP
22  restraints also contributed to his death.  It was obvious from his appearance and behavior,
23  as seen on the videos, that David was suffering from environmental stress, i.e. heat
24  stroke, not excited delirium.  Yet, in over 30 minutes before the arrival of Reed and
25  Figueroa, not one of the deputies attempted to hydrate, cool or even shade David from the
26  sun or protect him from the ground.  He laid in the full sun on the desert rocks and
27  ground, being held to the ground at times, with no barrier to protect him from direct
28  contact with the ground that may have been as hot as 140° F.  The report by PCSD of
29  David being "combative" contributed to the delay in response by Reed and Figueroa.
30  Since David was handcuffed and then in RIPP restraints, he was helpless, could not
31  remove himself from the environmental stress and was completely reliant on the deputies
32  to save his life before the arrival of Reed and Figueroa.  This gross negligence and
33  reckless indifference to David's obvious needs severely worsened David's condition and
34  also contributed to his death.

35  For this report I was granted access to all disclosures and discovery responses.  Among
36  the material I reviewed is the following:

37      1.  Rural/Metro Pima Patient Care Report

10

Haro000025

2. Autopsy Report
3. Toxicology Report
4. Video taken by Kristen Powell
5. 3 videos taken by Deputy Nadeen Dittmer
6. Northwest Medical Center Behavioral Administrative Order
7. Northwest Medical Center Hyperthermia Administrative Order
8. Northwest Medical Center Cardiac Arrest Administrative Order
9. Ketamine-StatPearls-NCBI Bookshelf
    https://www.ncib.nlm.nih.gov/books/NBK470357/
10. Pharmaceutical Review for Paramedics February 2017 Ferena Salek, PharmD
11. National EMS Education Standard Competency; PowerPoint slides
12. Nancy Caroline's Emergency Care in the Streets, 7th Edition
13. Keith Barnes deposition transcript July 31, 2019
14. Vince Figueroa deposition transcript June 25, 2019
15. Grant Reed deposition transcript June 25, 2019
16. David Winston, MD PhD.  deposition transcript August 15, 2019
17. Christopher Davenport deposition transcript February 6, 2019
18. Bentley Bobrow, MD deposition transcript May 3, 2019

I reserve the right to amend this report should new or additional information be presented
to me.  My hourly rate is $75 per hour for review and literature research.  My hourly rate
for deposition and courtroom testimony is $150 per hour plus all travel expenses.

Date: *12-30-19*

Guillermo G Haro, NRP

11

**Haro000026**

# Exhibit 3

Bentley Bobrow, M.D.
May 3, 2019

IN THE UNITED STATE DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Robert Steven Cutler,    )
                         )No. 18-CV-00383-TUC-FRZ
          Plaintiff, )
                         )
vs.                      )
                         )
                         )
Pima County, et al.,     )
                         )
          Defendants.)
_____)

VIDEOTAPED DEPOSITION OF BENTLEY BOBROW, M.D.

Phoenix, Arizona
May 3, 2019
8:05 a.m.

Prepared by:
SHELLEY HAVERMANN, CR      BARTELT NIX REPORTING
Certificate No. 50432      111 West Monroe Street

                           Suite 425
Prepared for:              Phoenix, Arizona 85003
SUPERIOR COURT             Phone: (602) 254-4111
(ORIGINAL)                 Fax:  (602) 254-6567
                           Office@BarteltReporting.com

Bentley Bobrow, M.D.
May 3, 2019

Page 24

1          I would like to ask you a little bit
2    about the -- in the beginning of your email here
3    you talk about the fact that they -- the
4    response, and then the time it took them to get
5    to the patient's side.
6          Do you believe that, with all of your
7    years of experience, that the response time to
8    get to the patient's side was reasonable under
9    the circumstances of the matter?
10       A.  What my recollection, that -- and I think
11   what I wrote is that it took -- they had
12   documented six minutes to get from the point
13   where they arrived on-scene to where the patient
14   was.
15          And my understanding was that it was in
16   the desert.  They had to walk a distance in the
17   desert.  And so -- and they also have to carry
18   their equipment, and so it did not appear to me
19   that there was a significant delay or anything
20   that you wouldn't expect, you know, physically
21   trying to get to a patient.
22       Q.  Okay.  And then later in your email here,
23   when the paramedic, Reed -- I'm sorry.  Let me
24   start over.  That's terrible.
25          What was your understanding of the

Bentley Bobrow, M.D.
May 3, 2019

Page 25

1   condition of the patient when Paramedic Reed

2   initially encountered the patient?

3        A.   Yes.   So after reviewing the EMS report

4   and the police report and the hospital report,

5   it appeared to me that he had a condition called

6   agitated delirium --

7        Q.   Okay.

8        A.   -- which is a syndrome, which is actually

9   quite difficult to treat.   So you can -- if you

10  have never seen this before, it's something that

11  you'll nothing forget.   You can picture the

12  Incredible Hulk, literally.

13       Q.   Okay.

14       A.   In agitated delirium patients are

15  hallucinating.   They are confused.   They're hot.

16  Their heart is racing.   They have a massive

17  adrenaline surge.   They are incredibly strong.

18  And the other very interesting thing that --

19  why this -- actually, that's what I think was

20  the right assessment, was they take their

21  clothes off.   It's this -- it's this very common

22  thing in agitated delirium.   Unless you've seen

23  it, you don't really quite get it.   It's also

24  incredible hard to restrain somebody.   You're

25  afraid for yourself.   You're afraid for your

Bentley Bobrow, M.D.
May 3, 2019

Page 26

1    staff.   You don't know, you know, exactly what's

2    going to happen.   It's a very, very scary thing.

3           And as I was reading this, the way the

4    police were describing it and the EMTs were

5    describing it and him rolling around on the

6    ground, naked in the desert, hot, screaming,

7    uncontrollable, that fits with this syndrome of

8    agitated delirium, which is an incredibly

9    dangerous situation for multiple different

10   reasons; that it affects multiple different

11   organs in the body -- the brain, the heart, the

12   microvasculature -- and has an extremely high

13   mortality rate.   In some cases, in some studies,

14   up to 15 -- 1-5 -- percent of people with

15   agitated delirium die regardless of what you do.

16       Q.   Okay.   Is there a -- when you say 15

17   percent -- or up to 15 percent, is there like a

18   study on that or --

19       A.   There -- there are multiple studies.   In

20   fact, the latest study -- I -- you know, so I've

21   taken care of people like this for years, and

22   this is a syndrome that emergency providers are

23   familiar with.   And once you've taken care of

24   somebody, you never forget it.

25           And I think I quoted -- and when I said

Bentley Bobrow, M.D.
May 3, 2019

Page 27

1    this, this syndrome is associated with a very

2    high mortality rate, roughly eight percent.

3    Well, there's even new data since then,

4    a large -- much, much larger studies that say

5    that it ranges up to 15 percent.

6            And the reason it's so difficult to

7    really understand this is, there's multiple

8    different causes of it.  And it's more of a

9    syndrome than a specific disease.  And, you

10   know, I'm sure you're very familiar with these

11   in-custody deaths and things like that.  So this

12   is a real entity, but it's a very polymorphic

13   entity.  There's a lot of different scenarios.

14   Interestingly, the most common scenario are

15   young males are the -- is the most common

16   demographic to suffer this.  And it's usually,

17   most commonly, associated with some kind of

18   psychostimulant.

19        Q.   Okay.  So getting back to Exhibit 1, your

20   findings here.

21        A.   Yes.

22        Q.   So when Paramedic Reed arrived on the

23   scene, did he do a quick assessment of the

24   patient?

25        A.   He did, and he documented that, as I

Bentley Bobrow, M.D.
May 3, 2019

Page 59

1      Q.   How does -- can we agree that Mr. Cutler
2  was hyperthermic at the time of this incident?
3      A.   They --
4           MR. REYNOLDS:   Object to the form.
5           Go ahead.
6           THE WITNESS:   Yes.   They documented a
7  temperature of 102.9, which is hyperthermic.
8      Q.   BY MR. ZWILLINGER:   And that makes sense
9  given the June date in Tucson, correct?
10      A.   I would not agree with that.
11      Q.   Why is that?
12      A.   You know, it -- you can be outside for,
13  you know, a couple hours, especially in Tucson
14  where it's not 120 degrees outside.   And most
15  young people, you know, are outside for a couple
16  hours.   They don't get a body temperature of
17  102.9.   They don't lose their mechanism to cool
18  themselves.   It doesn't happen.
19      Q.   Can LSD cause you to lose -- in your
20  opinion, lose that mechanism to control your
21  temperature?
22      A.   So LSD is associated with hyperthermia.
23  How it does it is probably multifactorial.
24      Q.   What does that mean?
25      A.   That means there's probably lots of

Bentley Bobrow, M.D.
May 3, 2019

Page 60

1   different mechanisms.  It causes your metabolism

2   to speed up.  It causes all kinds of central

3   nervous system changes.  It causes lots of

4   different changes.  It would be an

5   oversimplification to say it simply takes away

6   your body's ability to cool itself.  But LSD is

7   definitely associated with hyperthermia.

8       Q.  And what is the interplay between

9   hyperthermia and excited delirium, if there is

10  any?

11      A.  Well, there is.  It's one of the things

12  that's common in excited delirium, again,

13  agitation, confusion, you know.  People are --

14  they have enormous strength.  They -- for some

15  reason, they take their clothes off.  They take

16  all their clothes off and they're very, very

17  hot.  And so -- hyperthermia is one of the

18  criteria for agitated delirium -- excited --

19  excuse me, excited delirium.

20      Q.  And as far as the treatment for excited

21  delirium, treating the hyperthermia is part of

22  that treatment, is it not?

23          MR. REYNOLDS:  Object to form.

24          THE WITNESS:  The main treatment is to

25  get control of the person.  Like, if you just

Bentley Bobrow, M.D.
May 3, 2019

Page 61

1    try to start cooling them, that's not going

2    to -- that's not going to do the trick.  It's to

3    get control of them so that they're -- you calm

4    their -- you calm them down.  They're having a

5    massive surge of adrenaline.  And so unless you

6    take care of that metabolic derangement, you're

7    not going to cool them down.

8         Q.  BY MR. ZWILLINGER:  I'm just trying to go

9    through my questions and not duplicative ones,

10   so just give me a moment.

11        MR. ZWILLINGER:  Would you please mark

12   that.  Is that 5?

13        THE REPORTER:  Yes.

14        (WHEREUPON, Exhibit No. 5 was marked for

15   identification.)

16        Q.  BY MR. ZWILLINGER:  I'm handed you what's

17   been marked as Exhibit 5.  And I will tell you

18   that this is the hyperthermia order received

19   from Northwest Medical Center.

20        Have you seen this protocol before?

21        A.  No.

22        Q.  Did you -- so you did not review this

23   protocol as part of your review of Mr. Reed?

24        A.  No.  I reviewed the altered mental status

25   protocol that I believe they were operating