Scott H. Zwillinger (019645)
**ZWILLINGER WULKAN, PLC**
2020 North Central Avenue, Suite 675
Phoenix, Arizona 85004
Tel: (602) 962-0207
Fax: (602) 962-0207
Email:  scott.zwillinger@zwfirm.com
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Steven Cutler, et al.,<br><br>              Plaintiffs,<br><br>v.<br><br>Chris Nanos, Sheriff Pima County, et al.,<br><br>              Defendants. | Case No.  18-CV-00383-JCH<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' RULE 702/DAUBERT MOTION** |

Guillermo Haro, Plaintiffs' expert on the standard of care applicable to Defendant Grant Reed, was a firefighter/paramedic for 27 years. To this day, he continues to teach paramedics and EMTs. Defendants already moved, unsuccessfully, to preclude Haro's testimony under A.R.S. § 12-2604. He is qualified to testify, so the extent of his ongoing experience goes to the weight of his testimony, not its admissibility. Moreover, Haro's opinions are supported by the evidence and by his experience. The Court should deny Defendants' motion.

**I.       Haro's qualifications are sufficient.**
 **1. Haro is qualified to testify and the question of his current experience is one of weight rather than admissibility.**

Haro has 27 years of experience as a firefighter/paramedic. He maintains his National Registry of EMTs Paramedic level certification and his Arizona State Paramedic certification; is an Advanced Cardiac Life Support Instructor; and maintains his Basic Life Support Instructor certification and his Tactical Emergency Casualty Care Instructor certification. Haro Report, attached as **Exhibit A**, at HARO000006-7. In addition, he has been teaching other paramedics since he retired; he is an EMT tutor at Paradise Valley Community College, and a National

Registry Examiner, Paramedic level, which means he has been accredited through the National Registry of Testing. Deposition of Guillermo Haro, attached as **Exhibit B**, at 38:25-39:2; 41:10-24. Of note, there is a focus on "scenario work" in Haro's teaching curriculum; far from simply teaching from a textbook, Haro uses mock patients to allow the student paramedics to practice their skills. *Id.* at 44:3-45:4. In recent years, Haro has taught his students the practical skills needed to manage airways, insert IVs, and more. *Id.* at 45:5-12.

The fact that Haro hasn't been an active paramedic since his retirement goes to the weight of his testimony, not its admissibility. Determining whether a witness is qualified to testify as an expert "requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012). "In other words, a district court must consider whether an expert is qualified to testify competently regarding the matters he intends to address." *Id.* But this inquiry "is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *Id.* (internal citations omitted). Indeed, "after an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination." *Id.* "As long as some reasonable indication of qualifications is adduced, ... qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity." *Id.* (internal citations omitted). *See also, e.g.*, *Handley v. Werner Enters., Inc.*, 2022 WL 994881, at * 2 (M.D. Ga. Apr. 1, 2022) (explaining same, and that a witness "is *qualified* as an expert if he is the type of person who should be testifying on the matter at hand"); *Fletcher v. Allstate Tex. Lloyds*, 2022 WL 2980949, at * 3 (E.D. Tex. Jul. 25, 2022) (same); *Erickson v. ING Life Ins. & Annuity Co.*, 2011 WL 4583829, at * 2 (D. Id. Sep. 29, 2011 (same).

Haro's experience is undeniably sufficient and requires the denial of the motion.

**2. Haro's particularized experience goes, at best, to the weight and not the admissibility of his testimony.**

Defendants take issue with the fact that Haro has never administered Ketamine himself.

But as the Ninth Circuit Court of Appeals has explained, an expert's "lack of particularized expertise goes to the weight accorded her testimony, not to the admissibility of her opinion as an expert." *U.S. v. Garcia*, 7 F.3d 885, 889–90 (9th Cir. 1993). "As the Supreme Court explained in Daubert [I], vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Contreras v. Brown*, 2019 WL 2080143, at * 3 (D. Ariz. May 10, 2019).

In *Garcia*, the criminal defendant, who stood trial for assault of a minor, argued that the state's expert should not have been permitted to testify because 1) she did not have specific experience in the "areas of child testimony and closed-circuit television," which were issues specific to the case, and 2) she had only "glanced through a book on the subject." *Id.* at 889. The court explained that the expert's testimony was admissible because although she had "no particularized expertise on the subject of child testimony through closed circuit television, she had considerable experience working with the Navajo tribe and with sexually abused children as a children's mental health specialist." *Id.* at 889-890. As in *Garcia*, so here, Haro has "considerable experience" as a paramedic. Moreover, he is aware that Ketamine is a dangerous drug if improperly administered and not monitored; he is familiar with the protocol for administering Ketamine and the protocol requiring proper dosing, careful assessment, and critical monitoring; and he is familiar with the protocol's requirement that oxygen be available in the event that a patient loses his airway, as David did here. The fact that Haro has never directly administered the drug himself goes to the weight of his testimony, not its admissibility. Notably, Haro's level of experience in administering Ketamine mirrors that of Defendant Reed who *until he administered Ketamine to David had never given the drug to any patient*.

Courts in this circuit have rejected arguments that experts must have particularized expertise as Defendants contend here. *See, e.g.*, *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015-1016 (9th Cir. 2004) (finding that experienced claims adjuster could testify despite not having specific experience in the context of bad faith claims); *Shafer v. C.R. Bard,*

*Inc.*, 2021 WL 4305216, at * 3 (W.D. Wash. Sep. 22, 2021) (radiologist could opine about adequacy of warning on medical device without having written any warnings or ever having worked for FDA, because he could base opinions on having read and interpreted warnings on devices); *Contreras*, 2019 WL 2080143, at * 3 (nurse could opine on reasonableness of medical bills incurred in Arizona and Nevada, even though she had never practiced in either state, because she was familiar generally with medical-billing practices).

Defendants contend that Haro's testimony is inadmissible because Haro didn't identify the standard of care or the specific protocols that were ignored. Defendants are wrong. Haro's report makes clear that he takes issue with the administration of Ketamine without any of the equipment needed to administer the drug safely, as required by Northwest Hospital's relevant Administrative Order, coupled with the failure to treat David's obvious hyperthermia in accordance with the hospital's hyperthermia Administrative Order. Exhibit A at HARO000011-13. Defendants take issue with the fact that Haro did not believe David was suffering from excited delirium—a "diagnosis" not recognized by the American Medical Association, the World Health Organization, and others—and they argue that Haro ignored the "vast majority of evidence" in reaching that conclusion. But even Defendants' expert, Dr. Frank LoVecchio, opined that David's "prolonged exposure to the heat and desert elements . . . more likely than not, raised his body temperature and ***was the most important factor in causing hyperthermia***." Expert Report of Dr. Frank LoVecchio, attached as **Exhibit C**, at CUTLER/RM 0840 (emphasis added). Defendants' argument is tantamount to saying that Haro should be excluded because his opinions contradict those of Defendants. The Court should disregard it.

**II.     Haro's opinion is based on sufficient facts and data.**

Defendants seek to preclude Haro's testimony because he somehow discounted evidence about David's behavior before Defendant Reed encountered David that Defendants consider to be important. But "[t]o the extent [that] Defendants challenge the admissibility of" Haro's opinions "because he did not review certain other evidence prior to rendering his opinions, or consider different alternative theories or hypotheticals, such arguments go to the weight, not the

admissibility of his opinions." *Atencio v. Arpaio*, 2015 WL 11117187, at * 18 (D. Ariz. Jan. 15, 2015). "Further, to the extent Defendants challenge the conclusions" that Haro "reached," these are "issues of credibility reserved for the jury rather than the judge." *Id.*, *citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595-96 (1993).

Haro considered the medical records, autopsy and toxicology reports, the relevant Administrative Orders, the deposition testimony, and the videos recorded of David moments before Defendant Reed encountered him, and he formed his opinions based on that evidence. Exhibit A at HARO000015. Haro disagrees with Defendants that David was experiencing excited delirium—which isn't even a proper medical diagnosis—but that disagreement with Defendants positions plainly does not make his opinions inadmissible.

Defendants argue that Haro "believed the police videos were different from all witnesses' descriptions of [David's] behavior and that the videos provided the only evidence that mattered." Motion at 4:23-25. But even if that were true (it is not), this too goes to the weight of Haro's testimony, not its admissibility. Equally important, the video of David, which Defendant Reed's colleague testified depicts how David was acting when Defendants encountered him, *is what matters*. Whatever David was doing or saying earlier, it is his demeanor when Defendant Reed encountered him that is relevant to the trial of this matter.

### III. Haro's opinions are based upon reliable principles and methods.
#### 1. Hyperthermia

Defendants argue that there is a gap between Haro's opinions and the factual evidence, but Defendants are wrong.[1] First, Defendants argue, oddly, that Haro "failed to provide any principle or method that would support his conclusion that Cutler's hyperthermia was caused by the environment." *See* Motion at 7:20-22. But as mentioned above, Defendant's *own expert* has

---

[1] With respect to opinions about traumatic brain injuries, Haro does not intend to testify at trial that David had a TBI. He has referenced a TBI only to make the point that at the time Reed encountered David, he knew that he was the same person who had been involved in the earlier Jeep wreck, and ought to have suspected that David could be suffering from a TBI or other injury. Yet instead of treating David like a sick patient, Reed treated him like a criminal who needed to be restrained.

opined that "prolonged exposure to the heat and desert elements . . . more likely than not, raised [David's] body temperature and ***was the most important factor in causing hyperthermia***." Exhibit C at CUTLER/RM 0840 (emphasis added).

And Defendants themselves point out the evidence that Haro reasonably relied on to conclude that exposure to the intense summer desert heat caused David to become hyperthermic. Motion at 7:12-15 (stating that Haro did not consider LSD to be a cause of the hyperthermia because "it was a hot day in June, Cutler was lying on hot rocks, Cutler was completely unclothed, Cutler was red and dry").

Haro has 27 years of paramedic experience in the desert. His opinions link David's exposure to the desert heat with the hyperthermia that everyone agrees David was suffering from, and which Reed ignored and failed to treat. *Daubert* requires nothing more. *Daubert*, 509 U.S. at 590 (an expert is not permitted to simply give an opinion based on his "subjective belief or unsupported speculation"); *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 831 (9th Cir. 2001) ("An expert must back up his opinion with specific facts.").

Defendants focus on the deposition of Bentley Bobrow. Dr. Bobrow conducted an after-the-fact investigation into David's death—at Defendants' request and based only on a review of news articles—and concluded that Defendants had done nothing wrong. His conclusions are subject to a motion in limine. Crucially, Dr. Bobrow is not a percipient witness, nor did Defendants disclose him as an expert, so his opinions are irrelevant in any event, and Defendants do not explain how the mere fact that Dr. Bobrow disagrees with Haro somehow makes Haro's opinions inadmissible.

**2. Ketamine Administration.**

Defendants argue that Haro's opinions about the Ketamine causing David to lose his airway are somehow inadmissible, and they quote *Cartwright v. Home Depot U.S.A., Inc.*, 936 F. Supp. 900 (M.D. Fla. 1996), for the proposition that Haro's opinions are not scientifically supported. But Reed himself testified that the Ketamine caused David to lose his airway. Indeed, Reed testified that after administering Ketamine, he was "worried that this patient is losing his

airway because his respiratory drive is starting to decrease and it is becoming compromised." Deposition of Grant Reed, attached as **Exhibit D**, at 128:9-11. Then he explained that administering the Ketamine changed the status quo for David and led to respiratory depression:

> My assumption, what he presented to me, was that he had a downer and a upper, and the upper was stopped [by the Ketamine]. The upper was keeping him going, keeping him acting erratic, in – altered and -- and combative, and the Ketamine stopped that. So we take that out of the equation. We still have this downer, and there's nothing to keep it in check now. So now we have respiratory depression.

*Id.* at 128:23-129:5. Thus there is clearly evidence to support Haro's opinion that the Ketamine caused David to lose his airway. Indeed, the very first requirement in the Administrative Order dealing with Ketamine is that oxygen be available for exactly this eventuality. **Exhibit E** (TE053). Moreover, Haro's opinion is consistent with the opinion of Plaintiffs' causation expert, Dr. Stephen Thornton, who will testify consistent with his report that Ketamine can lead to respiratory depression and indeed did so here, with fatal results.

*Cartwright* does not support Defendants' position. It involved a plaintiff who painted her home using paint manufactured by the defendant and who later developed asthma. The court held that the plaintiff's expert had to do more than show that the asthma developed after exposure to the paint. *Id* 936 F. Supp. at 901, 906. Here, David lost his airway mere seconds after Reed administered the Ketamine, and as Haro will explain, that is one of the very risks of Ketamine.

Defendants argue that Haro's testimony about Ketamine should be excluded because he admitted that whether or not to give Ketamine was a judgment call. But although Haro described the decision as a judgment call, he then immediately followed that up by explaining that he would have no "business pushing [Ketamine] unless I have all the resuscitative equipment around me." Exhibit B at 150:19-22. And therein lies the heart of Haro's opinion. Whether or not Ketamine should have been administered, it never should have been given to David in violation of the relevant orders and at a time when Reed lacked the necessary equipment to keep David safe in the event, which of course was realized, that David lost his airway. Indeed, if Reed had carried the necessary equipment, and if David had gotten oxygen immediately, then the

parties probably wouldn't be here today.

### 3. Other opinions.

Defendants contend that Haro didn't identify any protocol requiring Reed to take equipment to David. This argument is nonsensical and defies common sense. The Administrative Order required monitoring equipment and oxygen to be available. Exhibit E. Logically, Reed could not have oxygen available if he didn't take it with him.

Defendants also argue that Haro shouldn't be allowed to testify to the impossibility of performing effective chest compressions while the patient is in a Stokes basket being transported down a hill over uneven ground. Defendants position is curious, given that even Defendant Reed told a detective the day of David's death that "with [David] in the Stokes basket, we can't do chest compressions and even try to assist ventilations," because "[i]t's not very practical." *See* Reed Interview, attached as **Exhibit F**, at 3:3-5. Haro will testify that he has performed chest compressions hundreds and possibly even thousands of times in his career as a paramedic. In addition, he has been involved in research studies on the efficacy of certain equipment designed to assist the user in performing complete compressions. He will testify that effective CPR requires chest compressions of approximately two to 2.5 inches, with complete release after each compression; common sense and his experience dictate that effective compressions are impossible to perform unless the patient is on a firm, static surface. Indeed, it is this basic and well-understood principle that makes bobbing for apples a challenging yet fun Halloween tradition.

And of course, as explained above, "lack of particularized expertise goes to the weight accorded [Haro's] testimony, not to the admissibility of [his] opinion as an expert." *Garcia*, 7 F.3d at 889. In the unlikely event that the jury doesn't believe Haro's testimony because Haro hasn't actually performed CPR on a patient being transported in a Stokes basket, then the jury is free to disregard it.[2]

---

[2] Defendants finally argue that Haro's opinion on gross negligence is inadmissible. Haro does not intend to opine on whether Reed's failure to meet the standard of care constitutes gross negligence. That is for the jury to decide.

## IV. Conclusion.

Haro was a practicing paramedic for 27 years and, since his retirement, he has taught paramedics and maintained his certifications. He is plainly qualified to testify. The extent of his ongoing experience, and particularized knowledge, goes to the weight of his testimony and not its admissibility. And Haro's opinions are supported by the evidence, and his opinion that David's hyperthermia was caused by his exposure to the desert heat is supported not only by the evidence but even by the opinion of Defendants' own expert. The Court should deny Defendants' motion.

RESPECTFULLY SUBMITTED this 14th day of October, 2022.

**ZWILLINGER WULKAN, PLC**

By: */s/ Scott H. Zwillinger*
Scott H. Zwillinger
2020 North Central Avenue, Suite 675
Phoenix, Arizona 85004-4584
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2022, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on all counsel of record via the Court's CM/EDF system.

*/s/ Tricia Jochum*