# EXHIBIT A

1    **Guillermo "Willie" Haro**
2    **11215 W Lower Buckeye Rd**
3    **Tolleson, AZ  85353**
4    **623-221-1828**
5    **ggharovb@gmail.com**

6                      **November 15, 2019**

7    I have been retained by the Plaintiffs and the attorneys for Plaintiffs to provide an expert

8    opinion and report regarding paramedic services, care, treatment and conduct in the

9    matter of Robert Steven Cutler, *et al.* v. Mark Napier, Sheriff, Pima Cunty, *et al.*, pending

10   in the United States District Court, District of Arizona, Case Number CV-18-00383-FRZ.


11   My background includes 41 years of experience in Fire and EMS in the Phoenix, Arizona

12   metropolitan area.  I retired as a firefighter from the City of Glendale in 2006 and have

13   devoted the past 13 years to EMS education and research.  My primary focus has been

14   paramedic education – both the initial training, as well as refresher courses.  I have the

15   reputation for excellence in both my patient management, as well as my instructor skills.


16   I currently maintain my National Registry of EMTs Paramedic level certification, in

17   addition to my AZ State Paramedic certification, which I have had since 1979.  I am an

18   Advanced Cardiac Life Support Instructor, in addition to maintaining my Basic Life

19   Support Instructor certification.  I am also a certified Instructor for Pediatric Advanced

20   Life Support.  I also maintain my Tactical Emergency Casualty Care Instructor

21   certification.  I primarily teach initial paramedic training courses through the Maricopa

22   County Community College District.


23   The majority of my professional time since 2002 has been devoted to training and

24   instructing paramedic students in the paramedic training program through Maricopa

25   County Community College District.  The paramedic training programs through

26   Maricopa County Community Colleges are accredited paramedic training programs.


27   Over the past 13 years, I have worked as an EMS coordinator and senior research

28   coordinator in conjunction with the University of Arizona, College of Medicine, for three

29   prehospital projects.  I was the lead for the RAMPART status epilepticus study to

30   evaluate IM Midazolam versus IV Lorazepam for efficacy in managing status seizure

31   activity.  The RAMPART Trial was published in the New England Journal of Medicine.

32   My agency, Glendale Fire, had the lowest protocol deviation rate out of the 10 research

1   hubs nationally.  The local success was attributed to my relationship with all the
2   participants and my dedication to excellence through education of the agency's
3   paramedics who participated in this groundbreaking prehospital study.

4   One of my other research projects is the EPIC (Excellence in Prehospital Injury Care)
5   Traumatic Brain Injury Project.  This project required significant initial training and
6   ongoing education of various agency Master Trainers, as well as individual EMS
7   personnel to ensure successful implementation of the nationally vetted TBI guidelines.
8   The project required extensive training, not only regarding the management of the TBI
9   patient, but also for "attention to detail" when properly documenting the patient
10  encounter.  My role as the State's Senior Master Trainer has taken me all over AZ and
11  allowed me to develop good working relationships with many EMS personnel and
12  hospital ED staff.  As various personnel heard my presentation, it led them to specifically
13  request that I provide this valuable training to their own respective agency personnel.  I
14  have trained over 90% of all the valley area fire departments, both BLS and ALS
15  employees, and I have trained 15-20 other agencies around the State.  I had initially been
16  training other personnel to be "Master Trainers", but the popularity of my classes has me
17  directly teaching many more personnel than I had anticipated.

18  The third project was in conjunction with Philips Healthcare.  I trained agency EMS
19  personnel to utilize the Q-CPR (puck) device to help ensure quality of compressions
20  during Cardio-Pulmonary Resuscitation (CPR).   There were 4 local fire agencies who
21  utilized the Philips MRx monitors and participated in this study.  The data collected from
22  their monitors allowed analysis of the CPR being performed and was/is an excellent
23  training tool to improve the quality of the compressions and help ensure the best possible
24  outcome for the patient.

25  As part of my review of the facts and my preparation of this report, I undertook a site
26  visit of the location at which the subject events occurred, in the "Twin Hills" area in Pima
27  County, Arizona, east of the city limits of Tucson.  During my visit, the temperature was
28  approximately 85 degrees, it was mid-day and the sky was cloudless.  I twice walked up
29  and down the subject hill to the east of the local resident, Kristen Powell (11405 E Calle
30  Catalina), who first reported seeing the subject of this case, the late David Cutler.  For
31  one of my trips up and down the hills, I wore a backpack with no less than 40 pounds of
32  weight in the backpack.  Walking up the hill with the 40-pound backpack and walking in
33  a slow but deliberative manner required 4 minutes and 45 seconds from the gravel

Haro000007

1  driveway to the Gomez residence (11407 E Calle Catalina) immediately to the east of
2  Mrs. Powell's residence.

3  Based on the information reviewed by me, my summary of the events of June 5, 2017 is
4  as follows:

5  Around 9:40 AM a vehicle (Jeep) fire was reported in a residential desert area east of
6  Tucson, but no driver was located. Rural/Metro Fire Dept., Inc. ("Rural Metro"), the
7  Pima County Sheriff's Department ("PCSD") responded to the Jeep fire. The Rural
8  Metro responding crews included Paramedic Grant Reed ("Reed") and Emergency
9  Medical Technician Vince Figueroa ("Figueroa"). The PCSD responding officers
10 included Deputy Keith Barnes ("Barnes") and Deputy Christopher Davenport
11 ("Davenport"). The Jeep was registered to Mr. David Cutler ("David"), then age 23
12 years. It had been driven up a hill, struck a tree, and then caught on fire.

13 Mrs. Powell reported first hearing a man yelling for help at around 11:00 AM, but she did
14 not initially see anyone. Soon thereafter she again heard the man yelling for help and
15 sighted him, later identified as David, naked and walking up the hill, one of the "Twin
16 Hills", to the east (behind) her residence. Mrs. Powell placed a 911 call at approximately
17 11:30 AM. Mrs. Powell's home was within a no more than 6-minute walk from the top
18 of the hill on which David was walking. The 911 emergency dispatcher called Mrs.
19 Powell back to receive additional information. Mrs. Powell continued to watch and keep
20 a lookout toward the hill.

21 Barnes had left the Jeep fire scene and was at a nearby convenience store. He responded
22 to the call of the sighting of David with his lights and siren. He reported that at the time
23 he assumed the person was involved in the earlier Jeep accident and fire. Barnes reported
24 that on arrival at the scene, his PCSD vehicle registered the temperature as 108°F.
25 Barnes was the first emergency responder to make contact with David, at around 11:45
26 AM. Once at David's side at the top of the hill, Barnes spoke with David. It is noted that
27 during this initial contact, David was cooperative and followed Barnes' commands,
28 including by agreeing to Barnes' request to be handcuffed; David turned around with his
29 hands behind his back and allowed himself to be handcuffed by Barnes. Barnes caused
30 David to go from standing on his feet to varyingly sitting and laying on the desert ground,
31 with no clothing and no other protection from the desert ground. By the time of arrival of
32 Davenport, the second deputy at the scene with David, David is reported as making
33 noises, but not uttering any decipherable words. Two more deputies, Nadeen Dittmer
34 ("Dittmer") and Jared Ernest arrived at the hilltop location with David, and David was
35 placed in RIPPS hobble restraints due to reports by Barnes of David having become
36 combative. While restrained, David is lying fully exposed with his bare skin in direct
37 contact with the hot desert rocky ground. There is no record of the deputies providing

3

Haro000008

protection between David's body and the ground or shade from the sun, and no report of
any other cooling efforts and no report of providing water to David. At approximately
12:05 PM, Dittmer took three short videos of David laying naked on the ground on his
back, with the RIPPS hobble restraints in place, with rapid and labored breathing and in
obvious pain. Upon review of the audio of the Dittmer videos, David uttered several
things which were decipherable.

Emergency medical services were called for at 11:48 AM but staged nearby due to the
reports of combativeness by Barnes, awaiting notice that David was secured and the
scene was safe for them to go to his location on the hill. A Rural Metro ambulance,
staffed by Reed and Figueroa, arrived at approximately 12:07 PM. Reed reported he
made contact with David at 12:13 PM. According to Rural Metro's Patient Care Report,
time-stamped at 6:52 p.m. on 6/5/17, David's vital signs initially were reported as a heart
rate of 160 BPM and a respiratory rate of 34. Since there was no report or documentation
of his initial blood pressure, blood sugar, temperature, capnography, oxygen saturation,
or ECG, it must be presumed that none of those assessments occurred at that time. David
was reported to have spontaneous eye opening, but he was reported to present with
incomprehensible speech and withdrawal from pain.

There was no report of Reed debriefing or receiving any information from the four
deputies who were with David when Reed arrived, so it must be assumed that Reed did
not know that David was placed on the ground by the deputies, that he was compliant
prior to being placed on the ground or that he was speaking clearly, even if allegedly
partly delusional, prior to being placed on the ground. Per Rural Metro's Patient Care
Report, Reed reports he administered 150 mg of Ketamine intramuscularly in each
deltoid of David (for a total of 300 mg of Ketamine), stating that he "followed
administrative order for excited delirium" which references the "Northwest Medical
Center (NWMC) Behavioral Administration Order". Reed reported drawing 500 mg of
Ketamine in the syringe and bringing only that to David's location on the hilltop. Reed
claims some was wasted during the injections. At least one deputy reported Reed stating
he administered 400 mg of Ketamine. There exists no waste report for any of the 500 mg
of Ketamine not injected by Reed into David's arms. According to Reed's report, David
had a "positive response to Ketamine administration." (Per Dittmer, shortly after the
Ketamine administration, David became very still, and his respirations notably slowed.)

Once Reed noticed David's breathing had slowed, he had David raised from the prone
position and placed in a seated position, still without any supportive oxygen or
ventilatory assistance. After he was raised to a seated position, the first effort to shield
David's naked body was reported – a tarp or blanket under him in the seated position. It
was reported that as David was placed on a spine board and prior to moving him to a

4

1  Stokes basket (a single wheeled basket on which the spine board is placed for removal
2  from rough terrain), he became apneic and pulseless and chest compressions were started.
3  Chest compressions were interrupted for at least 5 minutes as David was wheeled down
4  the hill in the Stokes basket. Effective chest compressions would have been impossible
5  while descending the hill. Continuous effective chest compressions are necessary for
6  survival of the patient. Chest compressions do not instantaneously create sufficient blood
7  pressure to circulate to the lungs and brain; once sufficient pressure is generated if it is
8  stopped, the decline in pressure is not gradual, it is precipitous. During this extrication
9  time, intramuscular naloxone was administered despite the fact there were no indications
10 of opioid use or toxicity prior to his collapse. In the time it took them to descend the hill
11 with David, there were no apparent airway, breathing, or circulatory lifesaving measures
12 taken to address the cardiopulmonary arrest. Such efforts are required to resuscitate a
13 person in cardiopulmonary arrest as reported for David.

14 Upon arrival with David at the ambulance, assisted ventilation was reported.  A
15 tympanic temperature of 102.9° F was reported. Reed administered more naloxone
16 intramuscularly and then at 12:36 PM David was intubated after an intraosseous line was
17 obtained. He was given multiple rounds of epinephrine (total of 4 mg), more naloxone
18 (total of 6 mg) and amiodarone (300 mg).

19 David was defibrillated once for an episode of ventricular tachycardia, but he developed
20 pulseless electrical activity and then, asystole. His blood sugar was checked at 12:40 and
21 reported to be 192 mg/dL. During David's prehospital care by the Rural Metro
22 paramedics, there was no reference to them following the "Northwest Medical Center
23 Hyperthermia Order" but there are reports of water being poured on David and ice packs
24 being applied after he was at the ambulance and continued in cardiopulmonary arrest.

25 David was transported to Tucson Medical Center ("TMC"), reportedly "per Northwest
26 Medical Center Cardiac Arrest Administrative Order". The Patient Care Report,
27 apparently incorrectly, identifies the "Name and Location of Facility" to which David
28 was transported as St. Joseph's Hospital. It is believed that TMC is approximately 3.3
29 miles further away from the scene than is St. Joseph's. After 15 minutes of resuscitation
30 effort at TMC, David was declared dead at 1:08 PM.

31 After the ambulance left the scene, several first responders went to Mrs. Powell's
32 property to get relief from the sun and heat, receiving shade and water.

33 The autopsy performed on June 7, 2017 by Dr. David Winston reported the cause of
34 death as "hyperthermia due to exposure to the elements and lysergic acid diethylamide
35 toxicity".

5

Haro000010

From this information and based on my education, training and experience, the following are my opinions, to a reasonable degree of scientific paramedic certainty, on the condition and care of David Cutler on June 5, 2017:

1) The use of Ketamine in treating David on June 5, 2017 was below the standard of care and grossly negligent for several reasons:

> A. David's condition and the circumstances at the time and location of Reed's arrival at his side on the hill did not justify the use of Ketamine. David was fully restrained and in obvious acute physical distress due to his exposure to the elements, and, possibly, due to injuries sustained in the Jeep crash and/or fire. He was hot and dry and not speaking clearly. Everyone on scene correctly believed that David was the victim of the Jeep crash and fire and that he had been in the desert for more than 2 ½ hours by the time Reed administered the Ketamine. No reasonable medically trained person, including no reasonable paramedic or emergency medical technician, would have concluded anything other than that David was suffering from heat stroke, or, at minimum, hyperthermia, and that he may have been suffering from head trauma/traumatic brain injury or other trauma from the Jeep crash and/or fire. Reliance on earlier, whether accurate or not, claims that David was "combative" when he was observed in the condition as depicted in the Dittmer videos, is grossly negligent and beneath the standard of care. Reed could and should have asked the deputies, including Barnes, everything that they knew about David's condition and behavior before considering administering Ketamine. There existed no facts on which any reasonable paramedic could conclude that David's condition and behavior was caused by illicit drugs or any other cause of so-called "excited delirium". Reed should have immediately initiated treatment for heat stroke, and he should have never administered Ketamine or any other sedative to David. Administering Ketamine was grossly negligent conduct by Reed and below the standard of care. The failure to immediately treat David for heat stroke and/or hyperthermia in place, on the hill, was grossly negligent conduct and beneath the standard of care.

> B. Even if it is claimed that Ketamine was appropriate, and I emphatically declare that it was not, the Rural Metro protocols under which Reed was operating, were not followed. The "Northwest Medical Center Behavioral Administrative Order" begins with initiation of supportive care, including a primary and secondary survey/assessment of the patient prior to obtaining vital signs, temperature and blood sugar and placing the patient on a cardiac monitor and oxygen if needed. Reed failed to adhere to this protocol and did not complete a secondary patient survey leading to his failure to recognize a patient in distress secondary to heat

Haro000011

stroke, rather than the "excited delirium" patient he was expecting based upon the PCSD's report. This too was gross negligence.

C. A blood pressure, oxygen saturation (ensuring maintenance of the oxygen saturations at 90% or higher), blood glucose and temperature were not obtained prior to administration of Ketamine. These measurements of the patient vital signs are required elements of patient assessment to assist with establishing the patient's baseline status, thus helping to drive the appropriate treatment and management of the patient. This essential part of patient assessment is taught to all emergency medical technicians, both EMTs and paramedics, in their initial training as well as during subsequent refresher training. This was a failure to act by all the emergency medical personnel on scene with David, including Reed. This contributed to their inability to recognize the actual nature of the problem that David was experiencing – heat stroke.

D. The only vitals that were taken upon patient contact were a pulse rate and a respiratory rate, because the only equipment taken up the hill to the patient's side was a syringe and Ketamine. The failure of Reed and Figueroa to take BLS and ALS equipment and heart monitor to the patient's side contributed to Reed's failure to identify a life-threatening emergency and prevented him from beginning immediate and appropriate emergency care. The proper equipment was in the ambulance at the bottom of the hill and could have been carried to David's side in no more than 5 minutes.

E. The use of Ketamine comes with adverse complications such as excessive salivation, laryngospasm, respiratory depression, bradycardia, tachycardia, hypotension, hypertension, and confusion. Increased airway secretions from the Ketamine can compromise breathing. David is noted by one of the deputies to be drooling after the Ketamine administration, yet immediate treatment (airway suctioning) was not available. The cascade of events involved his subsequent respiratory depression, leading to apnea and cardiac arrest. Treatment would require positive pressure bag-valve mask ventilation or intubation. Any paramedic who uses Ketamine must know the indications, contraindications, and adverse effects of this drug. Resuscitative equipment should be at the patient's side, before administering Ketamine, in case intubation is required. To administer Ketamine in David's setting and to not have immediate access to life saving equipment was grossly negligent and below the standard of care.

2) The failure to quickly recognize acute respiratory distress and appropriately treat the patient was gross negligence and failure to follow the standard of care for both an EMT and a paramedic in Arizona.

Haro000012

1  Upon Reed's arrival at David's side, per Reed's own documentation, David's respiratory
2  rate was 34. However, upon my review of both Video 1 and 2 by Dittmer, it was
3  apparent that the actual observed respiratory rate was between 56 and 68 times per
4  minute. Figueroa confirmed in his deposition that the condition of the patient, as seen in
5  the videos, was an accurate depiction of the condition of David at that time.
6  Any patient with a respiratory rate of 30 or greater needs immediate lifesaving
7  intervention. The more rapid the rate, the more distressed the patient is and the greater
8  the urgency of immediate lifesaving intervention. At a minimum, David needed
9  ventilatory assistance with a bag-valve-mask (BVM) and supplemental oxygenation to
10  manage a ventilatory rate of 10-12 breaths per minute. This treatment is a Basic Life
11  Support skill that either Reed or Figueroa should have performed. Their combined
12  failures to recognize and appropriately treat this life-threatening emergency contributed
13  to the death of David. Even if they had recognized the medical emergency in front of
14  them, they could not treat due to their failure to bring any BLS and ALS supportive
15  equipment to the patient's location on the hill.

16  3) David developed cardiopulmonary arrest, yet he was never evaluated to see if his
17  oxygen saturation was low, thereby requiring supplemental oxygen, or if his blood
18  pressure was low, thereby requiring interventions other than Ketamine. Both of these
19  problems can lead to the rapid cardiopulmonary collapse that David developed. Reed's
20  gross negligence in failing to follow his established "Northwest Medical Center Cardiac
21  Arrest Administrative Order" directly lead to David's death.

22  4) Once David went into cardiopulmonary arrest and chest compressions were necessary,
23  he should not have been moved from the hilltop until the rescuers accomplished return of
24  spontaneous circulation.  There is no record of any call via radio or otherwise to other
25  rescuers down at the bottom of the hill, to bring up all the emergency medical equipment,
26  so it must be assumed no such requests were made. The terrain, including the relatively
27  flat solid rock hilltop, has sufficient locations where effective chest compressions could
28  have been undertaken. Whether due to the earlier grossly negligent act/omission of
29  failing to bring to David's side all necessary equipment, or due to other grossly negligent
30  decision-making, the decision to descend the hill with David in the Stokes basket while
31  attempting to perform chest compressions was grossly negligent. With immediate and
32  uninterrupted chest compressions, rather than the at least 5 minutes with no effective
33  chest compressions, David would have, with a reasonable degree of paramedic certainty,
34  been resuscitated and survived. If Reed had kept David in place on the top of the hill
35  with effective chest compressions being performed, the other already present first
36  responders could have transported all other necessary equipment (the equipment which
37  should have been with Reed before he administered the Ketamine) to the hilltop.
38  Effective chest compressions are the single most important treatment in cardiac arrest.

8

Haro000013

1 Without good quality compressions, drug therapy, oxygen, and defibrillation are
2 ineffective at resuscitating a patient. The decision to descend the hill with David in
3 cardiopulmonary arrest equated to giving up any hope or expectation of resuscitating
4 David. This decision was grossly negligent.

5 5) David's temperature was not checked until well after the Ketamine administration and
6 was found to be elevated yet there was no indication that the "Northwest Medical Center
7 Hyperthermia Administrative Order for Heat Stroke" was followed. There are reports of
8 some cooling measures being taken but this occurred only after David's cardiopulmonary
9 arrest.
10 In my opinion, rapid recognition of this patently obvious hyperthermic emergency / heat
11 stroke and institution of cooling measures and rapid fluid boluses via IV or IO would
12 have saved David's life. For Reed to not follow Rural Metro's "Northwest Medical
13 Center Hyperthermia Administrative Order" was below the standard of care and grossly
14 negligent.

15 6) The administration of multiple rounds of naloxone to David was grossly negligent and
16 beneath the standard of care as naloxone is an antidote or reversal agent for the effects of
17 opioids, such as heroin or fentanyl. Opioids produce sedation and respiratory depression.
18 In addition, a paramedic or EMT should have been able to recognize pinpoint pupils and
19 any evidence of respiratory depression initially, had this truly been an opioid overdose.
20 David was reported by the paramedic to be breathing at 34 times per minute. Prior to his
21 cardiopulmonary arrest there was no indication that David was under the influence of
22 opioids nor was there any report that he had taken any. Naloxone is not a reversal agent
23 for Ketamine nor is it treatment for heat stroke or hyperthermia. The administration of
24 naloxone multiple times was grossly negligent and below the standard of care as it was
25 not indicated, and it harmed David as more beneficial, and obvious, therapies such as
26 assisted ventilation could have been performed during the time it took to administer the
27 naloxone. All the time spent administering an unnecessary and unindicated drug
28 (naloxone), could have been better utilized providing the patient with rapid IV fluid
29 boluses and rapid cooling of the patient's body. The approximate 16 minutes it took to
30 get David to this needed cooling down with ice packs and bolus fluid resuscitation via the
31 IO they established, also contributed to his death. These failures to act by Reed were
32 grossly negligent and beneath the standard of care.

33 7) PCSD's treatment of David after he was handcuffed and hobbled by the RIPP
34 restraints also contributed to his death. It was obvious from his appearance and behavior,
35 as seen on the videos, that David was suffering from environmental stress, i.e. heat
36 stroke, not excited delirium. Yet, in over 30 minutes before the arrival of Reed and
37 Figueroa, not one of the deputies attempted to hydrate, cool or even shade David from the

Haro000014

1  sun or protect him from the ground.  He laid in the full sun on the desert rocks and
2  ground, being held to the ground at times, with no barrier to protect him from direct
3  contact with the ground that may have been as hot as 140° F.  The report by PCSD of
4  David being "combative" contributed to the delay in response by Reed and Figueroa.
5  Since David was handcuffed and then in RIPP restraints, he was helpless, could not
6  remove himself from the environmental stress and was completely reliant on the deputies
7  to save his life before the arrival of Reed and Figueroa.  This gross negligence and
8  reckless indifference to David's obvious needs severely worsened David's condition and
9  also contributed to his death.

10  For this report I was granted access to all disclosures and discovery responses.  Among
11  the material I reviewed is the following:

12      1.  Rural/Metro Pima Patient Care Report
13      2.  Autopsy Report
14      3.  Toxicology Report
15      4.  Video taken by Kristen Powell
16      5.  3 videos taken by Deputy Nadeen Dittmer
17      6.  Northwest Medical Center Behavioral Administrative Order
18      7.  Northwest Medical Center Hyperthermia Administrative Order
19      8.  Northwest Medical Center Cardiac Arrest Administrative Order
20      9.  Ketamine-StatPearls-NCBI Bookshelf
21          https://www.ncib.nlm.nih.gov/books/NBK470357/
22      10. Pharmaceutical Review for Paramedics February 2017 Ferena Salek, PharmD
23      11. National EMS Education Standard Competency; PowerPoint slides
24      12. Nancy Caroline's Emergency Care in the Streets, 7th Edition
25      13. Keith Barnes deposition transcript July 31, 2019
26      14. Vince Figueroa deposition transcript June 25, 2019
27      15. Grant Reed deposition transcript June 25, 2019
28      16. David Winston, MD PhD.  deposition transcript August 15, 2019
29      17. Christopher Davenport deposition transcript February 6, 2019
30      18. Bentley Bobrow, MD deposition transcript May 3, 2019

31  I reserve the right to amend this report should new or additional information be presented
32  to me.  My hourly rate is $75 per hour for review and literature research.  My hourly rate
33  for deposition and courtroom testimony is $150 per hour plus all travel expenses.

34  Date: 11 - 15 - 2019
35                                        Guillermo G Haro, NRP
36

10

Haro000015

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Robert Steven Cutler, individually ) Case No.:
and as Administrator of the Estate ) 18-CV-00383-TUC-FRZ
of David A. Cutler, deceased, on   )
behalf of himself and on behalf of )
all beneficiaries of the Estate of )
David A. Cutler, deceased, and     )
Renee Luddington Cutler,           )
                                   )
            Plaintiffs,            )
                                   )
vs.                                )
                                   )
Mark D. Napier, Sheriff of Pima    )
County, Arizona, in his official   )
capacity; Rural/Metro Fire Dept.,  )
Inc., an Arizona for profit        )
corporation, Keith Barnes and Jane )
Doe Barnes, his spouse, Grand Reed )
and Brittany Reed,                 )
                                   )
            Defendants.            )
_____)


VIDEOTAPED DEPOSITION OF GUILLERMO HARO


Chandler, Arizona
February 13
10:02 a.m.


                              BARTELT|NIX COURT REPORTERS
                              RRF No. 1028
                              111 W. Monroe Street, Suite 425
Prepared by:                  Phoenix, Arizona  85003
Helen Pasewark, CR, RPR       Phone:  (602) 254-4111
Certificate No. 50905         Fax:    (602) 254-6567

Guillermo Haro
February 13, 2020

Page 38

1        A.    We got AmEvac.  I'm just counting down right

2    here.  EPIC, RAMPART, Phillips there.  No.  That

3    looks -- that looks accurate.

4        Q.    With the exception of --

5        A.    Exception of the ones I left out and we

6    explained about it, yes.

7        Q.    The next item here on your CV reflects that

8    you're a paramedic instructor.

9        A.    Em-hmm.

10       Q.    Is that true to this day?

11       A.    Yes.

12       Q.    And I see you are wearing your --

13       A.    Volcom shirt.

14       Q.    When were you appointed as a faculty member of

15   Paradise Valley Community College?

16       A.    That started -- I worked for -- well, they

17   always considered us part of the paramedic faculty.

18   That's -- that's if we come in to instruct, they

19   consider us -- they don't call it part-time faculty

20   because they don't have the position for that, so -- but

21   that's how -- that's what -- we're instructors.  We're

22   teachers.  And so they would prefer that we be

23   represented as faculty, but that's not a job title for

24   that -- for that EMT.

25       Q.    What is your current job title with Paradise

Guillermo Haro
February 13, 2020

Page 39

1    Valley Community College?

2         A.    I think they call it EMT tutor.  I think

3    that's a classification they have.

4         Q.    Okay.  On your curriculum vitae here, which is

5    marked again as Exhibit 1, it solely identifies Paradise

6    Valley Community College --

7         A.    Em-hmm.  Yes.  I'm sorry.

8         Q.    -- as the college that you were affiliated

9    with in a teaching capacity.  You agree that's what it

10   says?

11        A.    Yeah.  Yeah.  I would say the month is a split

12   between Glendale, which is kind of like I was still

13   working in 2000 with Glendale Fire, so I started

14   teaching with that paramedic program occasionally on

15   different subjects and because I was still working full

16   time with Glendale Fire and that started right around

17   2000.  My primary job with that was essentially anatomy

18   and physiology for paramedics.

19             Right around -- right around after I retired

20   from Glendale Fire in 2006, I was available to actually

21   teach more and so in 2007 I was teaching for Glendale

22   Community College primarily in their paramedic program

23   all the way up until even through RAMPART I was still

24   teaching for Glendale Community, and when EPIC was still

25   going on, I was still doing a little teaching for

Guillermo Haro
February 13, 2020

Page 41

1    that you listed on Exhibit 1 is Paradise Valley

2    Community College.

3         A.   Yeah.  I should have just listed it under

4    Maricopa community colleges basically.  Yes.

5         Q.   So apart from Paradise Valley Community

6    College and Glendale Community College, have you had any

7    other teaching responsibilities within the Maricopa

8    County college, community college system?

9         A.   No.

10        Q.   The last item here reflects that you are a

11   National Registry examiner.  What is that?

12        A.   That's a special class that you have to take

13   to -- because all our paramedics, when they graduate --

14   excuse me -- graduate from our program, what they need

15   to do is actually go through the National Registry of

16   Testing.  And so those -- those testers have to actually

17   be accredited or vetted and go through a special class,

18   because there's a certain way that instruction or

19   testing needs to be done.  The skills have to be at a

20   certain fashion.  It has to be consistent all the way

21   through.  As far as -- that's the testing we're talking

22   about.  It's all the skills related, paramedics' skills

23   that we test them on.  That's what that's associated

24   with, the National Registry examiner.

25        Q.    Is that something you are still affiliated

Page 44

1   pathophysiology for the paramedics.  I do work with

2   pharmacology, but not as much as the other two.

3        What we really spend a lot of time with is

4   scenario work.  And that's not -- where we actually put

5   emergencies in front of them and moulage people and

6   bring other students in to act as patients, where we

7   bring like a hypoglycemic patient or an overdose patient

8   or a traumatic patient or a cardiac event patient.  All

9   those -- whatever scenario you can think of, emergency

10  in the field, we bring them out and we move the students

11  through these scenarios.

12       The reason we do that is that it's not just

13  about giving them all the textbook information that you

14  see in those two volumes on the table.  It's about

15  applying it.  And that's -- that is the critical work of

16  their education as far as now they start bringing all

17  their ACLS, which is cardiac class support for -- you

18  bring in pediatric advanced life support.  You start

19  thinking about medical, all the medical calls where --

20  difficulty breathing.  You bring all those things into

21  and you teach them all the skills on how to do it, but

22  now you're applying it to somebody.

23       It's like a mock patient that we're doing.

24  And so that requires a lot of setup and it requires

25  listening, asking questions later on, all of the review

Page 45

1    afterwards.  Those we run all day, you know, because

2    each scenario almost takes a full hour to get done.  So

3    it's a pretty busy time.  That's where -- I think that's

4    where my expertise comes in.

5        Q.    Again, focusing on that 2016 and 2017 time

6    frame, tell me specific classes that you taught.

7        A.    Airway management, IV insertion, IO insertion,

8    cadaver labs and go into airway again.  We'd go into

9    crikes, cricothyrotomies.  We'd go into needle

10   thoracotomies.  We would go into intubations, but most

11   of the blades are Mac or the Miller.  We also would go

12   into King Vision.  We would have that available to them.

13           We start teaching them not only about the

14   anatomy approach on airway but what pitfalls to look

15   for, what areas to -- how to actually augment for a good

16   outcome or special tricks on how to use your hands and

17   pressure to actually view on the airway to get a good

18   intubation.

19           We go into super-glottic airways, how to

20   place, what are the pitfalls associated with them.  We

21   go into the binding, bandaging, hare traction splints

22   for femur fractures, also backboard applications, IVs,

23   what kind of fluid would you use on particular patients.

24   There's a lot more, but...

25       Q.    I'm more interested in, if you know -- and I

Guillermo Haro
February 13, 2020

Page 150

1   have an adverse reaction, because I don't know David

2   Cutler.  I don't know his past history.  I don't know

3   anything about him.  I'm reaching him cold.  He can't

4   even tell me what the problem is.  So now I'm going to

5   give him this drug.  I need to be ready to what?  Handle

6   any complications associated with the drug.

7          I haven't seen David Cutler and gave him

8   ketamine.  I don't think I would have given him ketamine

9   in this case, because he didn't present like somebody

10  who needed it.

11  Q.    You agree, though, that is a judgment call on

12  scene?

13  A.    That's right.  That's medicine.  I agree.

14  It's medicine.  It's a judgment call.  And so you look

15  at that and go am I really going to push ketamine on

16  this guy, on David?  And I go, I can.  If you think your

17  judgment that this is excitable delirium, okay.  If you

18  think this guy's combative when he's basically tied down

19  and laying on the ground, okay, maybe so.  But the thing

20  is this, if I'm going to push that drug, I don't have

21  any business pushing it unless I have all the

22  resuscitative equipment around me.

23  Q.    Let me -- let's jump into your opinions and

24  I'm going to, like I said, kind of skip around here.  So

25  we're back under I guess this is page 6, ending 000011.

Guillermo Haro
February 13, 2020

Page 207

1           MR. ZWILLINGER:  No further questions.

2           MR. REYNOLDS:  No questions.

3           MR. ZWILLINGER:  Read and sign.

4           THE VIDEOGRAPHER:  This concludes the

5    deposition of Guillermo Willie Haro.  The time is

6    3:05 p.m.

7                (Discussion held off the record.)

8           MR. SATTERLEE:  E-tran.  If we can get it

9    expedited, expedited to next week?  Two weeks.

10          MR. AUDILETT:  I want an E-tran.

11          THE REPORTER:  Counsel, did you want an E-tran

12   as well?

13          MR. ZWILLINGER:  Why ruin the fun.  Sure, an

14   E-tran.

15          THE REPORTER:  Does everyone want the exhibits

16   scanned and attached?

17          MR. ZWILLINGER:  Yes.

18          MR. SATTERLEE:  Yes.

19          MR. AUDILETT:  Yes.

20

21               (The deposition concluded at 3:05 p.m.)

22

23

24

25

Guillermo Haro
February 13, 2020

Page 208

```
 1   STATE OF ARIZONA      )
     COUNTY OF MARICOPA    )
 2

 3           BE IT KNOWN that the foregoing proceedings
     were taken before me; that the witness before testifying
 4   was duly sworn by me to testify to the whole truth; that
     the foregoing pages are a full, true, and accurate
 5   record of the proceedings all done to the best of my
     skill and ability; that the proceedings were taken down
 6   by me in shorthand and thereafter reduced to print under
     my direction.

 7
             I CERTIFY that I am in no way related to
 8   any of the parties hereto nor am I in any way interested
     in the outcome hereof.

 9
             [X] Review and signature was requested.
10           [ ] Review and signature was waived.
             [ ] Review and signature was not required.

11

12           I CERTIFY that I have complied with the
     ethical obligations set forth in ACJA 7-206(F)(3) and
13   ACJA 7-206 (J)(1)(g)(1) and (2). Dated at Phoenix,
     Arizona, this 26th day of February, 2020.

14

15

16                    _____
                           Helen Pasewark
17                       Helen Pasewark, RPR, CSR
                           Certified Reporter
                           Arizona CR No. 50905
18

19
             I CERTIFY that Bartelt Reporting, LLC has
20   complied with the ethical obligations set forth in ACJA
     7-206 (J)(1)(g)(1) through (6).

21

22

23
                      _____
                           Jackie Sotelo
24                       BARTELT REPORTING, LLC
                         Registered Reporting Firm
25                       Arizona RRF No. R1028
```

# EXHIBIT C

## Frank LoVecchio, DO, MPH, FACEP, ACMT

**Board Certified, Medical Toxicology**
**Board Certified, Emergency Medicine**
**Board Certified, Addiction Medicine**
**Board Certified, Medical Forensics**
**Certified Medical Review Officer (MROCC)**

11/1/2019

Scott Reynolds
Satterlee Gibbs PLLC
3133 W. Frye Rd., Suite 101
Chandler, AZ 85226

Dear Mr. Scott Reynolds,

Per your request, the following represents my Fed. R. Civ. P. Rule 26 Report in the matter of *Cutler v. Pima County, et al.* I have reviewed the circumstances surrounding an incident ("subject incident") that occurred on or about June 5, 2017, in Pima County, Arizona, at which time David Cutler ("Mr. Cutler"), was found naked while acting in an incoherent, aggressive and combative manner towards police, fire and EMS responders.

You have asked me to provide opinions as to: 1) the use of Ketamine by EMS Rural/Metro ("R/M") during the subject incident; 2) the effects of being exposed to the desert heat and elements on Mr. Cutler; 3) the effects of lysergic acid diethylamide ("LSD") on Mr. Cutler during the subject incident; and 3) the effects of caffeine on Mr. Cutler during the subject incident.

My opinions are based upon review of the materials submitted to me by your office, my education, training, experience and review of the documents and medical records relevant in this matter, as well as my knowledge of protocols and policies of providing sedatives and dissociative anesthetics, including Ketamine, in an EMS/emergent setting. I am qualified to provide an expert opinion in this matter due to my background in EMS, medical toxicology, and emergency medicine.

By way of background, I am an Attending Physician in the Departments of Emergency Medicine, Medical Toxicology and Critical Care Medicine at Good Samaritan Regional Poison Center and Medical Center in Phoenix, Arizona. I have been Co-Medical Director of the Banner Good Samaritan Poison and Drug Information Center and currently serve as Professor in the Research Scholar Departments of Emergency Medicine, Internal Medicine, and Pharmacology at the University of Arizona, College of Medicine in Phoenix, Arizona. I previously served as a New

1

York City Emergency Medical Service Academy Physician where I started my medical career in EMS and currently provide EMS medical direction for the Phoenix Fire Department. I am currently certified by the American Board of Emergency Medicine and licensed to practice medicine in the State of Arizona. A copy of my *curriculum vitae* outlining my qualifications has been previously sent to you under separate cover.

I have included within this report a list of information that I received and acquired in this case. I have reviewed all the listed information and reserve the right to amend this report if other evidence becomes available.

## Summary of Subject Incident:

At approximately 9:40 AM, on the morning of June 5, 2017, R/M was dispatched to the Twin Hills area of Tucson, Arizona where a Jeep belonging to Mr. Cutler was found engulfed in flames. Upon arrival, the Pima County Sherriff's Department ("PCSD") and R/M were unable to locate any individuals in the desert-area surrounding Mr. Cutler's burned-out Jeep. Later that morning, at approximately 11:40 AM, PCSD responded to a 911 call from a civilian who reported a naked man screaming in the desert. When PCSD arrived to the scene, Deputy Barnes approached the naked individual, later identified as Mr. Cutler. Mr. Cutler was noted to be "combative" and not "not following commands."   In addition to being naked and delirious, Mr. Cutler was noted to be bleeding or be covered with blood on at least six body areas. Deputy Barnes restrained and handcuffed Mr. Cutler after less invasive modalities were exhausted.

At approximately 12:07 PM, R/M arrived to the scene of the subject incident and found Mr. Cutler lying naked on the ground with his hands cuffed and legs cuffed.  With his hands cuffed behind him a strap extended to his lower legs, with the loose end of the strap attached to his handcuffs. Mr. Cutler was observed to be in an aggressive, agitated and combative state.  His weight was estimated to be 180 lbs at that time. PCSD alerted R/M to Mr. Cutler's altered mental status and requested sedation. Mr. Cutler exhibited objective signs consistent with excited delirium syndrome and agitation. At 12:17 PM, 3 cc/150mg of Ketamine was administered intramuscularly to Mr. Cutler in each deltoid with noted fluid leakage.  Shortly thereafter, Mr. Cutler's breathing slowed and his handcuffs were removed as he was strapped to the backboard of a Stokes basket. R/M crewmembers extricated Mr. Cutler down from the top of a rugged desert hill and simultaneously performed CPR on the patient. At 12:27 PM, 2mg of Narcan was administered to Mr. Cutler who was also intubated. At 12:29 PM, assisted ventilation was placed on Mr. Cutler. Mr. Cutler exhibited a Glasgow Scale Score of 3 and at 12:34 PM recorded a body temperature of 102.9 F. At 12:39 PM, .1mg of Epinephrine was administered and R/M then initiated defibrillation. At 12:44 PM, .1mg of Epinephrine and 50mg of Amiodarone was administered to Mr. Cutler, followed at 12:49 PM by 2mg of Narcan and .1 mg Epinephrine. At 12:53 PM, a last round of .1mg Epinephrine was administered. At approximately 12:57 PM, Mr. Cutler was transported to Tucson Medical Center.

2

CUTLER/RM 0838

At 1:08 PM, Mr. Cutler was pronounced dead, shortly before arriving to Tucson Medical Center. The cause of death was listed as hyperthermia. Mr. Cutler's body temperature was recorded to be 102.9 F at the time of his death.

An autopsy was subsequently performed which confirmed the cause of death (hyperthermia). A toxicology report revealed Mr. Cutler had both LSD and caffeine in his system at the time of his death. Although the toxicological results are accurate in confirming the substances noted the test is not 100% inclusive of all drugs and toxins.

**Professional Opinions and Basis for these Opinions:**

In my professional opinion, it was reasonable and appropriate for R/M to provide Mr. Cutler with Ketamine during the subject incident.

A. Patients, such as Mr. Cutler, with excited delirium and severe agitation, require rapid-acting pharmacological restraint to ensure the safety of first responders, law enforcement personnel and the patient themselves. Ketamine was the most appropriate pharmacological option to administer Mr. Cutler during the subject incident, given his agitated/combative nature and the immediate threat he posed to first responders, law enforcement personnel and himself. Furthermore, Ketamine was the only pharmacological option available to R/M at the time of the subject incident.

B. Had Mr. Cutler been exhibiting classic symptoms of hyperthermia then more likely than not he would have been comatose and not the behavior he was demonstrating on the video, etc.

C. In contrast to benzodiazepines and/or antipsychotic agents, Ketamine can provide rapid sedation without the loss of airway reflexes, hypoventilation, un-wanted hypotension, or elevated body temperature. In those individuals such as Mr. Cutler exhibiting signs of excited delirium, a main concern of EMS providers is to ensure the patient does not experience respiratory distress and arrest. Ketamine preserves airway reflexes and respiratory drive in a way no other drug can, making it reasonable and appropriate to use during the subject incident.

D. A dose of Ketamine, given intramuscularly, should generally be expected to produce sedation in a patient within a few minutes, with a duration of at least 20-30 minutes. In a patient, such as Mr. Cutler, who exhibited extreme agitation and combativeness, Ketamine would have been the fastest-acting emergency medication available to R/M, making its use necessary, reasonable and appropriate.

E. In the doses which were administered during the subject incident, Ketamine would not cause respiratory depression. In this case, the intramuscular injection of Ketamine, as

3

documented, would not have caused respiratory distress in Mr. Cutler. Therefore, it was reasonable and appropriate for R/M to use Ketamine in order to prevent respiratory distress in the patient.

F.  Ketamine would not have led, caused or contributed to the elevated body temperature recorded in Mr. Cutler during the subject incident.

G.  All doses of Ketamine administered by R/M throughout the duration of the subject incident were reasonable and appropriate, considering the circumstances.

H.  All medications administered by R/M throughout the duration of the subject incident were reasonable and appropriate, considering the circumstances.

I.  The only other alternative emergency medication one could have provided Mr. Cutler during the subject incident would have been Versed (midazolam), or a similar benzodiazepine. However, benzodiazepines can cause significant respiratory depression, which would make a reasonable EMS responder reluctant to administer in a patient, such as Mr. Cutler, exhibiting signs of excited delirium. Further, per Northwest Medical Center protocol, Versed, or a similar benzodiazepine, would not have been an approved emergency medication available for use by R/M at the time of the subject incident.

In my professional opinion, Mr. Cutler's prolonged exposure to the heat and desert elements before and during the June 5, 2017 subject incident, more likely than not, raised his body temperature and was the most important factor in causing hyperthermia in the Decedent.

In my professional opinion, the LSD present in Mr. Cutler's system during the subject incident and confirmed in the post-mortem toxicology report, more likely than not, raised his body temperature and caused hyperthermia in the Decedent.

In my professional opinion, the LSD that was present in Mr. Cutler's system during the subject incident and confirmed in the post-mortem toxicology report, caused the Decedent to experience signs of excited delirium, anxiety or fearfulness, paranoid thinking, physical or psychological discomfort, impaired judgment, and an altered mental state.

In my professional opinion, the caffeine present in Mr. Cutler's system during the subject incident and confirmed in the post-mortem toxicology report, more likely than not, caused anxiety, raised the body temperature, caused dehydration and contributed to the heat-stroke and excited delirium in the Decedent.

In this report, I have outlined my opinions based on the information I have reviewed thus far in this case. As additional information is made available to me, my opinions may be updated to reflect

4

this new information. The facts and opinions contained in this report are true and correct to the best of my knowledge.

In conclusion, it is my opinion to a reasonable degree of medical/toxicological probability that it was appropriate for R/M to use Ketamine in rendering emergency medical services to Mr. Cutler during the subject incident. It is also my opinion to a reasonable degree of medical/toxicological probability that all medications administered by R/M to Mr. Cutler during the subject incident were reasonable, necessary and appropriate.

Further, it is my opinion to a reasonable degree of medical/toxicological probability that exposure to the heat and elements, coupled with LSD and caffeine in Mr. Cutler's system during the subject incident and confirmed in the post-mortem toxicology report, caused or contributed to the increase in body temperature which led to the development of hyperthermia in the patient and ultimately caused Mr. Cutler's death.

## **Information Considered in Formulating the Above Opinions**

1. Complaint;
2. Rural/Metro Patient Care Report (CUTLER/RM 0001-00012);
3. Rural/Metro Fire Incident Report (Man in Desert)(CUTLER/RM 0013-0015);
4. Rural/Metro Fire Incident Report (Jeep Fire) (CUTLER/RM 0016-0020);
5. Pima County Sheriff's Department Incident Report (CUTLER/RM 0100-00464)
6. Pima County Sheriff's Department Detail Incident Report (Pima County 000027-000041)
7. Autopsy Report (CUTLER/RM 0021-0027);
8. Toxicology Report (CUTLER/RM 0028-0032);
9. Plaintiff's Preliminary Expert Witness Affidavit (Donald Locasto);
10. Protective Order;
11. Arizona Department of Health Services Supplemental Response to Subpoena, including case report and investigation by Dr. Bentley Bobrow (CONFIDENTIAL)(CUTLER/RM 0474-0482);
12. Northwest Medical Center's Excited Delirium Administrative Order (CONFIDENTIAL) (CUTLER/RM 0469)
13. Text messages and Snapchats between David and girlfriend on date of incident.
14. Bruce Evans Expert Report;
15. Guillermo Haro Expert Report (Cutler Expert);
16. Deposition of Grant Reed (Paramedic)
17. Deposition of Vince Figueroa (EMT);
18. NWMC Response to Subpoena;
19. Arizona Department of Health Services Response to Subpoena;
20. Deposition of Dr. Bentley Bobrow;
21. Deposition of Keith Barnes (Pima County Sheriff);
22. Photo Map Aerial Scene With Locations Labeled;

23. Videos of David Cutler;
24. Drone footage of incident area
25. Deposition of Deputy Davenport;
26. Deposition of David Winston, PhD.

## **Attachments**

Attached and made a part of this report are my curriculum vitae and a list of cases I have testified, by deposition and/or during trial, in the past four years.

## **Compensation**

A. $375.00/hour to review charts, literature and discuss matter;
B. $400.00/hour for deposition and trial, 2 hour minimum and 24-hour cancellation plus reasonable travel expenses;
C. The current total charges for my work on this case to date is ~ $3750

Sincerely,

Frank LoVecchio, D.O., M.P.H., F.A.C.E.P, ABMT.

6

CUTLER/RM 0842

# EXHIBIT D

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

```
Robert Steven Cutler,          )
                               )
                Plaintiff,     )
                               )
            vs.                )  No. CV 18-cv-00383-frz
                               )
Pima County, et al.,           )
                               )
                Defendants.    )
_____)
```

DEPOSITION OF GRANT REED

Tucson, Arizona
June 25, 2019
9:39 a.m.

REPORTED BY:
CATHY J. TAYLOR, RPR, CRR, CRC
Certified Reporter
Certificate No. 50111

PREPARED FOR:
ASCII/CONDENSED

(CERTIFIED COPY)

128

1       Q.    So what -- what are you -- what does that --

2       A.    So I said -- losing an area doesn't mean, like,

3  we've lost it in the desert and we're never going to find it;

4  right?  Losing an airway is a general term we say the patient

5  can no longer protect their own airway or their -- their

6  self-driven ventilatory status has been compromised.  So it's

7  a general term.

8       Q.    Okay.

9       A.    I'm worried that this patient is losing his airway

10  because his respiratory drive is starting to decrease and it

11  is becoming compromised.

12             The reason why I said I had them bring up the

13  Narcan is because I didn't feel that the -- I just felt that

14  he -- something's causing this altered mental status and he

15  probably had something else on board.

16       Q.    Right.

17       A.    Quite possibly a downer that was not able to kick

18  in because of whatever had him going the way he was was an

19  upper.  So with the way he presented, with the experience

20  that I have -- we can go off on a tangent there.  I'm going

21  to try not to, though.

22             I've got quite a bit of experience with

23  patients who take different varieties of medications.  My

24  assumption, what he presented to me, was that he had a downer

25  and a upper, and the upper was stopped.  The upper was

1    keeping him going, keeping him acting erratic, in -- altered

2    and -- and combative, and the Ketamine stopped that.  So we

3    take that out of the equation.  We still have this downer,

4    and there's nothing to keep it in check now.  So now we have

5    respiratory depression.

6                    Narcan hopefully will now bring that balance

7    back and stop whatever's causing that respiratory depression,

8    which my assumption is he's got some kind of opiate on board.

9    Q.    So the respiratory -- the losing the airway first,

10   the respiratory depression, somebody having difficulty

11   getting oxygen into their lungs?

12   A.    They're having difficulty breathing, whether --

13   it's not a profusion issue necessarily.

14   Q.    Okay.

15   A.    What you're describing is a profusion issue.  This

16   is more that their ventilatory status -- so their rate,

17   depth, and quality of breaths are not adequate.

18   Q.    What's OPAN, O-P-A-N?

19   A.    An OPA?

20   Q.    Okay.

21   A.    So I think what I said was an OPA in, which is we

22   inserted an OPA in.  An OPA is an oropharyngeal airway

23   device, and it's like -- it looks like Captain Hook's little

24   hook.  It's a plastic piece, different sizes, that goes in

25   the mouth and keeps the tongue off the back of their airway

 1              THE WITNESS:  -- goes in and out; right?

 2  BY MR. AUDILETT:

 3      Q.    Yes.

 4      A.    That's what his body was doing.  His legs -- from

 5  his head to his legs, he was going in and out, bucking --

 6      Q.    Okay.

 7      A.    -- them off of him.

 8      Q.    At some point his legs are pulled in, and other

 9  times his legs are shot out?

10      A.    Extended out, yes.

11      Q.    Extended out.

12              And I just want to make sure we're clear on

13  this.  At no time during your observations of Mr. Cutler in

14  the presence of the officers did you see his ankles tied in

15  close proximity to his wrists.  Am I right?

16      A.    Not that I recall.

17              MR. AUDILETT:  Okay.  That's all.

18              MR. ZWILLINGER:  Nothing further.

19              MR. SATTERLEE:  Nothing here.

20              We'll read and sign.

21              (Deposition concluded at 12:56 p.m.)

22

23                              _____

24                                            Grant Reed

25

DEPOSITION OF GRANT REED - 6/25/2019

156

1  STATE OF ARIZONA          )
                             )         ss.
2  COUNTY OF MARICOPA        )

3          BE IT KNOWN that the foregoing proceedings were
   taken before me; that the witness before testifying was duly
4  sworn by me to testify to the whole truth; that the foregoing
   pages are a full, true, and accurate record of the
5  proceedings, all done to the best of my skill and ability;
   that the proceedings were taken down by me in shorthand and
6  thereafter reduced to print under my direction.
           I CERTIFY that I am in no way related to any of the
7  parties hereto, nor am I in any way interested in the outcome
   hereof.
8
           [X] Review and signature was requested; any changes
9  made by the witness will be attached to the original
   transcript.
10
           [ ] Review and signature was waived/not requested.
11
           [ ] Review and signature not required.
12

13         I CERTIFY that I have complied with the ethical
   obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
14 J(1)(g)(1) and (2).
           Dated at Phoenix, Arizona, this 10th day of July,
15 2019.

16

17         _____

18                     CATHY J. TAYLOR, RPR, CRR, CRC
                             Certified Reporter
19                         Certificate No. 50111

20          *       *       *       *       *

21         I CERTIFY that GRIFFIN & ASSOCIATES, LLC, has
   complied with the ethical obligations set forth in ACJA
22 7-206(J)(1)(g)(1) through (6).

23         _____

24                     GRIFFIN & ASSOCIATES, LLC
                         Registered Reporting Firm
25                         Arizona RRF No. R1005

# EXHIBIT E

## NORTHWEST MEDICAL CENTER
## BEHAVIORAL
## ADMINISTRATIVE ORDER

Initiate immediate Support Care:
- O2 to maintain sat >90%
- Complete primary and secondary survey as indicated
- Cardiac monitor, vital signs including fingerstick blood glucose and temperature as indicated

---

- Assess for immediate danger
- Protect yourself and others
- Protect patient from injury
- Summon Law Enforcement as needed

---

Use Administrative Orders on patients with these symptoms:
- History of recent crisis, emotional trauma, bizarre or abrupt changes in behavior
- Suicidal Ideation
- History of psychiatric disorder
- Depression
- Anxiety

---

If patient is violent or exhibiting behavior that is dangerous to self or others and the EMS provider can **safely perform the following**:
- Restrain all four extremities with either padded leather restraints or soft restraints. Pt must remain in the supine position. Restraints must allow for quick release. **Handcuffs are for law enforcement use only**
- DO NOT release restraint until transfer of care at hospital
- Reassess and document neurovascular status of all extremities every 15 minutes
- Transport to closest receiving facility

---

- Prepare to transport to facility of patient choice or closest most appropriate facility

---

If patient wishes to refuse, the Ems provider can't safely restrain patient or Law Enforcement WILL NOT assist EMS provider.   Document Patient the Refusal of Transport utilizing Agency specific protocols and documentaion standards.

---

For patients with excited delirium (>15 years old):
- Ketamine 4mg/kg IM once (max 400 mg)

If minimal/no response in 5 min: Midazolam 2.5 mg via mucosal atomizer device, intranasal, or IM may repeat in 15 minutes once if indicated.

For patients in need of chemical restraints and Ketamine was NOT given:
- Administer Midazolam 5 mg via mucosal atomizer device, intranasal, or IM may repeat in 15 minutes as indicated

---

Created 3/09, Revised 3/12,4/13, 4/16, 2/17

---

**MEDS Notification to include: Behavioral Administrative Order, unit number, patient age, gender, and ETA to receiving facility.  Advise if patient is Unstable,**

CONFIDENTIAL – Subject to Protective Order

# EXHIBIT F

1  THIS IS DETECTIVE BANUELOS, BADGE #6861, CURRENTLY AT 2741 NORTH
2  HOUGHTON AT STATION 72, UH, SPEAKING TO, UH, PARAMEDIC GRANT REED,
3  REFERENCE CASE #170605143.  THE TIME NOW IS 1555 HOURS ON MONDAY, JUNE,
4  UH, 5, 2017.

5  LEGEND:      Q. DET. BANUELOS            A. FIRE FIGHTER/PARAMEDIC GRANT REED
6  _____

7  Q.    Grant, if you can give me your full name and date of birth for the record, please.
8  A.    Grant Reed, 4-12-84.

9  Q.    And, um, for the record, uh, what is your title here?
10  A.    Fire Fighter/Paramedic 2.

11  Q.    And, uh, do you have a badge number that you use?  Or like an employee number?
12  A.    Employee number is 66175.

13  Q.    Okay.  And, obviously, the reason that we're here is reference the incident that occurred
14        earlier.  Um, there was two separate incidents that Deputies were out on with you guys.
15        Um, but the one that I'm more worried about, unless you think, there's a, uh, some type
16        of a connection, is the one where the guy was running around, uh, naked on the top of the
17        hill, asking for help.  Do you remember anything about that?
18  A.    Yes.

19  Q.    Okay.
20  A.    Uh, so, I responded to both incidents.

21  Q.    Okay.  So, tell me from, if you want, if, from the other one, I mean, all the way through,
22        obviously, until you get back here.
23  A.    Okay.  So, the first incident was a vehicle fire.  Um, out on the east side, Melpomene, just
24        south of Broadway, I think Twin Hills.  Um, we pulled up and it was a Jeep up on the
25        side of the hill, fully involved.  The driver was never located for that vehicle.  So, uh, the
26        unknown, how, how the Jeep got there or how it got on fire, but, uh, we pulled up, put
27        that fire out.  And then returned to the station.  Uh, we were here trying to get cleaned
28        back up from that incident.  And then got dispatched for unknown problem.  Uh, PCSO
29        are requesting us to respond just south of the previous incident.

30        So, we got on scene, or well, we got close to the scene and then dispatch advised us to
31        hold off, due to the patient being combative.  Um, said PCSO was, uh, had made contact.
32        The patient was acting erratically and being combative with them.  So, I tried to talk to
33        my Captain to see if we could get COM 9, so that we could speak with them and figure
34        out what they wanted.  Um, or when we could approach, 'cause, they were waiving us in
35        at the same time.  And, uh, at that time, dispatch came up, uh, my Captain had talked to
36        dispatch and said that dispatch was contacted by PCSO, asking if we could come up and
37        assist with the patient and get him sedated, uh, 'cause, he was being combative.  So, at
38        that point, we pulled into the, close to the scene, anyway, where the other, uh, vehicle
39        was parked.  One of the other SO Deputies vehicles is parked, staged.

STATEMENT OF FIRE FIGHTER/PARAMEDIC GRANT REED – CASE #1706051432

| | | |
|---|---|---|
| 1 | Q. | Okay. |
| 2 | A. | And I pulled out, uh, my sedation medication, which is the Ketamine. And started hiking |
| 3 | | up the mountain just to get to, uh, the patient and the Deputies. And I could see from |
| 4 | | down on the gro-, ground, where we were at, the patient was like, bucking around and |
| 5 | | stuff. They had him, they were trying to restrain him. And he was still, it looked like he |
| 6 | | was giving them a pretty tough time, um, up there. |

7    So, I got up to PCSO and the patient. They said that he was just completely combative,
8    uncooperative and saying stuff that didn't make sense. I saw the patient was awake, but
9    making just a bunch of weird noises. Uh, he was laying face down and then restrained
10    with his arms and legs behind him and there was a leash connecting the two. So, like,
11    kind of hogtied, basically. Um, they said that he just was completely combative with
12    them. You know, they couldn't get him, all four of them were still trying to keep him
13    restrained and he was still fighting and everything.

14    So, at that point, uh, I following my administrative orders for excited delirium, um, and
15    administered Ketamine. And then he was still la-, he was completely naked, laying face
16    down. And so, after he started to kind of calm down a little bit, I asked if we could sit
17    him up. So, we sat him up and got him seated up. And I was worried about, you know,
18    him being too sedated. And so when we sat him up, he was still breathing on his own,
19    still had a pulse. I had my partner check to make sure he still had a, a radial pulse, and he
20    did. And I felt a good carotid pulse. Um, but he was calm at that point. So, I asked, uh,
21    one of the Deputies to un-cuff him and remove the restraints, at which point, they were
22    like, are you sure, uh, 'cause, he has, obviously, been given them a pretty tough time.
23    But, with the, the sedation, he's in like, we could manage him. And I'm more concerned
24    now about my patient. So, we sit him on the rocks. It's hot outside. He's burning. And
25    then, obviously, uh, just making sure that he is still conscious, you know. So, SO did,
26    was able to remove the restraints from him. Um, I had one of the other guys bring up
27    Narcan, just in case I did lose his airway or did go out completely, so I could try to
28    reverse it. Um, it doesn't work on Ketamine, but I don't know what else this guy has on
29    board. Um, if he has any other kind of illegal drug use or anything. And that, that might
30    cause him, 'cause Ketamine is not supposed to cause respiratory depression or respiratory
31    arrest, or cardiac arrest at all.

32    Um, so they brought up Narcan. I also asked them to bring up a blanket so we could get
33    him off of the, uh, the rocks and the, and the dirt, since he was naked. So, when they got
34    up, um, they got up there, picked him up, put him on the blanket so that he wasn't on the
35    rocks anymore. And then, at that point, I was worried that his respire-, he was starting to
36    show some sign of respiratory depression. So, I gave him some Narcan. Um, and that
37    seemed like it was working. We just kept evaluating, trying to monitor, make sure we
38    saw a pulse, he was still breathing. And right around the time when the other crew got up
39    there with the Stoke's basket and spine board to package him and, and take him down the
40    hill, uh, I could no longer feel a pulse. And I, it didn't look like he was breathing on his
41    own anymore. So, we put him on the backboard and I initiated compressions, chest
42    compressions. Um, and then we loaded him into the Stoke's basket, once that was
43    prepared. I gave him an additional dose of Narcan on the way down the hill. Um, just
44    because it didn't seem like he was responding. And now, at this point, he's a code arrest.

HOM\REEDG\BANUELOS\5524\159  - Reviewed

STATEMENT OF FIRE FIGHTER/PARAMEDIC GRANT REED – CASE #1706051433

| | | |
|---|---|---|
| 1 | | So, going down the hill, oh, and before, uh, or I guess, as we're putting him in the Stoke's |
| 2 | | basket, I instructed one of the EMT's to put, uh, and OPAN, which is an, uh, oral adjunct, |
| 3 | | airway adjunct and then put him on the oxygen. Uh, 'cause, we can't, with him in the |
| 4 | | Stoke's basket, we can't do chest compressions and even try to assist ventilations. It's |
| 5 | | not very, uh, practical. |
| 6 | Q. | Okay. |
| 7 | A. | So, we got him down, uh, off the mountain. Well, they took him down. I, I split off |
| 8 | | from them, at that point, and went down to the ambulance to get everything else ready to |
| 9 | | start preparing for a code. So, I get my monitor ready, um, get the pads out, get set up for |
| 10 | | airway, so, I could do an advanced airway on him, um, and work, uh, basically, the, the |
| 11 | | code arrest call. And, 'cause, I didn't have anything else up there with me at that point. |
| 12 | Q. | And then once they brought him down and they get him to the ambulance, then what |
| 13 | | happens? |
| 14 | A. | So, then, uh, they pulled him out of the Stoke's basket. He is still on the spine board, still |
| 15 | | has the oxygen on. Put him on the gurney and loaded him in the back of the ambulance. |
| 16 | | And then we resumed, uh, our cardiac arrest protocol. So, chest compressions. Um, I |
| 17 | | had the Engineer and then the EMT from the engine, ride in the back of the ambulance |
| 18 | | with me, so that I could have extra hands to, to treat him. So, on the way in, then, we |
| 19 | | gave, uh, our typical, uh, code arrest medications. So, he got, um, a total of four more |
| 20 | | Epinephrine. Not four more, but four, uh, doses of Epinephrine. He did convert, initially |
| 21 | | when I put him on the monitor, I saw him in asystole, which is like flat line. Um, and |
| 22 | | after we get our first rhythm check, which is about, uh, a couple minutes into the |
| 23 | | transport, and getting IO established, getting him, uh, first round of medications on board, |
| 24 | | he did have a conversation, uh, his heart rhythm changed to VETAC, ventricular, |
| 25 | | ventricular tachycardia. Um, so I delivered a shock for that, to try and get him out of that |
| 26 | | rhythm. And it didn't work. Um, he then, he changed rhythms, and the pulse's elec-, |
| 27 | | electrical activity had been into asystole, uh, which is back in the flat line. Um, we did |
| 28 | | give him an additional dose of Narcan and a dose of Ambiodarone. Um, which is a |
| 29 | | ventricular one. So, when he was in VETAC, I instructed the Engineer to, uh, add |
| 30 | | Ambiodarone to the, uh, administration. |
| 31 | Q. | Now how was that administered? |
| 32 | A. | That is administered through, um, an IO. So, intraosseous needle as in the chin. Um. |
| 33 | Q. | So, you guys were able to put in a, uh, a, uh, IV then?  A … |
| 34 | A. | No, we, we never got an I-, a peripheral IV. Um, it was just through the chin. Um, so, it's, it |
| 35 | | goes into the bone. It's, uh, a I-, IV, basically, that's drilled into the bone. And that's |
| 36 | | how the medications are administered. It's pretty typical for a code arrest. |
| 37 | Q. | Okay. Now the Amiodarone … |
| 38 | A. | Amiodarone. |
| 39 | Q. | An-, am-, Amiodarone. |
| 40 | A. | So, it's A-M … |

Pima County 001003

STATEMENT OF FIRE FIGHTER/PARAMEDIC GRANT REED – CASE #1706051434

| | | |
|---|---|---|
| 1 | Q. | Huh uh (yes). |
| 2 | A. | … I-O. |
| | | |
| 3 | Q. | I-O. |
| 4 | A. | … D-A-R-O-N-E. |
| | | |
| 5 | Q. | Perfect. |
| 6 | A. | Yeah. |
| | | |
| 7 | Q. | What was that for? |
| 8 | A. | So, that was for a ventricular, uh, arrhythmia. So, when he was in ventri-, or attack |
| 9 | | accardia, part of our protocol is to administer Amiodarone. |
| | | |
| 10 | Q. | Okay. So, you said he had four doses of epinephrine. And then this amio-. |
| 11 | A. | Amiodarone. |
| | | |
| 12 | Q. | Amiodarone. And then what else did, did he get? |
| 13 | A. | Narcan. |
| | | |
| 14 | Q. | Narcan? How many, did, two at least? |
| 15 | A. | Three. |
| | | |
| 16 | Q. | Three. |
| 17 | A. | And then one dose of Ketamine, initially. And oxygen. And he also received fluids on |
| 18 | | the, and he … |
| | | |
| 19 | Q. | Through the … |
| 20 | A. | Correct. |
| | | |
| 21 | Q. | … through the chin? |
| 22 | A. | Mm hm (yes). |
| | | |
| 23 | Q. | Is it one full bag or? |
| 24 | A. | Um, I'm not sure of the exact amount. But, it was, uh, administered by the time we got |
| 25 | | there. |
| | | |
| 26 | Q. | Okay. So, let's go back to the, to the beginning real quick. |
| 27 | A. | Mm hm (yes). |
| | | |
| 28 | Q. | Um, so when you, you initially get there. You see that, you, you can see the Deputies, |
| 29 | | wherever they're at. You can see he's still being combative. |
| 30 | A. | Correct. |
| | | |
| 31 | Q. | You said he was like, bucking. |
| 32 | A. | Yeah. |
| | | |
| 33 | Q. | Um, and how many Deputies were there at the time? Do you remember? |
| 34 | A. | I do not recall specifically. I think four ish. |

Pima County 001004

STATEMENT OF FIRE FIGHTER/PARAMEDIC GRANT REED – CASE #1706051435

| | | |
|---|---|---|
| 1 | Q. | Okay.  And the four Deputies were having problems get, like, getting him restrained? |
| 2 | A. | Absolutely. |
| | | |
| 3 | Q. | Okay.  And then you said, when you finally got up there, he had handcuffs to the back. |
| 4 | | He had, uh, something restraining his legs.  And then you described it as being hogtied. |
| 5 | | Um … |
| 6 | A. | Yeah. |
| | | |
| 7 | Q. | … so his, his ankles and, or the, whatever was restraining his ankles and the handcuffs |
| 8 | | were tied together. |
| 9 | A. | Tied together, correct. |
| | | |
| 10 | Q. | Okay.  Okay.  And he was on his face. |
| 11 | A. | Correct. |
| | | |
| 12 | Q. | So, he was still breathing. |
| 13 | A. | Correct. |
| | | |
| 14 | Q. | Was he, and he, was he still talking?  Was he saying anything at that time or no? |
| 15 | A. | He was mumbling … |
| | | |
| 16 | Q. | Okay. |
| 17 | A. | … um, incoherently.  And he was still, yeah, he was still conscious and being combative, |
| 18 | | uncooperative.  The SO Deputies were still attempting to restrain him.  It's kind of blurry |
| 19 | | for me, at that point.  Um, the initial thing, just 'cause, I wasn't really paying attention to |
| 20 | | them a whole lot. |
| | | |
| 21 | Q. | Okay. |
| 22 | A. | I was looking at the patient mostly, more than anything, trying to figure out, 'cause, he |
| 23 | | was covered in abrasions and burns and … |
| | | |
| 24 | Q. | Did it appear that he had, I mean, you said he's got abrasions and burns, um, you, you |
| 25 | | had said earlier, he was naked.  Did it look like he had any burn, burns?  Like from a fire? |
| 26 | | Or anything like that?  Or was he just more … |
| 27 | A. | No.  Yeah, not that I was aware of. |
| | | |
| 28 | Q. | … like, like roll around in dirt. |
| 29 | A. | Yeah, more, more like contact from the ground, is what it appeared.  I didn't see any, um, |
| 30 | | gross burn injuries on him. |
| | | |
| 31 | Q. | Okay.  And then, um, did you see where Deputies, um, having a, like, really force |
| 32 | | themselves on this person to keep him restrained?  Or at that point, was he just kind of, |
| 33 | | uh, being combative, but restrained?  Or did you, did anybody have his, you know, their |
| 34 | | knee on the guy's back? |
| 35 | A. | No, no … |
| | | |
| 36 | Q. | Or their foot on their, on the guy's neck? |
| 37 | A. | … nobody had any … |

HOM\REEDG\BANUELOS\5524\159  - Reviewed

Pima County 001005

STATEMENT OF FIRE FIGHTER/PARAMEDIC GRANT REED – CASE #1706051436

| | | |
|---|---|---|
| 1 | Q. | Or anything like that? |
| 2 | A. | … no. I mean, it, it wasn't like there was a dog pile on top of him. But, I do believe he |
| 3 | | was still being held like, by his extremities. Or, I know that they were still, everyone was |
| 4 | | still around me. But, there wasn't any Deputies, like, with the knees on his back or on his |
| 5 | | head, at that point, no. |
| 6 | Q. | Okay. |
| 7 | A. | Um, but, I do believe that he was still being restrained, um, and at least held in place. |
| 8 | Q. | Okay. But, he was, was, was he still clearly breathing and conscious and stuff like that |
| 9 | | … |
| 10 | A. | Yes. |
| 11 | Q. | … when this was going on? |
| 12 | A. | Yes. |
| 13 | Q. | When you administered the Ketamine, was that while he was still face down? |
| 14 | A. | Correct. |
| 15 | Q. | Okay. And where did you administer it? |
| 16 | A. | In, in the, each arm. |
| 17 | Q. | Okay. Is that, does it come in two doses? Or how does that work? |
| 18 | A. | It's just that there is, it's a lot to put into one arm. Um, 'cause, it's, uh, high |
| 19 | | concentration, so, it's a lot of CC's. |
| 20 | Q. | Okay. |
| 21 | A. | Um, and so, I split it up half and half. |
| 22 | Q. | Okay. |
| 23 | A. | But, some of it, um, some of it leaked out as well. When I, which is pretty typical for an |
| 24 | | IM injection. So, and that's because it's, it's a, the quantity going into the adult. So, it's |
| 25 | | on a huge muscle. Um, but … |
| 26 | Q. | Okay. And then was it pretty, did it react immediately? Did you immediately get … |
| 27 | A. | No, it's. |
| 28 | Q. | Like, what was the timeframe from the time you administered to it, to the time that you |
| 29 | | guys took the handcuffs off? |
| 30 | A. | Um, probably a couple minutes before the handcuffs came off. |
| 31 | Q. | Like, one, two, three, four, ten? |
| 32 | A. | Like, three to five ish. |
| 33 | Q. | Okay. And is he saying anything at this point? Is he still mumbling? |
| 34 | A. | Yeah, he was still mumbling, uh, but, softly. Still breathing. |

Pima County 001006

STATEMENT OF FIRE FIGHTER/PARAMEDIC GRANT REED – CASE #1706051437

| | | |
|---|---|---|
| 1 | Q. | Now did you guys, was, what else did you notice about the, the patient at that point?  I |
| 2 | | mean, was he hot to the touch?  Was he like, or was he cold? |
| 3 | A. | He, so, he seemed … |
| | | |
| 4 | Q. | I mean, what, what was his … |
| 5 | A. | … so, he seemed, uh, like, he was exposed to the heat for an extended period of time.  He |
| 6 | | was hot to the touch.  Um, he did have some superficial burns on him, which I assumed |
| 7 | | were from walking through the desert.  Um, 'cause, his feet, also, looked like they were |
| 8 | | burned and, and cut up pretty well.  And he was barefoot. |
| | | |
| 9 | Q. | Okay. |
| 10 | A. | Again, he had, he had zero articles of clothing on.  Um, and then he just had, it would be |
| 11 | | hard to even say that he had like, a bump and bruise or an abrasion here or there.  It was, |
| 12 | | ever-, he was covered everywhere, front and back, head to toe. |
| | | |
| 13 | Q. | Okay. |
| 14 | A. | Um, but, he looked very dry, at the point.  So, he wasn't sweaty.  Um, which means that |
| 15 | | he's, in my assumption, that would be because, he's already sweat out all of his fluids |
| 16 | | from being, uh, exposed to the heat for an extended period of time. |
| | | |
| 17 | Q. | So, when somebody's in that type situation, um, what you administered is typical for like, |
| 18 | | you didn't do anything out of the ordinary, you wouldn't do for any, uh, other person that |
| 19 | | was … |
| 20 | A. | Correct. |
| | | |
| 21 | Q. | … acting that, like that behavior? |
| 22 | A. | Correct. |
| | | |
| 23 | Q. | Or having that type behavior? |
| 24 | A. | Yes, sir. |
| | | |
| 25 | Q. | Okay.  Um, after you gave him the, the Ketamine, and started being less combative, you |
| 26 | | guys took him out of the restraints.  You guys asked for a blanket to be brought up.  Um, |
| 27 | | what other equipment did you have there to assess him, other than, you know, just, did |
| 28 | | you have like, your go bag? |
| 29 | A. | Uh, no, sir. |
| | | |
| 30 | Q. | Or I know you guys have stuff like that. |
| 31 | A. | We do have a backpack, um, that sometimes we'll bring with us.  This time we did not.  I |
| 32 | | thought that this was gonna be a quick easy, get him out of there. |
| | | |
| 33 | Q. | Okay. |
| 34 | A. | Um, but, because of the limited access up there to him, it, it's also standard with our, if |
| 35 | | we are doing any kind of search and rescue, which this patient kind of fell under, um, |
| 36 | | we're not gonna bring a lot of our equipment with us, because, it's more about trying to |
| 37 | | get the patient out of the elements, out of, um, whatever.  Like, so, for example, this |
| 38 | | guy's on the ground.  The ground's hot.  We need to get him out of that danger zone, |
| 39 | | which is still hurting him. |

HOM\REEDG\BANUELOS\5524\159   - Reviewed

Pima County 001007

STATEMENT OF FIRE FIGHTER/PARAMEDIC GRANT REED – CASE #1706051438

| | | |
|---|---|---|
| 1 | Q. | Okay. |
| 2 | A. | Um, and get him back to the, to the truck.  But, a lot of the stuff that we carry is pretty |
| 3 | | cumbersome.  It's already, like, we're not, I wasn't prepared to go on a search and rescue |
| 4 | | call.  So, I'm in steel toed boots, trying to climb up the side of this mountain.  Uh, |
| 5 | | bringing in any other equipment with me, but, I just maybe even more that will … |
| 6 | Q. | So, you were, I, I heard you say something earlier about the Deputies were saying this |
| 7 | | guy's combative.  And they need to, they need to get him controlled.  Is that why you |
| 8 | | took the, the Ketamine and … |
| 9 | A. | Correct.  Yeah. |
| 10 | Q. | … the, whatever other medications you have. |
| 11 | A. | So, that's what I brought right way.  Um, I went to the back of the ambulance, the drug |
| 12 | | box, as soon as we pulled up on scene, grabbed Ketamine and started withdrawing out as |
| 13 | | I was walking up.  Because, that's what they're requesting.  And, and _____. |
| 14 | Q. | And you saw them … |
| 15 | A. | … and, and I could see him fighting all four of the Deputies at the same time.  So. |
| 16 | Q. | Okay. |
| 17 | A. | What, what I was hearing, uh, definitely, was in conjunction with what I was seeing from, |
| 18 | | from where I was at. |
| 19 | Q. | Okay.  Were the Deputies saying anything?  Were they giving him instruction?  Were |
| 20 | | they telling him, you know, what were they saying to him? |
| 21 | A. | I'm not sure that they were saying anything to him, at that point.   Not, by the time that I |
| 22 | | got up there. |
| 23 | Q. | Okay. |
| 24 | A. | Um … |
| 25 | Q. | So, well … |
| 26 | A. | … relax.  I know I heard someone, I think say relax to him a few times.  But … |
| 27 | Q. | But, you weren't able to hear any of the conversation prior to them getting up there and |
| 28 | | ___. |
| 29 | A. | No, sir. |
| 30 | Q. | Okay.  Once you guys get him, uh, get him up.  You guys have, you guys, uh, get a |
| 31 | | blanket under him and all that stuff.  You said he starts kind of calming down. |
| 32 | A. | Mm hm (yes). |
| 33 | Q. | Kind of, you know, he's still breathing, still has a pulse.  Um, and you administer the, uh, |
| 34 | | the Narcan. |
| 35 | A. | Correct. |
| 36 | Q. | Um, what was the, what was the reason for the Narcan? |

Pima County 001008

STATEMENT OF FIRE FIGHTER/PARAMEDIC GRANT REED – CASE #1706051439

| | | |
|---|---|---|
| 1 | A. | So, the Narcan is if he did take any, like, if he first took any med-, or prescription drugs |
| 2 | | over the counter prior to, I, I don't know what is causing him to act erratically and be out |
| 3 | | in the middle of the desert naked. That's not normal. Uh, so, is he on heroin? Is he on |
| 4 | | prescription, uh, opiates? I, I don't know. Um, but, with his respiratory, he was starting |
| 5 | | to move towards respiratory depression, uh, quickly. It, it took a while for that to start. |
| 6 | | But, then once that started, he started deteriorating pretty, pretty rapidly. And so, the |
| 7 | | reason for the Narcan is because, Ketamine is not supposed to cause respiratory |
| 8 | | depression at all. Um, so something else was causing respiratory depression. And my |
| 9 | | assumption is that he might have something else on board. So, the Narcan doesn't hurt. |
| 10 | | It's a good diagnostic, it's clean. And it's usually a good Hail Mary, uh, if they did take |
| 11 | | something else and we don't know. |
| 12 | Q. | Okay. |
| 13 | A. | So, um, and it's also part of our standard protocol if someone does go unconscious, |
| 14 | | unresponsive, and we don't know what has caused that, uh, Narcan is something that we |
| 15 | | would ad-, administer, typically, anyway. Right. |
| 16 | Q. | So, that's in you guys' protocol is to, to do that. |
| 17 | A. | Correct. Correct. |
| 18 | Q. | To try to figure out something. |
| 19 | A. | Right. So, I was trying to stay … |
| 20 | Q. | You have nothing at that point. |
| 21 | A. | … trying to stay ahead of the curve ... |
| 22 | Q. | Okay. |
| 23 | A. | … uh, before he did go into respiratory arrest. |
| 24 | Q. | Okay. Obviously, um, you're a Paramedic. How long have you been a Paramedic? |
| 25 | A. | I've been a Paramedic for a little over four years. March, March was four years. |
| 26 | Q. | And in those four years, have you dealt with patients like this in the past? |
| 27 | A. | Yes. |
| 28 | Q. | And based on the protocol that you guys follow, and just your experience, and, you |
| 29 | | know, your training, um, everything that you did, was it pretty much within, I mean, did |
| 30 | | you deviate at all from any of your protocols? Or anything like that? |
| 31 | A. | No, sir. |
| 32 | Q. | Because, things were different or because of what you saw? Anything like that? |
| 33 | A. | No, I, I did, uh, what I thought was appropriate in the given situation. And it's, I, I have, |
| 34 | | uh, treated people for excited, patients with excited delirium before, in the past. And it's |
| 35 | | just part of protocol. |
| 36 | Q. | How you doing right now? |
| 37 | A. | I am, it's, it's rough. Uh, I'm a little shaken up, um, because, that was my patient. And I |
| 38 | | still don't know what caused him to die. So, not too happy. Not too stoked. |

Pima County 001009

STATEMENT OF FIRE FIGHTER/PARAMEDIC GRANT REED – CASE #17060514310

| | | |
|---|---|---|
| 1 | Q. | I can imagine. |
| 2 | A. | Uh, I pride myself on being a pretty good Paramedic, so, to not know what happened or |
| 3 | | whether if I had anything to do with it, you know, uh, or if I could have done something |
| 4 | | differently.  But, I did follow protocol.  So, it's still, I mean, saying I followed protocol, |
| 5 | | is one thing.  But, it still sucks when it's, my job is to make people better.  And … |
| 6 | Q. | Yeah. |
| 7 | A. | … you know, to fix them.  So. |
| 8 | Q. | Well, and that's why I asked, 'cause, I mean, even though it is an investigation, uh, a |
| 9 | | criminal investigation, because, we don't know what happened. |
| 10 | A. | Mm hm (yes). |
| 11 | Q. | Um, and there was a lot of hands involved.  You know, it's you guys, there's us, there's, |
| 12 | | so, we're trying to get to the bottom of it.  But, the reality is somebody did die. |
| 13 | A. | Mm hm (yes). |
| 14 | Q. | Um, and you, he was your patient. |
| 15 | A. | Yeah. |
| 16 | Q. | So, um, that's why I asked and obviously, we have, we have people you can talk to, you |
| 17 | | know, stuff like that. |
| 18 | A. | Yeah, thank you.  I appreciate it.  And it's not, it's not something that like, it's sucks big |
| 19 | | time, but, it's not something I … |
| 20 | Q. | Okay.  And I just put it out there in case … |
| 21 | A. | Yeah.  I appreciate it. |
| 22 | Q. | … you know, later on, or whatever, you, you feel like you need to talk to somebody. |
| 23 | A. | Thank you. |
| 24 | Q. | Um, when, when you went through your training, when you went through all that, um, |
| 25 | | and you were in prior situations like this, um, is there anything about this patient that was |
| 26 | | different?  Is there anything that you can think of that, I mean, I know all, all situations |
| 27 | | are completely different. |
| 28 | A. | Mm hm (yes). |
| 29 | Q. | And they're completely the same, at the same time.  I mean … |
| 30 | A. | Yeah. |
| 31 | Q. | … but is there any … |
| 32 | A. | _____. |
| 33 | Q. | … anything about this particular incident that is different, that you could think of? |
| 34 | A. | Yes.  So, the remote access to this patient, I have not had a, besides ____ patient, to have |
| 35 | | required remote access like this.  Um, so, that was, that was a challenge to have him up |
| 36 | | on the side of the, the hill like that.  I've had naked, crazy, excited, delirium patients, |
| 37 | | numerous times.  Plenty of times.  More than I'd like to remember.  Um, but to have |

HOM\REEDG\BANUELOS\5524\159   - Reviewed

Pima County 001010

STATEMENT OF FIRE FIGHTER/PARAMEDIC GRANT REED – CASE #17060514311

| | | |
|---|---|---|
| 1 | | somebody that on top of, that we have to go up and hike up the mountain for that, that |
| 2 | | was, uh, that was different than, than what I've done in the past.  I, I haven't had a patient |
| 3 | | that fit that algorithm, in that location before. |
| 4 | Q. | Okay.  Um, that being said, is there anything else, other than … |
| 5 | A. | Yeah. |
| 6 | Q. | … getting him down sooner, because of the remote access, that you think could have |
| 7 | | helped? |
| 8 | A. | No.  No.  Getting him down sooner, you know, the helicopter being right then and there, |
| 9 | | ready to pick him up, maybe.  But, uh, not being in the environment, I think that, uh, if he |
| 10 | | potentially had anything else of-, in his system, or if he was injur-, injured in the, if that |
| 11 | | was his, his Jeep and he was injured in that incident, the earlier incident, and then him |
| 12 | | being exposed to the heat for as long as he was, just those three things are really pretty |
| 13 | | big recipe for disaster.  Especially when they're all combined like that. |
| 14 | Q. | Yeah.  Anything that I haven't asked you that you think is important for me to know?  Or |
| 15 | | that, um, or, actually, be-, before I even ask that, uh, was there anything that you talked |
| 16 | | to, um, talked to the doctor about?  Or did the doctor talk to you about anything, um, after |
| 17 | | you guys got him to the hospital?  Um … |
| 18 | A. | Yeah, I … |
| 19 | Q. | … and, and who actually ca-, uh, called it and said, you know … |
| 20 | A. | So, I'm not sure what the … |
| 21 | Q. | … called time of death, I guess. |
| 22 | A. | … doctor's name was.  The, the one that was running the scene inside of the hospital.  It |
| 23 | | was a, a female. |
| 24 | Q. | Okay. |
| 25 | A. | Um, but, I, I did ask her when she came out, I said, hey, you know have you ever, I, this |
| 26 | | is a concern for me, because, I did chemical restraints on him.  Um, or chemical sedation. |
| 27 | | And obviously, that, that is alarming to me.  And so, her and I had talked about Ketamine |
| 28 | | a little bit.  And, um, and she just was saying that there's no reason that that should have |
| 29 | | caused respiratory depression or respiratory arrest.  So, that she feels that he may have |
| 30 | | had some kind of cardiac arrhythmia.  Or, uh, multi-system trauma prior to us getting, |
| 31 | | even making _____ contact to him.  And so once he was sedated, basically, his body |
| 32 | | wasn't able to continue fighting whatever massive issue, life threatening issue he had |
| 33 | | going on.  And so, that basically, his body was compensating prior to us getting there and |
| 34 | | sedating him.  And so, that, you know, I, I usually ask the doctors for follow-up on any |
| 35 | | kind of a big call like that.  Or if they have any suggestions, anything that they would |
| 36 | | suggest I do differently next time.  Or anything like that.  And she's, she said that, uh, we |
| 37 | | did the right thing.  It just is a crappy situation. |
| 38 | Q. | Okay.  And at the point, did you, had you ever had any contact with this person before? |
| 39 | | Did you recognize him or anything like that? |
| 40 | A. | The patient? |

Pima County 001011

STATEMENT OF FIRE FIGHTER/PARAMEDIC GRANT REED – CASE #17060514312

1   Q.   The patient, yeah.
2   A.   No.

3   Q.   Okay.  Did the hospital make any ID at all, while you were there?
4   A.   Not, not before I left.

5   Q.   Okay.
6   A.   They still had him as a John Doe.

7   Q.   Okay.  I'm just writing down some notes _____.
8   A.   Oh, okay.

9   Q.   Um, anything that I haven't ask you that you think is relevant to this particular incident,
10       or this case, that you haven't already told me?
11  A.   No, sir.

12  Q.   Okay.  Um, well, if you have nothing else, I think, as of right now, I'm good.  Uh, I'll end
13       this recording at 1624 hours, or 1625 hours.  And, um, if we have any additional
14       questions, we'll give you a call.
15  A.   All right.  Thank you, sir.

16  Q.   THANK YOU.

17  WITNESS:

18  _____
19  DET. BANUELOS                    #6861

20  TRANSCRIBED BY:
21  ROSEMARY SANFORD, JUNE 25, 2017

Pima County 001012