# Exhibit 1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Robert Steven Cutler, individually ) Case No.:
and as Administrator of the Estate ) 18-CV-00383-TUC-FRZ
of David A. Cutler, deceased, on   )
behalf of himself and on behalf of )
all beneficiaries of the Estate of )
David A. Cutler, deceased, and     )
Renee Luddington Cutler,           )
                                   )
            Plaintiffs,            )
                                   )
vs.                                )
                                   )
Mark D. Napier, Sheriff of Pima    )
County, Arizona, in his official   )
capacity; Rural/Metro Fire Dept.,  )
Inc., an Arizona for profit        )
corporation, Keith Barnes and Jane )
Doe Barnes, his spouse, Grand Reed )
and Brittany Reed,                 )
                                   )
            Defendants.            )
_____)


VIDEOTAPED DEPOSITION OF GUILLERMO HARO

Chandler, Arizona
February 13
10:02 a.m.


                          BARTELT|NIX COURT REPORTERS
                          RRF No. 1028
                          111 W. Monroe Street, Suite 425
Prepared by:              Phoenix, Arizona  85003
Helen Pasewark, CR, RPR   Phone: (602) 254-4111
Certificate No. 50905     Fax:   (602) 254-6567

Guillermo Haro
February 13, 2020

Page 27

1    Q.   I'm just trying to figure out -- you mentioned
2  lead, used the term lead.
3    A.   Yeah.  And basically they're heading up a
4  project.  And RAMPART, it was actually a hub from a
5  national study.  So that was based out of Michigan.  It
6  was the National Institute of Health study.  And so we
7  were the University of Arizona hub.  And so Dan Spait
8  and -- I can't remember the other -- almost on the tip
9  of my tongue, but I can't quite remember.  Dan Spait was
10  actually the medical lead who was on that hub for
11  RAMPART.  Okay.
12    Q.   And then who were the -- who was the lead or
13  the leads on the EPIC project?
14    A.   Dan Spait and Ben Bobrow.
15    Q.   Both of them were?
16    A.   Yeah.  They were the main physicians
17  associated with that.  And it really wasn't a study.  It
18  was more of an educational elevation of traumatic brain
19  injury to the pre-hospital field.
20    Q.   Dr. Spait and Dr. Bobrow are both, I think,
21  widely regarded as the leading scholars, at least in
22  Arizona, as it relates to EMS?
23    A.   I agree.
24    Q.   So the RAMPART study, you participated in
25  that, it looks like, or at least according to this, from

Page 150

1  have an adverse reaction, because I don't know David
2  Cutler.  I don't know his past history.  I don't know
3  anything about him.  I'm reaching him cold.  He can't
4  even tell me what the problem is.  So now I'm going to
5  give him this drug.  I need to be ready to what?  Handle
6  any complications associated with the drug.
7              I haven't seen David Cutler and gave him
8  ketamine.  I don't think I would have given him ketamine
9  in this case, because he didn't present like somebody
10 who needed it.
11       Q.    You agree, though, that is a judgment call on
12 scene?
13       A.    That's right.  That's medicine.  I agree.
14 It's medicine.  It's a judgment call.  And so you look
15 at that and go am I really going to push ketamine on
16 this guy, on David?  And I go, I can.  If you think your
17 judgment that this is excitable delirium, okay.  If you
18 think this guy's combative when he's basically tied down
19 and laying on the ground, okay, maybe so.  But the thing
20 is this, if I'm going to push that drug, I don't have
21 any business pushing it unless I have all the
22 resuscitative equipment around me.
23       Q.    Let me -- let's jump into your opinions and
24 I'm going to, like I said, kind of skip around here.  So
25 we're back under I guess this is page 6, ending 000011.

# Exhibit 2

Bentley Bobrow, M.D.
May 3, 2019

IN THE UNITED STATE DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Robert Steven Cutler,       )
                            ) No. 18-CV-00383-TUC-FRZ
            Plaintiff,      )
                            )
vs.                         )
                            )
                            )
Pima County, et al.,        )
                            )
            Defendants.     )
_____)

VIDEOTAPED DEPOSITION OF BENTLEY BOBROW, M.D.

Phoenix, Arizona
May 3, 2019
8:05 a.m.

Prepared by:
SHELLEY HAVERMANN, CR          BARTELT NIX REPORTING
Certificate No. 50432          111 West Monroe Street
                               Suite 425
Prepared for:                  Phoenix, Arizona 85003
SUPERIOR COURT                 Phone: (602) 254-4111
(ORIGINAL)                     Fax:   (602) 254-6567
                               Office@BarteltReporting.com

Bentley Bobrow, M.D.
May 3, 2019

Page 11

1  Recognized Centers of Excellence for the
2  University of Arizona.
3      Q.  Okay.  Great.  Thank you.  And when you
4  say you took this role here, I assume you're
5  talking about the Department of Health Services
6  for the State of Arizona.  Is that correct?
7      A.  Yes.
8      Q.  All right.  And did you take on that role
9  in or around --
10     A.  2004.
11     Q.  2004.  Okay.  And that's up to today,
12 correct?
13     A.  Yes.
14     Q.  And please explain to me what it is
15 exactly you do in your role for these -- Arizona
16 Department of Health Services.
17     A.  So my -- there's multiple aspects in my
18 role, but some of those include overseeing EMT
19 and paramedic certification and enforcement, as
20 well as -- as well as chairing the statutory
21 committees for the Bureau of EMS and Trauma
22 System.
23     Q.  Okay.  All right.  Thank you.  When
24 you -- you mentioned one of your roles here was
25 enforcement.

Bentley Bobrow, M.D.
May 3, 2019

Page 12

1      A.   Yes.
2      Q.   Could you go into a little more detail on
3   that.
4      A.   So we have roughly -- roughly 18,000
5   certified EMTs and EMT paramedics in the state.
6   And when they have -- when there are complaints
7   about their care or even issues revolving around
8   behavior or law enforcement-related issues, then
9   I am responsible for helping adjudicate those.
10     Q.   Okay.  And so as part of that function,
11  are you required to understand the standard of
12  care that's applicable to EMTs and/or paramedics
13  that are out there and certified by the
14  Department of Health Services?
15     A.   Yes.
16     Q.   Okay.  All right.  Now, are you familiar
17  with a case of a paramedic by the name of
18  Grant Reed?
19     A.   Yes.
20     Q.   Okay.  And can you tell me, how did you
21  first become involved in that particular matter?
22     A.   Well, our state statutes dictate that
23  it's my responsibility to open and oversee cases
24  related to EMTs in the state of Arizona.  So
25  it's my -- it's my responsibility to do this.

Page 13

1        Q.  Okay.  And did you open this particular
2   case for Mr. Grant Reed?
3        A.  This case was opened in an unusual
4   manner.  This is my responsibility.  It's my --
5   it's under my jurisdiction.  This case was
6   different than most cases in that it was opened
7   not with a complaint, which is normally how the
8   cases are opened.  It was opened when our office
9   became aware of an article -- an article that
10  was written about this case.
11       Q.  Okay.  Is that a newspaper article that
12  appeared in Tucson?  Is that your recollection?
13       A.  I believe it was, yes.
14       Q.  Okay.  So -- okay.  So -- and, typically,
15  when you say -- let me back up.  That's a bad
16  question.  Because it sounds like to me like
17  you're -- when a complaint comes in, you're sort
18  of like the gatekeeper in a sense of, you know,
19  reviewing the matter and deciding whether -- is
20  it that you look at it and then just decide
21  whether or not an investigation is even going to
22  go forward, or how does that process normally
23  work?
24       A.  So I -- it's not only me.  We have an
25  enforcement team --

1  different mechanisms.  It causes your metabolism
2  to speed up.  It causes all kinds of central
3  nervous system changes.  It causes lots of
4  different changes.  It would be an
5  oversimplification to say it simply takes away
6  your body's ability to cool itself.  But LSD is
7  definitely associated with hyperthermia.
8      Q.  And what is the interplay between
9  hyperthermia and excited delirium, if there is
10  any?
11      A.  Well, there is.  It's one of the things
12  that's common in excited delirium, again,
13  agitation, confusion, you know.  People are --
14  they have enormous strength.  They -- for some
15  reason, they take their clothes off.  They take
16  all their clothes off and they're very, very
17  hot.  And so -- hyperthermia is one of the
18  criteria for agitated delirium -- excited --
19  excuse me, excited delirium.
20      Q.  And as far as the treatment for excited
21  delirium, treating the hyperthermia is part of
22  that treatment, is it not?
23          MR. REYNOLDS:  Object to form.
24          THE WITNESS:  The main treatment is to
25  get control of the person.  Like, if you just

Bentley Bobrow, M.D.
May 3, 2019

Page 61

1  try to start cooling them, that's not going
2  to -- that's not going to do the trick.  It's to
3  get control of them so that they're -- you calm
4  their -- you calm them down.  They're having a
5  massive surge of adrenaline.  And so unless you
6  take care of that metabolic derangement, you're
7  not going to cool them down.
8       Q.   BY MR. ZWILLINGER:  I'm just trying to go
9  through my questions and not duplicative ones,
10 so just give me a moment.
11           MR. ZWILLINGER:  Would you please mark
12 that.  Is that 5?
13           THE REPORTER:  Yes.
14           (WHEREUPON, Exhibit No. 5 was marked for
15 identification.)
16      Q.   BY MR. ZWILLINGER:  I'm handed you what's
17 been marked as Exhibit 5.  And I will tell you
18 that this is the hyperthermia order received
19 from Northwest Medical Center.
20           Have you seen this protocol before?
21      A.   No.
22      Q.   Did you -- so you did not review this
23 protocol as part of your review of Mr. Reed?
24      A.   No.  I reviewed the altered mental status
25 protocol that I believe they were operating