WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Steven Cutler,<br><br>  Plaintiff,<br><br>v.<br><br>Rural/Metro Fire Department Incorporated, et al.,<br><br>  Defendants. | No. CV-18-00383-TUC-JCH<br><br>**ORDER** |

Trial is set to begin November 29, 2022. Before the Court are the following pretrial motions: (1) Plaintiffs' Motion to Exclude Testimony of Dr. LoVecchio Re: LSD Intoxication and Effect on Body Temperature ("Motion I") (Doc. 209); (2) Plaintiffs' MIL No. 7 (Bobrow Investigation) ("Motion II") (Doc. 216); and (3) Defendants' Motion to Preclude Opinions of Guillermo Haro ("Motion III") (Doc. 207).

On October 28, 2022, the Court held a Motions Hearing. (*See* Doc. 252.) The Court ruled on several motions and took Motions I–III under advisement. (*Id.*) This is the Court's written order.

**I.  Legal Standards**

   **a.  Fed. R. Evid. 401/402**

Relevant evidence is generally admissible. Fed. R. Evid. 402. Evidence is relevant if it has any tendency to make a consequential fact more or less probable. Fed. R. Evid. 401.

   **b.  Fed. R. Evid. 702**

An expert may testify if "the expert's scientific, technical, or other specialized

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). The Court must ensure that specialized evidence is relevant and reliable. *Id.* at 589. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* at 592–93.

In determining whether the proposed testimony is the product of reliable methods, the Court may consider, among other factors: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. *Daubert*, 509 U.S. at 594–95.

## II. ANALYSIS

### A. Motion I

#### a. Dr. LoVecchio's untimely "Declaration" is harmless to Plaintiffs.

Before addressing Plaintiffs' arguments, the Court must resolve a dispute Plaintiffs raised in their Reply (Doc. 248). There, Plaintiffs seek to exclude a supplemental "Declaration of Frank LoVecchio" attached as an exhibit to Defendants' Response (Doc. 244). Plaintiffs urge the Court to strike the Declaration under Fed. R. Civ. P. 26(a)(2)(B) as an impermissible new expert report filed three years after the expert disclosure deadline. (Doc. 248 at 1.) Plaintiffs argue that because the Declaration is untimely, admitting it would prejudice them and permit a "trial by ambush." (*Id.* (citing several cases including *Krause v. County of Mohave*, 459 F. Supp. 3d 1258, 1269–70 (D. Ariz. 2020)).)

Expert disclosure deadlines are governed by this Court's Scheduling Order (Doc. 27) and subsequent amendments. Plaintiffs are correct that the deadline for expert disclosures is long past. The rules of procedure state that "[i]f a party fails to provide information . . . as required by Rule 26(a) . . ., the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure

. . . is harmless." Fed. R. Civ. P. 37(c)(1). The Court considers the following factors, among others, to determine whether a violation is harmless: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption at trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *Krause*, 459 F. Supp. 3d. at 1270. In *Krause*, the Court found these factors weighed in favor of exclusion because there an expert "shared fresh conclusions that differed materially from his prior opinions" after the deadline. *Id.*

### i. The first 37(c)(1) factor weighs against exclusion because Dr. LoVecchio's Declaration does not prejudice Plaintiffs.

Under the first factor, admitting the Declaration will not prejudice or surprise Plaintiffs because Dr. LoVecchio's Declaration either provides information already known to Plaintiffs or is substantially similar to his original report ("Report") (Doc. 209-1).

In the Declaration Sections 1 and 4, Dr. LoVecchio supports his opinions about LSD and body temperature by referencing a study authored by Patrick C. Dolder, et al. (the "Dolder Study"). (Doc. 244-1 at 4–5.) Plaintiffs were aware of the Dolder Study because their expert Dr. Thornton cited it as a basis for his opinion (Doc. 209-2 at 12, 16.)

In the Declaration Section 2, Dr. LoVecchio clarifies that his Report's reference to "some" drugs predisposing a person to heat illness was not exhaustive. (Doc. 244-1 at 5.) Plaintiffs were aware of Dr. LoVecchio's study and its language because they cited it in Motion I. (Doc. 209 at 2.) Dr. LoVecchio's statement adds nothing new because it is an observation about ordinary meaning.

In the Declaration Section 3, Dr. LoVecchio clarifies that he is "not saying this was an LSD death" and that LSD caused poor judgment, which exposed David Cutler to a hot environment. (Doc. 244-1 at 5.) Plaintiffs were aware of this opinion because Dr. LoVecchio also provided it in his Report. (Doc. 209-1 at 5 (LSD caused impaired judgment), 6 (exposure to environment, coupled with LSD, caused temperature increase).)

In the Declaration Section 5, Dr. LoVecchio disputes whether his conclusion that LSD contributed to David Cutler's hyperthermia was unsupported by any scientific study or evidence. (Doc. 244-1 at 6.) Plaintiffs were aware of the grounds for Dr. LoVecchio's

dispute because Dr. LoVecchio cites Plaintiffs' expert Dr. Thornton and the medical examiner's report cited in Motion I. (Doc. 209-2 at 16; Doc. 209 at 3.)

In the Declaration Section 6, Dr. LoVecchio disputes Plaintiffs' characterization of the medical examiner Dr. Winston's testimony by quoting a different section of Dr. Winston's testimony. (Doc. 244-1 at 7.) Plaintiffs were aware of this testimony because they cited it in Motion I. (Doc. 209 at 3.)

In the Declaration Section 7, Dr. LoVecchio disputes Plaintiffs' assertion that no scientific fact or literature supports Dr. LoVecchio's opinion about LSD's psychoactive effects. (Doc. 244-1 at 7–9.) Plaintiffs were aware of the scientific support for Dr. LoVecchio's opinion because their expert also cited and discussed the Dolder Study. (Doc. 209-2 at 12, 16.)

In the Declaration Section 8, Dr. LoVecchio disputes Dr. Thornton's expert opinion and some of Plaintiffs' assumptions about David Cutler's LSD use. (Doc. 244-1 at 9.) Dr. LoVecchio's disagreement was already apparent in his Report. (*See* Doc. 209-1 at 4.)

In the Declaration Sections 9–12, Dr. LoVecchio refers to two articles and a book chapter he wrote on hyperthermia, as well as to his role as a medical director of a poison center, and five television appearances discussing his expertise. (Doc. 244-1 at 9–10.) Plaintiffs likely were aware of these materials because they are typically included on an expert's CV and are readily discoverable online. But even if Plaintiffs were unaware of the particulars, they almost certainly are not surprised that Defendants' chosen toxicology expert has a background in toxicology.

For these reasons, the first factor weighs against exclusion.

### ii. The remaining factors also weigh against exclusion.

Under the second factor, Plaintiffs' ability to cure any prejudice is not at issue because Plaintiffs are not prejudiced. Similarly, under the third factor the Declaration is unlikely to disrupt trial or preparation for trial because Plaintiffs are not prejudiced. Finally, Plaintiffs have identified no evidence that Defendants acted in bad faith.

All four factors weigh against exclusion. Nothing in the Declaration presents

substantially new information that would create a prejudicial "trial by ambush." And Dr. LoVecchio's new submission is unlike the revised expert opinion in *Krause* because Dr. LoVecchio has not changed his opinion on a material issue. For these reasons, the Court declines Plaintiffs' request to strike Dr. LoVecchio's Declaration.

### b. Dr. LoVecchio's testimony is reliably based on at least one scientific study and appears to be accepted within the scientific community.

In Motion I, Plaintiffs move to exclude "any testimony of Defendant's expert, Dr. Frank LoVecchio (or any other witness), to the effect that the LSD in David's system caused hyperthermia or excited delirium because it was still psychoactive and in doing so contributed to [David Cutler's] death." (Doc. 209 at 1.) Plaintiffs raise two basic objections. First, Plaintiffs argue Dr. LoVecchio's opinions about a connection between LSD and hyperthermia are speculative because Dr. LoVecchio offered "no facts, studies, literature or anything else to support" his opinion. (*Id.* at 2.) Second, Plaintiffs argue Dr. LoVecchio's opinions about a connection between LSD and excited delirium are speculative for the same reason as with hyperthermia, adding "there is simply no evidence that LSD is a deadly drug or . . . leads to deadly physiological reactions—particularly at the miniscule levels in which it was found in [David Cutler's] blood." (*Id.* at 3–4.) Although Plaintiffs do not define "excited delirium," they use the term synonymously with LSD's "peak effects." (*See id.* at 4.)

As described in more detail above, the Court reviews expert opinions for relevance and reliability. *Daubert*, 509 U.S. at 589. Dr. LoVecchio's opinion is relevant because, if reliable, it tends to make the fact that LSD contributed to David Cutler's death more likely. Plaintiffs appear to concede relevance because their motion focuses almost entirely on reliability. Of the suggested *Daubert* factors, two are particularly helpful: (1) whether the method has been published; and (2) whether the witness's method is generally accepted as reliable in the relevant medical and scientific community. *Daubert*, 509 U.S. at 594–95.

### i. LSD and Hyperthermia

Plaintiffs object that Dr. LoVecchio's association of LSD and hyperthermia is unscientific speculation. (Doc. 209 at 2.) Plaintiffs focus on Dr. LoVecchio's statement that

"the LSD present in Mr. Cutler's system . . . raised his body temperature and caused hyperthermia." (*Id.*; Doc. 209-1 at 5.) Plaintiffs argue that Dr. LoVecchio's statement is unscientific because (1) Dr. LoVecchio's study on drugs and heatstroke did not include LSD; (2) Dr. LoVecchio acknowledged that exposure to the environment was the most important factor in David Cutler's hyperthermia; and (3) Plaintiffs' expert Dr. Thornton and the medical examiner Dr. Winston could only say that LSD might have raised David Cutler's temperature but not by how much. (Doc. 209 at 2–3.) Plaintiffs are particularly skeptical of Dr. LoVecchio's statement because the only available study discussing LSD and hyperthermia found a modest 1.8 degree rise in body temperature at a dose 10–30 times greater than the level of LSD found in David's system. (Doc. 209 at 3.)

Dr. LoVecchio's association of LSD and hyperthermia is reliable because it is supported by at least one scientific study and because it appears to be generally accepted in the scientific community. The Dolder Study cited by Dr. LoVecchio and Dr. Thornton links LSD with increased temperature. (*See* Doc. 244-1 at 3–5.) Dr. Thornton and the medical examiner, Dr. Winston, also linked LSD with increased temperature. (*See* Doc. 209 at 3:16–18; Doc. 209-2 at 16; Doc. 209-3 at 3.) The doctors' agreement suggests that Dr. LoVecchio's opinion is generally accepted as reliable within his medical and scientific community. Read in context, Dr. LoVecchio's Report says that LSD was a potential contributing factor to David Cutler's hyperthermia, not the primary cause. (*See, e.g.*, Doc. 209-1 at 5 ("Cutler's prolonged exposure to the heat and desert elements . . . , more likely than not, raised his body temperature and was the most important factor in causing hyperthermia.").) Dr. Thornton and Dr. Winston appear to agree with that assessment. Their dispute is not whether LSD raises a person's temperature, but at what dose and to what degree LSD increases temperature. The Court cannot conclude from that disagreement that any opinion about it is unscientific.

Dr. LoVecchio's opinion about LSD's contribution to David Cutler's hyperthermia is therefore admissible. Still, the Court notes a limitation. Dr. LoVecchio's opinion is grounded in the Dolder Study, which discussed LSD's effects in controlled circumstances

at a given dose. David Cutler's use was in uncontrolled circumstances at an unknown dose. Dr. LoVecchio's opinion—and Dr. Thornton's, to the extent it also relies on the Dolder Study—should not attempt to quantify the degree to which LSD contributed to David Cutler's hyperthermia. That would exceed the scientific basis of their opinions' reliability.

### ii.  LSD and Excited Delirium

Plaintiffs object that Dr. LoVecchio's association of LSD and excited delirium is also unscientific speculation. (Doc. 209 at 3–4.) Plaintiffs focus on Dr. LoVecchio's statement that "LSD . . . caused [David Cutler] to experience signs of excited delirium, anxiety or fearfulness, paranoid thinking, physical or psychological discomfort, impaired judgment, and an altered mental state." (Doc. 209-1 at 5.) Plaintiffs argue that Dr. LoVecchio's opinion is unscientific because (1) Dr. LoVecchio provides no scientific studies showing that LSD is psychoactive after more than seven hours and (2) "there is simply no evidence that LSD is a deadly drug or a drug that leads to deadly physiological reactions." (Doc. 209 at 4.)

Dr. LoVecchio's association of LSD and excited delirium is reliable because it is supported by at least one scientific study and appears to be generally accepted in the scientific community. The Dolder Study cited by Dr. LoVecchio and Dr. Thornton links LSD with psychoactive effects more than seven hours later. (*See* Doc. 244-1 at 3–5, 8 (studies cited by Dr. LoVecchio graphing the peak and persistence of LSD psychoactive effects and listing their usual forms); Doc. 209-2 (Dr. Thornton statement that LSD psychoactive effects rarely last longer than twelve hours).) Dr. Thornton and Dr. Winston—as well as relatively common knowledge—also link LSD and psychoactive effects. (*See id.*; Doc. 209-3 at 4 (Dr. Winston agreeing that LSD is "psychotropically active" for an "unknowable" length of time). As with the link between LSD and hyperthermia, Dr. LoVecchio's community appears to agree that LSD causes effects that may be characterized as excited delirium. They disagree about the persistence of these effects, and the dose required for them. But the larger agreement within Dr. LoVecchio's community—together with the studies he cites—persuade the Court that his opinion is

- 7 -

1  sufficiently reliable and based on valid scientific reasoning and methodology.

2  Dr. LoVecchio's opinion about LSD's psychoactive effects must also be considered
3  in the context of this case. David Cutler sent text messages that confirmed he took LSD
4  before crashing his vehicle. (Doc. 126-1 at 59 (acknowledging he "took the tab" and was
5  "tripping so hard").) After crashing, he did not call 911 and wandered into the desert. (Doc.
6  155 at 1.) He took off his clothes and shoes. (Doc. 126-1 at 77.) He acted and spoke in a
7  bizarre manner. (Doc. 126 at 12 (assuming a "Jesus on the cross" pose), 14 (saying "just
8  decapitate me"), 16 (banging his head on rocks and saying "if we don't kill the devil, we'll
9  never be able to finish the wars").) In that context, Dr. LoVecchio somewhat naturally
10 associates David Cutler's behavior with the LSD took earlier in the day. If Plaintiffs wish
11 to present an alternate theory, like heatstroke, they are entitled to do so at trial. Dr.
12 LoVecchio's opinion about LSD's psychoactive effects is admissible.

13 For these reasons, the Court **denies** Plaintiffs' Motion I.

14 **B. Motion II**

15 In Motion II, Plaintiffs move to exclude "any reference to an investigation
16 conducted into [David Cutler's] death by Dr. Bentley Bobrow, Medical Director for the
17 Arizona Department of Health, who purportedly concluded that Defendant Grant Reed did
18 nothing improper in his treatment of David Cutler." (Doc. 216 at 1.) Plaintiffs argue that
19 Dr. Bobrow relied for his opinion only on a news article supplied to him by Defendants,
20 rather than detective interviews or medical records. (*Id.*) Plaintiffs cite a string of cases
21 they argue stand for the principle that courts often exclude evidence of investigations where
22 they risk confusing the jury and usurping its role. (*Id.* at 1–3.) Defendants respond that Dr.
23 Bobrow's position overseeing and evaluating paramedic treatment throughout Arizona
24 makes his opinion of Defendant Reed's judgment highly relevant. (Doc. 237 at 2–3.) In
25 their subsequent one-page "Supplemental Citation of Authorities," Defendants also list
26 without argument Federal Rule of Evidence 803(8) and several cases. (Doc. 250 at 2.)

27 Dr. Bobrow's report and any related testimony would be relevant because they
28 would tend to make Defendant Reed's liability less probable. But Dr. Bobrow's report and

related testimony would also be highly prejudicial. The court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, misleading the jury, wasting time, or needlessly presenting cumulative evidence. Fed. R. of Evid. 403.

Dr. Bobrow's report and related testimony would create a danger of unfair prejudice for several reasons. First, Dr. Bobrow is a de facto expert. (*See* Doc. 237-1 at 3 (Plaintiffs' expert Haro agreeing that Dr. Bobrow is one of "the leading scholars, at least in Arizona, as it relates to EMS").) His report is the product of his expertise and his office's primary function. (*See* CUTLER/RM 0474-0479.) Second, Defendants raised their FRE 803(8) argument two weeks after filing their Response and one day before oral argument. (*Compare* Doc. 237, *with* Doc. 250.) Admitting Dr. Bobrow's report under FRE 803(8) would deprive Plaintiffs of the opportunity to carry their burden under that rule. (*See* Fed. R. Evid. 803(8)(B) (opponent required to show untrustworthiness).)[1] Third, admitting Dr. Bobrow's testimony simply because Defendants labeled him a "fact witness" would prejudice Plaintiffs by permitting two experts on the same issue. (*See* Doc. 188 at 22 (listing Defendants' paramedic standard-of-care expert).) It would also strain the meaning of a "fact witness" because Dr. Bobrow was not privy to any facts in the case and can offer only his opinions about the facts. Finally, permitting Dr. Bobrow's report or testimony would prejudice Plaintiffs because Dr. Bobrow's office cloaks his opinions in the appearance of impartiality and judicial finality. His report and testimony could easily prove dispositive.

Even setting the risk of unfair prejudice to the side, several issues remain. Admitting the report and testimony would create a risk of misleading the jury. The jury might infer they should reach the same conclusion as the report rather than exercising independent judgment over the facts of the case. All evidentiary matter in this case will be presented to

---

[1] The Court notes that Dr. Bobrow's report lacks some of the indicia of reliability that underlie FRE 803(8)'s presumption that administrative reports are trustworthy. *See* Fed. R. Evid. 803(8), advisory committee note 8. For example, Dr. Bobrow began his investigation more than a year after the events of the case, and after this lawsuit was filed, because Defendants gave him a copy of the newspaper article describing the Complaint. (*See* Doc. 237 at 9.) Dr. Bobrow's investigation used the newspaper article verbatim for its statement of facts, took no testimony, held no hearing, and did not include Plaintiffs' participation. (*See* CUTLER/RM 0474-0479; Hr'g Trans. at 48:1–50:5.)

- 9 -

1 the jury in some other form. The only purpose of admitting the report and testimony would
2 therefore be to usurp the jury's role. Admitting the report and testimony would also create
3 a risk of wasting time. The circumstances of Dr. Bobrow's investigation would require its
4 own mini-trial. Admitting the report and testimony would also create a risk of presenting
5 needlessly cumulative evidence. Dr. Bobrow's opinions and the report add no new facts to
6 the case. *See, e.g.*, *Hudgins v. Southwest Airlines, Co.*, 221 Ariz. 472, 484 (2009) (affirming
7 admission of a report because it contained factual findings); *Desrosiers v. Flight Int'l of
8 Fla. Inc.*, 156 F.3d 952, 962 (9th Cir. 1998) (affirming partial admission of a report's
9 finding of facts).

10 For these reasons, admitting Dr. Bobrow's report and testimony would create a
11 danger of prejudice that substantially outweighs any probative value. The Court will
12 therefore **grant** Motion II. Defendants shall not elicit testimony from Dr. Bentley Bobrow,
13 or present any testimony or evidence that refers to Dr. Bobrow's investigation or supposed
14 exoneration of Defendant Reed.

15 **C.  Motion III**

16 In Motion III, Defendants move to "preclude Guillermo Haro from offering any
17 opinions in this matter." (Doc. 207 at 1.) Defendants argue: (1) Haro is not a qualified
18 expert; (2) his opinions are not based on sufficient facts or data; (3) his opinions are not
19 based on reliable methods and principles; and (4) Haro had no basis to conclude Defendant
20 Reed's conduct was gross negligence. (*Id.*)

21 **a.  Haro's training and experience qualifies him as an expert.**

22 Defendants do not dispute that Haro worked as a paramedic for 27 years. (Doc. 207
23 at 2.) Instead, Defendants argue that Haro is unqualified because he retired in 2006 and
24 since then "spent very limited hours teaching future paramedics at the Maricopa County
25 Community College," had only "limited involvement with some studies at the University
26 of Arizona," and has not stayed "current with developments in acting as a paramedic." (*Id.*
27 at 2–3.) Defendants also assert that Haro has never administered ketamine in the field, only
28 learned about it in a limited review for this case, and could not readily define a paramedic's

standard of care. (*Id.* at 3–4; Doc. 249 at 2.) Plaintiffs respond that, in addition to his experience as a paramedic, Haro maintains his certification as a Paramedic, Advanced Cardiac Life Support Instructor, Basic Life Support Instructor, and Tactical Emergency Casualty Care Instructor. (Doc. 236 at 1.) Plaintiffs argue that expert qualification is a low threshold, and that Defendants' objections go to the weight of Haro's testimony rather than its admissibility. (*Id.*)

Haro's training and substantial experience as a paramedic qualifies him to discuss a paramedic's standard of care. Haro's continued certification and involvement in the field since 2006 also support his qualification. Haro's training and experience, together with the materials he reviewed for this case, also qualify him to testify about ketamine administration. *See U.S. v. Garcia*, 7 F.3d 885, 889–90 (9th Cir. 1993). As discussed in subsection d below, Haro's qualification does not depend on his ability to define a legal term of art. The jury may find it helpful to understand how Haro would have approached David Cutler's symptoms. The jury may also decide Haro's limited experience after retirement and lack of particularized ketamine experience reduces his testimony's weight.

### b.  Haro sufficiently based his opinions on facts and data.

Defendants argue that Haro's opinions are not based on sufficient facts and data because Haro reviewed only police videos to conclude that David Cutler was a controlled, manageable patient when Defendant Reed encountered him. (Doc. 207 at 4.) Defendants further argue that, in doing so, Haro ignored relevant information from police reports, paramedic reports, and deposition testimony. (*Id.*) Plaintiffs respond that Haro's opinion was based on medical records, autopsy and toxicology reports, Administrative Orders, and deposition testimony, in addition to the police videos. (Doc. 236 at 5.)

As above, Defendants' objections go principally to the weight of Haro's opinion, not its admissibility. Even if Haro based his opinion primarily on the police videos, that would form a sufficient basis under Rule 702 to admit it because the videos are critical evidence of David Cutler's manner just before Defendant Reed encountered him. But Plaintiffs credibly identify additional facts and data Haro used to form his opinion. Haro's decision

to discount some of the evidence Defendants think is highly relevant is a matter for the jury to consider when deciding how much weight to assign Haro's testimony.

### c. Haro sufficiently based his opinions on reliable principles.

Defendants argue that several aspects of Haro's opinions are not based on reliable principles and methods: (1) the potential that David Cutler suffered from a traumatic brain injury; (2) the cause of David Cutler's hyperthermia; (3) Defendant Reed's decision to administer ketamine and its effect on David Cutler; (4) Defendant Reed's decision not to take certain equipment up the hill; and (5) the efficacy of chest compressions while a person is carried in a Stokes basket. (Doc. 207 at 5–10.)

### i. Traumatic Brain Injury ("TBI")

Defendants object to Haro's opinion that David Cutler suffered a TBI when he crashed his vehicle. (Doc. 207 at 5.) In deposition testimony, Haro explains that a paramedic arriving at the scene of an automobile accident may often conclude from the circumstances, together with erratic behavior, that a victim suffered a TBI. (Doc. 271-1 at 61–64.) That assessment may change the paramedic's approach. (*Id.* at 64.) Plaintiffs clarify that Haro will not testify that David Cutler actually had a TBI, only that the possibility of a TBI should have informed Defendant Reed's approach. (Doc. 236 at 4 n.1.)

To the extent Haro's report or testimony asserts that David Cutler suffered from a TBI, it is unscientific speculation. Plaintiffs conceded as much at oral argument and emphasized that Haro would not testify to that effect at trial. (Hr'g Trans. at 76:16–17.) To the extent the possibility of a TBI informs a paramedic's approach to an automobile accident victim, it is useful information based on Haro's training and experience. The Court will therefore not preclude Haro's opinion about TBI, noting the parties' agreement that Haro will not testify that David Cutler actually suffered from a TBI.

### ii. Hyperthermia

Defendants object to Haro's opinion that David Cutler's hyperthermia was caused primarily by the environment. (Doc. 207 at 7.) Specifically, Defendants argue that Haro failed to provide any principle or method supporting his conclusion except that "it was a

hot day in June, Cutler was lying on hot rocks, Cutler was completely unclothed, Cutler was red and dry, Cutler was breathing at somewhere between 34 and 60 times a minute, and Cutler was altered." (*Id.*) Plaintiffs respond that Defendants' expert Dr. LoVecchio also concluded the environment was the most significant cause of David Cutler's hyperthermia. (Doc. 236 at 5–6.)

Haro's opinion about the cause of David Cutler's hyperthermia is based in sufficiently reliable principles and methods because Haro worked as a paramedic in the desert for 27 years. Even if he had not, common experience associates hyperthermia with exposure to the elements. Defendants further concede a number of observations supported Haro's opinion, which together suggest a principled analysis. For these reasons, the Court will not preclude Haro's opinions about whether the environment caused David Cutler's hyperthermia, or whether that diagnosis was the most natural one under the circumstances.

### iii.  Ketamine Administration and Effects

Defendants object to Haro's opinion that ketamine caused David Cutler's respiratory depression and led to his death. (Doc. 207 at 8.) Defendants argue that Haro's opinion is based only on the fact that David Cutler's breathing and pulse slowed shortly after the administration of ketamine. (*Id.*) Defendants further argue that Haro's opinion must be excluded because Haro admitted the decision to administer ketamine was a judgment call. (*Id.* at 10.) Plaintiffs respond that Defendant Reed also acknowledged that ketamine caused respiratory depression and the closure of David Cutler's airway. (Doc. 236 at 7.) Plaintiffs argue that respiratory depression is a widely recognized risk of ketamine administration, as reflected in a ketamine Administrative Order and in the opinion of Plaintiff's causation expert Dr. Thornton. (*Id.*) Plaintiffs further argue that Haro immediately clarified his statement about ketamine administration being a judgment call by saying it should only be administered when resuscitative equipment is on hand. (*Id.*)

Haro's opinions about ketamine administration and effects were grounded in reliable principles enough to be useful to the jury. Defendants acknowledged that Haro reviewed a study and some PowerPoint slides about ketamine. Haro also testified that he saw ketamine

used in the emergency department in the course of his experience as a paramedic. (Doc. 207-1 at 29.) And, in context, Haro's statement that ketamine administration is a judgment call does not suggest that his opinion was improperly and inadmissibly founded. For these reasons, the Court will not preclude Haro's opinions about ketamine administration and its effect on David Cutler.

### iv. Required Resuscitative Equipment

Defendants object to Haro's opinion that Defendant Reed should have brought all of his advanced life support EMS equipment up the hill to David Cutler. (Doc. 207 at 9.) Defendants argue that Haro does not identify a protocol requiring Reed to take up the equipment. (*Id.*) Plaintiffs respond that Haro's opinion was based in part on an Administrative Order requiring monitoring equipment and oxygen on hand for ketamine administration. (*See* Doc. 236 at 9; Doc. 236-1 at 36.)

Haro's testimony is based on reliable principles to the extent he asserts that oxygen and monitoring equipment should be on hand when ketamine is administered. The Administrative Order Plaintiffs cite discusses ketamine administration in patients with excited delirium. (Doc. 326-1 at 36.) The Order provides a flow chart indicating the steps a paramedic should take after administering ketamine. (*Id.*) The first step states, "Initiate immediate Support Care: O2 to maintain sat>90%; complete primary and secondary survey as indicated; cardiac monitor, vital signs including fingerstick blood glucose and temperature as indicated." (*Id.*) This language implies a basis for an opinion that oxygen (O2) and at least some monitoring equipment should be available for "immediate" use when ketamine is administered. For these reasons, the Court will not preclude Haro's opinions about the resuscitative equipment Defendant Reed should have brought with him.

### v. Stokes Basket Chest Compressions

Defendants object to Haro's opinion that a paramedic cannot perform effective chest compressions on a patient being moved in a Stokes basket. (Doc. 207 at 9.) Defendants argue that Haro's opinion was not based in his experience because Haro never had to perform chest compressions on a patient being moved in a Stokes basket. (*Id.*) Plaintiffs

- 14 -

respond that an expert's lack of particularized experience goes to the weight of their testimony, not its admissibility. (Doc. 236 at 8.) Plaintiffs also argue that the effectiveness of chest compressions on a moving Stokes basket is within Haro's experience because he performed chest compressions many times, understood the requirements for effective compressions, and both common sense and Haro's experience dictate that compressions must be performed on a firm, static surface. (*Id.*)

Haro's opinions about chest compressions were grounded in reliable principles enough to be useful to the jury. Haro's training and experience with chest compressions provide a reliable basis because the particular circumstances of a patient carried in a Stokes basket down a hill are sufficiently obvious that they do not need specialized training. Defendants are free to attack Haro's credibility on this point during cross-examination. For these reasons, the Court will not preclude Haro's opinions about chest compressions on a patient moving in a Stokes basket.

### d.  Haro's statements about gross negligence are no longer at issue.

Defendants object to Haro's opinion that Defendant Reed's conduct was grossly negligent. (Doc. 207 at 10.) Defendants argue Haro's opinion is inadmissible because it is conclusory, conjectural, and not legally grounded. (*Id.*) Plaintiffs respond that Haro will not opine on whether Reed's failure to meet the standard of care constitutes gross negligence. (Doc. 236 at 8 n.2.) The Court understands Plaintiffs' response as a lack of objection. The Court therefore **denies as moot** Motion III's request to limit Haro's opinions regarding gross negligence because Plaintiffs have assured the Court Haro will give no such testimony.

For the foregoing reasons, the Court **denies** Motion III.

///
///
///
///
///

### III. Order

For the reasons above, **IT IS ORDERED**:

A. **DENYING** Motion I (Doc. 209);

B. **GRANTING** Motion II (Doc. 216); and

C. **DENYING** Motion III (Doc. 207).

Dated this 3rd day of November, 2022.

Honorable John C. Hinderaker
United States District Judge